# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


MAUREEN MCPADDEN,     :
   PLAINTIFF     :
             :
VS.          : CIVIL ACTION NO.:
             :  1:14cv-00475-SM
WAL-MART STORES EAST, L.P. :
AND JENNIFER FONSECA,   :
   DEFENDANTS.    :


RULE 30(b)(6) Deposition of

**HEATHER HARRIS McCAFFREY,** a Witness herein, taken on

behalf of the Plaintiff, on Thursday, August 27,

2015, 10:00 a.m., at the law office of Littler

Mendelson, P.C., One Financial Plaza, Suite 2205,

Providence, Rhode Island, before Cindy M. Tangney,

Registered Merit Reporter.

Vivian S. Dafoulas & Associates
50 Fieldstone Drive
East Greenwich, RI 02818-2064
(401)885-0992

1          MR. KACZMAREK:  Objection.

2      Q.   That's not what it's called.  Hold on.

3   Let me call it the right word.  Professional

4   accountability matrix.

5      A.   I have that, but I didn't review it.  I

6   have that.

7      Q.   Did you -- let me strike that.

8        When you say you have it, I mean, you have all

9   of these policies, right?

10      A.   Right.  Wal-Mart has many policies.  I'm

11   not familiar with all of them.  I'm very familiar

12   with the accountability matrix.  I didn't need to

13   review it.

14      Q.   Do you know who created that document?

15      A.   I believe it's professional affairs at

16   home office.  I'm not sure who specifically.

17      Q.   Have you reviewed any of the pleadings

18   that have been filed in this case, motions,

19   affidavits, anything like that?

20      A.   I had my own affidavit.

21      Q.   Okay.

22      A.   I don't believe I had -- I don't recall if

23   I have other ones.

24      Q.   Okay.  How about there was a communication

25   to the Human Rights Commission referred to as a

1  A. Like I said, I can't remember the exact

2 date that we expanded.  I think it was in February

3 of 2013.

4  Q. Okay.

5  A. But I can't remember.

6  Q. All right.  And when you expanded, you

7 expanded to include all of New England, correct?

8  A. Yes.

9  Q. And prior to that you had -- the region

10 was all of Massachusetts and some of New Hampshire?

11  A. Part of Southern New Hampshire.

12  Q. Southern New Hampshire.  How many

13 pharmacies; do you remember?

14  A. I think I had 56 maybe, around that.

15  Q. So it went from 56 to 112?

16  A. Yes.

17  Q. I hope it included a raise.

18  A. No.

19  Q. Okay.  It's my understanding, and correct

20 me if I'm wrong, that the objective is in terms of

21 accountability to be consistent within at least the

22 region; is that correct?

23  MR. KACZMAREK:  Objection.

24  A. Yes.

25  Q. Now, is it correct to say that you really

1  want accountability to be consistent within the

2  entire company?

3          MR. KACZMAREK:  Objection.

4      A.   I can only control my area of

5  responsibility.

6      Q.   I'm asking though, what does Wal-Mart

7  train you to do in terms of being a regional

8  manager; do they say we want you to distribute

9  accountability in a consistent manner throughout

10  your region; is that what they train you to do?

11         MR. KACZMAREK:  Objection.

12         MR. FRADETTE:  You can answer.

13     A.   Yes.  They want us to be consistent with

14  our accountability.

15     Q.   And that consistency, if they're training

16  you as a regional manager, they're presumably

17  training other regional managers the same way; is

18  that your knowledge?

19     A.   I would assume.

20     Q.   Okay.  When you do trainings, when

21  Wal-Mart trains you, do you do it as a group of

22  regional managers?

23     A.   It varies.

24     Q.   All right.  From what to what?

25     A.   We could have a computer-based learning,

1   we could have a webinar, we could have a

2   company-wide meeting.  It can vary on the trainings.

3       Q.   All right.  And if it's a webinar, it

4   would be other regional managers on the webinar?

5       A.   It could encompass regional directors.  It

6   could encompass market directors.  It could

7   encompass a lot of people.

8       Q.   Okay.  How often do you -- did you rather,

9   as regional manager, travel to Bentonville; can you

10  quantify that?

11      A.   It could be between four and ten times a

12  year, depending on what we were doing.

13      Q.   Now, I want to get an appreciation for how

14  well you knew Maureen McPadden.  Can you tell me,

15  first of all, when did you first meet her?

16      A.   I can't give you an exact date.  I visited

17  all of my stores.  I tried to visit them all within

18  the first year.  So if she was in the store when I

19  was there, I might have visited her within the first

20  year of me taking over.  I may have visited her

21  within my second year.  I can't give you an exact

22  date.

23      Q.   Okay.  So you may have even met her before

24  she was at Seabrook?

25      A.   It's possible.

1    the Americans With Disabilities Act?

2        A.   No.

3        Q.   They don't give you any training about

4    that?

5        MR. KACZMAREK:  Objection.

6        A.   They give us a computer-based learning,

7    but I don't approve or have any sort of oversight on

8    ADAs in the stores.

9        Q.   If a market director, like Mr. Certo, came

10    to you because a pharmacist had requested

11    accommodation, what would you do?

12        A.   I would send him to HR.

13        Q.   You would send Certo to HR?

14        A.   Yes.

15        Q.   Do you know whether Maureen made any

16    request for accommodation to Mr. Certo?

17        A.   I'm not aware of any.

18        Q.   Okay.  Were you aware of a staffing --

19    technician staffing problem at the Seabrook store in

20    2011 and 2012?

21        MR. KACZMAREK:  Objection.

22        A.   I don't remember the exact dates.

23    Seabrook had an opportunity at one point, and we

24    actually overstaffed them.

25        Q.   I'm sorry?

```
 1    safety, isn't your concern now focused on public

 2    safety, not -- you know, isn't that your concern?

 3              MR. KACZMAREK:  Objection.

 4         A.   My concern is safety, but my concern would

 5    also be why can't this person handle the workload

 6    that a pharmacist should be able to handle.

 7         Q.   Okay.  Do you know whether Mr. Certo did

 8    anything, to your knowledge, to address this e-mail?

 9         A.   Not this e-mail specifically.  Like I

10    said, we overstaffed this store; so I know they had

11    more help than they needed in this store.

12         Q.   Okay.

13         A.   Whether it was because of this e-mail, I

14    don't know.

15         Q.   All right.  The next one I'm going to show

16    you is Certo 5 and McPadden 12.  If you can read

17    that one.

18         A.   Okay.

19         Q.   In this e-mail on the 16th Maureen is

20    communicating with Mr. Certo in anticipation of a

21    need for additional support, correct?

22         A.   Yes.

23         Q.   And she's again expressing a concern for

24    safely filling prescriptions, correct?

25         A.   Yes.
```

1     A.   I was not aware of any disability for

2    Maureen.

3     Q.   And she's alleging that her written

4    expressed concerns for public safety due to

5    understaffing was a factor in the decision to

6    terminate her; do you deny that?

7          MR. KACZMAREK:  Objection.

8     A.   That was never brought up, and like I

9    said, we overstaffed that store.

10     Q.   When you say you overstaffed the store,

11    what do you rely on to prove that you overstaffed it?

12          MR. KACZMAREK:  Objection.

13     A.   You can look at any payroll records or any

14    of the pharmacists' wages.  It was overstaffed based

15    on what was allocated for that store.

16     Q.   Aside from looking at wages, did you do

17    any more of an investigation as to whether the

18    staffing was adequate?

19          MR. KACZMAREK:  Objection.

20     A.   Like I said, I personally toured that

21    store many times and watched what was going on in

22    the store.  There was productivity issues, there was

23    efficiency issues, and there was just lack of job

24    performance issues that needed to be addressed as

25    well.  We had plenty of bodies and plenty of people;