UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Maureen McPadden,
     Plaintiff

     v.                                 Case No. 14-cv-475-SM
                                           Opinion No. 2015 DNH 205
Wal-Mart Stores East, L.P.,
and Jennifer Fonseca,
     Defendants

**O R D E R**

Maureen McPadden had been a long-term employee of Wal-Mart, where she worked as a pharmacist at various stores, including locations in Maine, Massachusetts, and New Hampshire. In 2010, she began working at the Wal-Mart pharmacy in Seabrook, New Hampshire. After McPadden lost her key to the pharmacy, Wal-Mart terminated her employment. Shortly thereafter, McPadden filed a charge of discrimination with the New Hampshire Commission for Human Rights. And, subsequently, she filed this suit, in which she advances both state and federal claims that include workplace discrimination, retaliation, and invasion of privacy.

McPadden has voluntarily withdrawn several of her claims and, as to those that remain, Wal-Mart moves for summary judgment. For the reasons discussed, that motion is granted in part, and denied in part.

**Standard of Review**

When ruling on a motion for summary judgment, the court must "constru[e] the record in the light most favorable to the non-moving party and resolv[e] all reasonable inferences in that party's favor." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted). See also Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011). Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

**Background**

Viewed in the light most favorable to McPadden, as they must be at this stage, the relevant facts are as follows. McPadden

2

began working for Wal-Mart in 1994, as a staff pharmacist in one
of its Las Vegas, Nevada, stores.  She relocated to New England
and worked at various stores in this region.  She left Wal-Mart's
employ for approximately five years, but returned again in 2008.
Two years later, she began working at the Wal-Mart pharmacy in
Seabrook, New Hampshire.  There, McPadden reported to Janice
Urbanski, the pharmacy manager.

Wal-Mart has a progressive disciplinary policy known as
"Coaching for Improvement," which provides guidelines for
improving employee performance and for disciplining employees.
In July of 2011, Urbanski gave McPadden what Wal-Mart calls a
"verbal coaching" for failing to ensure that certain essential
tasks within the pharmacy were performed in a timely manner.  See
Affidavit of Janice Urbanski (document no. 21-13) at para. 6.
See also Coaching Report #8452914 (document no. 21-14).  McPadden
acknowledges that Urbanski raised those concerns with her, but
denies that it was ever formally treated as a "verbal coaching."
McPadden Deposition (document no. 21-2) at 45-47.  That is,
McPadden claims Wal-Mart's policy requires a supervisor to
specifically tell the employee that "you are being coached" in
order for the event to qualify as "verbal coaching" (i.e.,
discipline).  So, while Urbanski documented the meeting as a
"verbal coaching," McPadden says it should never have been

recognized as any form of official discipline against her (a
point that became relevant later, when McPadden lost her pharmacy
key).  See Plaintiff's Statement of Facts (document no. 24) at
15-16.

During the summer of 2011, McPadden began raising concerns
about pharmacy staffing - in particular, what she believed was an
insufficient number of adequately trained pharmacy technicians
during the pharmacy's busy summer season.  According to her
deposition, she raised those concerns with several superiors
(including Urbanski and District Manager David Kelley), and she
also "called Walmart home office."  McPadden Deposition at 105.
But, says McPadden, her concerns were ignored.  She also says she
was not alone in recognizing that the Seabrook pharmacy was
under-staffed: other pharmacy employees also complained to
management about the issue.  Indeed, Urbanski says she agreed
that Wal-Mart should hire additional pharmacy technicians and
raised the issue with Kelley.  Urbanski Affidavit at paras. 8-9.

On balance, McPadden's "Mid-Year Performance Evaluation,"
dated September 26, 2011 (document no. 21-7) at 34-37, suggests
that McPadden was a capable employee and Urbanski gave her an
overall rating of "solid performer" (a 3.0 out of 5.0).  Urbanski
did, however, again note that McPadden needed to work "on

completing auxiliary tasks within the pharmacy" in a more timely
way.  Id. at 36.

In December of 2011, Urbanski gave McPadden what Wal-Mart
says was McPadden's "Second Coaching," this time for being late
to work, failing to complete various tasks, and leaving work
before completing all of her tasks.  See Coaching #9029342
(document no. 21-15).  And, in her next Performance Evaluation of
McPadden, Urbanski gave McPadden an overall rating of
"development needed" (a 2.0 out of 5.0), while continuing to
recognize that McPadden was a "solid performer" with regard to
her technical competencies.  Performance Evaluation (dated March
27, 2012) (document no. 21-7) at 38-41.

Subsequently, Joshua Varieur replaced Urbanski as manager of
the Seabrook pharmacy.  McPadden was not pleased.  She reported
to District Manager Joseph Certo (who had replaced Kelley in that
position) that she believed Varieur was "not up to the job" and
was concerned that he lacked adequate training to act as the
manager of the Seabrook pharmacy.  She says those complaints
about Varieur's abilities ultimately related to a "public safety"
issue: her concern that customer prescriptions be filled
accurately.  McPadden also reiterated her concern that the

5

pharmacy did not have enough technicians to assist with the heavy workload.

According to McPadden, Certo agreed that turnover of pharmacy technicians was a problem.  And, documentation in the record shows that Certo was trying to hire additional staff at the pharmacy and/or obtain assistance from technicians at nearby Wal-Mart pharmacies.  Nevertheless, it remained busy and stressful in the Seabrook pharmacy and McPadden continued to be concerned that the staff was over-worked and that errors in filling prescriptions might well occur.  And, in fact, such an error did occur, in August of 2012, when Varieur mistakenly filled a prescription with a generic drug, rather than the brand name drug (the patient, it turns out, had a known severe allergy to the generic).  And, says McPadden, although Varieur had previously made two other dispensing errors (and a third would have required him to attend mandatory retraining), neither Certo nor any other Wal-Mart employee "coached" or disciplined him in any way for this particular error.

At some point in 2012, McPadden contacted the New Hampshire Board of Pharmacy about her concerns related to customer safety, pharmacy errors, and inadequate staffing at the Seabrook

pharmacy.[1]  She spoke with Margaret Clifford, a compliance
officer, who told McPadden that there were not any specific laws
or regulations concerning minimum staffing requirements for
pharmacies and, therefore, there was little she could do to help.
McPadden did not tell anyone at Wal-Mart that she had contacted
the Board of Pharmacy.  Nevertheless, she continued to raise her
staffing concerns with Certo.  See, e.g., Email dated August 29,
2012, from McPadden to Certo (document no. 21-4) at 25 ("I have
no cashier this morning until 10am.  I have one technician.  It
is next to impossible to open this pharmacy and do everything
required and be safe for our customers.").

Working in the Seabrook pharmacy - a pharmacy that she
believed was under-staffed and potentially posed a safety hazard
to the public - was extremely stressful for McPadden.  In early
September of 2012, her primary care physician recommended that
she take a two-week leave of absence, so she might address her
stress, anxiety, and depression.  See Certification of Health
Care Provider (document no. 23-26).  Specifically, McPadden's
physician opined that:

---

[1]     In her legal memorandum, McPadden claims she contacted
the Board of Pharmacy after, and in response to, Varieur's
dispensing error.  Plaintiff's Memorandum at 4.  But, in her
deposition, she suggested that she called the Board well before
that incident, "sometime prior to June of 2012."  McPadden
Deposition at 120.  At this point, however, it is not clear that
the precise timing of that telephone call is critical.

1.    Her disabling condition - a stress condition,
      anxiety, and depression - would last for (or
      be stabilized within) two weeks;

2.    During that period, she would be incapable of
      filling patient prescriptions;

3.    Once her disabling condition had resolved,
      McPadden would not need follow-up treatment,
      nor would she need to work on part-time or
      reduced schedule; and

4.    While McPadden might suffer "flare-ups" of
      her condition one or two times a year, she
      would not need to be absent from work during
      those periods.

Id.  Importantly (as McPadden now appears to realize, since she

has dropped her failure-to-accommodate claim), nothing in that

medical opinion stated or even implied that McPadden would

require any type of accommodation upon her return to work.


      McPadden did not discuss her health issues with co-workers

in the pharmacy and most appear to have thought that she had

taken time away from work to care for her ailing mother.  But,

while McPadden was on leave, defendant Jennifer Fonseca (who was

working at the counter where new prescriptions arrive and are

entered into the pharmacy computer system) told Varieur that

McPadden's doctor had called in a prescription for lorazepam - a

medication frequently used to treat anxiety.  Fonseca allegedly

commented that McPadden must have had a "nervous breakdown" and

speculated that was the reason for her absence from work.

8

Although no customers were present at the time, Deborah Genna - a pharmacy technician - overheard Fonseca's statement.  And, upon McPadden's return to work, Genna told her about the incident.

Soon thereafter, McPadden met with Certo to discuss working conditions in the pharmacy, as well as Fonseca's comment to Varieur about her prescription medication (which McPadden asserts not only violated the Health Insurance Portability and Accountability Act, but also amounted to an unlawful invasion of her privacy rights).  Certo assured McPadden that conditions would improve and told her that Wal-Mart was thinking of transferring Fonseca to a different department.  And, eventually, Fonseca did move to a different department, after which McPadden had no further contact with her.  But, McPadden claims that Certo failed to undertake any meaningful investigation into her assertion that Fonseca inappropriately disclosed to a co-worker McPadden's confidential patient information - a failure McPadden says violated Wal-Mart policy and, more importantly, reveals Certo's discriminatory animus toward her.

Approximately three weeks later, McPadden sent an e-mail to Certo, notifying him that she had lost her key to the pharmacy - presumably at some point over the weekend, while she was moving to a new residence.  Parenthetically, the court notes that

Pharmacies are heavily regulated and, not surprisingly, Wal-Mart has several internal policies designed to make certain its pharmacists and pharmacy technicians comply with all applicable state and federal laws.  One of those policies provides that, "Only a pharmacist may have access to the keys for the pharmacy, CII [narcotics] cabinet or drawer, and cash register.  Each pharmacist must keep the key on his or her person at all times." Asset Protection Pharmacy Security ("POM 902") (document no. 21-18) at 4.  And, the policy goes on to provide that:

> All associates and managers are required to comply with the guidelines, policies and procedures related to pharmacy security.  Violations are subject to disciplinary action up to and including termination as outlined in the corporate Coaching for Improvement Policy.

Id. at 7-8.


According to Certo, he had never heard of a pharmacist who had lost his or her key and was uncertain of the appropriate level of discipline to impose upon McPadden.  So, he contacted some of his colleagues to solicit their input and advice. Apparently none had ever been presented with a similar situation. Part of that email chain includes the following exchange between Certo and Donald Walls:

> Walls:    According to our key control policy this
>           would be a first level [coaching] up to

10

                    termination.  I would think a first written
                    [disciplinary report] would be appropriate.
                    Does everyone agree?

Certo:     I agree, but I believe she is on a Third
                    Written [disciplinary report] currently
                    [which would result in termination].  I will
                    get back to you.

E-mail dated November 26, 2012 (document no. 23-33) at 7.

Apparently still unsure of the appropriate level of discipline to

impose, Certo then contacted Heather McCaffrey, Wal-Mart's

Regional Health and Wellness Director, for guidance.

According to McPadden, Certo's refusal to simply accept

Walls' advice and impose a "first written" level of discipline

further evidences his discriminatory animus against her.

McPadden says that once Certo looked into the matter and

discovered that she was <u>not</u> currently on a "third written" (as

Certo thought), he realized that imposing the discipline

recommended by Walls would not result in McPadden's discharge.

So, he continued to pursue the matter further.

After Certo contacted McCaffrey, she organized a conference

call with Certo and Barbara Kulwicki (Senior Human Resources

Manager).  During the call, the participants discussed the fact

that none of them had previously dealt with a situation in which

a pharmacist had lost his or her key to the pharmacy.  They also

discussed an analogous situation, in which the manager of a Wal-
Mart Vision Center had lost his key.  In that case, Wal-Mart gave
the employee a "two level coaching."  Accordingly, McCaffrey and
Kulwicki decided that McPadden's loss of her pharmacy key also
merited a two-level coaching.  See Affidavit of Heather Harris
McCaffrey (document no. 21-16).  That, says McPadden is precisely
what Certo was looking for when he ignored Walls' suggested
resolution, and solicited the advice and input of McCaffrey and
Kulwicki: the imposition of discipline sufficiently severe to
trigger her discharge.


     On November 27, Certo notified McPadden that, because she
had lost her pharmacy key, she was being issued a two-level
coaching.  And, because she had received two prior coachings,
that meant her employment was subject to termination.  She was
fired that day.


     In this action, McPadden claims that Wal-Mart's stated
reason for terminating her employment - her loss of the pharmacy
key - is merely a pretext.  And, "[w]hat really happened is she
was fired because of her disability, use of FMLA, need for

accommodation, gender, and report of public safety threats."

Plaintiff's Memorandum (document no. 23-2) at 1.[2]


## Discussion

I.   <u>Unlawful Discrimination - Counts One, Two, and Three</u>.

McPadden asserts that Wal-Mart unlawfully terminated her
employment because she is disabled, because she took FMLA leave,
and/or because she is a woman.  She advances claims under New
Hampshire's Law Against Discrimination, N.H. Rev. Stat. Ann. ch.
354-A (disability, leave, and gender discrimination), the
Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.
(disability discrimination), and Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e, et seq. (gender discrimination).
As to each claim, Wal-Mart's motivation for disciplining McPadden
is plainly relevant.  That is to say, the dispositive issue is
"whether the employer took the adverse action because of a
prohibited reason or for a legitimate nondiscriminatory reason."
<u>Hodgens v. General Dynamics Corp.</u>, 144 F.3d 151, 160 (1st Cir.
1998).

---

[2]    McPadden has since withdrawn her disability
discrimination (failure to accommodate) claim, as well as her
negligent supervision and negligent infliction of emotional
distress claims (counts four, eight, and nine of her amended
complaint).

Consequently, as to each of McPadden's discrimination claims, the court must employ the familiar burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 800-06 (1973).

> Under that framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of discrimination or retaliation.  If [she] does so, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's termination, sufficient to raise a genuine issue of fact as to whether it discriminated against the employee.  The employer must clearly set forth, through the introduction of admissible evidence, the reasons for the employee's termination.  The explanation provided must be legally sufficient to justify a judgment for the employer.  If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating [her] was in fact a pretext for retaliating against [her] for having taken protected FMLA leave [or for having a disability under the ADA, or based on her gender].

<u>Hodgens</u>, 144 F.3d at 160-61 (citations and internal punctuation omitted).  And, importantly, the court went on to note that:

> While a satisfactory evidentiary explanation by the employer for its actions destroys the legally mandatory inference of discrimination arising from the employee's prima facie case, the evidence and inferences that properly can be drawn from the evidence presented during the employee's prima facie case may be considered in determining whether the employer's explanation is pretextual.

<u>Id.</u> at 161 (citation omitted).

14

While McPadden has done little to document her claimed
disability, the record is sufficient (barely) to warrant the
conclusion that she suffers from a disabling condition under the
ADA. See generally 42 U.S.C. § 12102(4)(D) ("An impairment that
is episodic or in remission is a disability if it would
substantially limit a major life activity when active."); 42
U.S.C. § 12102(4)(E)(i) ("[W]hether an impairment substantially
limits a major life activity shall be [determined] without regard
to the ameliorative effects of mitigating measures such as
medication.").  See also, Note from Dr. Robert Howe (document no.
23-26) and Affidavit of Robert Howe, M.D. (document no. 23-24)
(opining that "McPadden has had episodes where her depression and
anxiety has interfered with her ability to work, requiring
medical leave," and that her "depression and anxiety will require
ongoing treatment including medication management visits and
counseling").

In addition to suffering from a disability, McPadden plainly
invoked her right to FMLA leave within a few months of her
discharge.  Consequently, she has sustained her relatively modest
burden of making out a prima facie case of disability, leave, and
gender discrimination.

15

In response, Wal-Mart has articulated a legitimate, non-discriminatory reason for disciplining (and, as a result, firing) McPadden: her loss of the pharmacy key.  So, the burden reverts to McPadden to demonstrate that Wal-Mart's articulated reason for terminating her employment is merely a pretext for gender, leave, and/or disability discrimination.  While her evidence in support of those discrimination claims is thin, it is sufficient to avoid summary judgment.  Viewed in the light most favorable to McPadden, a properly instructed jury could plausibly conclude that she was the victim of unlawful discrimination, based upon the following:

1. Fewer than eight weeks after returning from medical leave, McPadden was fired;

2. Prior to that, McPadden had reported what she believed were safety issues in the pharmacy, as well as what she thought was Fonseca's violation of her privacy rights;

3. Despite Wal-Mart's policy that all suspected HIPAA violations must be investigated, there is some evidence suggesting that Certo undertook no such investigation of McPadden's report;

4. Some evidence suggests that Certo rarely disciplined employees for violations of Wal-Mart's policies (e.g., Varieur's dispensing errors and angry outburst), but singled out McPadden for such discipline and pursued it with some vigor;

5. When, in response to McPadden losing her key, Certo learned that a "first level" coaching would not result in termination of her employment, he declined to impose that level

16

> of discipline and, instead, sought additional
> advice from McCaffrey and Kulwicki (hoping,
> says McPadden, that they would decide to
> impose something more severe); and

> 6.   There is evidence that a male pharmacist who
>      lost his key to the Pharmacy (after McPadden
>      lost her key) was given only a "one level"
>      coaching, whereas McPadden was given a "two
>      level" coaching.

Wal-Mart asserts that Certo's subjective motivations are entirely immaterial in this proceeding since McCaffrey and Kulwicki are the relevant decision-makers; they, and they alone, decided to impose a two-level coaching as discipline for McPadden's loss of the pharmacy key.  And, says Wal-Mart, they were unaware of the protected conduct in which McPadden engaged. Consequently, those women could not have been motivated by a desire to retaliate or discriminate against McPadden.  But, says McPadden, there is evidence in the record from which the jury could plausibly conclude that Certo was actively involved in the decision to impose a two-level coaching.  And, she goes on to point out that the jury could plausibly conclude that Certo was motivated by a discriminatory animus in making (or influencing) that decision.  By failing to fully inform McCaffrey and Kulwicki about the one-level recommendation he already obtained, a jury might conclude that Certo manipulated the situation to effect her discharge for reasons that were actually discriminatory.

17

While McPadden's evidence of discrimination is both thin and circumstantial, it is sufficient to survive summary judgment.

II.  <u>FMLA Retaliation - Count Five</u>.

An employee is generally entitled under the FMLA to take up to 12 weeks of leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  An employer may not interfere with, restrain, or deny the exercise by employees of the rights conferred by the FMLA, and may not discriminate against an employee for having exercised those rights.  29 U.S.C. § 2615(a)(1) and (2).  "Nor may employers 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'"  <u>Hodgens</u>, 144 F.3d at 160 (quoting 29 C.F.R. § 825.220(c)).

Here, McPadden asserts that Wal-Mart unlawfully retaliated against her for having invoked her right to take medical leave under the FMLA.  <u>See</u> Amended complaint at para. 54.  Largely for the reasons discussed above, a properly instructed jury could credit McPadden's version of the relevant facts and conclude that Wal-Mart discriminated against her for having taken protected medical leave.  In particular, the jury could conclude that Certo harbored some discriminatory animus against McPadden, at least in

18

part because she had taken FMLA leave and had informed him that
she would likely require additional leave in the future (absences
that would leave an already under-staffed pharmacy in need of
substantial assistance).  A jury might also conclude that Certo
played an active role in orchestrating the termination of
McPadden's employment and in doing so was motivated by that
discriminatory animus against her.


III. <u>Wrongful Termination - Count Six</u>.

     To prevail on her claim for wrongful termination under New
Hampshire law, McPadden must establish "(1) that the termination
of employment was motivated by bad faith, retaliation or malice;
and (2) that she was terminated for performing an act that public
policy would encourage or for refusing to do something that
public policy would condemn."  <u>Lacasse v. Spaulding Youth Ctr.</u>,
154 N.H. 246, 248 (2006) (citation omitted).  Here, McPadden
claims that Certo orchestrated her termination in bad faith and,
in substantial part, in retaliation for her having repeatedly
reported alleged staffing and safety issues in the Seabrook
pharmacy.


     Again, while the evidence supporting McPadden's
discrimination claim is not particularly compelling, it is
sufficient, if fully credited by a jury, to support a conclusion

19

that she was fired in retaliation for having done something that
public policy would encourage: reporting potential safety issues
in the pharmacy.  To prevail on that claim, McPadden will have to
persuade a jury that Certo harbored a discriminatory animus
against her based upon her protected conduct.  Additionally, she
will have to demonstrate that Certo actively participated in and
orchestrated Wal-Mart's decision to issue McPadden a two level
coaching to achieve the alleged goal of terminating her
employment in retaliation for her having engaged in protected
conduct.

     For its part, Wal-Mart reiterates its assertion that Certo
had no role in the final decision regarding the appropriate level
of discipline to impose on McPadden.  That decision, says Wal-
Mart, was made exclusively by McCaffrey and Kulwicki.  And, as
noted above, Wal-Mart asserts that neither McCaffrey nor Kulwicki
had any idea that McPadden had been engaged in protected
activity.  Consequently, that fact did not affect (and could not
have affected) their decision.  But, Certo's role in the
disciplining of McPadden, and whether he bore any discriminatory
animus against McPadden, are genuinely disputed material facts,
which must be resolved by the jury.

IV.  <u>Invasion of Privacy - Count Seven</u>.

Finally, McPadden claims that Fonseca violated her common law right to privacy by publically disclosing the medications that she had been prescribed and by speculating (to Varieur) that McPadden must have had a "nervous breakdown."  <u>See</u> McPadden Deposition (document no. 21-3) at 82.[3]  While Fonseca denies having made such a statement, <u>see</u> Fonseca Deposition (document no. 21-10) at 35-36, and Varieur cannot recall having ever heard such a statement, <u>see</u> Varieur Deposition (document no. 21-9) at 132, and Genna doesn't recall Fonseca having used the phrase "nervous breakdown," <u>see</u> Genna Deposition (document no. 21-11) at 32, the court will, for purposes of resolving Wal-Mart's motion, assume that Fonseca both disclosed McPadden's confidential prescription information to Varieur and speculated that McPadden must have had a nervous breakdown.

New Hampshire common law recognizes four distinct claims for invasion of privacy: "(1) <u>intrusion</u> upon the plaintiff's physical and mental solitude or seclusion; (2) public <u>disclosure</u> of private facts; (3) publicity which places the plaintiff in a

---

[3]    McPadden's amended complaint and her legal memoranda reference HIPAA to demonstrate that she had a legally recognized interest in protecting from public disclosure the medications that had been prescribed for her.  But, she does not advance (nor could she advance) a private right of action under HIPAA.  <u>See, e.g.</u>, <u>Miller v. Nichols</u>, 586 F.3d 53, 59-60 (1st Cir. 2009).

false light in the public eye; [and] (4) appropriation, for the
defendant's benefit or advantage, of the plaintiff's name or
likeness." Hamberger v. Eastman, 106 N.H. 107, 110 (1964)
(emphasis supplied). See also Karch v. BayBank FSB, 147 N.H.
525, 534-35 (2002). Here, McPadden's amended complaint advances
a claim for the second type of invasion of privacy: public
disclosure of private facts. See Amended Complaint (document no.
11) at para. 62 ("Fonseca accessed and disclosed Maureen's
private and protected health information in violation of
Maureen's right of privacy.").[4]

      To prevail on her invasion-of-privacy claim, McPadden must
demonstrate that Fonseca disclosed something "secret, secluded or
private pertaining to the plaintiff." Karch, 147 N.H. at 535.
Next, she must prove that Fonseca "publicized" that secret or
private information. And, as the New Hampshire Supreme Court has
observed, "publicity" differs from mere publication:

      While "publication" involves any communication by the
      defendant to a third person, "publicity" means that the
      matter is made public, by communicating it to the
      public at large, or to so many persons that the matter
      must be regarded as substantially certain to become one
      of public knowledge.

---

      [4]      In her memorandum in opposition to summary judgment,
plaintiff suggests that she is also advancing a claim for
wrongful intrusion upon her physical and mental seclusion.  But,
such a claim is not advanced in her amended complaint.

22

Id. (citations and internal punctuation omitted).  According to
Wal-Mart, McPadden cannot show that Fonseca "publicized"
McPadden's private prescription information because the record
reveals that, at most, only two people overheard Fonseca: Varieur
and Genna.  See Genna Deposition at 23; McPadden Deposition at
95.  That, says Wal-Mart, is legally insufficient to meet
McPadden's burden of proving that her confidential medical
information was "made public" or became a matter of "public
knowledge."

      McPadden disagrees, asserting that there are genuinely
disputed material facts that preclude the entry of summary
judgment.  Specifically, she says:

> [T]here is a genuine issue of material fact regarding
> [publicity] because no one working in the pharmacy that
> day could have known how many people were in the over-
> the-counter area.  This area could not be seen from the
> pharmacy, however, that area was within earshot of
> Fonseca when she made the statement regarding Maureen's
> protected health information.  The statement was not
> whispered, but was loud enough to be heard by Genna and
> others across the pharmacy and in the public place.

Plaintiff's Memorandum (document no. 23-2) at 23.  But, of
course, merely pointing out that some unknown number of customers
could have overheard Fonseca's statement is not evidence that
customers were present within earshot or that they did hear
Fonseca's alleged comment.  And, McPadden has pointed to no

23

evidence in the record suggesting that anyone other than Varieur
and Genna actually heard the statement.  See Genna Deposition at
23 (identifying Varieur as the only other person who overheard
Fonseca's statement); McPadden Deposition at 94 (stating that
Genna told her that Genna and Varieur overhead Fonseca's
statement).

McPadden's allegations are sufficient to state a viable
claim and, therefore, survive a motion to dismiss.  See, e.g.,
Karch, 147 N.H. at 535.  But, to survive a motion for summary
judgment, it is not enough to merely plead all the essential
elements of a viable claim.  At this juncture, McPadden must do
more than speculate that members of the public could have
overheard Fonseca's statement; she must point to evidence
sufficient to warrant the conclusion that "so many persons
[actually overheard Fonseca] that the matter must be regarded as
substantially certain to become one of public knowledge."  Id.
She has failed to do so.

Stated somewhat differently, given the evidence of record,
it is not genuinely disputed that, at most, only Genna and
Varieur overheard the statement allegedly made by Fonseca.  As a
matter of law, that evidence is insufficient to permit a rational
trier-of-fact to conclude that Fonseca's statement - whatever it

24

might have been - was "publicized" or became a matter of "public knowledge."  Consequently, as to McPadden's common law invasion-of-privacy claim, Wal-Mart and Fonseca are entitled to judgment as a matter of law.

## Conclusion

For the foregoing reasons, Wal-Mart's motion for summary judgment (document no. 21) is granted in part, and denied in part.  As to count seven of McPadden's amended complaint (invasion of privacy), Wal-Mart and Fonseca are entitled to judgment as a matter of law.  But, the presence of genuinely disputed material facts precludes the court from entering judgment as a matter of law in favor of Wal-Mart on the following claims from McPadden's amended complaint, each of which necessarily survives:

1.  Unlawful Discrimination (disability, leave, and gender) (counts one, two, and three);

2.  FMLA Retaliation (count five); and

3.  Wrongful Termination (count six).

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

November 3, 2015

25

cc:  Richard E. Fradette, Esq.
     Lauren S. Irwin, Esq.
     Joseph A. Lazazzero, Esq.
     Christopher B. Kaczmarek, Esq.