UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                                *
MAUREEN MCPADDEN                *
                                *   14-CV-475-SM
            v.                  *   January 26, 2016
                                *   9:15 a.m.
WALMART STORES EAST, LP, ET AL. *
                                *
* * * * * * * * * * * * * * * * *
```


TRANSCRIPT OF JURY TRIAL
DAY FOUR - MORNING SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE


APPEARANCES:


For the Plaintiff:        Richard E. Fradette, Esq.
                          Holly Ann Stevens, Esq.
                          Beliveau, Fradette & Gallant, Esq.

                          Lauren S. Irwin, Esq.
                          Upton & Hatfield, LLP




For the Defendant:        Christopher B. Kaczmarek, Esq.
                          Joseph A. Lazazzero, Esq.
                          Littler Mendelson, PC




Court Reporter:           Susan M. Bateman, LCR, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

I N D E X

WITNESSES:                Direct    Cross    Redirect    Recross

HEATHER HARRIS MCCAFFREY:

(Continuation of viewing of videotaped deposition)


BARBARA KULWICKI:

By Ms. Irwin              12


EXHIBITS:                                    FOR ID   IN EVD

Plaintiff's Exhibit 52.                                 54

P R O C E E D I N G S

(IN COURT - NO JURY PRESENT)

THE COURT:  Last night it occurred to me -- I did stress you don't have to write a memo, just cite me the cases, right?

MS. IRWIN:  I think you had said that it could be sort of barebones.  It didn't have to be --

THE COURT:  Yes.  Just cite me the cases. Write what you want, but don't feel you need to write a memo.

In the meantime, take a look -- if you haven't seen it already, I'm sure you're familiar with it.

I know you're probably familiar with it, Mr. Kaczmarek.

You may or may not be.

Soto-Feliciano versus Villa Cofresi, 779 F.3d 19.  It's about a year ago from the First Circuit.

MS. IRWIN:  Yes.

THE COURT:  I'm not entirely sure how this squares with the Supreme Court precedent in the area. However, I guess I don't have to worry about that because it's First Circuit precedent.

It makes the point that I've been struggling with, though.  "Plaintiff must elucidate specific facts which would enable a jury to find that the reason given

1  is not only a sham but a sham intended to cover up the
2  employer's real motive" in that case age discrimination,
3  "which led me to the following thought experiment that
4  may be invalid."
5          I haven't had time to think it through really,
6  but you haven't brought an age discrimination claim
7  here.
8          But let's assume you did, just as a thought
9  experiment.  Your client is over 40 in a protected
10 class.  Mr. Tau is obviously under 40.  He got a one
11 level under let's say substantially similar
12 circumstances.  Your client got a two level.  What else
13 is there?
14         You would say, I think, that's enough to go to
15 the jury because we've, you known, shown that the
16 policies they cited don't really say fire somebody.
17         How does that differ from your FMLA claim?  It
18 strikes me that it doesn't.  That the evidence --
19 remember I was talking about the box of evidence that
20 you say you would just point to the box and say, that
21 box, that box shows age discrimination, or at least
22 raises the specter sufficiently that a jury could
23 reasonably conclude that the real motivation was age
24 discrimination.
25         Same with race.  She's Caucasian.  Tau is

1   obviously Asian.  He didn't say anything about race.

2   There's no smoking gun.  But on the other hand, I think

3   you would say, well, that box.  Something bad happened

4   to me.  I'm in the protected class.  I'm Caucasian.

5   He's Asian.  He got one level.  I got two levels.  What

6   more do you need?  I think in either case I'm not sure

7   that would work.

8           But that's what I'm struggling with.  You

9   don't have to show your cards yet.

10          MS. IRWIN:  Your Honor, we are aware of that

11  case, and we would point out that in that case for the

12  retaliation claim the plaintiff did not have any direct

13  or circumstantial evidence that the employer said or did

14  anything to suggest retaliatory animus for the complaint

15  of age discrimination.

16          THE COURT:  Yes, and that differs from this

17  case how?

18          MS. IRWIN:  And the plaintiff -- we have

19  retaliation claims, our whistleblower, our wrongful

20  termination.

21          THE COURT:  Oh, claims.  Evidence, I thought

22  you said.

23          MS. IRWIN:  And they --

24          THE COURT:  No, no.  I thought you said the

25  distinction is in that case they didn't have evidence.

1         MS. IRWIN: Well, what I understood that your

2 Honor was struggling with yesterday was whether we

3 needed sort of direct -- or what kind of evidence did we

4 need to demonstrate retaliatory animus.

5         THE COURT: We don't say pretext plus anymore,

6 of course. But whatever concept has replaced it, which

7 has been ill-defined in my view, the concept is, I

8 believe, something like, there is a quantum of evidence

9 required that goes beyond the prima facie case, and the

10 courts are very vague about what that looks like and how

11 you discern whether it's present or not present.

12         And the answer seems to be, from the Supreme

13 Court at least, you know, if you have a strong prima

14 facie case, whatever the heck that means, and there's

15 some other evidence, some circumstances that will be

16 enough to get to the jury, and sometimes it won't be,

17 and, you know, just decide.

18         The First Circuit, however, seems to take a

19 more rigid view. They seem to say, no, no, no. You

20 really do have to have evidence that the pretext is in

21 fact pretext to cover up discriminatory animus. It's

22 not enough to just show pretext. It's got to be

23 something more than that.

24         MS. IRWIN: Well, I guess I would just point

25 particularly on the retaliation claims that we have.

1  The case that your Honor has just cited just talked
2  about the fact that there didn't have to be specific
3  direct or circumstantial evidence of the retaliatory
4  animus, but that we were able to show pretext by
5  temporal proximity, gaps and inconsistency in the
6  evidence regarding the misconduct, and that the
7  plaintiff had raised concerns several times right before
8  he was terminated.
9          So we have demonstrated that evidence.  I'm
10 certainly going to give some more thought to whether the
11 -- sort of the status-based claim, like the disability
12 claim.
13         Gender -- I would say when there is a decision
14 maker who specifically knows that a female pharmacist
15 has been a second level discipline and that's why she's
16 consulted, and she's consulted for consistency, and one
17 of the reasons for consistency is to make sure men and
18 women are treated the same, and then she says, oh,
19 forget it, let's give the man a first level -- Barbara
20 Kulwicki knew of gender.  That doesn't have to just be
21 Mr. Certo.
22         And we also had evidence yesterday from Mr.
23 Certo that he did treat Mr. Varieur leniently with
24 respect to discipline.  That he viewed Ms. McPadden's
25 complaints as aggressive; whereas when Mr. Varieur

```
 1   raised any sort of concern it was viewed as constructive
 2   and a good thing to do.
 3           So I think we have gender bias and we have
 4   some direct evidence of gender discrimination.
 5           But, your Honor, I think we will seriously
 6   think about the disability status claim.
 7           The other things are based on reporting, and I
 8   do think that the law on retaliation -- the evidence has
 9   been met on those issues.
10           THE COURT:  Here's another case you might want
11   to take a look at.  I'm sure, again, Mr. Kaczmarek, this
12   is your field, but it's Ray v. Ropes & Gray, 799 F.3d
13   99.  It's also a 2015 case out of the First Circuit.
14           MS. IRWIN:  Your Honor, the other cases that
15   we were pulling up last night included the Billings
16   case, which is Billings versus Town of Grafton.  That
17   says that pretext can be established through
18   circumstantial evidence alone, and that conflicting
19   accounts made by the defendants regarding who made the
20   decision and how it was made can serve as evidence of
21   pretext if an employer's different and arguably
22   inconsistent explanations for its challenged employment
23   action can serve as evidence of pretext.
24           THE COURT:  What's the cite?
25           MS. IRWIN:  Billings is -- I'm sorry.  Just
```

1    one second.  515 F.3d 39, a First Circuit case from

2    2008.

3            And then pretext can be shown through

4    circumstantial evidence alone is that Soto-Feliciano

5    case that your Honor cited.

6            And then we also have temporal proximity,

7    which is from Cooper versus Thomson Newspapers, 6

8    F.Supp. 2d 109.

9            THE COURT:  How does temporal proximity work

10    with gender?  I mean, there's no --

11            MS. IRWIN:  No, no.  The temporal proximity

12    doesn't work with the gender, I agree with you, your

13    Honor, but it does work with all of the other issues.

14    All of the other claims have to do with temporal

15    proximity.  It's when she raised the issues.  She has

16    the meeting.  She raises the issue.  He gets frustrated,

17    and then he looks for discipline.

18            THE COURT:  Okay.

19            MR. KACZMAREK:  Your Honor, if I may.  Just

20    the one case that I would add to the mix, in addition to

21    the ones that your Honor cited, would be Alvarez-Fonseca

22    versus Pepsi Cola, 152 F.3d 17.

23            THE COURT:  First Circuit?

24            MR. KACZMAREK:  Yes, your Honor.

25            MS. IRWIN:  I'm sorry, your Honor.  One final

1    one that I think is important to our analysis is in the

2    case of Harrington versus Aggregate Industries

3    Northeastern Region.  The Court stated that in

4    retaliation cases the whole is sometimes greater than

5    the sum of the parts.  That bits and pieces of evidence

6    taken collectively have significant probative value.

7    And we think that's consistent with your Honor's order

8    on summary judgment.  We looked at all of the evidence

9    and the inferences that the jury could make based on

10   light most favorable to the plaintiff, and we've proven

11   -- we're going to have proven by the end of the trial

12   all of the items that your Honor listed in that order

13   and more.

14            THE COURT:  What's the cite?

15            MS. IRWIN:  Sorry.  That is 668 F.3d 25, a

16   First Circuit 2012 case.

17            THE COURT:  Okay.  That's great.

18            Do we have an hour left?

19            MR. KACZMAREK:  Hour and a half.

20            MR. FRADETTE:  Approximately an hour and a

21   half, your Honor.

22            THE COURT:  Total?

23            MR. FRADETTE:  Total.  So this one here is

24   going to go about 20 minutes.  Then I'm going to put the

25   next disc in, which is exactly 48 minutes.

```
 1              THE COURT:  Okay.
 2              (IN COURT - JURY PRESENT)
 3              THE CLERK:  Court is in session and has for
 4   consideration jury trial, day four, in the matter of
 5   Maureen McPadden versus Walmart Stores East, LP, et al.,
 6   case number 14-CV-475-SM.
 7              THE COURT:  All right.  Good morning, ladies
 8   and gentlemen.  I apologize for the delay.  It was my
 9   bad.  I had issues to discuss with the lawyers this
10   morning.
11              We're going to continue with this deposition.
12   Again, I know it's tough watching a video deposition,
13   but we only have an hour and a half to go with a little
14   break in between.  So I think we'll probably just try to
15   run it out and get it behind us.
16              Any other administrative things?  No?  There
17   will be a switch somewhere after about an hour, I
18   suppose, or 45 minutes.
19              All right.  Mr. Fradette, whenever you would
20   like.
21              MR. FRADETTE:  Thank you, your Honor.
22              Ladies and gentlemen of the jury, we're going
23   to begin with Exhibit 22.  So when the tape resumes,
24   they're going to be talking about Exhibit 22.
25              (Continuation of viewing of videotaped
```

1    deposition of Heather Harris McCaffrey)

2              (Conclusion of viewing of videotaped

3    deposition of Heather Harris McCaffrey)

4              (RECESS)

5              MS. IRWIN:  The plaintiff calls Barbara

6    Kulwicki.

7                      BARBARA KULWICKI

8              having been duly sworn, testified as follows:

9              THE CLERK:  For the record, please state your

10   name and spell your last name.

11             THE WITNESS:  Barbara Kulwicki,

12   K-U-L-W-I-C-K-I.

13                    DIRECT EXAMINATION

14   BY MS. IRWIN:

15        Q.   Good morning, Ms. Kulwicki.

16        A.   Good morning.

17        Q.   We have not met in person before, but we met

18   through a video deposition while you were in Arkansas.

19   Do you recall that?

20        A.   Yes, I do.  Thank you.

21        Q.   You've worked for Walmart since 1988?

22        A.   Yes.

23        Q.   Can you just briefly go through the different

24   positions you've held with Walmart?

25        A.   When I joined Walmart, I was an assistant in

1    the legal department.  And after two years or so there I

2    moved to the people division, personnel, and did some

3    special projects.

4            After the people division and the special

5    projects area I moved to the photo division and was a

6    human resource manager for the photo division.

7            After the photo division I moved to compliance

8    and worked in the wage and hour group.

9            After compliance I moved to the pharmacy

10   division, and then the pharmacy division has merged with

11   Health and Wellness now.

12       Q.   Thank you.  And you hope to work for Walmart

13   until you retire?

14       A.   Yes.  Uh-huh.

15       Q.   And your current position is divisional senior

16   human resources manager?

17       A.   That's correct.

18       Q.   And you've held that position since June of

19   2005?

20       A.   Yes.

21       Q.   And that includes that you held that position

22   in 2012?

23       A.   That's correct.

24       Q.   Okay.  And you are responsible for providing

25   human resources advice and guidance concerning

1  associates employed in Walmart's pharmacies, including

2  those employed at the Seabrook pharmacy?

3      A.   That's correct.

4      Q.   During your deposition we marked a job

5  description for you.  It's Exhibit 64.  I'll just bring

6  to your attention there were two job descriptions,

7  because this first one, regional human resources

8  director, is what your job was called when this was

9  published in 2010.  But then you confirmed for me that

10  your current title of senior manager human resources

11  Health and Wellness is the same job, same duties, that

12  you held in 2012; is that right?

13      A.   Yes.

14      Q.   Okay.  So I'm going to use this description

15  that has your current title on it to talk with you about

16  it.

17          Your job requires you to ensure compliance

18  with the laws, right?

19      A.   Yes.

20      Q.   And your job requires you to promote and

21  support the standards of ethics and integrity by

22  providing direction to others and ensuring compliance

23  with them?

24      A.   Yes.

25      Q.   Okay.  And then we're going to turn to the

1  second page of this job description.  Part of your job

2  is to make informed judgments.  Do you see that?

3       A.    Yes.

4       Q.    And that goes on to say that you need to

5  identify and apply sound fact-based criteria in making

6  decisions, right?

7       A.    Yes.

8       Q.    And you need to integrate knowledge and

9  expertise in making fact-based recommendations and

10 decisions, right?

11      A.    Yes.

12      Q.    Okay.  And part of your role is to help

13 Walmart be consistent with discipline in the region,

14 right?

15      A.    Yes.

16      Q.    And being consistent ensures that those who

17 have raised concerns are not treated more harshly than

18 those who have not, right?

19      A.    Yes.

20      Q.    And it would also ensure that women are not

21 disciplined more harshly than men?

22      A.    Yes.

23      Q.    And that's really an essential part of your

24 job is to ensure compliance with the laws, right?

25      A.    Yes.

Q.    When I took your deposition -- and that was
just about two months ago.  Do you remember that?

A.    Yes.

Q.    You told me that you didn't think it was
possible to make sure that the people in the field
follow every law at Walmart, right?

A.    I'm, you know, one person, and we have -- I'm
responsible for an entire division, 650 stores right
now, and so to ensure that everybody is following
everything every minute of the day would be difficult at
best.

Q.    Yeah.  And so when I took your deposition --
if you could just turn to page 39.  Actually, back then
you told me you were responsible for a thousand stores.

A.    At one point I was covering two divisions.

Q.    When was that?

A.    Up until about August of this year.

Q.    So in 2012 you were covering two divisions?

A.    Yes.

Q.    Okay.  And so was that over a thousand stores?

A.    Yes.

Q.    Okay.  So you had a lot to do in 2012?

A.    Yes.

Q.    Okay.  So when I asked you -- on page 39, I
said, "Don't you also have to make sure that the people

1  out in the field are following the laws?"  You answered,

2  "I don't think that's possible to make sure that they're

3  following the laws or make sure that everybody in a

4  thousand stores are following every single law that's

5  out there.  When I talk to people, I certainly would

6  have that as a goal."

7          Do you still agree with that testimony?

8      A.    Yes.

9      Q.    Okay.  And so really you view your job as

10  having a goal to make sure your advice is consistent

11  with the law, but you don't view your job as ensuring

12  that the managers actually follow the law?

13      A.    When I'm involved -- again, that is certainly

14  what I strive for is to make sure that everybody follows

15  the laws.

16      Q.    Okay.  And it's a goal?

17      A.    That's what I strive for, yes.

18      Q.    Yes.  And you've been trained on the laws,

19  including the disability laws, the FMLA, and Title VII?

20      A.    Yes.

21      Q.    And you've been trained on HIPAA?

22      A.    Yes.

23      Q.    And if a manager says that he's been trained

24  on HIPAA, that includes being trained that complaints

25  need to be investigated, right?

1          A.    Yes.

2          Q.    And you told me that you haven't attended any

3    conferences on whistleblower or wrongful termination or

4    retaliation or gender discrimination in the last ten

5    years?

6          A.    If that was my testimony, that's true.

7          Q.    Okay.  And you can't recall any Walmart

8    webinars on whistleblowers or wrongful termination or

9    retaliation or gender discrimination in the last ten

10   years?

11         A.    I don't recall.  No, I don't have a memory of

12   it.

13         Q.    Okay.  And you used to have a certification

14   with the National Society for Human Resource Management?

15         A.    That is true.

16         Q.    Which is called SHRM?

17         A.    Yes.

18         Q.    But you let that lapse, right?

19         A.    Yes.  Yes, I did.

20         Q.    And that organization would require you to

21   have regular training, right?

22         A.    Yes.

23         Q.    And even though you were the senior human

24   resource manager responsible for compliance with

25   employment laws for pharmacies in New Hampshire, you

1 don't know anything about New Hampshire's

2 antidiscrimination law, right?

3     A.    Specifically -- our policies have specific

4 state laws imbedded in them.  So when I access a policy

5 and there is something specific about the state, I would

6 access that state within that policy.

7     Q.    But, ma'am, when I asked you about New

8 Hampshire's antidiscrimination law, you told me that you

9 didn't know if you had ever even looked at New

10 Hampshire's antidiscrimination law.

11     A.    I'm not disagreeing with that.  I'm just

12 saying that our policies do have imbedded in them

13 state-specific information.

14     Q.    Do you have any present recollection of

15 anything about New Hampshire's antidiscrimination law

16 that you didn't have when I asked you at your

17 deposition?

18     A.    No.

19     Q.    Okay.  And you understand that Walmart cannot

20 lawfully retaliate against an employee for raising

21 safety concerns?

22     A.    Yes.

23     Q.    And you understand that Walmart cannot

24 lawfully retaliate against an employee for raising a

25 HIPAA violation?

1       A.      Yes.

2       Q.      And you understand that the company cannot

3   lawfully retaliate against an employee because she

4   requests FMLA leave?

5       A.      Yes.

6       Q.      Or because she raised a concern about the

7   designation of the FMLA leave?

8       A.      Yes.

9       Q.      Or because she said she may need to take more

10  FMLA leave in the future?

11      A.      Yes.

12      Q.      Okay.  And you understand that anxiety and

13  depression may qualify as a serious medical condition

14  under the FMLA?

15      A.      Yes.

16      Q.      And also may be considered a disability under

17  the ADA?

18      A.      Yes.

19      Q.      And you understand that the company cannot

20  treat men more favorably than women with respect to

21  discipline?

22      A.      Yes.

23      Q.      And you actually know of this concept called

24  pretext, and you understand that to mean that an

25  employer cannot use an --

```
1              THE COURT:  Well, no.  I don't think you
2    should be using the witness as a sounding board for
3    elucidating legal principles.  I'll instruct the jury on
4    the law to apply in deliberating.  So, you know, facts
5    you're eliciting, not do you agree with me that the law
6    says X, okay?
7              MS. IRWIN:  Okay.
8         Q.   Ms. Kulwicki, you understand that Walmart
9    cannot use an excuse --
10             THE COURT:  No, no.  Objection to resume is
11   sustained.  Facts.
12             MS. IRWIN:  Well, she's the senior resource
13   person who was involved in --
14             THE COURT:  Yes.  What did she do?  What did
15   she know based on personal knowledge?  What happened?
16   What did she observe?  That kind of thing.  Not do you
17   agree with my X elucidation of the applicable law.  Not
18   that.
19             MS. IRWIN:  Your Honor, may we approach for
20   just a moment, please?
21             THE COURT:  Sure.
22             (SIDEBAR)
23             MS. IRWIN:  My purpose in asking these
24   questions is she has the responsibility to make
25   knowledgeable decisions, and her job responsibility
```

1    involves having to know about these issues so it's

2    important that she knows she had the responsibility.

3           THE COURT:  Just ask her.  You can't be giving

4    a recitation of what the applicable law is in your sort

5    of advocatory way and convey to the jury somehow your

6    suggestion is what the law is.  It's not about her

7    knowledge of the law.  Whether she knows what's required

8    or not required is not outcome determinative here.  It's

9    what did she do.

10          MS. IRWIN:  It's her job duties.

11          THE COURT:  But you're not doing that; hence

12   my objection.

13          MS. IRWIN:  But I'm trying to figure out how

14   she understood it was her duty to --

15          THE COURT:  No.  You're asking her if she

16   understands your view of the law is correct.  We're not

17   interested in your view of the law or whether it's

18   correct.  I'll tell the jury what the applicable law is.

19          All you have to get from this witness is what

20   did she know based on personal knowledge, what did she

21   observe, what the facts are.

22          MS. IRWIN:  And what her responsibility is.

23          THE COURT:  You know that.

24          MS. IRWIN:  But she has to have the facts to

25   give advice.  I don't want to get another objection.

1          MR. KACZMAREK:  And she's already testified

2    that the company can't discriminate or retaliate.

3          THE COURT:  She's an educated person.  You're

4    not going to educate her on the stand.  You're not going

5    to convey to the jury what you think her job

6    understanding should be.  She's a witness.

7          What do you know based on your personal

8    knowledge, your observations?  What happened?  What did

9    you do?  What did you hear?  What did you say?  That

10   sort of thing.  Not do you agree with me that prima

11   facie case is good enough.

12         MS. IRWIN:  Well, one of the final issues is

13   we have a reckless indifference standard for some of our

14   damages, and she's the one who is supposed to be making

15   sure that Walmart is complying with the law.  And she

16   knew what the law was, and she didn't do anything to

17   comply.  So it's an important part of our enhanced and

18   punitive damage argument.  I don't see how we get

19   reckless disregard evidence from her unless we have her

20   knowing of the responsibilities and failing to --

21         THE COURT:  Your questions right now, A,

22   they're not evidence.  They seem to me quite

23   argumentative.  You're implying that -- I don't know

24   what you're implying.  Without evidence you're

25   suggesting Walmart didn't do any of these things.

1          Why don't we first establish whether they

2    violated some requirement or not and then ask her if she

3    knows that that's a violation.

4          MS. IRWIN:  Okay.

5          MR. FRADETTE:  If the question were put such

6    as, what do you understand pretext to mean --

7          THE COURT:  No, no, no.  Not even close.

8          MS. IRWIN:  I'll switch the order.

9          (CONCLUSION OF SIDEBAR)

10     Q.   Ms. Kulwicki, I'm going to first cover -- move

11   to covering your involvement with Mr. Certo, okay?

12     A.   Okay.

13     Q.   You don't recall Joe Certo ever getting you

14   involved to talk about discipline when Josh Varieur

15   failed to have log copies completed, right?

16     A.   No.

17     Q.   Okay.  And you don't recall Joe Certo ever

18   getting you involved to talk about discipline when Josh

19   Varieur had a dispensing error in 2012, right?

20     A.   No.

21     Q.   Okay.  And you don't recall Joe Certo ever

22   getting you involved when Maureen McPadden raised

23   serious safety concerns from August through November of

24   2012?

25     A.   No.

1      Q.    And you agree that Maureen had the right to

2  raise safety concerns and that raising those concerns is

3  something that Walmart protects under its policies?

4      A.    Yes.

5      Q.    And you agree that it's a market director's

6  responsibility to ensure that a safety concern is looked

7  into?

8      A.    Yes.

9      Q.    And you provide guidance to market managers on

10  how to conduct investigations?

11      A.    Yes.

12      Q.    And you don't recall Joe Certo consulting with

13  you when Maureen raised a serious HIPAA violation in

14  October of 2012?

15      A.    No.

16      Q.    And you agree that the protocol in

17  investigations says that any conversations for that type

18  of investigation should be documented?

19          MR. KACZMAREK:  Objection.

20          THE COURT:  Overruled.

21      A.    A HIPAA violation is investigated by the HIPAA

22  group -- should be investigated by the HIPAA group.

23      Q.    But anyone who takes on a HIPAA investigation

24  should be documenting it?

25      A.    Yes, yes.

1    Q.    And witnesses should be present to take notes?

2    A.    Yes.  That would be standard practice.

3    Q.    And the associate who is accused of the

4    misconduct is typically asked to write a statement?

5    A.    Yes.

6    Q.    And in your opinion if a market manager told

7    you that an associate had reported that a technician had

8    violated HIPAA, it would need to be investigated?

9    A.    I would advise them to contact the HIPAA

10   group, yes.

11   Q.    But you believe it would need to be

12   investigated?

13   A.    Yes, yes.

14   Q.    Okay.  And you don't recall Joe Certo telling

15   you or getting you involved when in October of 2012 he

16   met with Maureen McPadden and she raised a serious HIPAA

17   violation, raised safety concerns again, told him of her

18   medical condition, and told him that she may need an

19   additional medical leave, right?

20   A.    No.

21   Q.    And Joe Certo didn't tell you on the very

22   morning of November 26th when you approved discipline

23   later that day that he had e-mailed Josh Varieur and

24   said that he understood Mr. Varieur's frustration when

25   Maureen raised concerns about technicians not being

1   allowed to take bathroom breaks?

2           MR. KACZMAREK:  Objection.

3           THE COURT:  Well, overruled.  But that -- I'll

4   tell you this at the end as well when I give you

5   instructions, but you should understand questions by

6   lawyers are not themselves evidence.  So when a lawyer

7   asks a question that assumes a fact in the question,

8   that's not evidence of that fact, okay?  Evidence of

9   facts come from the witnesses who are sworn to testify

10  and from documents and things that are admitted into

11  evidence.

12          So I've overruled the objection -- you

13  probably noticed hesitantly -- because the document is

14  in evidence.  You can read the document.  You can decide

15  for yourself what the document says and what its

16  implications are.

17          So that counsel suggests through the question

18  that it means one thing, that's not evidence that it

19  means that.  You'll decide what the document means,

20  okay?  All right.

21      Q.   Ms. Kulwicki, I'll restate to make it easier.

22          Mr. Certo didn't mention anything to you about

23  a one hour meeting that he had with Ms. McPadden in mid

24  to late October where she raised a number of concerns,

25  correct?

```
 1        A.    That's correct.

 2        Q.    And he didn't mention to you that she had

 3   indicated that she may need an additional medical leave?

 4        A.    No, he did not.

 5        Q.    Okay.  And you actually knew about Ms.

 6   McPadden's October -- late September, early October FMLA

 7   leave, right?

 8        A.    No, I did not.

 9        Q.    Oh.  I believe your affidavit said that you

10   were aware of that.

11        A.    I am now, but I wasn't at the time.

12        Q.    Ms. Kulwicki, if you could just look at

13   Exhibit 96, which is marked for ID.

14        A.    Exhibit 96?

15        Q.    Yes.  It's your affidavit.  I think it's right

16   next to you there.  Not the deposition.

17              MR. FRADETTE:  May I approach?

18              THE COURT:  Anytime, Mr. Fradette.

19              MR. FRADETTE:  It should be this document

20   right here.

21              THE WITNESS:  Oh.  The affidavit.  Okay.

22        Q.    And just to look at paragraph 6, does that

23   refresh your memory that you were aware that Ms.

24   McPadden had taken a leave of absence in 2012?

25        A.    I really did not remember that, and I am not
```

1   involved in approving leaves of absences.  We have a

2   central group that is called HRSS, Human Resources

3   Shared Services.  So leaves of absences go into the

4   shared services group, and I am not involved in

5   approving those.

6        Q.   And I'm not suggesting that you were involved

7   in approving it.  I'm just pointing out that you made a

8   statement under oath in the past where you said that you

9   knew that Ms. McPadden had taken a leave -- at the time

10  that you made the coaching decision, you were aware that

11  Ms. McPadden had taken a leave of absence in 2012.

12           If that's not true, you can tell us, but it's

13  just that this was a statement that you submitted under

14  oath.

15       A.   Like I said, right now I have no recollection

16  of knowing that, but perhaps -- you know, it's not

17  something that would have been on top of my mind.

18       Q.   So you don't know if your sworn statement is

19  true or not as you sit here today?

20       A.   At this point I don't have a recollection of

21  it.

22       Q.   Okay.  And back to the bathroom break issue.

23           You agree that employees should be given

24  bathroom breaks?

25       A.   Oh, yes.

1     Q.   And you would not support a manager holding up

2  bathroom breaks for Walmart's convenience?

3     A.   No.  Absolutely not.

4     Q.   Okay.  And so you were only asked to get

5  involved to discuss disciplining Maureen McPadden for

6  losing her key in November of 2012, right?

7     A.   Would you say that again, please?

8     Q.   Let me back up one step.

9     You don't recall any discussions with Mr.

10  Certo about Maureen raising concerns or indicating that

11  she may need another leave of absence, right?

12     A.   No, I don't.

13     Q.   So the first time in 2012 that any issues

14  regarding Maureen McPadden were brought to your

15  attention was when the issue of whether she should be

16  disciplined for losing her key was brought to your

17  attention?

18     A.   Yes.

19     Q.   Okay.  Now I would like to get to that issue.

20     You do recall speaking with Heather McCaffrey

21  in late November of 2012 regarding Maureen McPadden?

22     A.   Yes.

23     Q.   Okay.  And you obviously knew someone with the

24  name Maureen McPadden was female?

25     A.   I would assume so, yes.

Q. Okay. And you don't remember if Joe Certo was on the call with you and Ms. McCaffrey or not?

A. I remember speaking with Heather. I do not remember Joe -- speaking with Joe at all.

Q. Okay. And did you understand from Ms. McCaffrey that before the call with you Joe Certo had already filled Ms. McCaffrey in on some of the facts?

MR. KACZMAREK: Objection.

THE COURT: Overruled.

A. I'm not -- would you repeat that, please?

Q. Why don't you tell us -- when you started the call with Ms. McCaffrey, how did you understand, you know, who had raised the issue and what the situation was?

A. When Heather called, she simply told me that there was a pharmacist that had lost their keys and wanted to discuss it with me to determine what accountability level there should be.

Q. Okay. And if Joe Certo testified that he was on the call, you have no reason to dispute that?

A. Again, I didn't speak with Joe. If he was on the call, he didn't speak on that call that I have any memory of.

Q. And you've testified that it would have been appropriate for Mr. Certo to be on the call if he wanted

1  to be involved?

2      A.    Yes, it would have been appropriate.

3      Q.    And Mr. Certo didn't indicate to you that he

4  had already sought advice from his peers about the

5  appropriate level of the discipline, right?

6      A.    No.

7      Q.    And it wasn't communicated to you in any way,

8  either through Mr. Certo or anyone else, that Mr. Certo

9  had already agreed with Don Wallis, his manager, that a

10 one level discipline was appropriate?

11     A.    I don't know who Don Wallis was, but, no, I

12 had no knowledge of that.

13     Q.    And certainly Mr. Certo could have raised that

14 issue to you as you've had done on other occasions?

15     A.    Yes.

16     Q.    And Mr. Certo did not tell you that there had

17 been an example raised to him that someone had been

18 disciplined for losing a key and not reporting it?

19     A.    I did not speak with Joe prior to this.

20 Heather was on the call with me.

21     Q.    Well, Joe Certo has testified that he was on

22 the call with you.  So you don't know one way or the

23 other, right?

24     A.    I did not speak with Joe.  Now, he may have

25 been on the call, but I don't recall speaking with Joe

1    at all about this.

2        Q.   Okay.  But no one raised to you the example

3    that Mr. Certo was aware of about someone being

4    disciplined for losing a key and not reporting it?

5        A.   Heather and I spoke about -- she gave me an

6    example of the Vision Center manager that was

7    terminated.

8        Q.   That's somebody else.  We'll get to her.

9            But you don't remember any discussion of an

10   employee who was disciplined for losing and not

11   reporting?

12           THE COURT:  Specifically a pharmacist key?

13       A.   No.  No pharmacist.  This was the first that I

14   was aware of of a pharmacist losing a key.

15       Q.   And actually the example that was raised to

16   Mr. Certo from my understanding was not a pharmacist,

17   but it was someone who was given as an example by

18   Walmart in the litigation, and that's why I raise her.

19   But you have no knowledge of someone named Maria Holder,

20   and that person wasn't brought to your attention in

21   November of 2012?

22       A.   No.

23       Q.   Okay.  Now, I'll represent to you that this

24   morning Ms. McCaffrey testified by videotape and she

25   said the reason that she consulted with you was to

1  ensure consistency in the region because you had the

2  broader knowledge of whether pharmacists have lost their

3  key before, whether there had been discipline, any of

4  those issues, okay?

5       But when I took your deposition, you testified

6  that you didn't do anything to ensure consistent

7  discipline for Ms. McPadden's key loss because you

8  thought the new matrix made past practice irrelevant?

9       A.   That's correct.

10      Q.   Okay.  So even though the reason that you were

11  consulted was for consistency, that's not what you did

12  for Ms. McPadden?

13           MR. KACZMAREK:  Objection.

14      A.   That's correct.

15           THE COURT:  Overruled.

16      Q.   Okay.  And you certainly could have pulled

17  other managers, HR people, to determine if other

18  pharmacists have lost their keys and what the discipline

19  had been?

20      A.   In other areas of the country, yes.  Yes.

21      Q.   And so you were relying on this new matrix to

22  sort of start a whole new world of what the discipline

23  should be for Ms. McPadden?

24      A.   Yes.

25      Q.   Okay.  And that's Exhibit 15?  Is this the

1  matrix that you're talking about?

2      A.   Yes.

3      Q.   But when we looked at this matrix during your

4  deposition, you had to admit that losing the key and

5  properly reporting it was not an exact match for

6  anything listed on that matrix?

7      A.   That's correct.

8      Q.   Okay.  And then when I asked you to sort of

9  tell us what had been discussed and led you and Ms.

10  McCaffrey, and possibly Mr. Certo, to determine that

11  discipline was appropriate, you testified, "I guess it's

12  No. 3, leaving the facility and leaving the pharmacy

13  unsecured when no pharmacist is present," right?

14          MR. KACZMAREK:  Objection.

15          THE COURT:  Sustained.  But maybe you should

16  come to the sidebar.

17          (SIDEBAR)

18          THE COURT:  You know, I know -- maybe you're

19  trying to save time, but the witness is here so you have

20  to ask the questions.  What you're doing is reciting her

21  deposition and having her agree to it.  That's an

22  improper use of the deposition.

23          She can testify.  If she says something

24  inconsistent, then you can use the deposition.

25          MS. IRWIN:  Okay.  Sure.

1            MR. KACZMAREK:  Thank you, your Honor.

2            (CONCLUSION OF SIDEBAR)

3     Q.   Ms. Kulwicki, back to November of 2012 when

4 you were discussing this matrix to determine what

5 discipline was appropriate.

6            Which number are you testifying was the number

7 that led you to believe Ms. McPadden should receive a

8 second level discipline?

9     A.   We looked at No. 3 and No. 11.

10     Q.   And which one did you believe applied to Ms.

11 McPadden's situation?

12     A.   Neither one are exactly on point.  They don't

13 talk about keys per se.  They talk about the security of

14 the pharmacy and the fact that leaving it unsecured or

15 having it unsecured violates the matrix.

16     Q.   Okay.  And so you don't -- so when you and Ms.

17 McCaffrey talked about the matrix, you sort of concluded

18 that it didn't fall under the matrix but nevertheless

19 second level discipline was appropriate?

20     A.   It made clear that the security of the

21 pharmacy was extremely important.  No. 3 calls for

22 termination and No. 11 calls for a coaching, and we

23 discussed that.  And we did discuss the fact that I was

24 aware of a store manager who was terminated for losing

25 his keys.  Ms. McCaffrey talked about a vision center

manager who was terminated, and we talked about the fact
that the pharmacist losing her key did not rise to the
level of termination and so we talked about what level
of coaching there should be. We ended on second level
coaching.

Q. Okay. I just want to back up for a moment,
because you've just told me really the items in this
matrix don't apply and that your real issue was having
the pharmacy be unsecure due to a lost key was an issue,
right?

A. Yes.

Q. And that had certainly been the case before
this matrix came into effect, right?

A. Yes. I would take that very seriously. This
was the first situation that I was aware of of a
pharmacist losing a key.

Q. But that's because you didn't do any checking
because you decided that you needed to start all over
because of this matrix, right?

MR. KACZMAREK: Objection.

THE COURT: Overruled.

A. I had no knowledge of a pharmacist losing a
key.

Q. But you didn't look to see if your lack of
knowledge was actually the truth?

1   A.   Not in my area.  There was no pharmacist that

2   had lost a key in my area.

3   Q.   You were going on your memory.  You didn't do

4   anything to look it up, right?

5   A.   Yes.

6   Q.   Okay.  And you and Ms. McCaffrey -- and Mr.

7   Certo says he was on the call.  There was no discussion

8   of AP-05 on that call, right?

9   A.   No.

10   Q.   And AP-05 doesn't apply to pharmacists, right?

11   A.   Not specifically, no.

12   Q.   It wouldn't be a policy that would justify

13   discipline of Maureen McPadden in this case, right?

14   A.   No.  It's not what I would use.

15   Q.   And in advising on discipline do you look to

16   see whether there's a policy that's been violated?

17   A.   Yes.

18   Q.   And you look at past practices?

19   A.   Yes.

20   Q.   And you look at what type of training there's

21   been?

22   A.   Yes.

23   Q.   And you look at what kind of communication has

24   been distributed?

25   A.   Yes.

1    Q.   But in this case you didn't look at past

2  practices because you were using this new matrix?

3    A.   Yes.

4    MR. KACZMAREK:  Objection.

5    THE COURT:  Overruled.

6    Q.   And you concluded that the matrix didn't

7  actually dictate that there had been a violation of the

8  matrix in this case?

9    A.   That's true.  I mean, you recognize that no

10  policy is ever going to cover every situation that you

11  can encounter.

12    Q.   Sure.  And I understand, and I'm sure you

13  understand, ma'am, Walmart doesn't have to have a

14  policy.  We're just going over what Walmart has stated

15  as the justification for the disciplining of Ms.

16  McPadden.

17    And is it your testimony that the matrix was

18  the justification for the discipline that was imposed on

19  Ms. McPadden?

20    A.   And the matrix references a policy.

21    Q.   Okay.  So is it your opinion that the matrix

22  justified -- is the policy?

23    A.   That was the basis for it, yes.

24    Q.   Okay.  And you don't recall anyone telling you

25  during that call that Maureen was on a second level

1    discipline?

2         A.   No.

3         Q.   Okay.  They told you that after the second

4    level decision had been made, right?

5         A.   Yes.  Several days.

6         Q.   And no one suggested to you that Maureen was

7    not taking the issue seriously, right?

8         A.   No.

9         Q.   In fact, you knew that Maureen -- by the time

10   Maureen was fired, you had been told that she looked all

11   over her house and couldn't find the key?

12        A.   Yes.

13        Q.   And I think you've already mentioned Ms.

14   McCaffrey told you that she remembered a vision center

15   manager who had been terminated for losing keys?

16        A.   Yes.

17        Q.   Okay.  Did you look up that person?

18        A.   There would have been no way for me to look up

19   that one person.

20        Q.   There was no way for you to look up that

21   person?

22        A.   I did not know who she was referring to.  She

23   did not give a name.

24        Q.   Did you ask her to tell you which store it was

25   or what the person's name was or when the date was?

1     A.   No, I didn't.

2     Q.   So if you had actually looked up that

3 person -- we now know that's Susan Carroll, which is

4 Exhibit 18.  And just looking at the manager comments on

5 that one, do you see that this person actually left the

6 keys in the lock overnight?

7     A.   I see that, yes.

8     Q.   Okay.  But you didn't know that because you

9 didn't look her up, right?

10     MR. KACZMAREK:  Objection.

11     THE COURT:  Sustained.  She didn't look it up.

12     Q.   And looking at this, Ms. Carroll's exit

13 interview, she also left a spare set of keys in a drawer

14 which was unlocked and had access to HIPAA information?

15     MR. KACZMAREK:  Objection, your Honor.

16     THE COURT:  Sustained.  I'm not sure why this

17 is relevant because the document is in evidence, right?

18 She was unaware of it.  She has no personal knowledge of

19 it.  She didn't look it up.  So what can she possibly

20 offer?

21     MS. IRWIN:  Okay.  Thank you.

22     Q.   And just back again, you -- just for a moment,

23 even if you had looked Ms. Carroll up, you've testified

24 there really wasn't any relevant comparator to you

25 because the matrix was brand-new?

1     A.   The matrix was recently formulated and

2  distributed, yes.  So it was the first time that I had

3  considered the security of the pharmacy with the matrix.

4     Q.   Okay.  And even during this litigation you

5  don't have any recollection of Mr. Certo asking you to

6  look into whether other pharmacists had actually lost

7  their keys and whether or not they had been disciplined

8  before Maureen McPadden?

9          MR. KACZMAREK:  Objection.

10     A.   No.

11          THE COURT:  Overruled.

12     Q.   I'm sorry?

13     A.   No.

14     Q.   No.  And you have a short note documenting the

15  November 26, 2012, conversation, right?  That's Exhibit

16  67.

17     A.   Yes.

18     Q.   Okay.  And actually, will you look at the

19  front of the exhibit?  It looks like sort of an

20  organizer book that goes from August 20th of 2012 to

21  November 29th of 2012.  Do you see that?

22     A.   Yes.

23     Q.   Okay.  And on the second page it simply says

24  Heather, and then what does it say after that?

25     A.   RPh, which is pharmacist.  Pharmacist lost

1    their key.  Second level coaching.

2        Q.   Okay.  And how do we know what date that note

3    is?

4        A.   I date the page -- the first page of each day

5    till the next day.  So it would have been on the

6    previous page.

7        Q.   Okay.

8        A.   Or one of the previous pages.

9        Q.   Okay.  And so other than your writing the

10   words that you wrote, we don't know from this note

11   anything about the conversation that you had with Ms.

12   McCaffrey and possibly Mr. Certo?

13       A.   That's correct.

14       Q.   And after you and Ms. McCaffrey settled on a

15   second level discipline, were you told that this second

16   level would lead to Ms. McPadden's termination?

17       A.   Not during that conversation.  A couple days

18   later.

19       Q.   Oh, a couple days later?

20       A.   That's my recollection at this point, but it

21   was later.  It was at least the next day or the day

22   after.

23       Q.   Okay.  And you said, well, the decision has

24   already been made so go ahead?

25            MR. KACZMAREK:  Objection.

1          THE COURT:  Sustained.

2     A.   We talked about --

3          THE COURT:  No, no.  There's no question

4   pending.

5          THE WITNESS:  Sorry.

6          THE COURT:  That's okay.

7     Q.   When you were told Ms. McPadden was going to

8   be terminated, did you say go ahead with the decision?

9     A.   I indicated that we had made the decision on

10  what the accountability level should be.  It was

11  irrelevant what level of coaching she was already on

12  because the decision was based on the infraction, not on

13  what level she was in the coaching process.

14    Q.   Okay.  Were you one of the decision makers?

15    A.   HR advises the operators, and the operators

16  make the decision.  So as I discussed it with Heather,

17  my recommendation was a second level.  Heather was

18  really the decision maker.

19    Q.   And actually, Joe Certo was the other

20  operator, right?

21    A.   Joe was an operator, yes.

22    Q.   Okay.  And so when you say that the operators

23  made the decision, that would be Joe Certo and Heather

24  McCaffrey, right?

25         MR. KACZMAREK:  Objection.

1       THE COURT:  Overruled.

2       A.    My recollection is I spoke with Heather.

3  Heather is Joe's supervisor.  What Heather and Joe

4  discussed -- I don't know what they discussed, but on

5  the phone I spoke with Heather, and Heather and I

6  agreed.

7       Q.    Okay.  And so if at any point Walmart has

8  claimed that you were an actual decision maker, that's

9  not accurate because you give recommendations and the

10 operators make decisions?

11      A.    That is our process.

12      Q.    Okay.  And so if you could just look back

13 at -- have you ever given sworn testimony suggesting

14 that you were a decision maker in this issue?

15      A.    Again, we give advice.  Our advice is then

16 either taken or not taken.  That is the option that they

17 have.  I don't enforce my decision.  My decision was to

18 give the advice that it would be a skip level coaching.

19      Q.    And my question to you is, have you ever given

20 sworn testimony in this matter suggesting that you were

21 a decision maker?

22      A.    I'm sorry.  I don't know.  My deposition was

23 six hours.  I don't know if I ever said anything.

24      Q.    Okay.  Can you take a look back at Exhibit 96,

25 please, to refresh your recollection.

1          Ms. Kulwicki, do you know what an affidavit
2    is?
3         A.   Yes.
4         Q.   Okay.  And that's a statement that you're
5    making under oath, just like testimony at a deposition
6    or in court?
7         A.   Yes.
8         Q.   Okay.  And just looking at paragraphs 5, 6, 7
9    and 8, will you agree with me that in your sworn
10   testimony you suggested that it was you and Ms.
11   McCaffrey who made the decision?
12        A.   We discussed the situation and we came to
13   agreement on what the accountability level should be.
14        Q.   Okay.
15        A.   Again, you know, we made the decision.  Now,
16   Heather has the autonomy to take that decision or not
17   take that decision.
18        Q.   Okay.  So are you now saying you were a
19   decision maker or you weren't a decision maker?
20        A.   I did not make the decision to coach Maureen.
21   I made the decision that it was appropriate to do a skip
22   level accountability for losing the keys.
23        Q.   Okay.  So now -- my question is -- you've said
24   pretty clearly you were not a decision maker.  And so my
25   question to you is, when you gave sworn testimony that

1    said you were a decision maker, are you correcting that

2    and changing your testimony here to say that you were

3    not a decision maker, you just made recommendations?

4              MR. KACZMAREK:  Objection.

5              THE COURT:  Overruled.

6         A.   I don't think that -- I see the confusion.  I

7    made the decision that it was appropriate to do a skip

8    level coaching.  I made that decision and I communicated

9    that decision to Heather.

10             Now, Heather has the autonomy to either accept

11   or not accept that decision.  So she was making the

12   decision whether or not to accept what I had decided as

13   far as the accountability level.  I don't impose that

14   accountability level on an associate.  My decision is

15   the decision to communicate that to the operator.  The

16   operator then decides whether or not to implement that

17   decision.

18        Q.   Okay.  So I'm understanding you correctly

19   when -- to be saying you make recommendations, and Ms.

20   McCaffrey, and possibly Mr. Certo, are the ones who make

21   the decision?

22        A.   Yes.

23        Q.   Okay.  And I believe that you wrote -- after

24   you participated in the McPadden discussion you wrote on

25   your copy of the matrix second level discipline, right?

1      A.   Yes.

2      Q.   Okay.  And that's because this was sort of the

3  new matrix and you wanted to remember that if a

4  pharmacist loses the key and properly reports it, second

5  level discipline is what you thought was appropriate?

6      A.   Yes.

7      Q.   Okay.  Before we leave the McPadden issue, I

8  just want to go back to your role as the senior human

9  resource person.

10      We've talked about the fact that you are --

11  one of your biggest job responsibilities is to make sure

12  that Walmart is complying with the law, right?

13      A.   Yes.

14      Q.   And to do that you have to obtain the

15  information necessary to make sure that a decision is

16  not motivated by something unlawful, right?

17      MR. KACZMAREK:  Objection.

18      THE COURT:  Overruled.

19      A.   Yes.

20      Q.   Okay.  So with respect to Ms. McPadden, you

21  didn't solicit or request or talk about any information

22  to help you understand whether Ms. McPadden's discipline

23  could have been motivated by something unlawful?

24      MR. KACZMAREK:  Objection.

25      THE COURT:  Overruled.

    A.    I expect that district managers and regional
managers are going to provide relevant information to
me.

    Q.    So does that mean you don't ask any questions
to make sure that Walmart is complying with the laws?

            MR. KACZMAREK:  Objection.

            THE COURT:  Well, overruled.

    A.    In this case we were discussing the losing of
the key, and that was a fact, and that's what the
discussion was centered on.  It was not based on any
particular individual.  It was -- the discussion was
around losing the keys and what the accountability level
should be.

    Q.    But based on Walmart's policies and your
knowledge of ensuring compliance with Walmart's policies
and the law, one of the things that you would want to
make sure is that someone was not taking -- advocating
or taking steps to get more severe discipline than would
normally be imposed because of protected activity?
Isn't that part of your job?

            MR. KACZMAREK:  Objection.

            THE COURT:  Overruled.

    A.    I really had no indication that there was any
animus toward any associate.  The concern was the
security of the pharmacy and losing the keys.

1     Q.   So let me just back you up for a moment.  You

2   say you don't have any evidence, but you don't even

3   remember speaking with Mr. Certo, right?

4     A.   No.  I was speaking with Heather.

5     Q.   Okay.  And so if Mr. Certo was escalating the

6   issue, or advocating for harsher discipline, that's not

7   something that you would know unless you asked?

8     A.   No one was really advocating for any type of

9   discipline.  The discussion was around what should the

10   discipline be.

11     Q.   Well, let me just bring to your attention the

12   fact that Ms. McCaffrey testified this morning that

13   before she even had the conference call with you Mr.

14   Certo had told her that Ms. McPadden did not appear to

15   take the matter seriously.  Would you consider that --

16         MR. KACZMAREK:  Objection.

17         THE COURT:  Sustained.  This witness need not

18   comment on other evidence.

19     Q.   Did anyone tell you that Mr. Certo had passed

20   on information to Ms. McCaffrey that Ms. McPadden didn't

21   take this issue seriously?

22         MR. KACZMAREK:  Objection.

23         THE COURT:  Overruled.  Did anybody tell you

24   that?

25         THE WITNESS:  No.

1     Q.   Is that information that you would have wanted

2  to have?

3          MR. KACZMAREK:  Objection.

4          THE COURT:  Sustained.  I'm not sure I see the

5  relevance.  Sorry.  Do you want to approach?

6          MS. IRWIN:  No.  That's okay.  I'll move on,

7  your Honor.

8          THE COURT:  All right.

9     Q.   And we've already gone through -- Mr. Certo

10  hadn't told you, and Ms. McCaffrey didn't tell you, of

11  any of Ms. McPadden's protected activity?

12     A.   No.

13     Q.   Okay.  And when you are fulfilling your duty

14  to make sure that Walmart is not violating any laws and

15  it's ensuring legal compliance, you don't ask, and you

16  didn't ask in this case, whether Ms. McPadden had

17  recently taken a leave or raised any legal or safety

18  concerns?

19     A.   No, I did not.

20     Q.   And I think you -- you just hope that you have

21  all of the relevant information when you're considering

22  the situation?

23     A.   I expect that I am given that information.

24     Q.   You would expect that you would be given it?

25     A.   Yes.  Any relevant information.

1    Q.   Okay.  And it's one of your goals to make sure

2    that disciplinary decisions are not motivated by

3    discrimination or retaliation, right?

4    A.   That's correct.

5    Q.   And it's a goal because that's what the law

6    requires, right?

7    A.   Yes, yes.

8    Q.   Now, I would just like to turn --

9        MS. IRWIN:  Your Honor, I probably have at

10   least twenty more minutes.  I don't know when the best

11   time for a break is.

12       THE COURT:  All right.

13       Members of the jury, would you like to go

14   twenty more minutes, or would you like to break for

15   lunch now?  Those who would like to break for lunch now,

16   raise your hand.

17       (No juror raises his or her hand)

18       All right.  We'll go twenty more minutes.

19       MS. IRWIN:  All right.  Thank you, your Honor.

20   Q.   Now, Ms. Kulwicki, I would like to talk about

21   Andy Tau.  We talked about Mr. Tau at your deposition

22   just a couple months ago, remember?

23   A.   Yes, I do.

24   Q.   And you had a recollection of the Andy Tau

25   issue back then, right?

```
 1        A.    Yes.
 2        Q.    Okay.  And you told me that you had been
 3   consulted about Andy Tau, who was a pharmacist in the
 4   same region as Ms. McPadden, right?
 5        A.    Yes.
 6        Q.    And he had also lost his key and properly
 7   reported it like Ms. McPadden?
 8        A.    Yes.
 9        Q.    Okay.  And you were actually involved in
10   approving the discipline for Mr. Tau, right?
11        A.    I was.
12        Q.    Okay.  But when you were asked about two
13   months ago, you thought -- and actually you didn't
14   hesitate at all, and said that the reason -- that you
15   had become involved after the discipline was already
16   imposed, right?
17        A.    Yes.
18        Q.    Okay.  But that's not true, right?
19        A.    That's correct.
20        Q.    Okay.  And it is true that Lurene Riel called
21   you to tell you about Mr. Tau, right?
22              MR. KACZMAREK:  Objection.
23              THE COURT:  Overruled.
24        A.    I did talk with Lurene, yes.
25        Q.    Okay.  And it's your understanding that she
```

1  contacted you because she had been told that Maureen

2  McPadden had received a second level discipline for

3  losing the key and properly reporting it?

4  　　　A.　　Yes.

5  　　　Q.　　So that's why she was consulting with you, to

6  make sure that there was consistency?

7  　　　A.　　She had called me because -- and I have no

8  memory of an e-mail that we had corresponded before

9  where she had asked for us to do a next level coaching

10  and I had supported that.  I don't have any memory of

11  that e-mail, but she called me then after she learned of

12  the skip level.

13  　　　Q.　　Okay.  So why don't we just -- let's pull up

14  Exhibit 82.

15  　　　　　MS. IRWIN:  Your Honor, defense counsel has

16  agreed that the ID can be stricken from Exhibit 82.  We

17  ask that it be stricken.

18  　　　　　THE COURT:  ID may be stricken on 82.

19  　　　　　(Plaintiff's Exhibit 82 Admitted)

20  　　　Q.　　Okay.  Ms. Kulwicki, I just want to start out

21  by saying you know that we did not have this e-mail

22  produced to us until after your deposition, right?

23  　　　A.　　Yes.

24  　　　Q.　　Okay.  So we didn't have this e-mail to talk

25  about during your deposition and you didn't talk about

1   the e-mail, right?

2       A.   And I had no memory of this e-mail.

3       Q.   Okay.  So at your deposition you testified

4   that you had been told about Mr. Tau after the first

5   level discipline had already been imposed, and because

6   it had already been imposed you didn't want to undo it

7   and you let it go?

8       A.   And I think I also talked about the

9   differences in the situation, yes.

10      Q.   Yeah, we'll get to that.

11           Okay.  You were told that Mr. Tau thought he

12  lost his key in the snow in the parking lot, right?

13      A.   Yes.

14      Q.   Okay.  And it was your understanding that Ms.

15  Riel had issued the first level on her own without

16  getting a recommendation from HR?

17      A.   I did not recall this e-mail.  So when we

18  spoke, yes, that was my understanding.

19      Q.   Yeah, and that was your testimony.  And you

20  decided to leave it as a first level and then you tried

21  to explain the difference, right?

22           MR. KACZMAREK:  Objection.

23      Q.   The difference between Mr. Tau losing his key

24  in the snow and Ms. McPadden losing her key either in

25  the parking lot or at her house?

1    A.    I think it was reverse, where we talked about

2  the differences and then decided to leave it as a first

3  level coaching -- or a next level coaching.

4    Q.    Okay.  And if you could -- when you talked

5  about the difference between Mr. Tau and Ms. McPadden,

6  you believe the difference is that -- there was a

7  difference between this pharmacist losing his key due to

8  the situation of the snowstorm versus someone that

9  simply lost control of the key.  Do you remember?  Is

10 that true?

11   A.    That's part of it, yes.

12   Q.    Is there something else that we didn't talk

13 about?

14   A.    Well, I think that -- you know, the fact that

15 he reported it before he even left the premises, before

16 the pharmacy was closed, and so the pharmacy was never

17 unsecured where we didn't know that the key was missing.

18   Q.    And one of the main things that you have

19 previously told us was that it was a big deal that Mr.

20 Tau reported the key immediately, right, as soon as he

21 realized that the key was lost?

22         MR. KACZMAREK:  Objection.

23         THE COURT:  Overruled.

24   A.    I think it's -- yes, I think that it's

25 important that he reported it and had not left the

1     premises, the pharmacy had not been closed, and

2     therefore, we could ensure the security of the pharmacy

3     knowing that a key was missing.

4          Q.   Okay.  And so back at your deposition you --

5     and I just want to know if this is sort of still true.

6          It was very significant to you that you didn't

7     know that for Mr. Tau the pharmacy hadn't actually been

8     rekeyed for several days?

9          A.   No, I didn't know that.

10         Q.   Okay.  But when we look at the e-mail that

11    actually is contemporaneous, it's a day after Mr. Tau

12    lost his key, you were actually told that the pharmacy

13    had not been rekeyed.

14         MR. KACZMAREK:  Objection.

15         THE COURT:  Overruled.

16         A.   I did not notice that in the e-mail or it

17    didn't strike me that -- yeah, it is there.  I see it.

18         Q.   Okay.  You see it?

19         A.   Yes.

20         Q.   When you previously testified, it was very

21    significant to you that the pharmacy was somehow more

22    secure because he reported it right away.  But in fact,

23    that pharmacy wasn't rekeyed for several days and you

24    were told that right at the time, right?

25         A.   I don't really --

```
 1              MR. KACZMAREK:  Objection.

 2              THE COURT:  Just a second.

 3              MR. KACZMAREK:  The Judge hasn't ruled on it

 4     yet.

 5              THE WITNESS:  Oh, I'm sorry.

 6              THE COURT:  I just need to read it.

 7              Overruled.  You may answer.

 8         A.   Okay.  What was the question?  I'm sorry.

 9         Q.   It was very important to your

10     distinguishing at your -- to distinguish Mr. Tau getting

11     a first level discipline from Ms. McPadden getting a

12     second level discipline.  It's very important to you

13     that somehow in your analysis the pharmacy was not

14     unsecure because he reported it right away.  And you

15     said you thought that the pharmacy had been rekeyed.

16     You didn't know that it had been several days, right?

17              THE COURT:  Okay.  As we discussed --

18              MS. IRWIN:  That's a hard question.  Let me go

19     back.

20              THE COURT:  It's not that.  It's as we

21     discussed at sidebar.  The witness is here.  Ask her

22     what was important to her.  If there's some change

23     between that and -- some difference, then use the

24     deposition.

25              You're really asking her -- you're
```

recharacterizing her deposition and then asking her to
subscribe to it. Just ask her what she thinks.

       MS. IRWIN: Okay.

    Q. Ms. Kulwicki, first let me just make sure.
You did actually receive this e-mail back on December
15th of 2013, right?

    A. Yes, I did. Sunday, December 15th.

    Q. Okay. And we know that because you got the
e-mail and you responded to it?

    A. Yes.

    Q. Okay. And in the e-mail Ms. Riel specifically
told you that the pharmacy had not yet been rekeyed?

    A. Yes, she does.

    Q. Okay. And if the pharmacy hadn't been rekeyed
and the keys were lost somewhere in the parking lot,
isn't it true that someone could have found the key
right there in the parking lot and gone to use them at
the store?

    A. Sure.

    Q. So because the pharmacy wasn't rekeyed it's
actually more likely to be a security breach with keys
just floating out there in the snow in the parking lot?

    A. Yes, yes.

    Q. And you never had any information to suggest
that Maureen had not reported the loss of the key right

1    away?

2        A.    No.

3        Q.    Okay.  And I think you -- you didn't even look

4    at the matrix when the Mr. Tau issue was brought to your

5    attention, right?

6        A.    No.  Quite frankly, I had forgotten about the

7    previous situation.

8        Q.    But I thought you told -- I think that you've

9    testified that the reason that Ms. Riel was reaching out

10   to you was because it had come to light that Maureen

11   McPadden had received a second level discipline.

12       A.    Yes, she did.

13       Q.    Okay.  So that's why she was coming to you,

14   and you knew that?

15            MR. KACZMAREK:  Objection.

16       A.    She told me that.

17       Q.    Okay.

18            THE COURT:  Sustained.  I mean overruled.

19   Sorry.  Overruled.

20       Q.    So when Ms. Riel was seeking advice to be

21   consistent, it was specifically to be consistent with

22   respect to what had been imposed on Ms. McPadden?

23       A.    Yes.  But it was after -- after this e-mail.

24   It wasn't simultaneous with this e-mail.

25       Q.    Okay.  And I apologize because we didn't have

1  this e-mail at your deposition so I'm sort of starting

2  over here.

3       A.   Right.  We did not.

4       Q.   So you're telling me first you got this

5  e-mail?

6       A.   On a Sunday, yes.

7       Q.   Okay.  And Ms. Riel told you full information

8  in writing, correct?

9       A.   Uh-huh.  Yes.

10      Q.   And actually in this e-mail she told you that

11  she had checked with her peers at the store level.

12  Who's the AP?

13      A.   Asset Protection.

14      Q.   And HR, is that the store level HR?

15      A.   I would assume so.  Either store level or

16  market level.

17      Q.   Okay.  And she told you that she had checked

18  with them to see what they thought the proper

19  accountability should be, right?

20      A.   Uh-huh.

21      Q.   And they had thought that next level, meaning

22  first level, was appropriate because he notified

23  everyone as soon as possible and did what he could to

24  find the keys?

25      A.   Yes.

1     Q.   Okay.  And then Ms. Riel told you, I would

2  totally agree that this would be the next level of

3  coaching, right?

4     A.   Yes.

5     Q.   And then she says, "I am supposed to inform

6  Barb if we need to coach a pharmacist on doing so.  I

7  want to be consistent in the region and division

8  market."  Right?

9     A.   Yes.

10     Q.   So she gave you the information that he had

11  lost it; it had not been rekeyed yet; that she sought

12  advice from her peers; that they had thought first

13  level; that she agreed that first level was appropriate;

14  and based on all of that information you said I agree

15  with that first level coaching, right?

16     A.   In this situation, yes.

17     Q.   Okay.  And then I think what you're telling me

18  is somebody said, uh-oh, after that; is that right?

19          MR. KACZMAREK:  Objection.

20          THE COURT:  Overruled.

21     A.   Yes.

22     Q.   Okay.  So what happened after the e-mail?  Are

23  you saying after the e-mail someone reminded you -- that

24  just a year earlier it had been the very first time you

25  had ever dealt with a pharmacist losing a key under the

1    matrix, and somebody reminded you of that?

2               MR. KACZMAREK:  Objection.

3               THE COURT:  Overruled.

4          A.   Yes.

5          Q.   Okay.  And even then you didn't go back and

6    look at the matrix, because you've already -- you didn't

7    go back and look at the matrix and see that it said

8    second level on it, right?

9          A.   I'm not -- well, okay.  So the e-mail came in

10   on a Sunday, and I probably responded to this from home

11   and did not have the matrix with me.

12              So when she called -- and again, I'm not sure

13   exactly whether it was Monday, Tuesday, a couple days

14   later, and I'm not sure how she learned that there had

15   been a second level coaching for losing the keys, but

16   that's what she was calling about at that time.

17              So it was not Sunday that we talked about

18   this.  It was after the coaching had already been given.

19         Q.   Okay.  And so it was after you had already

20   agreed to first level coaching?

21         A.   Yes.

22         Q.   Okay.  And even when she called -- and I

23   believe you testified that you thought it was because

24   Heather McCaffrey had pointed out that Ms. McPadden had

25   received a second level discipline, right?

1        A.    I assumed it was.  Heather was regional that

2    both Joe and Maureen reported to, so I assume that's

3    where she learned of it, but it could have been someone

4    else.  It could have been some other way.

5        Q.    And certainly even when Ms. McCaffrey was on

6    maternity leave I'm sure there were occasional phone

7    calls that could take place.

8        A.    Walmart's policy is that we do not call people

9    on leaves -- when they're on a leave of absence.

10        Q.    Okay.  So somehow Ms. Riel learned that Ms.

11    McPadden had been given a second level discipline for

12    losing and reporting.  And by this point you had already

13    approved it based on the information that Ms. Riel

14    provided to you, right?

15        A.    Yes.

16        Q.    Okay.  And then you say there's a phone call

17    and they ask you if it should be changed, because now we

18    have a difference in treatment, right?

19        A.    Yes.

20        Q.    Okay.  And you didn't look at the matrix at

21    that point either, right?

22        A.    I looked at the situation again.

23        Q.    My question is, did you look at the matrix?

24        A.    I don't recall looking at the matrix, but I

25    did have the matrix in my office.  I don't recall

1  looking at it per se.

2      Q.   Okay.  If you could just turn to page 145 of

3  your deposition.

4      A.   Okay.

5      Q.   Just because we went over it really clearly.

6  I just want to make sure it's clear.

7           Do you see at page 145, towards the top, I

8  asked you, "Did you look at the matrix when you were

9  talking to Ms. Riel?"  And you answered, "I had

10 recollection from prior looking at the matrix.  I did

11 not pull it out again."

12     A.   Okay.

13     Q.   Is that true?

14     A.   I would assume so.

15     Q.   Okay.  And if you had a prior recollection of

16 the matrix, you would have remembered that you wrote

17 second level for the first time that you dealt with the

18 loss of a key, right?  You wrote it right on there.

19     A.   I did write it right on there, on my copy of

20 the matrix, but I did not recall it.  I made a mistake.

21     Q.   Okay.  And again, before you remembered this

22 e-mail had occurred, it's your belief that the pharmacy

23 was secure in Mr. Tau's case because he had reported the

24 loss and you didn't know that the pharmacy had not been

25 rekeyed?

1    A.    No, I did not know when they rekeyed the

2  pharmacy.

3    Q.    Okay.  And you didn't -- you claimed that you

4  didn't know that it hadn't been rekeyed by the time he

5  left, right?

6    A.    I'm sorry.  By the time I left?

7    Q.    By the time Mr. Tau left the pharmacy.  I'm

8  sorry.

9    A.    No, I did not know.

10    Q.    Okay.  But you really did know because it was

11  in the e-mail, right?

12    A.    It is in the e-mail that they were working on

13  it then.

14    Q.    And actually you've stated, and you believed,

15  that if Ms. Riel had consulted with you first, you would

16  have recommended a second level discipline, but she had

17  not consulted with you first.

18    A.    Had I recalled, I would have been consistent.

19    Q.    Had you recalled what?

20    A.    When I responded to this e-mail, had I

21  recalled the second level coaching I would have tried to

22  be consistent.

23    Q.    Okay.  And all that would have required would

24  be for you to pull out the matrix, which you said was

25  the key document to look at, and you had written right

1    on it second level?

2        A.    Yes.  But this was a Sunday that I responded

3    to this.  I wasn't at the office, and I didn't have that

4    matrix right there with me.

5        Q.    And you didn't even look at it later when you

6    talked to Ms. Riel on the phone?

7        A.    At that point I have recollection when she

8    brought that up to me.

9        Q.    Okay.  And even when it was specifically

10   brought up to you that there was a second level

11   discipline, you said, fine, leave Mr. Tau as it is?

12       A.    We discussed the fact that there was some

13   differences between the two situations.

14             And since he had already been coached, I did

15   not believe it was the proper thing to go back and say,

16   oh, we really need to coach at a different level now.

17       Q.    I'm just going to show you -- this,

18   unfortunately, has tiny, tiny print.  I need to put on

19   my glasses to see it myself.

20             This is Exhibit 3, and I'll represent to you,

21   ma'am, that this is the documentation produced by

22   Walmart relating to Andy Tau's disciplinary record.

23   Okay?

24       A.    Okay.

25       Q.    And if we look at the second page of this, it

1    tells us when the discipline was given, right?

2        A.    That certainly appears that way.

3        Q.    Okay.  And it says that the discipline was not

4    given to Mr. Tau until December 19th of 2013, right?

5        A.    I can't see the name on this, but it does say

6    given date.

7        Q.    It's on the first page where it says Sze Chuen

8    Tau.  I think he goes by Andy.

9        A.    Okay.

10       Q.    Can you see that?

11       A.    Yes.

12       Q.    Okay.  And then this is the second page that

13   talks about this discipline, and the given date is

14   December 19th.  Do you see that?

15       A.    Yes.

16       Q.    And we know the offense occurred -- in terms

17   of the loss of the key, occurred right on -- it lists it

18   as December 14th, right?

19       A.    Yes.  That's what it says.

20       Q.    So you don't have any reason to dispute

21   Walmart's documentation of the timing of that

22   discipline, do you?

23       A.    No.  It's systematic.

24       Q.    Okay.  So when they're disciplined, it goes in

25   the system?

```
 1      A.   That's my understanding, yes.
 2      Q.   Okay.  So there were several days in between
 3 your approval of first level to when the discipline was
 4 actually given to Mr. Tau?
 5      A.   Yes.  It appears to be.
 6      Q.   Okay.  And just back to Exhibit 82 for a
 7 moment.
 8           One of the things that Ms. Riel told you when
 9 she was telling you that she thought first level was
10 appropriate was that the pharmacy did have an alarm that
11 was set, right?
12      A.   Yes.
13      Q.   Okay.  And Lurene Riel was a market manager
14 just like Mr. Certo was, right?
15      A.   Yes.
16      Q.   And in the same division?
17      A.   Yes.
18      Q.   Okay.  And so Ms. Riel was the one who was
19 providing the information and telling you that she
20 thought first level was appropriate?
21      A.   Yes.
22      Q.   And you agreed?
23      A.   Yes.
24           MS. IRWIN:  If I could just take one moment,
25 your Honor.
```

```
1              THE COURT:  Certainly.
2              (Attorney Irwin confers with Attorney
3    Fradette)
4        Q.   I guess I just have one last question.  You
5    understand that Andy Tau is male, right?
6        A.   I would assume so.
7              MS. IRWIN:  Okay.  Thank you.
8              THE COURT:  All right.  We'll wait and have
9    lunch.
10             Ladies and gentlemen, we'll take our lunch
11   break now.  Why don't we say 1:20, thereabouts.  No
12   pressure.  But probably around 1:20 we'll resume.
13             (RECESS)
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3

4        I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9
     Submitted: 2-9-16
10                                **SUSAN M. BATEMAN, LCR, RPR, CRR**
                                  LICENSED COURT REPORTER, NO. 34
11                                STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25