UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * *
                              *
MAUREEN McPADDEN             *    1:11-cv-475-SM
                              *    January 26, 2016
vs.                          *    1:32 p.m.
                              *
WAL-MART STORES EAST, LP     *
                              *
* * * * * * * * * * * * * * *
```

DAY 4
AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE STEVEN J. McAULIFFE

Appearances:

For the Plaintiff:     Richard E. Fradette, Esq.
                       Holly Ann Stevens, Esq.
                       Beliveau, Fradette & Gallant, PA
                       91 Bay Street
                       P.O. Box 3150
                       Manchester, NH 03105-3150

                       Laurin S. Irwin, Esq.
                       Upton & Hatfield, LLP
                       10 Centre Street
                       P.O. Box 1090
                       Concord, NH 03302-1090

For the Defendant:     Christopher B. Kaczmarek, Esq.
                       Joseph A. Lazazzero, Esq.
                       Littler Mendelson, PC
                       One International Place
                       Suite 2700
                       Boston, MA 02110

Court Reporter:        Liza W. Dubois, RMR, CRR
                       Official Court Reporter
                       LCR No. 104
                       U.S. District Court
                       55 Pleasant Street
                       Concord, NH 03301
                       (603)225-1442

I N D E X

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **BARBARA KULWICKI** | | | | |
| By Mr. Kaczmarek | | 3 | | |
| By Ms. Irwin | | | 14 | |
| **CRAIG MOORE** | | | | |
| By Mr. Fradette | 21 | | | |
| By Mr. Kaczmarek | | 37 | | |
| By Mr. Fradette | | | 42 | |
| By Mr. Kaczmarek | | | | 45 |
| **KEVIN McDEVITT** | | | | |
| By Mr. Fradette | 61 | | | |

| EXHIBITS | FOR ID | IN EVD. |
|---|---|---|
| Plaintiff's 69 | | 22 |
| Plaintiff's 70 | | 22 |
| Plaintiff's 71 | | 22 |
| Plaintiff's 72 | | 22 |
| Plaintiff's 73 | | 22 |

```
1                        PROCEEDINGS

2                (IN OPEN COURT - JURY PRESENT)

3             THE COURT:  Mr. Kaczmarek.

4             MR. KACZMAREK:  Thank you, your Honor.

5                     CROSS-EXAMINATION
```

BY MR. KACZMAREK:

```
7        Q.    Good afternoon, Ms. Kulwicki.

8        A.    Good afternoon.

9        Q.    A few questions for you.  You indicated

10  earlier that part of your job responsibilities is

11  to provide advice.  To whom do you provide advice?

12       A.    To -- to -- normally to the operators, to the

13  market -- well, market directors or district managers,

14  they're called now, or the regional directors.

15       Q.    You used the term operators.  What does that

16  mean?

17       A.    It's a designation in Walmart of those folks

18  that are responsible for implementing the execution of

19  the strategies of -- within the stores.

20       Q.    Does it include store level employees?

21       A.    No.

22       Q.    So someone like a market health and wellness

23  director would be considered an operator?

24       A.    Yes.

25       Q.    And a regional health and wellness director
```

1  would be considered an operator?

2       A.   Yes.

3       Q.   But not a pharmacy manager?

4       A.   That's correct.

5       Q.   Okay.  And when you provide advice, are

6  operators required to follow your advice?

7       A.   No.

8       Q.   And I think you testified earlier that your

9  practice is not to ask about whether -- when discussing

10  whether someone should be held accountable or coached

11  for something, your practice is not to ask whether that

12  person is engaged in any kind of protected activity?

13       A.   That's correct.

14       Q.   And why don't you ask about whether the person

15  is engaged in protected activity?

16       A.   I don't want -- I don't want my decision to

17  be biased in any way.  I want it to be based on the

18  infraction.

19       Q.   So if you don't know that the protected

20  activity has occurred, that protected activity can't

21  influence your decision?

22       A.   That's correct.

23       Q.   And I think you testified that in the course

24  of your job responsibilities that you're familiar with

25  Walmart's personnel policies?

```
 1        A.    Yes.

 2        Q.    And how are those policies made available to

 3   associates at Walmart?

 4        A.    They're electronically on our intranet, which

 5   is called the Wire.  It's also available through what's

 6   called WalmartOne, where they can access it

 7   electronically from a home computer also.

 8        Q.    And I think you testified that in 2012, when

 9   Ms. McPadden received a skip-level coaching, that you

10   were covering approximately a thousand stores; is that

11   right?

12        A.    Yes, uh-huh.

13        Q.    And do all those -- did all of those stores

14   have pharmacies?

15        A.    Yes.  Yes.

16        Q.    And is one of the -- there's been some

17   testimony in this case about a policy called the

18   Coaching for Improvement policy.  You're familiar with

19   that?

20        A.    Yes, I am.

21        Q.    Okay.  I'm showing you what's been marked as

22   Defendant's Exhibit F.  Do you see that?

23        A.    Yes.

24        Q.    And do you recognize that document?

25        A.    Yes.
```

1    Q.    What is it?

2    A.    That is the Coaching for Improvement policy.

3    Q.    And there's a -- there's a date at the top.

4    What's that date?

5    A.    July 19th, 2010.

6    Q.    Okay.  And if you go down on this first page,

7    there's a reference to a verbal coaching and then a

8    written coaching and then something called a

9    decision-making day.

10    A.    Yes.

11    Q.    Were those the steps in the Coaching for

12    Improvement policy at that time?

13    A.    Yes.

14    Q.    And did those change at some point?

15    A.    Yes, they did.

16    Q.    And what did the verbal coaching change to?

17    A.    A first written.

18    Q.    And what did the written coaching change to?

19    A.    A second written.

20    Q.    And what did decision-making get changed to?

21    A.    A third written.

22    Q.    And when those terms were changed at Walmart,

23    did it affect any existing coachings that had been

24    issued?

25    A.    They changed the terminology.

1    Q.   So if someone had received a verbal coaching

2  at Walmart, did that verbal coaching automatically get

3  changed to a first written coaching?

4    A.   Yes.

5    Q.   And did a written coaching automatically get

6  changed to a second written coaching?

7    A.   Yes, that's correct.

8    Q.   And that was for all Walmart associates?

9    A.   Yes.

10    Q.   Now, when an associate at Walmart is coached,

11  is it required that you have a witness attend the

12  coaching?

13    A.   It's recommended, yes.

14    Q.   And who can witness a coaching?

15    A.   Any member of management.

16    Q.   And who can -- when you terminate someone?

17    A.   Uh-huh.

18    Q.   Do you also have to have a witness?

19    A.   It's recommended, yes.

20    Q.   And who is it -- who can attend a termination

21  meeting as a witness?

22    A.   Again, any member of management.

23    Q.   So it doesn't have to be a member of the human

24  resources department to witness a coaching?

25    A.   No.

1    Q.    And it doesn't have to be a member of human

2    resources to witness a termination?

3    A.    No.

4    Q.    I'd like to show you what we've marked as

5    Defendant's Exhibit M.  Do you recognize that document?

6    A.    Yes, I do.

7    Q.    What is it?

8    A.    It's Walmart's Open Door policy.

9    Q.    And the jury's heard a little bit of testimony

10   about the Open Door.  Can you just describe in general

11   terms for the jury what the Open Door is?

12   A.    The Open Door is Walmart's vehicle, I guess,

13   to allow associates to express any concerns or -- or

14   to -- it's not only concerns, it's any ideas or

15   suggestions that they might have for the company.  But

16   it's used many times for situations that they -- they

17   feel that need to be rectified in some way.

18   Q.    And does the Open Door policy apply to health

19   and wellness employees?

20   A.    Yes, it applies to all associates.

21   Q.    Next I'd like to show you what's been marked

22   as Plaintiff's Exhibit 66.  Do you recognize that?

23   A.    Yes, I do.

24   Q.    And what is it?

25   A.    That's Walmart's discrimination and harassment

1   policy.

2       Q.   And that policy applies to all associates at

3   Walmart?

4       A.   Yes, it does.

5       Q.   If a Walmart associate wants to report

6   perceived discrimination or harassment or retaliation,

7   how would they go about doing that?

8       A.   They should bring it to the attention of any

9   member of management.  And if they don't feel

10  comfortable talking to someone in person, they can --

11  there's a 1-800 number that they can call that goes

12  right into Bentonville.

13      Q.   And I'm going to show you the second page of

14  this exhibit.  And you see under Reporting Procedures,

15  there's a reference to a Global Ethics Office?

16      A.   Yes.

17      Q.   Do you see that?  What's that?

18      A.   That's the division that would investigate any

19  ethics complaints, any concerns that -- that anybody has

20  that would call the ethics hotline to report.

21      Q.   And there's a 1-800 hundred number here?

22      A.   Yes.

23      Q.   Is that the number for the ethics hotline?

24      A.   Yes, it is.

25      Q.   And aside from this policy, how else are

1 associates made aware of the existence of the ethics

2 hotline?

3      A.    There should be a poster in every store

4 that's -- I guess it's been hung in different places,

5 but by the time clock or the break room, sometimes in

6 the training room -- where associates have visibility to

7 it.

8      Q.    In the course of your job duties, do you

9 sometimes receive reports from other departments within

10 Walmart?

11      A.    Yes.

12      Q.    Do you sometimes -- there's been discussion in

13 this case about HRSS.  Do you know what that stands for?

14      A.    Health -- Human Resource Shared Services.

15      Q.    And what do they do?

16      A.    They do a number of things.  For health and

17 wellness, they do -- review and approve all leaves of

18 absences for our pharmacists and vision center managers;

19 they take different complaints, wage and hour

20 complaints, any -- any concerns along that line, too.

21      Q.    Does HRSS ever send you information regarding

22 employees who are coming back from a leave of absence?

23      A.    I do not -- they send -- they send information

24 to the market -- well, to the market director, to the

25 immediate supervisor, gets a -- an e-mail.  I sometimes

1    see them, but not -- not -- not on a routine basis.

2       Q.    So if you had seen one of those report --

3    you've seen at least some of those reports --

4       A.    Yes --

5       Q.    -- at times?

6       A.    -- yes.

7       Q.    And do those reports -- what's in those

8    reports?

9       A.    What's in the report?

10      Q.    Yes.

11      A.    It's -- it's a record of when they received a

12   request for a leave of absence, when they approved it,

13   the dates that it's approved for, whether it's a paid

14   leave or an unpaid leave, how that leave is classified,

15   et cetera.

16      Q.    And do you remember being asked some questions

17   earlier by Attorney Irwin about whether you were aware

18   that Ms. McPadden had, in fact, taken a leave of

19   absence?  Do you recall those questions?

20      A.    Yes.

21      Q.    Now, if you had received a -- one of those

22   reports during the time period when Ms. McPadden was on

23   leave, would it have identified Ms. McPadden by name?

24      A.    Yes, it would.

25      Q.    And if you had read that, would that have made

1   you aware that, in fact, she had taken a leave of

2   absence?

3        A.   Yes.

4        Q.   As you sit here today, do you actually have a

5   memory of having reviewed such a report?

6        A.   No, I don't.

7        Q.   Is it possible that you did?

8        A.   I -- you know, right now I have about 3,000

9   management associates I'm responsible for, so I don't

10  get into the details of those unless there's an issue

11  with one.

12       Q.   But you don't recall there being any kind

13  of issue with Maureen McPadden's leave of absence?

14       A.   No, I do not.

15       Q.   I'd like to show you what was marked as

16  Plaintiff's Exhibit 67.

17            Plaintiff's Exhibit 67, those are pages from a

18  notebook, correct?

19       A.   Yes, that's correct.

20       Q.   And that's in one of your notebooks?

21       A.   Yes.

22       Q.   Okay.  And on the second page of Exhibit 67,

23  there's that two-line reference to the conference call

24  that we talked about -- that you talked about with

25  Attorney Irwin.  Are these your only notes regarding

1    that conference call?

2         A.    Yes.

3         Q.    And prior to that conference call where you

4    talked about Ms. McPadden, had you ever heard of a

5    pharmacist at Walmart losing their pharmacy key?

6         A.    No.

7         Q.    And you have no memory of Joseph Certo being

8    on that phone call, correct?

9         A.    I do not.

10         Q.    You were also asked a few questions about

11    Andy Tau, so I'd like to show you what we've marked as

12    Plaintiff's Exhibit 82.

13              So as you testified earlier, Plaintiff's 82 is

14    comprised of two e-mails, correct?

15         A.    Yes.

16         Q.    And the bottom e-mail is from Lurene Riel and

17    it's to you and to Pamela DeChellis.

18         A.    Yes.

19         Q.    Do you know Ms. DeChellis?

20         A.    Yes, I do.

21         Q.    And in -- and she's a Walmart associate?

22         A.    Yes.

23         Q.    In December of 2013, what was Ms. DeChellis's

24    role?

25         A.    She was covering for Heather McCaffrey while

1   Heather was on maternity leave.

2       Q.   Now, you testified earlier that at some point

3   after this e-mail exchange you had a telephone call with

4   Ms. Riel.  Do you remember that?

5       A.   Yes.

6       Q.   And is it your memory that at the time you had

7   that phone call with Ms. Riel that she had already

8   issued the coaching to Mr. Tau?

9       A.   That's my memory, yes.

10      Q.   And you have no reason to believe that

11  Joseph Certo was involved in the decision to coach

12  Mr. Tau, do you?

13      A.   No.

14          MR. KACZMAREK:  Thank you very much.

15          THE COURT:  Any redirect?

16          MS. IRWIN:  Yes, thank you, your Honor.

17                      REDIRECT EXAMINATION

18  BY MS. IRWIN:

19      Q.   Ms. Kulwicki, Attorney Kaczmarek was talking

20  to you about your memory of whether Ms. McPadden --

21  whether you knew Ms. McPadden had been on a leave of

22  absence before.  You were the one who put that knowledge

23  into a sworn statement in this case and that's why I was

24  asking you about it.

25          So even though you -- you made a sworn

1  statement that you were aware of it, now you're not sure
2  if that's actually the case, right?
3      A.   No.
4      Q.   Okay.  And you've testified that you -- you
5  don't believe you had been made aware of anyone -- any
6  pharmacist losing a key before Maureen McPadden, right?
7      A.   That's correct.
8      Q.   But even a year later, in 2013, you didn't
9  remember that Maureen McPadden had lost her key when you
10 were first faced with the issue for Mr. Tau, right?
11     A.   That's correct.
12     Q.   So you really wouldn't know what the issue is
13 unless you looked it up because you don't have a very
14 good memory because you handle so many employees?
15     A.   Is that a question?  I'm sorry.
16     Q.   Yes.
17     A.   And what was the question?
18     Q.   Even -- even a year after Ms. McPadden, you
19 didn't remember that there had been a pharmacist who'd
20 lost her key and properly reported it, right?
21     A.   That's correct.
22     Q.   Okay.  And even though Walmart has a lot of
23 policies that talk about prohibiting discrimination
24 and other things, you can't make the operators of --
25 operators obey the law all the time despite these

1    policies, and you -- that's your understanding, right?

2             MR. KACZMAREK:  Objection.

3             THE COURT:  Well, sustained, relevance.

4        Q.   Despite all of Walmart's policies, it has been

5    your experience that the operators do not always follow

6    the law out there in the field?

7             MR. KACZMAREK:  Objection.

8             THE COURT:  Overruled.  Yes, that goes without

9    saying in any practice, correct.

10       Q.   You can answer.

11       A.   Okay.  So I can't -- I can't guarantee that

12   everything is done perfectly by the 1.2 million people

13   that are employed by Walmart.

14       Q.   Sure.  Just one moment, please.

15            Ms. Kulwicki, I believe you testified

16   that you recall being involved in the coaching with

17   Ms. McCaffrey, but you didn't recall Mr. Certo being

18   on the call?

19       A.   That's correct.

20       Q.   And before the break you were telling me

21   that you weren't actually a decision-maker; you just

22   give advice.  And, in this case, you gave advice to

23   Ms. McCaffrey, who made the decision, right?

24       A.   Yes.

25       Q.   I'd just like to draw your attention to

Exhibit 11, which are the interrogatories -- the court
interrogatories in this case.  And I'll just represent
to you, I think the jury knows this at this point, but
these are written questions that Walmart is asked to
answer under oath.  And if we look at interrogatory
number 1, it asks who contributed -- consulted or
contributed to providing these answers and then if we go
down --

MR. KACZMAREK:  Objection, your Honor.

THE COURT:  What's the -- are you using it to
impeach --

MS. IRWIN:  I'm just doing this as a --

THE COURT:  -- refresh her memory, what?

MS. IRWIN:  Yes.

THE COURT:  Which?

MS. IRWIN:  Well, the first thing is she was
involved in these interrogatories, and the second thing
is I'm impeaching her for not being -- saying she was
not a decision-maker --

THE COURT:  Show her the document, ask her if
she recognizes it --

MS. IRWIN:  Yes.

THE COURT:  -- ask if it refreshes her
recollection.  She'll give you an answer and we'll go
from there.

1          MS. IRWIN:  Your Honor, I believe --

2          THE COURT:  You can't just read it to her.

3          MS. IRWIN:  Sure.  Okay.  So first I just

4     wanted to establish what this document is and that she

5     was involved in answering that.

6          So shall I show it?

7          THE COURT:  That's the customary way of doing

8     it, showing it first to the witness --

9          MS. IRWIN:  Sure.

10          THE COURT:  -- and asking if they recognize

11     what it is.

12          MS. IRWIN:  Let me just get one more copy so I

13     can give her the whole packet.

14     Q.   Ms. Kulwicki, could you please turn to

15     interrogatory number 14.  It's on -- starting on page 14

16     and going to page 15.

17     A.   Okay.

18     Q.   Are you there?

19     A.   Yes.

20     Q.   Okay.  In reading interrogatory 14, both the

21     question and the answer -- and let me just give you a

22     moment to do that.  And tell me when you're done.

23     A.   Okay.

24     Q.   Okay.  So my first question --

25          Your Honor, this is a full exhibit in the

1    case.

2              THE COURT:  Okay.

3              MS. IRWIN:  So am I allowed to put it on the

4    ELMO?

5              THE COURT:  Certainly.

6              MS. IRWIN:  Okay.  Thank you, your Honor.

7        Q.    Okay.  So first looking at the question,

8    Ms. Kulwicki, you'll agree that the question was to --

9    asking who made the decision to coach the plaintiff two

10   levels for not being able to account for the pharmacy

11   key.  Do you see that?

12       A.    Yes.

13       Q.    Okay.  And then looking at the answer -- I'll

14   just ask you, does it refresh your memory or otherwise

15   change your testimony when you see that Walmart has

16   listed that it was you and Heather McCaffrey who

17   determined that based on the defendant's policies and

18   application thereof, the plaintiff's loss of the

19   pharmacy key merited a two-level coaching and then at

20   the end it says, Ms. Kulwicki and Ms. McCaffrey's

21   decision was communicated to Mr. Certo for purposes of

22   implementation.

23              Do you -- do you agree with Walmart's

24   statement under oath?

25              MR. KACZMAREK:  Objection.  She can first ask

 1   whether it refreshes her recollection and then --

 2          MS. IRWIN:  Okay.  I'll break it up.

 3   Certainly, your Honor.

 4          THE COURT:  It's okay.  Overruled.  You can

 5   answer.

 6          MS. IRWIN:  Okay.

 7      A.   I don't see what the inconsistency is because

 8   Heather and I did confirm -- confer.  We had a

 9   discussion.  I made the decision to advise her that a

10   skip level was appropriate or I would support a skip

11   level, and she agreed.

12      Q.   Okay.  And you understand there's nothing in

13   that answer that talks about advising and accepting or

14   anything like that, right?  There's nothing in that

15   answer that says that?

16      A.   No, it does not.

17          MS. IRWIN:  All right.  Thank you.

18          THE COURT:  Any more based on that?

19          MR. KACZMAREK:  Nothing further.

20          THE COURT:  Thank you, Ms. Kulwicki.  You may

21   step down.  You're excused as a witness.

22          THE WITNESS:  Thank you.

23                  (Witness excused.)

24          THE COURT:  You may call your next witness.

25          MR. FRADETTE:  Thank you, your Honor.

1        I'd call Dr. Craig Moore, your Honor.

2        **CRAIG MOORE**, having been first duly sworn,

3   testified as follows:

4        THE CLERK:  Thank you.  Please be seated.

5        For the record, please state your name and

6   spell your last name.

7        THE WITNESS:  My name is Craig Lawson Moore,

8   M-o-o-r-e.

9        THE COURT:  Good afternoon.

10       THE WITNESS:  Good afternoon, your Honor.

11                  DIRECT EXAMINATION

12  BY MR. FRADETTE:

13     Q.   Dr. Moore, I'd like to ask you a few

14  questions.

15       First, you've been retained by the plaintiff

16  to do an economic analysis of her damages; is that

17  correct?

18     A.   That's correct.

19     Q.   Could you please just identify -- state for

20  the jury exactly where you reside.

21     A.   In Southwick, Massachusetts.

22     Q.   And what is your educational background?

23     A.   I have a Ph.D. in economics from Syracuse

24  University and a Ph.D. in statistics as well, master's

25  degree in economics from Syracuse, and a Bachelor of

1    Science degree in economics from West Virginia

2    University.

3            MR. FRADETTE:  Okay.  And, your Honor, by

4    agreement between counsel, the ID may be stricken from

5    69, 70, 71, 72, and 73.

6            MR. KACZMAREK:  (Nods head.)

7            THE COURT:  ID may be stricken on 69, 70, 71,

8    72 and 73.

9            (Plaintiff's Exhibits 69-73 were

10           admitted.)

11           MR. FRADETTE:  Thank you, your Honor.

12       Q.   Dr. Moore, what's been marked as Plaintiff's

13   Exhibit 70, which is an Appendix A to your report, is

14   that your curriculum vitae?

15       A.   It is.

16       Q.   And could you briefly -- you identified your

17   degrees.  Just briefly introduce us to what you studied

18   in your resume.  I'm sorry, not in your resume, but what

19   you studied to get your degrees.

20       A.   Well, I studied economics and business at

21   West Virginia University as an undergraduate and then

22   got a scholarship to Syracuse University, where I spent

23   the next six years studying both economics and

24   statistics and taught as a teaching assistant and

25   worked as a research assistant.

1       Upon completing my doctoral work, I was

2   automatically given a master's degree because it's

3   subsequent theory, and then I joined the faculty at the

4   University of Massachusetts in Amherst in the fall of

5   1972.

6       Q.   So have you lectured abroad?

7       A.   Yes.  I've lectured and lived abroad at a

8   number of universities in Sweden, Ireland, England,

9   Holland, Poland, Russia.  A number of places, yes.

10      Q.   And I should have asked this, but how long --

11  when did you get your degree and how long have you been

12  doing this?

13      A.   I received my Ph.D. in 1972 and I worked at

14  the university until the end of December 2003 when I

15  took early retirement.  And during those 30-plus years,

16  lectured and taught, had administrative duties.  I was

17  chairman of the finance department for 12 years.  I ran

18  the MBA program and designed it.  I established the

19  operations management program at the school.

20          I worked for two different presidents as

21  special assistant to them, both David Knapp and

22  William Bulger, for a number of years.  I was senior

23  policy advisor to them and to the board of trustees.

24      Q.   And have you published scholarly articles on

25  the subject of economics and statistics?

1    A.    Yes.

2    Q.    And does this CV reflect --

3    A.    Yes.

4    Q.    -- those various publications?

5    A.    Yes, it does.

6    Q.    We won't go through them all, but the jury

7  will have these available.

8          And in your publications, do the -- did it

9  include economic analysis of damages for plaintiffs in

10  employment cases such as this?

11    A.    In one journal article I do and most of

12  the other things where I've addressed that it's been

13  material published by Massachusetts continuing education

14  for lawyers, continuing legal education.

15    Q.    And have you won any awards?

16    A.    I've won a number of awards over the years

17  for -- the chancellor's award for university

18  advancement; faculty service award for the school

19  management.  I won professor of the year given to me

20  by the Massachusetts Telecommunications Council, and in

21  1997, I was made a chaired professor by the board of

22  trustees, which is the highest level of honor you can

23  get within the university.

24    Q.    Okay.  And when did you first begin testifying

25  as an expert?

1       A.    Around 1973.

2       Q.    Can you just give us an example of the

3    different courts that you've testified in as an expert

4    in cases like this?

5       A.    I've testified in most of the federal and

6    state courts in the Northeast, New England, and around

7    various parts of the country as well, even in Australia.

8       Q.    Okay.  And what types of cases are you

9    retained to testify in?

10       A.    Most of the cases I testify in have to do with

11    economic damages arising from personal injury, wrongful

12    death, employment discrimination, or business disputes.

13       Q.    Do you have a sense for how many times you've

14    testified in a court?

15       A.    A large number.  It's been 43 years.  It's

16    been well over a hundred times.  I lost count a long

17    time ago.

18       Q.    Sure.  Do you do other types of consulting and

19    what does that involve?

20       A.    I do economic research and I do management

21    consulting.  In the last eight years, I've been focused

22    mostly on working with various states around the country

23    on the crisis with the shortage of nurses and nursing

24    workforce.  As a matter of fact, this Friday I'll be up

25    in Maine signing a contract to do a large study for nine

 1    months for the State of Maine on building a big model of

 2    the nursing workforce.

 3         Q.    Okay.  Do you also give presentations

 4    regarding economic damages?

 5         A.    Yes, I -- sure.

 6         Q.    Do you advertise for your services as an

 7    expert?

 8         A.    No, I don't.

 9         Q.    Do you do cases for both plaintiffs and

10    defendants?

11         A.    Yes.

12         Q.    Do you use the same methodology in terms of

13    analyzing the facts for -- the economic facts for both

14    of the plaintiff and the defendant?

15         A.    Yes.

16         Q.    How much time is involved in working for

17    clients involved in litigation?

18         A.    About -- it's varied.  As my career has

19    varied, my responsibilities have varied.  Both at

20    the university and following my retirement at the

21    university, I also was in charge of running Marox

22    Corporation for four years.  During that period of time

23    when I was running the company, I did less.  Since I

24    stepped away from that, I've done more.  Currently,

25    probably 60 percent of my time is involved in

1   litigation.

2       Q.   And it's fair for us to conclude you're being

3   paid for your services here today?

4       A.   I certainly hope so.

5            MR. FRADETTE:

6       Q.   I'd like to have the witness recognized as an

7   expert, your Honor, economic expert.

8            THE COURT:  Any objection?

9            MR. KACZMAREK:  No objection, your Honor.

10           THE COURT:  All right.  Witness may give

11  opinion testimony.

12           MR. FRADETTE:  Thank you.

13      Q.   When did you first become involved in the

14  McPadden matter, approximately?

15      A.   Oh, it was last spring, I think.

16      Q.   Do you recall what you were asked to do?

17      A.   I was asked to take a look at what the

18  economic damages were arising from her termination at

19  Walmart in November of 2012.

20      Q.   And do you recall what documents you relied

21  upon in doing your economic analysis?

22      A.   I reviewed a lot of documents, but the ones

23  that I relied upon were the Charge of Discrimination

24  that she filed on April 18th, 2013; her tax returns for

25  the years 2009 through 2013; W-2 statements from CVS,

CVS CareMark, for her for 2014; W-2 from her employers
for 2013; CVS human resources report dated August 26th,
2015; CVS payroll records of weekly hours and earning
for 2015; statements of earnings from CVS for the period
ending September 12th, 2015; pay stubs from CVS for the
reported period ending December 19th, 2015; records of
the plaintiff's 401(k) account at Walmart and CVS;
information from you, from the plaintiff's counsel,
regarding the claims in the case, background, and
information from public sources that are published,
such as interest rates and other kinds of economic data.

Q.   And did you actually -- do you recall actually
having a telephone interview with Maureen?

A.   Yes, I -- I did interview Ms. McPadden by
telephone.  I didn't meet her in person, but had
conversations with you involved on them, too.

Q.   And did you get a sense for how long she had
intended to work at Walmart had she not been terminated?

A.   My -- from what she told me, she had intention
to work until retirement, as long as she could.

Q.   Did you make that assumption in your economic
analysis?

A.   Not exactly.  What I assumed was that she had
the opportunity to work until age 67, which is what more
and more people are doing because that's when social

1   security is maximized and when other financial factors

2   influence people's retirement decision.

3       Q.   And before I ask you details about the

4   analysis, I'd like you to define some concepts for the

5   jury.  And you just mentioned one, opportunity cost.

6       A.   Opportunity cost is a concept in the

7   discipline of economics that has to do with what

8   something is worth to you in the future.  If you lose an

9   opportunity, if it's taken away from you, the question

10  is what is it valued at.

11          We value opportunities all the time.  In the

12  stock market, if you go out -- you pay a premium to buy

13  stocks on options in the future.  You pay a premium on

14  it to have that opportunity.  You may give someone a

15  premium on a piece of land to keep the option open to

16  buy it for the next two years if you're a real estate

17  developer.  There are lots of things in life where we

18  value opportunities.  In economic damages, that -- the

19  value of the opportunity that's lost is the value of the

20  damages.

21      Q.   Okay.  And earnings capacity?

22      A.   Earnings capacity is the measure of that

23  opportunity cost where someone loses employment.  So if

24  I want to know what someone's lost opportunity cost is,

25  I want to know what they could have worked, what their

capacity was; not necessarily what would have happened, but what they had the opportunity to do.  In other words, if they took full advantage of that opportunity, what was their capacity to earn.  And if they garnered all of it, what would that have given them, what would have been the fruits of that opportunity that was taken away.

Q.  And the concept of present value?

A.  Present value has to do with the time value of money.  Let me explain that by giving you an example.

Suppose I had a new granddaughter born today and I wanted to put aside $20,000 for her first year in college 18 years from now.  I wouldn't have to put $20,000 in the bank today.  I'd only have to put an amount in the bank today or invest that amount of money plus the earnings on it, the interest on it, the returns on it, would equal $20,000 18 years from now.  The amount I'd have to put in the bank or invest is the present value of that $20,000 in the future, which is called the future value.

Q.  Okay.  And you prepared what's been marked as Plaintiff's Number 69.  You prepared an economic report in this matter, right?

A.  That's correct.

Q.  And, actually, this is updated through today,

1  which includes Maureen's 2015 earnings, right?

2      A.   That's correct.

3      Q.   All right.  And the jury will have this full

4  report.  And did you prepare some tables to help explain

5  the computation used in analyzing economic damages in

6  this case?

7      A.   Yes.

8      Q.   Would you please explain each of the numbers

9  in the tables?  And perhaps it's best here to begin with

10 the first table, Exhibit 71, Table of Earnings.  And if

11 that's --

12     A.   Table 1 is simply a summary of Ms. McPadden's

13 earnings from 2009 through 2015, both at Walmart and

14 then during a temporary job that she had in 2013 and at

15 CVS then in 2014 and '15 working for CVS.

16          You'll notice that in 2012, the number has an

17 EST after it.  That's an estimate.  It's based on what

18 her W-2 was during 2012 for the first 11 months.  She

19 was terminated in November.  So for that -- what she

20 could have earned during that or would have been

21 expected to earn for the 12 months, I took a look at

22 what her average increase had been between 2009 and '10,

23 2010 and '11, and took that average increase and added

24 it to 2011 to estimate what one would reasonably expect

25 2012 to be for all 12 months, rather than just the 11.

1  And that's the $132,988 that's listed there.

2    Q.   Okay.  And in these computations, did you

3  consider any unemployment benefits that she may have

4  received?

5    A.   No.

6    Q.   And why not?

7    A.   Because there's a lien placed against those

8  and she'll have to pay those back.  She will not receive

9  that money.

10    Q.   Okay.  Do you have an opinion to a reasonable

11  degree of economic certainty as to the present value of

12  Maureen's economic damages in this case?

13    A.   Yes.

14    Q.   And, just tell me, is that Table 2?

15    A.   Well, I think it might be helpful to break it

16  up in two parts.

17    Q.   Okay.  Go ahead, please.  I'll just follow

18  your lead.

19    A.   Why don't we go through Table 2 and then

20  Table 3.

21    Q.   Okay.

22    A.   Table 2 depicts what's called back pay, which

23  means how much she's lost from the time she was

24  terminated until now.  Actually, until December 19th,

25  2015.  That's the latest date I have numbers for.

1          And it shows what her prior earnings would

2    have been expected to be based on that estimate that I

3    did for 2012.  You'll notice I have not increased that

4    number.  I've not given her a raise for cost-of-living

5    or merit or promotion or anything.  I've left it flat,

6    which is the most conservative thing you can do in this

7    sort of analysis.

8          I've then compared that with the actual

9    earnings that she made during those years, which are

10   from Table 1, and simply subtracted the two to show how

11   much she's lost in terms of that opportunity from the

12   time she was terminated until December 19th, 2015.  And

13   that equals $164,093.  So that's part one of her

14   damages, the past.

15       Q.   I've learned that you can actually -- and you

16   can do this, too, by the way -- you can touch the

17   screen.  And that 164 would be back pay?

18       A.   Back pay, which it says right up there.

19       Q.   Oh, there you go.  Thank you.  That's much

20   better.

21          And then Table 3?

22       A.   Yes.

23       Q.   Table 3, which is marked as Plaintiff's

24   Exhibit 73 -- and this one, I guess, is marked Lost

25   Future Earning Capacity.

1    A.    Here we're dealing with damages going forward.

2  Ms. McPadden is not earning as much money now as she did

3  when she worked at Walmart.  There's a gap.  The

4  question is how big is that gap, how long will it last,

5  and what's the consequences of it in terms of the

6  opportunity she has lost by being terminated.

7          The chart starts in 2016, which is January 1st

8  of -- coming up, in this year.  Her age and what she

9  would have earned at Walmart.  Again you'll notice I

10  have not increased that by the cost of living, which is

11  important going forward.  And I'll explain why in a

12  minute.

13          Then what her expected pay will be going

14  forward at CVS in her current employment situation and

15  then subtracting the two, which is $36,197 a year less

16  at CVS than she was making at Walmart.

17          If we look at that in each year going forward

18  all the way to age 67, you can see that in the last

19  column.  That cumulative loss keeps adding up.  So that

20  by the time she gets to her 67th birthday -- and that's

21  when that last row ends; you'll notice the number's

22  smaller.  It's because it does it at the end of the year

23  and it's on her birthday.  She retires at age 67, when

24  she turns 67.  The total possible potential loss for her

25  over those years in the future is $558,392.87.

1          You'll also notice there's a column to the

2    left of that that says Present Value.  That's not the

3    future amount she'll actually lose.  It's the amount in

4    each year that would have to be invested to make monthly

5    payments to make up that net loss.  The way we do that

6    is we use what's called a discount rate.  And the

7    discount rate that I use is called a Treasury Inflation

8    Protected Security, TIPS.  You can buy these yourself

9    through the market if you want.  The way they work is

10   this way.

11         The United States Government would sell you a

12   bond.  That would give you a particular stated yield on

13   it, which really is determined in an auction in the

14   marketplace by investors.  They offer you that security,

15   and it's for different time horizons -- for five years,

16   seven years, ten years, 20 years, 30 years.  At the end

17   of that time horizon, they'll pay you the interest that

18   they said they would, but on top of that, they'll also

19   reimburse you for any inflation that took place.  It

20   protects you 100 percent against future inflation.

21         So you'll notice in Table 3, I hadn't

22   increased any of Ms. McPadden's future earnings by the

23   cost of living, which is inflation, and that's because

24   I've discounted them with a guaranteed rate that offsets

25   it.  So it's a wash.  We don't have to speculate about

 1    what inflation might be in the future, how fast her

 2    income could have grown or would have grown.  We keep it

 3    all in present -- present value, the dollar today, and

 4    the United States Government guarantees that that will

 5    be the value when it comes due.

 6        Q.   The methodology that you've just described and

 7    that you used in analyzing Maureen's economic damages,

 8    is that a usual and customary methodology in the

 9    discipline of economics?

10        A.   It is for people who are economists trained in

11    finance, yes.

12        Q.   All right.

13        A.   And it's the highest -- it's kind of the gold

14    standard.

15        Q.   I see.  And it's accepted by your peers and is

16    relied upon in your discipline?

17        A.   Oh, yes.  I've testified to it many times in

18    court.

19             MR. FRADETTE:  May I, your Honor, just a

20    moment?

21             THE COURT:  Certainly.

22        Q.   The -- you've captioned that Lost Future

23    Earnings Capacity.  Is that also referred to as front

24    pay?

25        A.   Yes, it is.

1    Q.    All right.  So the back pay was from the date

2    of termination to essentially the end of 2015?

3    A.    Yes.

4    Q.    And front pay is from 2016 to the date of

5    retirement?

6    A.    Yes.  And so the total damages are the sum of

7    those two numbers.

8         MR. FRADETTE:  Okay.  Thank you, your Honor.

9         THE COURT:  All right.  Mr. Kaczmarek?

10        MR. KACZMAREK:  Thank you, your Honor.

11                    CROSS-EXAMINATION

12   BY MR. KACZMAREK:

13   Q.    Good afternoon, Mr. Moore.  How are you?

14   A.    Good afternoon.

15   Q.    I'd like to ask you a few questions about

16   Appendix -- excuse me -- Table 3, which I'm going to put

17   on the ELMO.

18   A.    Sure.

19   Q.    Table 3 to your report assumes that

20   Ms. McPadden will or intends to retire when she hits

21   age 67, correct?

22   A.    She has the opportunity to work until age 67,

23   not that she'll definitely retire then.

24   Q.    Well, your calculations run through the moment

25   when she turns 67?

1        A.    Correct.

2        Q.    And you chose that date because that's when

3   social security kicks in?

4        A.    That and other reasons.  There -- most of the

5   studies about people retiring today, given the financial

6   situation we're all in, people are working longer,

7   retiring later, and it's a question of opportunity.

8   It's opportunity cost.  It's not what she necessarily --

9   she might decide to retire earlier or later.  I mean,

10  I'm an old guy, in my 70s, and I'm still working, so ...

11       Q.    Did you ever specifically ask Ms. McPadden

12  when she intends to retire?

13       A.    To the best of my recollection when we were

14  talking, she said she had no definite plan to retire but

15  would continue to work.

16       Q.    It's something she hadn't decided yet?

17       A.    Pretty much, yeah.

18       Q.    You mention in your report that -- on page 1

19  of your report that Ms. McPadden left Walmart for a

20  period of time to work at another pharmacy.

21       A.    Yes, she did.

22       Q.    And --

23       A.    That's my understanding.

24       Q.    Sure.  And that's -- all you know is based on

25  the information that you received from Ms. McPadden and

1  her attorney?

2      A.    That's correct.

3      Q.    And it's possible that she could leave CVS at

4  some point in the future; she could get another job?

5      A.    Yes.

6      Q.    And you based your calculations in Table 3

7  under the Walmart column, that's essentially the

8  earnings that she was receiving when she last left

9  Walmart, correct?

10     A.    That's correct.

11     Q.    And you certainly did not -- as you testified,

12 you certainly did not build in any cost-of-living

13 adjustments, correct?

14     A.    No.

15     Q.    And on the CVS column, that's based on her

16 current -- most recent earnings at CVS?

17     A.    Her most recent earnings at CVS.

18     Q.    And in an attempt to sort of compare apples to

19 apples, if you will, you did not build in any increases

20 for cost of living in your CVS column?

21     A.    That's correct.  I treated them both equally.

22     Q.    I understand.  And it's certainly possible

23 that Ms. McPadden could get a promotion at CVS?

24     A.    It is.  The -- the key ingredient here,

25 though, is that by having to leave Walmart and go to

1  work for CVS, she lost seniority, she lost advantages

2  she would have had.  And to make those up, it's unclear

3  how.  And if she left CVS to take a job with another

4  pharmacy, she would be at a disadvantage entering again.

5  So there is this gap that one would reasonably expect to

6  exist for some period of time.

7      Q.   Do you understand that Ms. McPadden is

8  currently working as a floater pharmacist at CVS?

9      A.   Yes.

10     Q.   Do you know whether she's ever applied for a

11 position as a staff pharmacist at CVS?

12     A.   I believe that she has, and she's hopeful that

13 she will be assigned to some kind of a store.

14     Q.   And do you have an understanding as to whether

15 if she becomes a staff pharmacist, she would actually

16 earn more than she currently earns as a floater

17 pharmacist?

18     A.   That's not my understanding.

19     Q.   You think she would be paid the same?

20     A.   About the same.

21     Q.   Do you think she would have more assigned

22 hours to her as a float -- as a staff pharmacist than a

23 floater pharmacist?

24     A.   Yes.

25     Q.   And if she's being paid at the same rate, but

1   was making more -- working more hours, she might earn

2   more?

3       A.   She might.

4       Q.   Do you know how CVS sets its salaries for

5   staff pharmacists or floater pharmacists?

6       A.   In my experience it varies, depending on where

7   they are and what part of the operation.

8       Q.   Do you have any specific experience with how

9   CVS sets the compensation for staff or floater

10   pharmacists in New Hampshire?

11       A.   Not in New Hampshire, but I've been involved

12   in other CV -- cases where CVS has been involved in

13   those states.

14       Q.   And did you represent CVS in those cases?

15       A.   No.

16       Q.   Did you have access to data regarding how CVS

17   sets compensation for its staff pharmacists?

18       A.   I had salary schedules of -- of staff

19   pharmacists and regional managers in various positions

20   within CVS, how they were set.

21       Q.   Based on that information, do you know whether

22   if Ms. McPadden became a staff pharmacist she would be

23   eligible for any sort of incentive compensation?

24       A.   I'm sorry?

25       Q.   If Ms. McPadden became a staff pharmacist

1    at CVS, would she be eligible to receive any form of

2    incentive compensation above and beyond her regular

3    wages?

4         A.   She may.

5         Q.   You're not sure?

6         A.   She might.

7              MR. KACZMAREK:  Nothing further.  Thank you

8    very much, Mr. Moore.

9              THE WITNESS:  Thank you.

10             THE COURT:  Any redirect?

11             MR. FRADETTE:  Just a couple questions, your

12   Honor.

13                    REDIRECT EXAMINATION

14   BY MR. FRADETTE:

15        Q.   You mentioned that she had seniority at

16   Walmart, some 13 years' seniority at Walmart.  That has

17   value?

18        A.   That's very valuable, sure.

19        Q.   And you also mentioned that if she were to

20   leave -- well, she had to leave Walmart, so she lost

21   that 13 years' seniority?

22        A.   Yes.

23        Q.   And if she has to start again, if she should

24   lose CVS, she'd again be starting over?

25        A.   Yes.

1    Q.   You were asked questions about her most recent

2 earnings at CVS, and I wanted just to -- this was

3 educational to me and I wanted to see if you could point

4 this out.

5         In 2014, she earned 96,791, right?

6    A.   Correct.

7    Q.   At CVS, right?

8    A.   Uh-huh.

9    Q.   And then in 2015, she earned 93,174, right?

10    A.   That's correct.  She earned less money in 2015

11 than in 2014.

12    Q.   But they nevertheless -- and Maureen testified

13 that she is given hours based on what is available --

14    A.   Exactly.

15    Q.   -- notwithstanding this difference, in your

16 economic analysis, you actually used --

17    A.   I used the highest -- the higher number.

18    Q.   So you used the higher income that Maureen

19 earned.  And what does that do to the damages?

20    A.   Well, it makes them lower.  They're not quite

21 as high.

22    Q.   So you -- so you gave the -- you made the

23 assumption that -- I'm going to strike that.  Let me

24 begin again.

25         Had you used the lower number, $93,000, as the

1  CVS earnings, there'd be approximately $3,000 more per

2  year that would be added to the damages?

3     A.    Over those 15 years, yeah.

4     Q.    So you took the most conservative approach in

5  estimating her damages?

6     A.    Yes.  And there's a reason for that.

7     Q.    Okay.

8     A.    The -- it goes back to our definition of

9  earnings capacity.  She demonstrated that she had the

10  capacity to earn that much.  And rather than take a low

11  ball figure based on the most recent year, I took a

12  figure that showed what her capacity was to earn, which

13  is the -- the appropriate thing to do.

14     Q.    And Mr. Kaczmarek also asked you about

15  incentive compensation.  Maureen received bonuses at

16  Walmart?

17     A.    Yes.

18     Q.    She also received stock options or benefits,

19  correct?

20     A.    She had opportunity to get -- to buy stock.

21     Q.    And that -- those benefits inure to the

22  employee based on seniority or do you know?

23     A.    I don't know precisely.

24     Q.    Okay.

25     A.    I assume the longer you're there, the more

1  options you have for benefits.

2      Q.   All right.  So --

3      A.   That's typical.  I don't know specifically for

4  Walmart.

5      Q.   And, similarly, with respect to what you were

6  testifying to about income, it -- it's beneficial -- the

7  more years you have invested in a company that your

8  compensation package and benefits would be better?

9      A.   Typically.

10      MR. FRADETTE:  Nothing further.  I'm sorry.

11      THE COURT:  Anything else, Mr. Kaczmarek?

12      MR. KACZMAREK:  Yes, your Honor, very briefly.

13                RECROSS-EXAMINATION

14  BY MR. KACZMAREK:

15      Q.   Mr. Moore, looking again at Plaintiff's 73,

16  again, this is based on the expectation or understanding

17  that Ms. McPadden would continue to work for Walmart

18  through the time that she reaches the age of 67.  And

19  it's certainly possible that if she was working for

20  Walmart that the store that she was working at could

21  close and she could lose her job, correct?

22      A.   Yes, but that has nothing to do with the

23  analysis.

24      Q.   Correct.  That's not -- it was not a factor in

25  your analysis.

1      A.    No, because we use opportunity cost, not

2  expectation of, you know -- in this kind of analysis

3  where you're trying to determine the value of the

4  opportunity, you do not discount it.  Things like

5  illness, early death, unemployment, that's not part of

6  the methodology.

7      Q.    It's not part of the methodology --

8      A.    No.

9      Q.    -- because those are things you can't predict.

10     A.    Not only you can't predict it, it doesn't give

11 you an accurate value for the opportunity.

12     Q.    Because you just never know if the store might

13 close or if she might get a job somewhere else?

14     A.    Doesn't matter if it does.  It's a question of

15 what the opportunity were.

16     Q.    But those are certainly things that could

17 happen?

18     A.    Sure, those things could.  She could also buy

19 a lottery ticket and win a million dollars.  You don't

20 know what's going to happen.

21          MR. KACZMAREK:  Sure.

22          Thank you.

23          THE WITNESS:  You're welcome.

24          MR. FRADETTE:  Nothing further, Your Honor.

25          THE COURT:  Thank you, Dr. Moore.  You may

1  step down.  You're excused as a witness.

2          THE WITNESS:  Thank you, your Honor.

3          THE COURT:  Call your next witness.

4          MR. KACZMAREK:  May we approach, your Honor?

5          THE COURT:  Certainly.

6                    (AT SIDEBAR)

7          MR. KACZMAREK:  Your Honor, it's my

8  understanding that they intend to call Ms. McPadden's

9  boyfriend or former boyfriend.  To the extent that he's

10 being called to reinforce Ms. McPadden's testimony

11 regarding her emotional distress, we ask that he be

12 barred from doing so.  She's already testified

13 unrebutted and had -- regarding her emotional state.

14 She's also had her doctor testify regarding it.  It's

15 unnecessary.

16         MR. FRADETTE:  Well, your Honor, I think it

17 is relevant -- it is relevant and necessary.  He's a

18 layperson that is -- that observed what she went through

19 during the time that she was terminated, which was --

20 you know, how she was before she was terminated, what

21 happened after she was terminated.

22         THE COURT:  All right.  How long?

23         MR. FRADETTE:  I would expect him to be 15, 20

24 minutes.

25         THE COURT:  Okay.  Objection overruled.

1          MR. KACZMAREK:  Thank you, your Honor.

2          MS. IRWIN:  I was just asking if we can take

3    our afternoon break.

4          THE COURT:  Oh, you're asking if we can?

5          MS. IRWIN:  Yes.

6          THE COURT:  Sure.

7          MS. IRWIN:  Thank you.

8          THE COURT:  Sure.

9                    (IN OPEN COURT)

10          THE COURT:  Ladies and gentlemen, we'll take

11    our afternoon break now.  Please don't discuss the case

12    during the course of the break.  I know it's been short,

13    but it's a request.

14                    (Jury excused.)

15          THE COURT:  My list suggests you've pretty

16    much exhausted everybody.  Do you have any more?

17          MR. FRADETTE:  We have one rebuttal witness,

18    your Honor, and --

19          THE COURT:  Somebody you said couldn't make it

20    until tomorrow?

21          MR. FRADETTE:  Dave Kelly, right.  He's

22    a brief witness, but he's a rebuttal witness to

23    Mr. Certo's testimony.  And -- and our expectation is

24    that it would be a 15-minute witness.  It's not going

25    to be a long witness, but it is an important witness.

1        He's a pharmacist.  I tried everything to get

2   him here today, including --

3        THE COURT:  That's all right.  That's fine.

4   Just but -- you have one more?

5        MR. FRADETTE:  That's it, yeah.

6        THE COURT:  Okay.  And then you're going to

7   call witnesses?

8        MR. KACZMAREK:  No.  Our intent is not to call

9   any witnesses, your Honor.

10        THE COURT:  You're not calling DeChellis and

11   you're not calling Urbanski?  You listed them, that's

12   why I'm asking.

13        MR. KACZMAREK:  Yeah, we listed them, and

14   based on the presentation thus far, we decided not to

15   call them unless Mr. Kelly, for some reason, says

16   something.  But we're not going to call them as part

17   of our case in chief.

18        With regard to Mr. Kelly, I believe that he

19   was part of our motions in limine.  He was the pharmacy

20   manager before Varieur, before Urbanski.  I don't see

21   how his testimony is relevant.  I think we're going to

22   be back in the realm of what pharmacy conditions were

23   like and I think we've explored that to death with this

24   jury.

25        THE COURT:  What's he for?

1           MR. FRADETTE:  Yeah, he's actually the

2    previous market manager.  He's not going to --

3           MR. KACZMAREK:  Market manager, excuse me.

4           MS. IRWIN:  That's what Mr. Certo was.

5           MR. FRADETTE:  Yeah, I understand it wasn't

6    intentional.

7           And the -- we're not going to get into the

8    working conditions at the store at the time.  He did

9    have direct interaction for several years with

10   Ms. McCaffrey specifically.  He knows specific

11   information --

12          THE COURT:  What's he going to say?

13          MR. FRADETTE:  Well, his dealings with

14   Ms. McCaffrey as a regional manager; that he has

15   specific instances or recalls specific instances of

16   pharmacists having lost keys and what the consequence

17   of that involved.  He has information regarding what the

18   regional direction was.  He has information regarding --

19          THE COURT:  No, no.  I'm trying to get a sense

20   of relevance.

21          So what -- make a proffer.  What's he going to

22   testify to, in summary form?  He's going to get on the

23   stand and say, I know McCaffrey, she was the regional

24   manager, what, like I was?

25          MR. FRADETTE:  That she --

```
 1              THE COURT:  No, I was Certo.  I was Certo.
 2              MR. FRADETTE:  Yeah, he's Certo.  And he's --
 3              THE COURT:  And I dealt with McCaffrey and
 4   there were other lost keys and they were males and they
 5   only got one level, something like that?
 6              MR. FRADETTE:  Well, no, that they did not get
 7   reported up to regional; that they were, in fact --
 8              THE COURT:  But that -- that makes it
 9   irrelevant right then and there.
10              MR. KACZMAREK:  Exactly, your Honor.
11              THE COURT:  The same decision-maker didn't
12   make any decision.
13              MS. IRWIN:  Ms. McCaffrey testified this
14   morning --
15              THE COURT:  There's nothing wrong with
16   referring something up to regional, right?  That's not
17   probative of --
18              MS. IRWIN:  No, but there was --
19              THE COURT:  -- discriminatory animus or
20   anything else, right?
21              MS. IRWIN:  But Ms. McCaffrey testified this
22   morning quite strenuously that there had never been a
23   loss of a key before --
24              THE COURT:  That she was aware of.
25              MS. IRWIN:  -- and that she would have known.
```

1          THE COURT:  No.  Come on.

2          MS. IRWIN:  She did.

3          THE COURT:  No, no, no, no.

4          MR. FRADETTE:  Your Honor, she did say --

5          THE COURT:  Even if she did say that, we know

6    that that's not correct, right?

7          MR. FRADETTE:  Well, no.  She said that -- she

8    did say that she would know.  She said that if --

9          THE COURT:  What's the point you're trying to

10   make, McCaffrey lied about the fact that she -- she

11   really did know that there were lost keys in the past

12   and she -- she's covering up the lost key because the --

13   what, the sanctions were somewhat lower or there were no

14   sanctions?  What's the point?

15         MS. IRWIN:  She was influenced by Mr. Certo,

16   which we've, of course, learned --

17         THE COURT:  No, no, no.  He's not going to say

18   that.  Kelly's not going to say that.

19         MS. IRWIN:  No, no, no.  But Mr. Kelly is

20   going to say in his experience, the reason you go to

21   regional, to someone like McCaffrey, is because

22   you're -- certainly if you're looking for a discipline

23   that would be termination level.  And obviously there's

24   been a big dispute in this case about why Mr. Certo went

25   to regional; did he know that it was going to -- if he

1  could get a second level, it would get Ms. McPadden

2  fired?  It's a huge issue in the case and there's been

3  testimony on both sides of the issue.

4         I mean, it's going to be a very short witness,

5  but he's pretty important.

6         MR. KACZMAREK:  Your Honor, unless he's

7  going to tie that information somehow directly to

8  Joseph Certo, that Joseph Certo was aware of lost keys

9  in the past and how that process was handled; or he's

10 going to testify that Ms. McCaffrey was aware of lost

11 keys and did nothing or imposed a different kind of

12 discipline, his testimony is completely irrelevant

13 because it did not influence either the true

14 decision-maker here, Ms. McCaffrey, or the alleged

15 bad actor, Mr. Certo.  It's irrelevant.

16        MR. FRADETTE:  The other issue he testified --

17        THE COURT:  No, I have to -- I mean, I can

18 sort of see your argument, I guess, maybe, but --

19        MS. IRWIN:  He's going to be very short.

20        THE COURT:  -- it seems awful tenuous and

21 awfully strained.  I never understood your real point

22 about that.

23        MR. KACZMAREK:  It's also never been disclosed

24 prior to this moment.

25        THE COURT:  Certo's the bad guy, right?  Am I

1  getting -- have I got that right?  He's the bad guy.

2  Okay.  And I guess your theory is he somehow manipulated

3  the outcome by Kulwicki and McCaffrey and he did it

4  in two ways:  One, he referred it up there, which is

5  somehow probative of malice; and, secondly, he didn't

6  disclose things that would be perhaps mitigating and

7  that discloses some sort of malice.  But the basic

8  question here is why did they fire her?

9       MS. IRWIN:  And --

10      THE COURT:  And the people that fired her had

11  no idea that she had taken leave or claimed a disability

12  or anticipated leave in the future or was complaining

13  about safety or other violations or conditions in the

14  workplace.  And so it's -- how did -- why is it --

15      MS. IRWIN:  What we have -- first of all,

16  there have been --

17      THE COURT:  And they both say he didn't say a

18  thing.  He didn't -- I don't remember him saying

19  anything.  So --

20      MS. IRWIN:  Your Honor --

21      THE COURT:  But let's assume he was wearing a

22  bad hat, and let's --

23      MS. IRWIN:  Yes.

24      THE COURT:  -- assume your strained theory of

25  causation has some merit.  He apparently never

1    effectuated it.

2              MS. IRWIN:  Yes, he did, because --

3              THE COURT:  How?

4              MS. IRWIN:  Because we heard this morning from

5    Ms. McCaffrey that the first thing that happened is

6    Mr. Certo e-mails her and she calls Mr. Certo.  And in

7    that conversation, Mr. Certo tells her that Ms. McPadden

8    did not take the matter seriously.  That's why

9    Ms. McPadden -- Ms. McCaffrey goes into the conference

10   call with Kulwicki thinking second level.  She testified

11   this morning it was one of the two reasons why she

12   supported a second-level discipline.  It came from

13   Mr. Certo.  And it wasn't true.  And --

14             THE COURT:  And -- and just to stop you, your

15   theory then is because he told her -- assuming the jury

16   accepts that he, in fact, told her that she didn't take

17   it seriously, that swayed McCaffrey?

18             MS. IRWIN:  That's what she said.  That's what

19   she testified to.

20             MR. KACZMAREK:  Your Honor, her testimony

21   was --

22             THE COURT:  I'm giving you all that.

23             MS. IRWIN:  Okay.

24             THE COURT:  I'm just trying to figure out what

25   the link is.

1          And that evinces a discriminatory animus

2    with respect to her having taken FMLA leave how?

3          MS. IRWIN:  Okay.  So the animus -- and I know

4    we're going to go through this and I did ask for the

5    break because I have to use the ladies' room, but I

6    believe that the case is --

7          THE COURT:  Oh, I'm sorry.

8          MS. IRWIN:  -- that the cases would allow us

9    to say that the animus comes from Mr. Certo hearing her

10   safety concerns, viewing them as aggressive, viewing

11   them negatively, not taking any concerns that she raised

12   and doing -- escalating it, not --

13         THE COURT:  Plus FMLA leave, et cetera,

14   et cetera, all of it.

15         MS. IRWIN:  -- not doing even an investigation

16   that he was trained to do and obligated to do.  So we

17   get the animus.  And being frustrated and expressing

18   frustration by -- both at the October meeting with

19   Ms. McPadden and on November 26th.

20         So we've got his -- the conduct --

21         THE COURT:  And his means of executing --

22         MS. IRWIN:  -- and his activity.  And so then

23   what does he do with it?  What he --

24         THE COURT:  He says --

25         MS. IRWIN:  -- does with it --

1          THE COURT:  He says, I don't think -- I don't

2    think she took it too seriously.

3          MS. IRWIN:  What he does with it is first he

4    gets a peer's recommendation that doesn't do it, first

5    level.  Okay?  He goes and he reaches up to regional

6    when he doesn't have to.  He doesn't tell them, as -- as

7    we saw with Ms. Kulwicki's exhibit today, someone who's

8    advocating, as Ms. Riel did for Mr. Tau, says, oh, he

9    really looked, I checked with my peers, we all think

10   first level's appropriate.

11         He did none of that.  What he did instead, not

12   only did he get -- not give the positive information --

13         THE COURT:  Of course, he's not required to do

14   that, right?

15         MS. IRWIN:  No, but we're looking at what

16   someone does --

17         THE COURT:  You've presented it as he has an

18   obligation to do it.

19         MS. IRWIN:  He does not have an obligation,

20   but there's a huge difference.  When you look at

21   Ms. Riel, who wants to -- to have a first level done,

22   that's how she does it.  What does Mr. Certo does -- do?

23   He talks to Ms. McCaffrey and he tells her, ah, I don't

24   think she took it seriously.  He supports the second

25   level, he gets her mindset on second level, and then a

1    second level is accomplished.

2          So we have the -- the animus comes from the

3    earlier stuff; the action is information that he failed

4    to give and false information that he did give, which is

5    really quite a classic cat's paw, from my understanding.

6          THE COURT:  Okay.

7          MR. KACZMAREK:  Your Honor, I know

8    Attorney Irwin needs to go to the bathroom so, I --

9          THE COURT:  She does.

10         MR. KACZMAREK:  -- will be extremely brief.

11         Regardless of what all that was just said,

12   even if that theory is permissible, Mr. Kelly does not

13   fit in that theory based on the proffer that they have

14   come forward with.  So I believe it --

15         THE COURT:  He's apparently going to say, I

16   assume -- I assume -- something like, I'm familiar with

17   Walmart's practices and employment customs and you only

18   refer something like that up if your goal is to get more

19   severe discipline.

20         MS. IRWIN:  Enough to terminate.

21         MR. FRADETTE:  And he has been involved in

22   termination decisions --

23         THE COURT:  And when --

24         MR. FRADETTE:  -- and he has done --

25         THE COURT:  What's his contemporaneous --

1          MR. FRADETTE:  -- investigations.

2          MR. KACZMAREK:  He was fired --

3          MR. FRADETTE:  For a completely legitimate

4    reason.

5          MS. IRWIN:  Yes, but 2011.

6          MR. KACZMAREK:  In 2011 --

7          MS. IRWIN:  Yeah, right.

8          MR. KACZMAREK:  -- over a year before.

9          MR. FRADETTE:  No, no, no, actually less

10   than --

11         MR. KACZMAREK:  Well, let's call it a year,

12   before --

13         MR. FRADETTE:  We'll call it a year.

14         MR. KACZMAREK:  -- he was fired.  So it's

15   completely irrelevant.

16         THE COURT:  Let me think about it.  And if you

17   have anything else before the jury comes in, we'll take

18   it up.  Or after.  Are you going to finish -- you're

19   going to finish your witnesses today, right?

20         MR. FRADETTE:  Oh, absolutely.  The next --

21   oh, I'm sorry.  You're asking me?

22         THE COURT:  Yes.  You're going to finish in

23   half an hour?

24         MR. FRADETTE:  We will, your Honor.  It will

25   be a short --

1          THE COURT:  Okay.  We can take it up after

2   that.

3          (Recess taken from 2:45 p.m. until 3:12 p.m.)

4          THE COURT:  Judy's going to hand you a couple

5   copies each of the rough, rough -- stress rough --

6   draft.  It's overinclusive.  And you know what we'll do,

7   since we're going to quit in a few minutes, is have a

8   preliminary charging conference after the testimony and

9   do a brief -- meet again tomorrow morning and go over it

10  again.  But there's a lot to talk about there.

11         MS. IRWIN:  Thank you.

12         THE COURT:  When it says surviving claims,

13  though, that doesn't mean they've survived.

14         MS. IRWIN:  I understand.

15         THE COURT:  It's just a heading.

16             (IN COURT - JURY PRESENT)

17         THE COURT:  All right.  Ladies and gentlemen,

18  we're -- Mr. Fradette advises me that they have one

19  short witness this afternoon and then that's it.  There

20  is another witness who couldn't come today or yesterday,

21  so he's going to be here in the morning, which I think

22  is probably not going to be too long.  So I think at

23  the moment my plan is we'll finish this witness tonight

24  and then I'll excuse you and then if you could come in

25  tomorrow morning at ten o'clock -- there's some

1  administrative things we have to do with respect to

2  the jury instructions.

3          So if you'd come in tomorrow at 10:00, we'll

4  finish that last witness and you'll probably have the

5  case tomorrow, I expect.  Certainly you'll have closing

6  arguments tomorrow and I expect you'll have the

7  instructions in the case tomorrow.  That doesn't require

8  you to decide it tomorrow, obviously, but we're on

9  schedule is the point.  We'll have a brief afternoon

10  tonight, late start in the morning, and we'll be good.

11          Mr. Fradette.

12          MR. FRADETTE:  Kevin McDevitt.

13          THE CLERK:  Please raise your right hand.

14          **KEVIN McDEVITT**, having been first duly sworn,

15  testified as follows:

16          THE CLERK:  Thank you.  Please be seated.

17          For the record, please state your name and

18  spell your last name.

19          THE WITNESS:  Kevin McDevitt.  And it's

20  M-c-D-e-v-i-t-t.

21                  DIRECT EXAMINATION

22  BY MR. FRADETTE:

23      Q.   Good afternoon, Mr. McDevitt.  Is it okay if I

24  call you Kevin?

25      A.   Of course, yes.

1    Q.   And could you just state your residence, where

2 you live.

3    A.   Bow, New Hampshire.  Excuse me, Bow Street,

4 Portsmouth, New Hampshire.

5    Q.   Thank you.

6    A.   A little nervous.

7    Q.   When did you first meet Maureen?

8    A.   We met about 11 or 12 years ago.

9    Q.   And what was that circumstance?

10    A.   It was a blind date.

11    Q.   So you've known her for approximately how many

12 years?

13    A.   11 or 12.

14    Q.   When did you actually start dating?

15    A.   Well, about five years ago.

16    Q.   And what were the personality traits that

17 attracted you to Maureen?

18    A.   Well, you know, she was very confident,

19 engaging, vibrant, smart, funny.  She had a lot of

20 remarkable qualities.  I guess I didn't recognize them

21 the first time we had our date, but I came around.

22    Q.   And how did -- how is it that you met her

23 again?  Where was she working, do you remember?

24    A.   I know she was a pharmacist and -- but we were

25 reintroduced again by friends and we thought that we

1  were a good match.

2      Q.   Did you find her to be a -- pretty

3  independent?

4      A.   Yeah.  I mean, she really was very

5  well-rounded.  She had her own home, she was, you

6  know, professional, you know, very attractive person.

7      Q.   And what was your relationship with Maureen in

8  2012?

9      A.   Well, we dated, you know, for about a year and

10 then we fell in love and I asked her to move in with me.

11     Q.   And approximately when was the date that you

12 moved in or she moved in?

13     A.   It took about a month, but, yeah, actually, it

14 was around Thanksgiving weekend that we finished the

15 move.

16     Q.   And that was 2012?

17     A.   '12, yeah.

18     Q.   You observed Maureen while she was working at

19 Walmart as a pharmacist, right?

20     A.   I did.

21     Q.   Can you give the jury your observations of

22 Maureen as a pharmacist?  Was she proud of that

23 position?

24     A.   Well, she was very serious about the

25 profession.  She was proud to be a pharmacist.  You

1  know, if we went out for dinner the night before, she

2  wouldn't drink.  And she displayed a lot of compassion.

3  She really cared about her patients or customers.  I'm

4  not sure what they say in pharmacy.  But she really

5  cared about them.

6      Q.   Did she appear to you to be dedicated to her

7  job at Walmart specifically?

8      A.   Very much so.  You know, I mean, again, if she

9  was on the next day, she more or less planned her meals,

10 her -- you know, she -- she limited activities the day

11 before.  She took it very seriously.

12     Q.   Now, there was a day when she contacted you

13 because she had accidentally lost her pharmacy key.  Do

14 you remember that day?

15     A.   I certainly do.

16     Q.   All right.  So can you just tell the jury, the

17 telephone call -- did you get a telephone call from

18 Maureen?

19     A.   I did.  I was home at the time.  She was in a

20 panic and asked me to look around for the key.  I didn't

21 find it.

22     Q.   All right.  That evening, did you -- did she

23 come home and did you help her try to find that key?

24     A.   Yes.  We were on a mission.  We tore my house

25 apart; we went over to her house.  It had, you know, all

1    the markings of a house that had just been moved out of,

2    a lot of trash bags, a lot of stuff that, you know, was

3    going to go to the Goodwill and such.  It was really

4    torn up because we had just moved her over the weekend.

5    So -- but we spent the better part of the night looking

6    through trash bags and everything else that was there to

7    see if we could find the key.

8         Q.   So she took it -- the desire and the effort to

9    find the key, she took it seriously?

10        A.   Oh, yeah.  She -- yeah.  This was the only

11   thing on her mind.  We -- we were up late that night and

12   I -- I went through her purse a couple times, she went

13   through her purse a couple times.  We -- we

14   double-checked each other, you know, to see if, you

15   know, we had overlooked it somehow.

16        Q.   All right.  Now, I want to compare the Maureen

17   before her termination and the Maureen after her

18   termination.  Can you just describe what your

19   observation was with respect to Maureen's -- say, her

20   demeanor after she learned that she'd been terminated?

21   Did she call you?

22        A.   She called me from the parking lot.

23        Q.   Where were you?

24        A.   I was at work.

25        Q.   And was she crying?  What was her --

1      A.   Yeah, she was.

2      Q.   And what was your -- what did you do?

3      A.   You know, I -- I told her, you know, to --

4  that I would be home.  I left work, I met her at the

5  house, and, you know, I tried to console her.  She was

6  distraught, obviously, given this was a -- her career

7  and it was over, pretty much, in her mind, you know,

8  basically being fired as a pharmacist -- pharmacist.

9  She basically felt like she lost her career.

10      Q.   Did you have an observation about her trying

11  to find work, her application for work?

12      A.   Well, I mean, that was a mission that lasted

13  months and, you know, it was a tortuous experience for

14  her because of her age and because of the circumstances

15  of her leaving Walmart.  It's kind of hard to explain to

16  a prospective employer when you've been fired, you know.

17  She was in doubt that anybody would rehire her,

18  basically, because she -- she really felt her career in

19  pharmacy might be over.

20      Q.   And did she -- eventually we know she finds a

21  job approximately seven months later in the -- towards

22  the end of July at CVS.  Did you observe her to be

23  looking for work during that entire period of time?

24      A.   Every day.  She was very diligent.  She

25  checked -- and she looked at other careers.  I mean, she

1   looked at anything and everything she could find to get

2   back into a circumstance where she could earn a living.

3      Q.   Can you give us some appreciation for her

4   distress or any changes in her appearance, her -- you

5   know, the time that she wakes up in the morning, time

6   she goes to bed, that kind of stuff, during that first

7   year posttermination?

8      A.   This -- this was the hardest thing I've ever

9   witnessed, what she went through.  It -- it was

10   humiliating for her.  She -- she tried to keep a

11   positive attitude and I tried to coach her and counsel

12   her as much as I could, but she was finding it difficult

13   to -- to be with family and friends and, you know, she

14   just felt that she had let people down.  And, you know,

15   she -- her self-esteem was really under -- underwater.

16         She -- again, she worked really hard to find

17   a job, but, you know -- you know, I would find her at

18   two o'clock in the morning, sitting on the couch staring

19   at the ceiling.  She wasn't sleeping, she was -- she

20   had, I would say, an eating disorder, she gained weight.

21   She was miserable.

22      Q.   Did you try to kind of get her out of that

23   funky state of feeling --

24      A.   You know, I did everything I could, you know,

25   to try to take her mind off of this, you know.  It --

1  she worked hard to get back into pharmacy.  She even

2  reapplied at Walmart, which I thought was the ultimate

3  humiliation, but she saw an opening in the paper and

4  literally tried to reapply, which they actually

5  encouraged her to do, but they didn't even interview

6  her.

7         But be that as it may, it -- it took her

8  months of interviews and she finally got a call from

9  CVS.  That was a big day.

10     Q.   Did it impact, in your observations, her sense

11  of self-confidence and independence?

12     A.   I'm sorry.  What?

13     Q.   Did the termination and the fact that she got

14  fired, did it impact her sense of independence and

15  self-confidence?

16     A.   Yeah.  You know, I mean, she was --

17  unfortunately, she had taken a lot of her savings and

18  spent it on the house.  She had done a new roof and

19  resided it.  She had no savings.  They were all

20  invested, reinvested, in her house.  She was scared to

21  death about losing the house.  She racked up credit card

22  debt, she -- she felt, you know, basically, like she was

23  at my mercy because I was helping her out and it's a

24  terrible position to be in, you know, to be -- I know

25  she relied on her mom, you know, at times.

1    But -- so, I mean, she laid there, you know,

2  at night, worrying about, essentially, you know, how to

3  pay the bills, how to keep her credit rating, you know.

4  It was very humbling.

5    Q.   Did she end up selling the -- is it the Maine

6  property that she had lived in before she moved in with

7  you?

8    A.   Yeah, she immediately tried to -- she didn't

9  want to sell the house.  You know, we were just moving

10  in together and she viewed that as kind of like a safety

11  or parachute in case our relationship didn't work out

12  and she didn't want to sell the house.  She wanted to

13  rent it.  And so she went through a lot of different

14  steps trying to rent it, Craigslist and newspapers and

15  everything else, and got nowhere with that.

16    And I told her, I said, look, you're going

17  to have to bite the bullet and sell this.  I mean,

18  the taxes, the monthly payment, the insurance, it was

19  just -- it was -- the clock was ticking and she had to

20  put it on the market.  And finally she made that

21  decision and -- yeah.

22    Q.   She sold it at -- do you know if she sold it

23  at a loss or a gain or break even?

24    A.   You know, I don't know the exact numbers, but

25  I can tell you that she sold it for a lot less than she

1  felt it was -- than her real estate agent told her it

2  was worth and what she originally listed it for.  She --

3  she basically fire-saled it to get it off her back.

4      Q.    Now, you have seen her since she went to work

5  for CVS?

6      A.    Yes.

7      Q.    And have you made observations about the

8  difference between working at the Seabrook store in one

9  location as a staff pharmacist as compared to CVS now as

10  a floater pharmacist?

11      A.    Well, you know, I guess the biggest difference

12  is the -- the schedule.  Essentially, she never knows

13  from one week to the next where she's going to work or

14  what -- how many hours she's going to work.  It was

15  impossible for us to make any kind of plans because she

16  could get a call that night and say, come on in

17  tomorrow.

18          So you know, from a -- the point of view of

19  working for Walmart and then going to work for CVS, it

20  really complicated our lives.  I can tell you that.  She

21  was commuting as far as North Conway, she was working

22  13-hour shifts, which I -- I just, you know, couldn't

23  believe.  But she'd drive two hours to North Conway,

24  work a 13-hour shift, and then drive home on Route 16

25  which, you know, to me was insanity.  But what can you

1  do?  You've got to take what they give you.  So ...

2      Q.    Now, today.  I'd like to bring it current and

3  just if you could tell the jury whether the old Maureen

4  is back or if there's some residual damages or residual

5  lack of confidence or any residual impact to Maureen now

6  that she's been terminated or after -- as a result of

7  having been terminated.

8          MR. LAZAZZERO:  Objection.

9          THE COURT:  Overruled.

10     A.    So I think it would be fair to say that this

11  was a life-changing event for her; that she's lost her

12  self-confidence in a big way.  She lives in fear of

13  losing her job.  And she's lost her independence.  She's

14  lost her savings.  She is never sure from one week to

15  the next how many hours they're going to give her.

16          They seem to really like her, but, you know,

17  there's a lot of young pharmacists out there and this

18  was the biggest issue really when she was looking for

19  work is there's so many kids graduating from pharmacy

20  school now that will work for a lot less money than what

21  a -- you know, an accomplished pharmacist would make

22  that she knows that she's on the bubble and that, you

23  know, her future is very insecure and she feels that

24  way.  It's something that she fights and she tries to

25  maintain a positive attitude, but it's -- it was a

1　life-changing event for her.

2　　　　　MR. FRADETTE:  All right.  Just a moment, your

3　Honor.

4　　　　　THE COURT:  Certainly.

5　　　　　MR. FRADETTE:  Nothing further, your Honor.

6　　　　　THE COURT:  Okay.  Mr. Kaczmarek.

7　　　　　MR. KACZMAREK:  No questions, your Honor.

8　　　　　THE COURT:  All right.  Thank you, sir.  You

9　may step down and you're excused as a witness.

10　　　　　　　　　　(Witness excused.)

11　　　　　THE COURT:  And do you rest?

12　　　　　MR. FRADETTE:  Yes, your Honor, with the

13　exception of tomorrow --

14　　　　　THE COURT:  Oh, I'm sorry.  Yes, right.

15　　　　　MR. FRADETTE:  -- the additional witness

16　tomorrow.

17　　　　　THE COURT:  Sorry.

18　　　　　MR. KACZMAREK:  You're not resting?

19　　　　　THE COURT:  No, no.  He's not resting.

20　　　　　You're calling Mr. Kelly, right?

21　　　　　MR. FRADETTE:  Yes.

22　　　　　THE COURT:  All right, ladies and gentlemen,

23　it's early, but we'll adjourn for the day.  Tomorrow,

24　ten o'clock.  Ten o'clock.  Hopefully by then we'll have

25　all the work done we need to do.  We'll have one

1  witness, and I don't imagine it's going to take too

2  long, and then after that we'll probably take a short

3  break and have closing arguments after that, probably go

4  right into the instructions, although they're a little

5  long, so we'll figure that out tomorrow.

6        Have a good evening and please don't discuss

7  the case during the course of the adjournment.

8                    (Jury excused.)

9        THE COURT:  All right.  With Mr. Kelly, you

10  know, I -- I'm not sure your -- I don't know what your

11  proffer is, really, but I think it's only fair to say

12  I'll treat it just like I treated the motions in limine.

13  You can call him, you can examine him, you can interpose

14  objections as you think appropriate, and I'll rule on it

15  as we go along.

16        But you're generally telling me that he was at

17  the level of Mr. Certo and he's essentially going to say

18  people in that position generally don't kick these

19  things upstairs unless they're looking for termination,

20  they can handle them on their own, he wouldn't have done

21  that, there were other lost keys, I assume, and she did

22  or did not know about it, maybe did, maybe didn't, but

23  lesser discipline, never got up there, I guess.

24        MR. FRADETTE:  Never got up there, your Honor.

25        THE COURT:  Never got up there.  Okay.

1          MR. KACZMAREK:  So, your Honor, if I may --

2          THE COURT:  Sure.

3          MR. KACZMAREK:  If he's going to testify

4    regarding what -- his general belief that people only

5    kick things up to Heather Harris McCaffrey if they

6    wanted to get her fired, I mean --

7          THE COURT:  Well, hopefully they'll couch it

8    in terms of a custom, practice, understood way of doing

9    business by whatever they are, direct market manager,

10   direct --

11         MR. KACZMAREK:  Market director.

12         MR. FRADETTE:  Market director, your Honor.

13         THE COURT:  Market director.  I was a market

14   director like him, this is the way market directors in

15   Walmart understand how to handle personnel matters.

16   It's sub rosa, but understood.

17         MR. KACZMAREK:  If it's a practice, if it's a

18   policy, if it's something like that, that is one thing,

19   I suppose, your Honor --

20         THE COURT:  No, no.

21         MR. KACZMAREK:  I certainly hope we're not

22   going to hear testimony that it was my practice as an

23   individual to do things a certain way, because that

24   would be --

25         THE COURT:  Well, it won't be now.

1       MR. KACZMAREK:  Okay.  Understood.  Thank you,

2  Your Honor.

3       THE COURT:  Okay.  No, obviously if it's -- if

4  it's a means of operation that is intended to manipulate

5  a system, it obviously wouldn't be a formal practice or

6  custom of the company; it would be a custom and practice

7  of those who manipulate the company.  Therefore, you

8  wouldn't expect it to be formally adopted anyway, but --

9  I assume that's the idea, sort of, Attorney Irwin?  Yes?

10  At least give me that confidence that, yes, that's sort

11  of what you're thinking.

12       MS. IRWIN:  Yes.

13       THE COURT:  Okay.

14       MR. FRADETTE:  I think it's more than sort of,

15  but certainly it is our direction that we're going with

16  Mr. --

17       THE COURT:  Okay.  You might want to lay that

18  foundation a little early, rather than later, so that we

19  know where we're working from.

20       MR. FRADETTE:  And he is -- he's been a

21  pharmacist for like 40 years and a market manager

22  with -- he was with Walmart for ten years about.

23       THE COURT:  All right.  Why don't you come

24  upstairs.  You can take 10 or 15 minutes, but if you

25  just come upstairs to one of the conference rooms, we'll

just do a quick -- not quick in that sense, a rough

charging conference. And then if any issues come up,

we'll have the opportunity to go over them again in the

morning. Why don't you guys come in at -- is 8:30 too

early for any of you?

MR. KACZMAREK: 8:30?

THE COURT: 8:30.

MR. FRADETTE: That works for me.

MR. KACZMAREK: Okay.

MR. FRADETTE: That's fine.

THE COURT: Okay. So then 8:30 we can take up

any problems that we have and maybe find out anything

last minute so we get them prepared. And I expect we'll

give the case to the jury tomorrow?

MR. FRADETTE: Yes.

THE COURT: Good.

MS. IRWIN: So, your Honor, we're going to

your chambers in 15 minutes?

THE COURT: Just a conference room. Just

go -- when you get off the elevator, just --

MS. IRWIN: Okay.

THE COURT: -- go straight through. There's a

conference room there.

MS. IRWIN: Okay. Thank you, your Honor.

(Proceedings adjourned for the day at 3:35 p.m.)

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


                              *Liza W. Dubois*
                              Liza Dubois, LCR, RMR, CRR
                              Licensed Court Reporter No. 104
Submitted:  2/12/16           State of New Hampshire
                         LIZA W. DUBOIS, LCR, CRR