UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*

MAUREEN McPADDEN             \*     1:11-cv-475-SM
                                   \*     January 27, 2016

vs.                         \*     9:15 a.m.
                                   \*

WAL-MART STORES EAST, LP   \*
                                   \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DAY 5
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE STEVEN J. McAULIFFE

Appearances:

For the Plaintiff:     Richard E. Fradette, Esq.
                     Holly Ann Stevens, Esq.
                     Beliveau, Fradette & Gallant, PA
                     91 Bay Street
                     P.O. Box 3150
                     Manchester, NH 03105-3150

                     Laurin S. Irwin, Esq.
                     Upton & Hatfield, LLP
                     10 Centre Street
                     P.O. Box 1090
                     Concord, NH 03302-1090

For the Defendant:     Christopher B. Kaczmarek, Esq.
                     Joseph A. Lazazzero, Esq.
                     Littler Mendelson, PC
                     One International Place
                     Suite 2700
                     Boston, MA 02110

Court Reporter:       Liza W. Dubois, RMR, CRR
                     Official Court Reporter
                     LCR No. 104
                     U.S. District Court
                     55 Pleasant Street
                     Concord, NH 03301
                     (603)225-1442

                    I N D E X

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **DAVID KELLY** | | | | |
| By Mr. Fradette | 4 | | | |
| By Mr. Kaczmarek | | 8 | | |

| **CLOSING ARGUMENTS** | **Page** |
|---|---|
| By Mr. Kaczmarek | 23 |
| By Ms. Irwin | 71 |

**JURY INSTRUCTIONS**                117

<u>PROCEEDINGS</u>

(IN OPEN COURT - JURY PRESENT)

1      THE CLERK:  Court is in session and has for
2 consideration jury trial day five in the matter of
3 Maureen McPadden vs. Wal-Mart Stores East, LP et al.,
4 case number 14-cv-475-SM.

     THE COURT:  Good morning, ladies and
gentlemen.  The plan, as you probably know, is we're
going to finish up with the final witness this morning,
we'll take a short break.  I'll have to do some work
with counsel, then we'll come back for closing
arguments; probably take a break after that and then
come back for instructions and then you'll have the
case.

     All right.  Mr. Fradette, you may call your
next witness.

     MR. FRADETTE:  Thank you, your Honor.
Mr. Dave Kelly.

     THE CLERK:  Please raise your right hand.

     **PAUL DAVID KELLY**, having been first duly
sworn, testified as follows:

     THE CLERK:  Thank you.  Please be seated.

     For the record, please state your name and
spell your last name.

     THE WITNESS:  Paul David Kelly, K-e-l-l-y.

<u>DIRECT EXAMINATION</u>

<u>BY MR. FRADETTE:</u>

Q.   Good morning.  Is it okay if I call you Dave?

A.   Yes.

Q.   Dave, can you tell us where you currently reside?

A.   14 Kingswood Circle, Silver Lake, New Hampshire.

Q.   And where -- what is your current occupation?

A.   Pharmacist.

Q.   How long have you practiced pharmacy?

A.   39 years.

Q.   And how many years did you actually practice at Walmart?

A.   Eight years.

Q.   And between what years?

A.   2003 and 2011.

Q.   Okay.  And you were terminated at Walmart in -- when were you terminated?

A.   November 1st, 2011.

Q.   And the reason for termination had to do with an unlicensed technician on your watch?

A.   That's correct.

Q.   That was a clear compliance violation; is that correct?

1       A.      Absolutely.

2       Q.      And did you have any dispute with Walmart

3  about the fact that you were terminated?

4       A.      No.

5       Q.      During the eight years that you were employed

6  with Walmart, how many were you employed as a market

7  manager?

8       A.      Three years.

9       Q.      And that's in the health and wellness

10  department?

11      A.      That's correct.

12      Q.      And as a market manager, how many years did

13  you work under the supervision of Heather McCaffrey?

14      A.      About 21 months.

15      Q.      21 months?

16      A.      Yeah.

17      Q.      And during that over three years as a market

18  manager and 21 months with Ms. McCaffrey, did you become

19  familiar with Walmart's custom and practices in regards

20  to disciplining pharmacists?

21      A.      Yes.

22      Q.      Similarly during that period of time, did you

23  become familiar with Walmart's customs and practices in

24  regards to firing or terminating pharmacists?

25      A.      Yes.

1    Q.   Now, with respect to discipline -- I'm sorry.

2   Let me begin again.

3        What was Walmart's custom and practice if a

4   pharmacist reported the accidental loss of his or her

5   pharmacy key immediately upon discovering the loss?

6             MR. KACZMAREK:  Objection.

7             THE COURT:  Overruled.

8             If you know.

9        Q.   You can answer.

10       A.   The immediate resolution is to rekey the

11   pharmacy ASAP.

12       Q.   Okay.  And with respect to discipline

13   involving a pharmacist, what was Walmart's custom and

14   practice in terms of information that would be discussed

15   and reviewed when making a disciplinary decision?

16             MR. KACZMAREK:  Objection.

17             THE COURT:  Sustained.  Maybe you should lay a

18   foundation, his basis of knowledge and so forth.

19             MR. FRADETTE:  Sure.

20       Q.   Did you participate in the decision ultimately

21   to discipline or terminate a pharmacist while employed

22   at Walmart?

23       A.   Yes.

24       Q.   And is there a custom and practice within

25   Walmart as to what would be discussed in arriving at

1   that decision?

2      A.   Yes.

3      Q.   And what is that custom and practice?

4      A.   Well, generally speaking, we would take the

5   circumstances that were involved and discuss those with

6   my boss, which would be my regional.  We would discuss

7   at what level of coaching that they were already at and

8   make a decision from there.

9      Q.   So the -- the meeting or the discussion would

10  include information as to what their coaching was?

11     A.   Yes.

12     Q.   And would it include information such as leave

13  of absence or recent activity?

14     A.   Yes.

15     Q.   And based on Walmart's custom and practice in

16  arriving at disciplinary decisions, would the market

17  manager advocate for whatever discipline he or she

18  wanted?

19         MR. KACZMAREK:  Objection.

20     A.   Yes.

21         THE COURT:  Overruled.

22     Q.   And, I'm sorry; your answer was?

23     A.   Yes.

24         MR. FRADETTE:  Nothing further, your Honor.

25         THE COURT:  All right.  Mr. Kaczmarek.

<u>CROSS-EXAMINATION</u>

<u>BY MR. KACZMAREK:</u>

    Q.   Good morning, Mr. Kelly.

    A.   Good morning.

    Q.   The custom and practice that you just testified to, did you ever discuss that custom and practice with Joseph Certo?

    A.   No.

    Q.   And you indicated that you had been a market health and wellness director for about 21 months; is that right?

    A.   No.

    Q.   I'm sorry.

    A.   Three years.

    Q.   Three years.  I'm sorry.

    A.   I was working under Heather for about 21 months.

    Q.   You worked under Heather Harris McCaffrey for about 21 months?

    A.   That's correct, uh-huh.

    Q.   Do you know how long Mr. Certo had worked under Heather Harris McCaffrey before the decision was made to give Ms. McPadden skip-level coaching?

    A.   No.

        MR. KACZMAREK:  Nothing further.

1    THE COURT:  All right.  Any redirect?

2    MR. FRADETTE:  Nothing further, your Honor.

3    THE COURT:  Thank you, Mr. Kelly.  You may

4    step down and you are excused.

5                    (Witness excused.)

6    MR. FRADETTE:  Your Honor, the plaintiff has

7    no -- no further witnesses, your Honor.

8    THE COURT:  All right.  Do you rest?

9    MR. FRADETTE:  Yes.

10    THE COURT:  All right.

11    Mr. Kaczmarek, my understanding is you're not

12    intending to call any witnesses.

13    MR. KACZMAREK:  That's correct, your Honor.

14    THE COURT:  You've covered all your evidence.

15    MR. KACZMAREK:  Yes.

16    THE COURT:  The defense put in its case, as

17    I'm sure you gathered, through the course of the same

18    witnesses because each side would have called them.  So

19    the defendant's not going to call any additional

20    witnesses.  You've already heard from all the witnesses

21    that the parties believe are relevant to resolving this

22    dispute.

23    All right.  So that completes -- that will

24    complete the presentation of evidence in the case.

25    We're going to take a short break, maybe 15, 20 minutes,

1   because I need to go over some matters with counsel,

2   and when we return, counsel will have an opportunity,

3   as I told you at the outset, to stand before you and

4   direct -- address you directly once again and make a

5   closing argument in which they will sum up the evidence

6   as it's been received in the context of their respective

7   positions in the case.

8         So we'll take a brief recess.

9         (IN OPEN COURT - NO JURY PRESENT)

10         MR. KACZMAREK:  May I be heard, your Honor?

11         THE COURT:  Mr. Kaczmarek, even though I kind

12   of forced you into resting, I am holding you harmless

13   with respect to any motions you'd like to make at the

14   close of the plaintiff's case.

15         MR. KACZMAREK:  Thank you, Your Honor.

16         Given that the plaintiff's case is closed, as

17   I indicated to your Honor earlier, the defendant moves

18   for what used to be called direct verdict, I suppose now

19   is called judgment as a matter of law.

20         We have discussed with your Honor multiple

21   times throughout the course of this trial our

22   perspective on the evidence and I will be very brief

23   this morning because I know that we want to move things

24   along and get this to the jury.

25         We believe that plaintiff, even taking the

1   inferences in the favor of the plaintiff as the Court

2   should in the context of this sort of motion, we believe

3   that the plaintiff has failed to carry her burden of

4   establishing evidence sufficient to take any of her

5   claims to the jury.  And we've argued this and discussed

6   this with your Honor multiple times throughout this

7   week.

8           I would point out that when your Honor denied

9   in part the defendant's motion for summary judgment, you

10  indicated that the plaintiff's case was very thin.  I

11  would respectfully submit to your Honor that it's even

12  thinner today than it was represented to you during oral

13  argument on the summary judgment motion.  At that motion

14  it was represented to you that there would be comparator

15  evidence with regard to Mr. Certo's supposed differing

16  treatment as to other male employees, specifically

17  Mr. Varieur.

18          There has been no such evidence in this case,

19  your Honor.  There's no evidence as -- in -- there's no

20  evidence in the record before the jury, your Honor,

21  regarding any physical outbursts, physical -- violence

22  in the workplace as was represented to your Honor during

23  the summary judgment argument, and to the extent that

24  plaintiff bases her gender claim on the fact that

25  Mr. Varieur was not disciplined in some way for the

1 synthroid error that the jury has heard some evidence

2 about, we would submit that he is not an appropriate

3 comparator for purposes of -- particularly with regard

4 to the gender claim because it is a pure

5 apples-to-oranges comparison.  We're talking about the

6 loss of the pharmacy key and we're talking about an

7 error, an error that was actually reported and sort of

8 resolved through the system.  There can't be a finding

9 of discrimination based on such dissimilar

10 circumstances.

11          I'm happy to address -- and so I would focus

12 your Honor on that.  I'm happy to address any questions

13 your Honor has, but I feel like we've raised these

14 issues in summary judgment, we've raised them with your

15 Honor, and I know we want to move things along this

16 morning, so we respectfully move for judgment on all

17 claims.

18          THE COURT:  All right.  Thank you,

19 Mr. Kaczmarek.  Appreciate it.

20          MR. KACZMAREK:  Thank you.

21          THE COURT:  Attorney Fradette?

22          MR. FRADETTE:  Your Honor, thank you very

23 much.

24          During the course of the trial we have

25 actually made arguments on the record with respect to

1   the points that have been raised.  We will be submitting

2   a written opposition as well, but certainly on the issue

3   that was just raised, the --

4           THE COURT:  Written opposition to what?

5           MR. FRADETTE:  To the --

6           THE COURT:  This motion?

7           MR. FRADETTE:  Yes.

8           THE COURT:  Oh.  Your time's now.

9           MR. FRADETTE:  Yeah.  Okay, your Honor.

10          So the -- I'd call your attention, your Honor,

11  to the standard of review with respect to a Rule 50

12  motion.  You -- the Court would generally draw all

13  reasonable inferences in favor of the nonmoving party

14  and it may not rely on the credibility determinations or

15  weigh the evidence.  Thus, although the Court should

16  review the record as a whole, it must disregard all

17  evidence favorable to the moving party that the jury's

18  not required to believe.

19          In that regard, Mr. Certo took the stand, as

20  well as Ms. Kulwicki, and they gave explanations for

21  their -- their conduct in the course of the termination

22  decision made on behalf of Ms. McPadden.  There's --

23  there's inconsistencies between what Mr. Certo

24  remembers, what Mr. -- what Ms. Kulwicki remembers, what

25  Ms. McCaffrey testified to.  They're just all over the

place in terms of their explanation for the decision
that they reached.  We -- we submit, your Honor, that
you should disregard all of that evidence in ruling on a
Rule 50(a) motion.

      The standard for a Rule 50 is the same as a
standard -- the motion for summary judgment and in the
summary judgment motion, your Honor found specifically
six -- I won't go through them all, but six factors to
support.

      MS. IRWIN:  I think the judge is allowing us
to submit this if we can right now.

      THE COURT:  Oh, right, if you can right now.

      MR. FRADETTE:  I understood --

      THE COURT:  You implied that you were going to
write a memo and give it to me sometime in the future.
And that ship will have sailed.

      MR. FRADETTE:  All right.  All right.  So we
will be submitting a full memo in opposition to --

      THE COURT:  When will you be submitting it?

      MS. IRWIN:  We just haven't done it
electronically, but we can submit it to the Court.

      THE COURT:  If you want me to read it, you
better hand it to me now.  How long is it?

      MR. FRADETTE:  It's 20 pages.

      THE COURT:  Oh, you better make your argument

1  then.

2       MR. FRADETTE: So the six factors that the

3  Court considered in the summary judgment motion are

4  that -- temporal proximity. Fewer than eight weeks

5  after returning from the medical leave, she was fired;

6  prior to that, Ms. McPadden had reported that she

7  believed there were safety issues and the defendant has

8  stipulated they're reasonable and good faith beliefs;

9  that Ms. Fonseca was violating her privacy rights.

10  Mr. Certo neglected to investigate that at all despite

11  Walmart's policy that clearly specifies that a HIPAA

12  violation should be investigated. There's evidence

13  suggesting that Mr. Certo undertook absolutely no

14  investigation. In fact, he testified at the Human

15  Rights Commission that there was no investigation. In

16  this court he answered interrogatories saying that he

17  called a couple of people at the pharmacy and that

18  constituted his investigation. And then you heard

19  testimony that a HIPAA violation would absolutely have

20  produced some kind of a written document evidencing the

21  investigation and there was none produced in this case.

22       There's evidence that suggests that Mr. Certo

23  rarely disciplined employees for violations of Walmart

24  policies; for example, the dispensing error that

25  Mr. Varieur clearly made. There's no dispute, he

admitted it, that he was not disciplined for the error

and he was not disciplined for failing to report the

error.  In fact, the evidence suggests that he was

trying to blame the error on Maureen and --

Ms. McPadden, and that's actually what triggered her to

be particularly concerned and pay -- paying closer

attention, since now not only was she's worried about

public safety, she couldn't trust her partner on the

prescription filling bench.

And then, when Ms. McPadden accidentally lost

her key, there were a flurry of e-mails, I think it was

described as, between Mr. Certo and his peers at the --

at the Seabrook pharmacy as to accountability for the

accidental loss of a key.  And that ends up everybody

agreeing, among those peers, that it should be a

one-level discipline.  Mr. Certo himself agrees that it

should be a one-level discipline when he thought that

Maureen was on a third level, which, of course, one

level would have resulted in his being fired -- her --

her being fired.

Not satisfied with that outcome, he then

escalates the matter to Ms. McCaffrey and in that

telephone call, he provides misinformation to

Ms. McCaffrey specifically so that he could get more

than a one-level discipline for an event that his peers

1  agreed would be -- or should be a one-level coaching, if

2  anything.  And, of course, predictably, Ms. McCaffrey

3  followed Mr. Certo's lead and authorized the two-level

4  discipline that ultimately resulted in her termination

5  the very next day.  In response to Ms. McPadden losing

6  her key, like I mentioned, Mr. Certo was informed that

7  it should be a first-level coaching and it would not

8  have resulted in her termination.  Mr. Certo's

9  explanation, again, I suppose -- the defendant's

10  evidence on that point should be disregarded as it

11  relates to the Rule 50 motion, but it certainly was not

12  consistent.

13          There is evidence that a male pharmacist who

14  lost his key to the pharmacy was given a one-level

15  coaching and we know now that Ms. Kulwicki was the

16  decision-maker in his case and authorized the issuance

17  of a one-level key (sic), even knowing that just 12

18  months earlier, which had been called to her attention

19  12 months earlier, the same event resulted in a

20  two-level discipline to Ms. McPadden.  And her

21  explanation for the disparity -- the different treatment

22  was that there was a snowstorm or that the pharmacist --

23  primarily, it was a snowstorm when he lost his key and

24  lost it in the parking lot.  It was never found.

25          THE COURT:  I think I get the gist of it,

1  Mr. Fradette.

2           MR. FRADETTE:  Okay.

3           THE COURT:  You know, as counsel -- I should

4  say on the record, as counsel know, I've certainly -- I

5  certainly don't see this as a particularly strong case.

6  In fact, I think it's probably the weakest case that I

7  can remember ever sending to a jury.  But I'm going to

8  send it to the jury.  I -- I really doubt -- I have

9  great doubt as to whether you've satisfied your burden

10 of showing specific facts from which a reasonable person

11 could conclude that not only was the reason given by

12 Walmart not legitimate, but, in fact, was a pretext for

13 actual discriminatory animus of some type.

14          You know, as I've said in chambers to you, it

15 seems to me this is sort of a reverse hourglass kind of

16 a case where, yes, all of that -- all of what you

17 described is in the lower part of the hourglass, you're

18 trying to get it up to the top, and it all goes through

19 Mr. Certo's interaction with Ms. McCaffrey and

20 Ms. Kulwicki.  You know, whether -- whether you succeed

21 in making that transition, I guess we'll see.  The jury

22 will decide that.

23          What's saving you, I think -- in my view,

24 you're right at the borderline, right on the border

25 between inferences that perhaps can be validly relied

1    upon to find in your favor on one side and mere tenuous

2    insinuations, I think the Court of Appeals refers to it

3    as, which would not entitle you to even have jury

4    consideration.

5            But you're on the border and the Court of

6    Appeals has said in cases like this where it's a pretext

7    case and it devolves down to was the employer's -- was

8    the employer's reason for discharge, can it be

9    challenged and could it be inferred that there might be

10   discriminatory animus as the real cause, the Court

11   should be very cautious in granting judgment to the

12   employer, either summary judgment or on a motion at the

13   end of the evidence, assuming the evidence is the same.

14           So what's saving you is that cautionary

15   language that courts should be cautious about entering

16   judgment in cases such as this.  Now, is that to say

17   you're not going to prevail at all?  You might prevail.

18   You might prevail.  That'll be up to the jury.

19           So motion's denied.  And I assume the same

20   motion you're going to -- why don't you make the same

21   motion now because we've closed the evidence as well.

22           MR. KACZMAREK:  Correct, your Honor.

23           THE COURT:  Right.  For the same reasons --

24           MR. KACZMAREK:  For the same reasons

25   previously articulated both this morning and in the

1  prior conversations with the Court, defendant moves for

2  judgment as a matter of law.

3          THE COURT:  All right.  And for the same

4  reasons I've just articulated, the motion's denied.

5          MR. KACZMAREK:  Thank you.

6          THE COURT:  Do you want to go through the

7  motions of making a -- a motion for judgment as a matter

8  of law on the behalf of plaintiff or can we skip that

9  part?

10          MS. IRWIN:  We can skip that part, your Honor.

11          THE COURT:  Okay.  Why don't we take a --

12          MR. FRADETTE:  Note my objection.

13          THE COURT:  Why don't we take a brief recess

14  and when we return -- what do you need, ten minutes --

15          MR. KACZMAREK:  Ten minutes would be great.

16  Thanks, your Honor.

17          THE COURT:  -- and we'll have final arguments.

18                  (Recess.)

19          (IN OPEN COURT -  NO JURY PRESENT)

20          THE COURT:  Do you want me to tell them about

21  the discrimination claim being out before you argue,

22  just so they -- or do you want me to tell them before

23  the instructions?  Up to you, both of you.

24          MS. IRWIN:  I was going to address it.

25          MR. KACZMAREK:  I think your Honor should just

1  mention it.

2            THE COURT:  Before you argue?

3            MR. KACZMAREK:  Before we argue.

4            THE COURT:  Okay.

5            MR. KACZMAREK:  Just so they're clear.

6            MS. IRWIN:  And I think we talked that the

7  disability claim is no longer before them.

8            THE COURT:  I was just going to say the

9  plaintiff's disability discrimination claim is no longer

10  before you and need not be considered by you for any

11  purpose.

12            MS. IRWIN:  Great.

13            MR. KACZMAREK:  Excellent.  Thank you, your

14  Honor.

15                 (IN OPEN COURT - JURY PRESENT)

16            THE COURT:  Ladies and gentlemen, we've

17  completed the presentation of evidence, as you know, and

18  now counsel once again have an opportunity to stand

19  before you and speak to you directly and review with you

20  the evidence that actually has been presented in the

21  case in the context of their respective positions on the

22  issues.

23            Before we begin, let me just cover a couple

24  things.  One, you've heard reference to a disability

25  discrimination claim that plaintiff asserted.  That

1  claim is no longer before you and need not be considered

2  by you for any reason or any purpose.

3         Secondly, during the course of the trial,

4  you've I'm sure noticed, obviously, counsel for both

5  sides have occasionally raised objections and I've ruled

6  on those objections.  You should understand that counsel

7  have an obligation or duty to their respective clients

8  to raise issues of law with me when they think it's

9  appropriate and so you shouldn't hold it against

10  client -- you shouldn't hold against either counsel the

11  fact that they were raising objections to the evidence.

12  It's just a shorthand way of raising a legal issue with

13  me that then I ruled on.

14         I've already told counsel privately, I'm happy

15  to tell you publicly, I think they've both done a

16  remarkably good job representing -- an excellent job

17  representing their respective clients and I'm confident

18  that they've presented to you all the relevant evidence

19  that you need to have before you to revolve these

20  issues.

21         Please just keep in mind that while counsel's

22  closing arguments are intended to help you understand

23  the evidence and its significance in the context of

24  their respective positions, their closing arguments,

25  like their opening statements, are not themselves

1  evidence.  The evidence is as you find it to be and

2  the -- and the -- obviously the verdict is yours and

3  yours alone to return.

4          All right.  With that, I'd invite counsel to

5  begin.

6          Let me also say in civil cases in federal

7  court the roles -- the order is reversed on closings

8  from openings.  Because the plaintiff always retains the

9  burden of proof in the case, plaintiff is -- argues

10  last.  So in closings, defendant argues first, then

11  plaintiff argues.  Okay?

12          Mr. Kaczmarek, are you prepared?

13          MR. KACZMAREK:  Thank you, your Honor.

14          <u>CLOSING ARGUMENT BY ATTORNEY KACZMAREK</u>

15          MR. KACZMAREK:  Good morning.  Let me begin by

16  thanking you.  I want to thank you for your patience as

17  I fumbled through the ELMO, your patience as we moved

18  courtrooms, your patience for sitting through two

19  videotaped depositions.  I know that that was a lot for

20  you to soak in, a lot for you to deal with, and I

21  appreciate that.  I appreciate your time and your

22  attention to all the evidence that we've seen in this

23  case.

24          Remember last week when I gave my opening?  I

25  told you what the evidence would show.  I told you that

1  the evidence would show that Ms. McPadden lost her

2  pharmacy key.  And you heard her testify to that fact.

3  That fact is undisputed.

4          And I told you in my opening statement that

5  the evidence would show that neither Joe Certo nor any

6  of his Division 1 colleagues that he exchanged e-mails

7  with, nor his boss, Heather Harris McCaffrey, nor

8  Barbara Kulwicki, the head of HR for the eastern

9  United States of the Health and Wellness Division of

10 Walmart, had ever heard of a staff pharmacist at Walmart

11 losing their pharmacy key.  That's what I told you in my

12 opening statement the evidence would show and, ladies

13 and gentlemen, that is exactly what the evidence showed.

14 You heard testimony from all three of those individuals

15 regarding that fact.

16          I also told you in my opening statement that

17 the evidence would show that Ms. McPadden was on an

18 active second written coaching as of the day she lost

19 that pharmacy key.  And you heard testimony from

20 Ms. McPadden herself and you saw documents in the form

21 of Defendant's Exhibit A and B establishing that fact.

22          I also told you that the evidence would show

23 that it was part of Ms. McPadden's job as a staff

24 pharmacist to help keep the pharmacy secure.  And you

25 heard testimony establishing that not only is it her

obligation as an employee -- as a staff pharmacist at
Walmart, it's also a professional obligation that she
has as a pharmacist licensed by the Board of Pharmacy of
New Hampshire.

And I told you that the evidence would show
that there is no Walmart policy that specifically says
if you lose your pharmacy key, then you will receive
this level of coaching.  I told you there was no such
policy and, ladies and gentlemen, we certainly heard
lots of testimony that there is no exact policy on that
point.

And I also told you that the evidence would
show that on Tuesday, November 27th, 2012, Mr. Certo
informed Ms. McPadden that because she had lost her
pharmacy key and she was already on a second written
coaching, her employment was being terminated.  And you
heard testimony from Ms. McPadden and Mr. Certo
establishing that that is exactly what she was told on
Tuesday November 27th, 2012 in that meeting at the
Seabrook pharmacy when she was fired.  You also saw
documentary evidence of that fact in the form of
Plaintiff's Exhibit 17, the exit interview form that
Ms. McPadden testified that she saw upon her
termination.

Let me pause right there.

1        Despite all the interrogatory responses you've

2   seen, the deposition transcripts that you've heard

3   about, the repeated questions from Ms. McPadden's

4   attorneys, the fact remains that Joe Certo told

5   Ms. McPadden that she had lost her -- that because she

6   had lost her pharmacy key while she was on a second

7   written coaching, her employment was being terminated.

8   Both Ms. McPadden and Mr. Certo testified that that is

9   what she was told at her termination meeting on

10  November 27, 2012 and Mr. Certo and Ms. McCaffrey

11  testified at trial that this is why Ms. McPadden was

12  fired.  That was what they told her at the termination

13  meeting, that's what they told her during trial --

14  that's what they told you, the jury, during trial

15  through their testimony.  Those are facts and they're

16  all in evidence and they're all there for you to

17  consider in your deliberations.

18        As a result, what's really at issue here

19  are the events that occurred between the morning of

20  November 26th when Ms. McPadden reported her pharmacy

21  key lost to Joe Certo and the morning of November 27th

22  when Mr. Certo told Ms. McPadden that she was being

23  terminated as a result of having lost that key.  And

24  when you look at those events carefully, the evidence

25  related to those events, I'm confident that you will

1   find that plaintiff's four remaining theories simply do

2   not hold up.

3           Before I talk about the events of

4   November 26th and November 27th, I think it's important

5   to emphasize two points.  First, Ms. McPadden is the one

6   bringing this lawsuit.  She bears the burden of

7   establishing the elements of her remaining claims by a

8   preponderance of the evidence.  You'll hear instructions

9   from the Court about what that means in a little while,

10  but it's about evidence.  She has to have evidence to

11  support her claims.  Not conjecture, not speculation,

12  not guesses, not statements or questions from counsel.

13  Evidence.

14          Second, although you've heard from a number of

15  witnesses, Ms. McPadden's theory is that Joe Certo, not

16  Barbara Kulwicki, not Heather Harris McCaffrey,

17  discriminated and/or retaliated against her for a number

18  of different reasons.  So for you to enter a verdict in

19  Ms. McPadden's favor, you must conclude, among other

20  things, that she established by a preponderance of the

21  evidence that Mr. Certo harbored some sort of

22  discriminatory or retaliatory intent against her.

23  Ladies and gentlemen, there is no such evidence.

24          If Joe Certo harbored this discriminatory or

25  retaliatory intent against Ms. McPadden, he had every

1    opportunity to act on that before November 26th, 2012.

2    He didn't need to wait for her to lose her pharmacy key.

3    If the conditions in Seabrook truly were as bad as

4    Ms. McPadden claimed they were in the fall of 2012,

5    Mr. Certo could simply have chosen to tour the facility

6    while she was on duty, identified some sort of problem,

7    and coach her for it.  But he didn't.

8         Take a look at Plaintiff's Exhibit 47, which

9    I'm going to show you right now and which you'll have

10   with you in your deliberations.

11        Plaintiff's Exhibit 47 is an e-mail string.

12   And the original e-mail, which starts on the second

13   page, goes onto the third, is from Josh Varieur to

14   Maureen McPadden, November 19th, 2012 and he copies

15   Joe Certo.  And on the second page of this e-mail, what

16   does Mr. Varieur say?  We need to make sure that we're

17   keeping our -- making -- that we're working with our

18   associates to make sure that tasks are getting done.

19   Monday morning I came in to two days' backup of day 10s,

20   22 log copies from previous dates, two recall web forms

21   not completed, outdates for November not completed,

22   three transactions for POS and other things not

23   completed.  Lots of things not completed on

24   Ms. McPadden's watch.  One of them were log copies, the

25   exact same thing for which Ms. McPadden received

coachings the year before from Janice Urbanski.

Any of those issues, any of those issues, which were at -- which were in place in Seabrook in October and November of 2012, any of those issues would have been grounds to issue a coaching to Ms. McPadden. Any of them. But did he coach her? No.

He also didn't coach Mr. Varieur for those same problems. They were happening on both Mr. Varieur's watch and on Ms. McPadden's watch. Right? Both of them were having difficulty dealing with things in the Seabrook pharmacy. And Mr. Certo didn't coach either of them because he knew that they were trying to make the best of a difficult situation. He knew that Josh Varieur was an inexperienced manager. He knew, as he testified to, that he was stretched thin. After putting this inexperienced manager in place, he suddenly had his territory expanded. He was covering two different markets. He didn't have as much time as he would have liked to spend in Seabrook.

He did the best he could. He approved overtime for technicians, he worked his contacts within Walmart to try and get technicians from other pharmacies to help out in Seabrook, he paid for travel time for those technicians, he even obtained 20 additional pharmacist hours above his allocated budget to help out

in Seabrook.  And he shared his experiences with
Mr. Varieur to try and make him a better manager.  And
he didn't hold Mr. Varieur accountable for the
deficiencies in Seabrook and he didn't hold Ms. McPadden
accountable for the deficiencies in Seabrook because he
knew they were trying to work through it together.

But, ladies and gentlemen, there's no dispute,
you heard testimony, that if Mr. Certo wanted to coach
Ms. McPadden, he could have.  He had that authority.  At
any point he could have done another tour of Seabrook or
even just acting upon the e-mails that he received from
Mr. Varieur simply issued her a coaching.  If his intent
was to -- if he had some discriminatory intent or
retaliatory intent, he had every opportunity to act on
that.  And he didn't.  He didn't.  He didn't act on it
because he didn't have that intent and there's no
evidence of that intent.

Now, let's talk about the events of
November 26th.  First, the e-mails.  That morning, on
November 26th, Ms. McPadden e-mails Mr. Certo and says
she lost her key.  Undisputed.  It's also undisputed
that Mr. Certo could have coached her on his own without
checking with anyone right then and there.  The moment
she sends that e-mail, he could have said, a-ha, this is
it, this is what I've been waiting for.  Think about it.

1    This is their theory, that Mr. Certo is out to get

2    Ms. McPadden.

3           Does he -- does he fire her right away?  Does

4    he immediately say, start the process for getting her

5    fired?  No.  He could have, and if he -- I'll submit to

6    you that if he really harbored that kind of

7    discriminatory intent, he could have and would have.

8    But he didn't.

9           Instead, what does he do?  He engages in some

10   back-and-forth with his Division 1 colleagues and a

11   number of them expressed their opinion that under the

12   Division 1 Key Control policy, which you'll have in

13   front of you in the jury room, a first-level coaching is

14   appropriate.

15          Now, you heard Mr. Certo testify that he

16   agreed in his opinion as a new -- as a relatively new

17   manager that he thought a level-one coaching was

18   appropriate.  He testified to that fact.  He put that

19   fact down in the e-mail.

20          Ladies and gentlemen, if Mr. Certo really

21   wanted to get Ms. McPadden fired, why would he put in an

22   e-mail that he agreed with the first-level coaching

23   without first checking on her coaching status?  You

24   heard testimony from Mr. Certo and I believe from

25   Ms. Kulwicki that it would take really no time at all to

1  check on her coaching status.  Two -- two minutes, I

2  think someone said.  And he didn't -- he didn't -- if it

3  is his master plan to get rid of Ms. McPadden, he didn't

4  check on her coaching status, a quick, two-minute check?

5         Ladies and gentlemen, according to their

6  theory of this case, Mr. Certo wanted to get rid of

7  Ms. McPadden since August when she sent that e-mail

8  indicating that she was documenting her safety concerns,

9  or since she requested FMLA leave in September, or at

10  least since she had had that meeting with him in October

11  when she raised a HIPAA issue.  But according to them,

12  this person who is out to get Ms. McPadden and had the

13  authority to get rid of her never once bothered to check

14  on her coaching status, not once, even though the

15  undisputed testimony is that it would only take him a

16  minute or two to look it up on the computer.  Instead

17  they would have you speculate without any actual

18  evidence in the record that he didn't check on her

19  coaching status until after he e-mailed his Division 1

20  colleagues on November 26th indicating that he had

21  agreed to a level-one coaching.  Does that make sense?

22         Ms. McPadden also would have you believe that

23  Mr. Certo only e-mailed Ms. McCaffrey because he thought

24  she would be willing to issue more than a one-level

25  coaching.  Let's think about that.  The argument you'll

hear is that he contacted Heather Harris McCaffrey
because he thought she'd be a stickler, that she'd come
down with a harsh punishment, harsher than a first
level.  Well, if that's true -- if that's true, if
that's what he believed about Heather Harris McCaffrey,
and if Joe Certo really wanted to get Ms. McPadden
fired, why not reach out to her first?  Why not just
call Heather Harris McCaffrey and say, can you believe
it, she lost her pharmacy key, that's outrageous.  He
didn't do that.  No evidence of that.  He could have
just forgotten about all this back-and-forth with
Division 1 and gone straight to Ms. McCaffrey, but he
didn't.

          For that matter, if Mr. Certo was hoping to
get Ms. McPadden fired, then reaching out to
Ms. McCaffrey is a bit of a Hail Mary play.  A Hail Mary
play.  He'd only been on the job for seven months.  For
all he knows, Ms. McCaffrey has dealt with this exact
situation before and only given a first-level coaching.
He has no idea what she knows.  Why take the risk?  Why
take the risk?  Why involve Ms. McCaffrey at all?  He
had the authority to issue a skip-level coaching if he
wanted to.  That's undisputed.  But he didn't.  Why take
that risk?  Doesn't it make far more sense that as
Mr. Certo testified, that since he'd only been on the

1  job seven months or so and he'd never dealt with this

2  situation before, and none of his Division 1 peers had

3  dealt with it before, that he would reach out to his

4  boss for guidance, a boss who'd been in that role far

5  longer than he had been in his role?  Yeah.

6       About that e-mail to Ms. McCaffrey.  This

7  e-mail, which you'll have in your -- in the jury room

8  with you, is page 16 of Plaintiff's Exhibit 7.  It's

9  also Defendant's Exhibit C.

10      I'm going to fumble with this right to the

11  end.  Excuse me.

12      This is the e-mail.  This is the moment when,

13  according to them, Joe Certo acts on his discriminatory

14  and retaliatory animus.  This is his moment; this is the

15  chance he's been waiting for.  What does he say?  Is

16  there accountability on that?  Is there accountability

17  on that?  I don't know; Ms. McCaffrey, you tell me, is

18  there accountability on that?  Not she should get a

19  second-level coaching, not even she should get a

20  coaching.  No descriptors about how bad it was that she

21  lost her key, no discussion about security of the

22  pharmacy, just a question.  Not a recommendation, not a

23  request, not advocacy.  A question.

24      If he really had wanted to discriminate or

25  retaliate against her, if he really had that in his

heart, he could have just imposed a second-level

coaching.  He could have said, the folks in Division 1

say level one, I think level two.  He could have said

nothing about Division 1 and said, I think level two.

He could have said, I think she should be fired.  He

could have commented on it.  He didn't.  He just asked a

question.  He was a new manager.  He just asked a

question.  He was looking for guidance.  He wasn't

looking to discriminate or retaliate.

Second, the time stamp.  You heard Mr. Certo

testify that he has no idea in which order the e-mails

were sent.  He doesn't -- he doesn't know if he sent

this e-mail before, after, during all those other e-mail

exchanges.  It was clearly all that morning, but which

came first we'll never know.  But, for what it's worth,

11:35 a.m. on this e-mail, in the "I agree" e-mail,

which is also in Plaintiff's Exhibit 57, I believe, time

stamped 11:53 a.m., 18 minutes later.  It's at least

possible he reached out to her before sending -- that he

reached out to Ms. McCaffrey before sending that "I

agree" e-mail.

In any event, he didn't say, oh, I definitely

reached out to her before I sent that "I agree" e-mail.

No.  He admitted, I don't know; this is an e-mail issue

that comes up from time to time; I don't know how it

1    happens; I can't recall what happened exactly in what

2    order on November 6th (sic), 2012, so I don't know.  But

3    it's possible.

4            In any event, you heard him testify that as

5    new market director having been on the job for less than

6    eight months at this point, he just wanted to reach out

7    to Heather Harris McCaffrey to obtain some guidance.

8    That's the e-mail.

9            Now let's talk about the conference call.

10           Remember in my opening I told you that the

11   evidence would show that Joe Certo, Heather Harris

12   McCaffrey, and Barbara Kulwicki all had different -- all

13   would have different memories about what was said during

14   that conference call?  Some of them remember some

15   details, some of them remember other details, sometimes

16   they conflict, sometimes they agree.  You certainly

17   heard that come through loud and clear during the course

18   of this trial, ladies and gentlemen.  They have

19   different memories about that phone call.

20           But what does that show?  That phone call was

21   over three years ago.  Do you remember the exact details

22   of what you were doing on November 26th, 2012, November

23   2013, November 2014?  Do you remember what you had for

24   breakfast last week?  We all know that memories are

25   fallible.  Would it have been great if they'd all

written down notes of exactly what has said?  Yeah, it'd

be great.  It'd be great.  It'd be wonderful.  We could

just compare A to B to C.  Instead, we have to rely on

memory.  And we all know that memory is faulty.

But what does Joe remember about that call?

What does Joe Certo, the local person who knows

Ms. McPadden, who's closest to the situation?  Well,

let's start with the fact that he's the only one of the

three that remembers that he was on the call.  Think

about that.  Think about that when Attorney Irwin gets

up here and starts talking about some kind of cover-up.

Mr. Joe Certo admits he was on the call.  If he was

trying to try and lie and somehow insulate himself from

this whole decision-making process, he'd never admit to

being on the call.

Remember Attorney Irwin's loaded question

suggesting that it would be better if Walmart -- for

Walmart if Joe Certo was not involved?  Well, he

testified under oath he was on that call.  He remembers

it.  He didn't do a lot of talking because he had his

boss and the head of HR for the whole east coast on that

call, but he was on that call.  And since he was on that

call, if he really wanted to fire her, why wouldn't he

have been more vocal?  Why wouldn't he have advocated

for a skip level?  Instead, Ms. Kulwicki and

1   Ms. McCaffrey don't remember him being on the call at

2   all.

3         Now, I suppose that we could hear some

4   argument that Heather Harris McCaffrey and -- Heather

5   Harris McCaffrey and Barbara Kulwicki are lying under

6   oath because of some unarticulated desire to protect Joe

7   Certo.  But, again, those aren't facts.  That's just

8   speculation.

9         You heard from Mr. Kelly this morning that

10   it's some -- that in his opinion, as a person who

11   predated Mr. Certo in the market manager -- market

12   director role, that in his opinion, it was custom and

13   practice to advocate for an associate when you're on a

14   phone call like this.  Well, that may be his custom and

15   practice, but there's certainly no evidence and you saw

16   me ask him, well, did you ever talk about that custom

17   and practice with Joe Certo?  Nope.

18         Joe's a new manager; he was learning the

19   ropes; he sends an e-mail saying, is there

20   accountability on that.  You know, there's no evidence

21   that in the way Joe Certo approached the situation that

22   he treated this situation with Ms. McPadden any

23   differently than he had treated any other disciplinary

24   situation involving any other associate.

25         And, again, if Mr. Kelly is correct, it would

have been his -- Mr. Certo's obligation, if you will, to advocate for Ms. McPadden during that conference call. To advocate. Well, he could have advocated for a second-level coaching. But he didn't. He didn't. He didn't say anything. He said so little that the other two people on the call don't even remember he was on it. Surely they would have remembered if he had advocated for a skip-level coaching.

They would have you believe that Joe Certo, who had waited apparently months for the opportunity to discriminate or retaliate against Ms. McPadden, after waiting all those months, he chose to act out his intent by saying nothing; by saying nothing, and just crossing his fingers and hoping that someone on that phone call would make the decision to issue a skip-level coaching.

Now, Mr. Certo, the person most likely -- the person who certainly remembers himself being on that call, testified that he thought the decision to issue a skip-level coaching was a little harsh, so he asked Ms. McCaffrey for the opportunity to call Ms. McPadden to look for the key that night. He testified, you heard him, that if she could find the key, maybe he could bring the coaching down to a first level. He's advocating on her behalf. And Ms. McCaffrey says, go ahead.

1          Now, ladies and gentlemen, this is

2    particularly important because it's undisputed that

3    Ms. McPadden's first and only telephone call with

4    Joe Certo on November 26th was that evening.  There's no

5    evidence of any other phone calls in the record that

6    day.  Their prior communications that day were by

7    e-mail, e-mails that you've seen.  Mr. Certo and

8    Ms. McPadden both testified that on the evening of the

9    26th, Mr. Certo called Ms. McPadden and asked her to

10   tear her house upside down to look for that key.  You

11   even heard Mr. McDevitt talk about the search that

12   evening.  Why on earth would Mr. Certo ask Ms. McPadden

13   to look for a pharmacy key if the decision to terminate

14   had already been made; if the locks had already been

15   changed?

16          According to the theory that you're going to

17   hear from Ms. Irwin, Mr. Certo had already gotten what

18   he wanted.  The decision to fire her had already been

19   made.  The only logical explanation for Mr. Certo's

20   request to Ms. McPadden to go find that key is what

21   Mr. Certo testified to, that he had asked Ms. McCaffrey

22   for the opportunity to call Ms. McPadden to look for the

23   key that night so that hopefully she'd find it and he

24   could say, look, it was -- the pharmacy remains secure

25   because we found the key.  That's not the act of someone

who wants to discriminate.  It's not the act of someone

who wants to retaliate.  It's the act of someone who's

trying to help someone out.  He was trying to help

Ms. McPadden out.

Now, I know you heard Ms. McCaffrey testify

that Mr. Certo told her before making the phone call --

before the phone call with Ms. Kulwicki that when

Ms. McPadden was moving, she lost her key and she didn't

take it seriously.  You heard that testimony by

videotape.  That's her testimony.  But there's no

reference to Ms. McPadden moving in e-mails.  Mr. Certo

didn't find out until that evening when he called her to

tell her to look for the key later that day.  That's

when he found out she had been moving, after the store

had been rekeyed.  He testified that he did not tell

Ms. McCaffrey that Ms. McPadden was not taking the issue

seriously until the next morning when he called her to

let her know that Ms. McPadden was unable to find the

key.  And Ms. Kulwicki testified that there was no

discussion during the conference call between the three

of them about the issue of whether Ms. McPadden took the

loss of her key seriously or not.  Instead, the focus

was on the conduct, the loss of the key itself.  Thus,

it appears that Ms. McCaffrey's combined memories of

these calls, there's simply no way Mr. Certo could have

told her that she had lost the key moving in the morning when he was completely unaware of that fact until the evening.

You also heard some speculation that Mr. Certo was going to partner with Henry Hamilton, a member of human resources, because a member of human resources needs to be present for a termination of a staff pharmacist. But that's not true. That's speculation. You heard Ms. Kulwicki testify that any member of management could witness a coaching or termination. It doesn't have to be a human resources person like Henry Hamilton.

So Ms. McPadden goes home after her shift, she and her boyfriend turn the house upside down. They can't find the key. The next morning, Ms. McPadden e-mails Joe Certo to say she could not find the key. He then calls Ms. McCaffrey and in this conversation he tells her she is not taking it seriously.

And that makes sense because he was asking her to find a key that didn't work anymore. And he didn't tell her why. Right? He didn't explain, please, go find this key because you're going to get a skip-level coaching and I really want to advocate for you. He didn't tell her that. He could have. I don't know why he didn't. There really was no testimony exactly as to

1     why he didn't.  But the fact is he didn't tell her why.

2     And so I don't know how seriously she treated it.

3     You -- that night.  She certainly looked all over for

4     it.  Would she have looked harder if she had been told

5     that she might get a coaching?  Perhaps.  Perhaps.

6             But, in any event, after Mr. Certo tells

7     Ms. McCaffrey that she couldn't find the key and that,

8     by the way, she's on a second active-level coaching, he

9     says to her, you know what this means, active

10     second-level coaching, I give her a skip level, she's

11     going to be terminated.  And Ms. McCaffrey, you heard

12     her, said, go ahead; go ahead and fire her.  Why?

13     Because in her mind, the focus was on the conduct; not

14     the status of the person, not the person's background,

15     not whether the person has engaged in any sort of

16     legally protected activity.  The focus is on the

17     conduct.  And if you start making exceptions or changing

18     coaching decisions and levels of accountability based on

19     individual characteristics regarding the person who

20     committed the offense, then what do you have?  Then you

21     have willy-nilly decisions about disciplinary actions

22     instead of Walmart's attempts -- difficult though they

23     are given how many associates they have -- Walmart's

24     attempts to try and be consistent.  Think about that.

25             Again, the decision had already been made.  If

he really wanted to discriminate against Ms. McPadden, why call Heather Harris McCaffrey again the next morning and say, you know what this means; this means termination. For all he knows, she might say, you know what, I spoke to someone last night and I -- someone else told me about a situation involving this exact same scenario, you know, it's only a first level. Again, it was -- if he wanted to get her fired, he'd already done so. There was no need for him to call Heather Harris McCaffrey on the morning of the 27th. Why give her an opportunity to reconsider that decision? Why.

Ladies and gentlemen, you've heard a lot of testimony during this trial. What you haven't heard is anyone say one bad thing about Maureen McPadden. Not one. Maybe some comments about some log copies that apply to lots of people, but not one bad thing about Ms. McPadden. But that doesn't mean she was discriminated against and that doesn't mean that she was retaliated against for requesting FMLA leave, or complaining about HIPAA, or complaining about conditions in the pharmacy. It's her burden to prove those claims and she hasn't carried her burden. The evidence will show -- the evidence showed that at the time of the decision, Heather Harris McCaffrey and Barbara Kulwicki had absolutely no knowledge that Ms. McPadden had

complained about the HIPAA violation or that she'd

complained about conditions in Seabrook.  Ms. McCaffrey,

who's currently on her third FMLA leave, testified that

she was unaware of Ms. McPadden's FMLA requests and the

fact that she'd taken leave at the time that she made

the decision to issue the skip-level coaching.  And

there certainly is no evidence, ladies and gentlemen,

that these two women discriminated against Ms. McPadden

because of her gender.

Again, Ms. McPadden claims that it's Joe

Certo, not Heather Harris McCaffrey or Barbara Kulwicki,

who's the bad guy here.  But what's the evidence of

that?  What's the evidence?  Not speculation, not

guesswork.  What's the evidence that Joe Certo had some

form of discriminatory or retaliatory intent?  There is

none.

I asked Ms. McPadden whether she had ever

heard any negative complaints or negative statements

about the fact that she'd taken FMLA leave and she said

no.  She also testified, and you saw it in evidence,

that Walmart has a policy prohibiting discrimination, a

policy that Ms. McPadden was aware of.  And that policy,

which is Plaintiff's Exhibit 66, expressly prohibits any

kind of discrimination and, more importantly, it

provides an avenue for Ms. McPadden and other associates

1　to complain if they feel like they're being

2　discriminated or retaliated against in the workplace.

3　She doesn't have to complain to Joe Certo, her direct

4　manager -- or her next level manager if she feels like

5　Mr. Certo's discriminating against her or retaliating

6　against her.  And she doesn't have to go to Josh

7　Varieur, who reports to Mr. Certo, either.  She can go

8　to another level of management or she can call this

9　1-800 number and have -- make an anonymous complaint and

10　she can pursue that route.

11　　　　　And she testified, Ms. McPadden testified,

12　that she was aware that Walmart had a policy prohibiting

13　discrimination and she testified that she was aware that

14　she -- there was a mechanism for her to make a complaint

15　if she felt like she was being discriminated against.

16　And she also testified that she never made any complaint

17　of that kind.  Never.  Not once.

18　　　　　Now, about Ms. McPadden's legal claims, her

19　four legal claims which you'll hear some instructions

20　from the jury about -- from the Court about after

21　Ms. Irwin gives her closing.

22　　　　　Her first claim is gender discrimination.

23　And, really, what she relies upon here is the Andy Tau

24　situation that you heard testimony about.  You saw the

25　videotape from Mr. Tau, you saw the e-mail exchange

between Barbara Kulwicki and Lurene Riel.  And I -- I
guess what Ms. McPadden's attorneys will say is that,
look, this is an example of a market manager advocating
on behalf of an employee who lost their key and that
person only got a first-level coaching.  Well, that's
great.  That's great.  That's Ms. Lurene Riel's decision
to send that e-mail.  But there's absolutely no -- no
suggestion in the record, first of all, that Joe Certo
was involved in that Andy Tau situation.  It's not like
he said, you know, I think this, and then changed his
mind about that.  They're completely different
scenarios.  He was not involved in the Andy Tau
situation whatsoever and there's certainly been no
suggestion in the evidence that he was.

          That decision, made a full a year after
Ms. McPadden's termination, was made by the manager
responsible for Mr. Tau's pharmacy, a woman named Lurene
Riel.  The fact that she chose to handle the situation
one way is no evidence of Mr. Certo's discriminatory
intent.  Right?  For all we know, that was Ms. Riel's
way of handling things.  Maybe she'd never handled it
that way before.  We don't know.  But there's certainly
no evidence that Joe Certo had a policy or practice of
sending those kinds of lengthy e-mails up -- up the
chain, if you will, to advocate on behalf of employees.

1   There's no suggestion that he deviated in any way from

2   his standard practices in dealing with associates.

3   Ladies and gentlemen, the Andy Tau situation has

4   absolutely no relevance here to the central question

5   that you're being asked to decide:  Did Joe Certo have

6   discriminatory or retaliatory intent?  How can you find

7   intent of Mr. Certo based on a decision in which he was

8   not even involved?  It's simply a reflection of a

9   different management style.

10          And I think I should also point out to you

11  that Andy Tau, who you heard from by video, he testified

12  that he expected to be coached for losing his key.  His

13  first manager had told him that it's a very serious

14  issue to lose the key.  He knew it was coming.  He

15  expected to be coached.  So is there any surprise that

16  Ms. McPadden got coached for losing her key as well?

17          I suppose you'll hear some argument that the

18  Andy Tau situation is important because Andy Tau was a

19  man, is a man, and Mr. Certo -- and Ms. McPadden is a

20  woman, and they were treated differently.  Again,

21  treated differently by different people.  And, in any

22  event, I think it's important for you to know that to

23  the extent Ms. McPadden argues that this is relevant to

24  her gender discrimination claim, Ms. -- Mr. Certo

25  testified under oath -- who replaced Maureen McPadden as

a -- as the staff pharmacist in Seabrook?  Diane Libby,
a woman, and he was involved in that decision.  If he
had some sort of deep-seated gender bias, why would he
hire a woman to replace Ms. McPadden?  Why would he do
that?  It's because he didn't have that bias.  There's
no evidence of it.

Now, the other thing that you'll hear some
argument about is Josh Varieur.  Well, ladies and
gentlemen, Josh Varieur was not a decision-maker with
regard to the decision to issue the skip-level coaching
to Maureen McPadden.  He was completely uninvolved.  And
to the extent you hear some argument that Mr. Varieur
was not coached for some things that he did, I'll
respectfully submit to you that during that same time
period, as I discussed at the beginning of this
argument, that Ms. McPadden was doing some of the exact
same things that Mr. Certo (sic) was doing, like log
copy issues and he wasn't coached -- and she wasn't
coached for them either.  So that comparison simply
doesn't go very far.

Now, Ms. McPadden also has an FMLA claim.  She
claims that Mr. Certo, once she came back from her FMLA
leave and told him that she might need some leave in the
future, that he didn't like that, that would make her
job difficult.  Well, again, ladies and gentlemen,

1    that's just speculation because there's no evidence in

2    the record that Mr. Certo had any trouble finding a

3    floater pharmacist to cover the pharmacy either when she

4    was out on leave or at any point.  There is no evidence

5    suggesting that that was difficult for Mr. Certo to do.

6              You heard testimony from Ms. McPadden that as

7    a floater pharmacist at CVS, she's desperate to try and

8    pick up hours.  She wants as many hours as she can get.

9    Well, there are floater pharmacists, as you heard

10   Mr. Certo testify, at Walmart who exist specifically for

11   these kinds of situations, to float.  If -- if someone

12   goes on vacation, if someone goes on a leave of absence,

13   those floaters are there to pick up the slack because

14   things happen.  People have children, people get sick,

15   they need to be out.  And to cover for the pharmacy,

16   they have floater pharmacists.  There's no evidence that

17   Mr. Certo viewed Ms. McPadden's FMLA leave or request

18   for leave or the fact that she might take additional

19   leave in the future, that he viewed that as some sort of

20   negative.

21             HIPAA.  I don't know if you'd ever heard of

22   HIPAA before this case.  You heard a fair amount about

23   it during this case.  One of Ms. McPadden's theories is

24   that Mr. Certo retaliated against Ms. McPadden because

25   she complained about the HIPAA issue -- that she

1    complained about the fact that a technician in Seabrook

2    had made some mention about her prescription or her

3    medical condition or why she was on a leave of absence.

4           Ladies and gentlemen, it's undisputed that

5    Mr. Certo made a mistake.  He didn't follow the HIPAA

6    policy.  He should have absolutely referred that matter

7    to the HIPAA team and he didn't.  It's also true that

8    the evidence in the record shows that this was the first

9    time he had ever had an associate bring a HIPAA

10    complaint to him about another associate.  He had never

11    dealt with this situation before.  He had conducted

12    other investigations -- you heard him talk about Redbook

13    investigations -- and so he did what came naturally to

14    him is he started making some phone calls.  And he did

15    those -- made those phone calls in -- as he said, using

16    broad, open-ended language so that he wouldn't actually

17    disclose HIPAA information in the context of looking

18    into this HIPAA issue.

19           Again, undisputed that he violated the HIPAA

20    policy.  But is there any evidence in the record that he

21    held it against Ms. McPadden for raising the HIPAA

22    concerns?  I submit to you there's none.  There's no

23    such evidence.  There's no negative comments in the

24    record, why are you raising this issue, nothing like

25    that.  Nothing.

1        Another of Ms. McPadden's claims is that she

2   was retaliated against for complaining about safety

3   issues.  What's the evidence of that?  I guess what

4   you'll hear is that -- well, before I get to that,

5   there's no dispute that there were problems at Seabrook.

6   If you want to call them opportunities, great; you want

7   to call them problems, great.  It was a tough place to

8   work because they were having staffing issues.  They

9   were having staffing issues in 2012, they were having

10  staffing issues in 2011, and if you read some of the

11  e-mails from Ms. McPadden that are in evidence, they

12  were having staffing issues in 2010.  At one point she

13  described the Seabrook pharmacy as a sinking ship, well

14  before Josh Varieur arrived, well before Mr. Certo

15  arrived.  And Mr. Certo testified that he absolutely

16  viewed it as her responsibility to bring these issues to

17  his attention.  It was part of her job.  It was part of

18  her professional responsibility as a pharmacist in

19  New Hampshire.

20        So what's the evidence, ladies and gentlemen?

21  What's the evidence that Mr. Certo somehow wanted to

22  retaliate against Ms. McPadden because she raised these

23  issues?  What's that evidence?  I understand your

24  frustration?  I understand your frustration?  Is that

25  what we're going to hear, that when Mr. Certo responds

1   to Josh Varieur's e-mail on November 26th, in

2   Plaintiff's 47, I understand your frustration, they're

3   going to ask you to believe that this frustration is

4   frustration with Maureen McPadden complaining about

5   safety issues?

6           Read the e-mail, ladies and gentlemen.  When

7   you have the opportunity in the jury deliberation room,

8   read the e-mail.  He's talking about retraining the

9   staff, including Ms. McPadden, because they are both

10  jointly responsible for helping to fix the problems in

11  Seabrook.  The problems that he was -- that he testified

12  about that he was trying to fix through his efforts,

13  they were responsible as well.

14          He was talking about 15-minute breaks.  Not

15  bathroom breaks, ladies and gentlemen; not bathroom

16  breaks.  You heard him testify to the fact that he was

17  talking about the 15-minute breaks and that it's

18  important when you're trying to organize work flow in

19  the pharmacy to have people take their breaks at

20  scheduled times so that people aren't taking a 15-minute

21  break whenever they want to, leaving some poor customer

22  at the pharmacy window waiting and unattended to.

23          There's no evidence in the record, ladies and

24  gentlemen, to suggest that this frustration -- and the

25  frustration is Josh Varieur's frustration.  I understand

1  your frustration.  He's not saying -- he doesn't say,
2  I'm frustrated.  I understand your frustration.
3          And you heard Mr. Certo testify as to why he
4  understood the frustration, because he had dealt with
5  the exact same kinds of situations when he was a
6  pharmacy manager in Providence.  He'd had to help train
7  technicians there and get that pharmacy back up on its
8  feet.
9          You'll also hear, as you heard during the
10  course of this case, some comments about shifting
11  decision-makers, shifting policy rationales.  Well,
12  ladies and gentlemen, if you ask -- if lawyers ask you
13  the same question over and over and over in slightly
14  different ways, I'd submit to you that you're bound to
15  get some inconsistencies over time.
16          Think back to Ms. McPadden's own testimony.
17  At her deposition, she denied ever having received the
18  first coaching, the one that was originally designated
19  as a verbal coaching, and then when Walmart globally
20  sort of changed its policies it became a first written
21  coaching.  At deposition she denied ever having received
22  it.  Then at trial she admitted -- she said, oh, yup, I
23  admit it, I did receive that coaching.
24          When I asked her why -- this is a change,
25  right?  She was sworn to tell the truth in her

deposition -- you learned a lot about depositions during this case. She was sworn to tell the truth at her deposition, she was sworn to tell the truth here, and she changed her testimony when she came to this court.

And I asked her, well, you know -- well, in the course of the questions, you know, why did you change your testimony? And she said she was nervous during the -- during the deposition that I took of her. Okay. Well, she sat for one deposition and some of these witnesses that you heard from sat through multiday depositions, including what are called 30(b)(6) depositions, where witness is supposed to synthesize all the information available to Walmart and testify to it in a coherent manner. Aren't they allowed to be a little nervous, too? Is it not expected that they might not remember things 100 percent, just like Ms. McPadden didn't?

Ms. McPadden also couldn't recall whether she had her keys on -- her pharmacy keys on Sunday or not, right? She testified that she -- she thought she did, she testified at deposition, as you heard, that she couldn't recall whether she'd lost them over the weekend on Saturday or Sunday. And don't we expect that? Don't we expect that three years ago you might -- you might not remember exactly what happened in exactly what in

1   what sequence three years ago?

2          Ms. McPadden had difficulty remembering

3   things.  So did Heather Harris McCaffrey, so did Barbara

4   Kulwicki, and so did Joseph Certo.  That's memory.

5   That's life.  That's what happens when people are asked

6   to remember things that happened long ago.

7          With regard to the coaching, Ms. McPadden

8   testified that -- well, I remember it now, but I didn't

9   think it was coaching.  Well, then I showed her the

10  e-mail where she complains to David Kelly.  She says,

11  hey, I just received a coaching for these issues; and

12  there wasn't a spot for me on the form to explain why I

13  disagreed with the coaching or put it in context.  And

14  she articulated that in this e-mail to David Kelly.

15         Now she said, I didn't think it was a coaching

16  at the time; I remember the conversation, I didn't think

17  it was a coaching.  And then I showed her the e-mail and

18  she said, oh, yeah, yeah, I guess, yeah, it's a coaching

19  -- here I am, in writing, saying it's a coaching.

20         Am I saying she was lying or she was doing

21  anything inappropriate?  No, ladies and gentlemen.  It's

22  memory.  Memory is a funny thing.  Some people will

23  remember every single thing that happened, some people

24  will not, and when you try to have three people remember

25  under oath exactly what happened in exactly what

1    sequence in a conference call three years ago, there's

2    bound to be some discrepancies.

3            Going back to the conference call with Heather

4    Harris McCaffrey, Barbara Kulwicki, and Joe Certo,

5    Heather Harris McCaffrey testified that going into that

6    conference call she had already -- she had already had

7    in her head a second-level coaching before she even

8    spoke to Barbara Kulwicki because of the situation

9    involving the vision center employee, that she had been

10   told that a vision center employee had lost her key and

11   as a result received a skip-level coaching in the same

12   region and so she was thinking in her mind that this was

13   a precedent.  You heard that testimony.  Barb recalls --

14   Barbara Kulwicki recalls Ms. McCaffrey testifying or

15   talking about that vision center employee as well.

16           Now, you may, as you sit here, say to

17   yourself, well, I don't think that vision center person,

18   whoever she was, had -- you know, should have gotten a

19   second coaching; that's just not -- doesn't make sense

20   to me.  I -- you look at that situation and you might

21   say to yourself, that's not how I would do it.  Well,

22   ladies and gentlemen -- and you'll hear some

23   instructions on this from the Court -- that was

24   Walmart's business judgment at the time.  Whoever made

25   the decision to issue that second-level coaching to that

1  vision center employee decided that a second-level

2  coaching was appropriate.  Okay?  And Heather Harris

3  McCaffrey is entitled to rely on that in making a

4  decision.  And that was a decision that Joe Certo

5  apparently had never even known about.  Okay?  She

6  thought that given that that a second-level coaching was

7  appropriate.

8           Ladies and gentlemen, you have heard testimony

9  from a number of people about what was said and when it

10 was said.  You've heard -- you've heard and seen

11 documents talking about different policies that were

12 identified at different times.  And, ladies and

13 gentlemen, I guess what you're going to hear is that

14 this was all part of some sort of cover-up; that Walmart

15 kept changing its reasons as to, you know, who was

16 involved in the decision and what policy was relied upon

17 as some form of cover-up.  Well, ladies and gentlemen,

18 if that was -- if that's the theory, if that's their

19 claim, they did a poor job of it because they left a

20 track record of exactly each step along the way, what

21 they said, and it's in writing.  If there was some grand

22 master conspiracy going on here, why would -- and if you

23 believe, as I think you're going to hear argument, that

24 these individuals are willing to lie under oath for some

25 reason, if they're going to lie, why not all get

together in one room and agree upon a story? Why not

just come up with a story that is consistent throughout?

They didn't do that. There's no evidence that they did

that. Instead, they told the truth. And the truth is

messy because memories are fallible.

Now, you've heard some testimony about

interrogatory responses and you'll have the opportunity

to review those responses in full; the long, lengthy

questions, the legal objections, the factual responses.

The lawyers -- the lawyers' questions, the lawyers'

responses, the company's responses. And I'll submit to

you that the first set of interrogatory responses, the

commission -- the responses filed with the New Hampshire

Commission for Human Rights or submitted in the course

of the New Hampshire Human Rights Commission

proceedings, those are signed by Joe Certo and they

identify Joe Certo as the person who's -- who was

consulted regarding those interrogatories.

Specifically, when you look at Plaintiff's

Exhibit 10, interrogatory number 2, it says, Joe Certo

assisted in the preparation of these responses. He is

the person named in interrogatory number 2 as the person

who assisted in preparation of these responses. And

what does he say in these interrogatory responses?

Specifically, number 11, he says that Ms. McPadden's

employment was terminated after she admitted losing her

pharmacy keys while on a second written coaching,

exactly what you heard him testify to here under oath.

And the interrogatory responses number 14 --

well, 15, in response to interrogatory number 15, when

asked about what policies might have been implicated by

the loss of the pharmacy key, Mr. Certo identifies the

Key and Door Control policy, the very policy that he was

discussing via e-mail with his Division 1

colleagues in the e-mail exchanges during the morning of

November 26th.

And he, in interrogatory response number 14,

states that he and Heather Harris McCaffrey and Barbara

Kulwicki conferred and determined that Ms. McPadden

should be terminated after she admitted losing her

pharmacy keys while on a second written coaching.

Mr. Certo provided -- is the one who provided

information in connection with these interrogatory

responses and he provided information that's completely

consistent with how he testified here at trial regarding

his role in the events.

He absolutely was involved in the process.  He

raised the issue to Heather Harris McCaffrey, is there

accountability.  Ms. McCaffrey then takes it upon

herself to start a conference call with Barbara

Kulwicki.  And Joe, in his memory, as he'd testified to here, he's on the phone call.  They're all conferring. Heather Harris McCaffrey, Barbara Kulwicki, they don't remember him, but these are -- you know, this is the information that Joe has.  He remembers being on that call, he remembers being part of the process, if you will, and he remembers Barb and Heather making the decision.

And then what happens?  Then this case moves from the Human Rights Commission to the court.  And, once again, Maureen has attorneys serve interrogatories on Walmart.  And in these responses, which are Plaintiff's Exhibit 11, a little different.  Who provides information in response to these interrogatories?  Take a look at response to interrogatory number 1.  Joseph Certo, Barbara Kulwicki, Heather Harris McCaffrey are the individuals identified as providing information responsive to these interrogatories.  The first set was Joe; the second set was information provided by all three.

And now we have the same questions repeated again, but this time they're trying to get -- they're getting information, they're getting responses, from three different individuals, three individuals who have very different memories of what happened on that phone

1  call.  How do you provide a response to a question when

2  it's posed to a company that's based on information from

3  three different people, each of whom have different

4  memories of what happened during a phone call?  You

5  provide all the information.

6        So in response to interrogatory number 9, what

7  are the policies that -- that led to her termination?

8  What's identified?  The Coaching for Improvement policy,

9  obviously; she was on second-level active coaching.  A

10  skip level resulted in her termination.  Two, the AP-05

11  Key and Door Controls policy, the very policy that

12  Mr. Certo had previously identified in the responses to

13  the New Hampshire Commission for Human Rights

14  interrogatories, the very policy that Mr. Certo

15  discussed via e-mail or received comments about by via

16  e-mail with his Division 1 colleagues on the morning of

17  the 26th, the very policy that is referenced in his

18  e-mail to Heather Harris McCaffrey.  In that e-mail, in

19  the subject line, what does it say?  Key control.

20  That's the policy that he had in his mind that morning,

21  because that's the policy that his colleagues had

22  mentioned.

23        What else is identified in interrogatory

24  response number 9?  The HIPAA policy.  Because that was

25  a policy that Ms. McPadden had made a complaint under

1   way back when, so it's obviously relevant to the case.

2           And then finally we have a reference to the

3   Pharmacy Operations Manual policies.  And you heard

4   testimony here under oath from multiple witnesses that

5   the matrix that Heather Harris McCaffrey and Barbara

6   Kulwicki talked about during the conference call is a

7   part of the Pharmacy Operations Manual.  The Pharmacy

8   Operations Manual includes the matrix.  It also includes

9   POM 902, which is that sort of broader policy about

10  pharmacy security that you heard some testimony about as

11  well.  That policy, that POM 902, is referenced in the

12  matrix.  And, again, neither the matrix nor POM 902 nor

13  AP-05 specifically say that if you lose your pharmacy

14  key, you will get a skip-level coaching or even that you

15  will get a first-level coaching.

16          But I think if you look at those policies and

17  if you consider the testimony that you heard here about

18  the importance of maintaining pharmacy security, I think

19  the only conclusion that you can reach is the same

20  conclusion that Heather Harris McCaffrey and Barbara

21  Kulwicki reached:  Pharmacy security is important; we

22  may not have an exact policy on point, but a pharmacy

23  key is part of that security system, if you will, and so

24  the loss of a key merits some significant discipline.

25          Now, in those same interrogatory responses,

1   interrogatory number 14 asks, again, who made the

2   decision to issue the skip-level coaching. And just

3   like in the prior interrogatory responses, Barbara

4   Kulwicki, Heather McCaffrey, this time it's they

5   determined that. Not conferred and determined, but

6   determined.

7         How do you synthesize three different memories

8   of what happened? How do you synthesize the fact that

9   Heather Harris McCaffrey and Barbara Kulwicki testified

10   and believed and remember that they're the ones who had

11   this back-and-forth, and they're the ones that made the

12   decision with the -- and the fact that they don't even

13   remember Joe Certo being on the phone call? How do you

14   sort of close that loop? You write that Barbara and

15   Heather determined. They're the two who made the

16   decision. It's not to say that Joe wasn't on this phone

17   call. He absolutely was. He testified to it. He

18   stated as much in the interrogatory responses. But it's

19   clear that the decision-makers on this call were

20   Ms. Kulwicki and Ms. McCaffrey, and not Mr. Certo.

21         These interrogatory responses, when you look

22   at them in context, when you consider the testimony that

23   you have heard, do not represent any sort of shifting of

24   who made the decision, what the decision was based on.

25   They're simply responses to convoluted questions that

1  were prepared as best as possible based on the memories

2  of three people who have different recollections of what

3  happened.  If anything, they're evidence of poor

4  memories, not evidence of discrimination, not evidence

5  of retaliation, and they're certainly not evidence that

6  Joe Certo -- who's consistently admitted that he was on

7  that phone call when this decision was made -- certainly

8  not evidence that Mr. Certo harbored any kind of

9  discriminatory or retaliatory animus.

10         Ladies and gentlemen, Ms. McPadden received a

11  skip-level coaching because she lost her pharmacy key.

12  As I testified -- as I told you in my opening statement

13  and as you heard from Ms. McCaffrey and Ms. Kulwicki,

14  that loss was significant.  No one had ever -- to their

15  knowledge, no one had ever lost a pharmacy key before

16  and it's important.  You know its what's behind the

17  pharmacy counter.  You know why it's important to keep

18  that secure.  And they decided -- the evidence has shown

19  that they decided that Ms. McPadden's loss of her

20  pharmacy key warranted a skip-level coaching.

21         They didn't know it was going to be

22  termination.  They testified they didn't think it was

23  on -- in and of itself that it warranted termination,

24  but that it warranted a skip-level coaching.  This was

25  their testimony.  That is what happened in the case.

1    They decided to hold Ms. McPadden accountable.  Not

2    because of her gender -- Heather Harris McCaffrey and

3    Barbara Kulwicki did not coach Ms. McPadden because of

4    her gender.  There's no evidence of that.  There's no

5    evidence that she -- that they coached her because she

6    requested a leave of absence, there's no evidence that

7    they coached her for complaining about concerns of the

8    pharmacy.  Indeed, there's no evidence that they were

9    even aware of those concerns.  There's no evidence in

10   the record that they coached her for complaining about

11   HIPAA issues.  None.  The only thing that you've heard

12   is some conjecture and some speculation.

13           Ms. McPadden was a pharmacist and she lost her

14   key to the pharmacy.  That's what the evidence has shown

15   in this case.  That's what I told you at the outset of

16   this case the evidence would show.

17           Ladies and gentlemen, thank you very much for

18   your time this week.  Thank you for your consideration

19   of the evidence.  I believe that the evidence will show

20   once you've had a chance to deliberate that Walmart held

21   Ms. McPadden accountable because of her actions, not

22   because of any discriminatory or retaliatory reasons.

23           Thank you.

24           THE COURT:  Thank you, Mr. Kaczmarek.

25           Ladies and gentlemen, just because the

1    argument was a little extended and I don't -- to be fair

2    to plaintiffs, maybe we should take a short break so

3    that we're all ready to go because I think plaintiff's

4    will be equally extended.

5              So we'll take just a brief recess.

6                        (Recess.)

7              MS. IRWIN:  Your Honor, we just have a very

8    quick issue.  There were a couple of blow-up charts that

9    are not exhibits in the case that we wanted to use.  And

10   Attorney Kaczmarek objects, so we hoped that we could

11   just --

12             MR. KACZMAREK:  Yeah.  And the primary reason

13   for my objection, your Honor, is that as you can see,

14   the charts contain, among other things, direct quotes

15   from deposition testimony; not the testimony that was

16   given in court, but deposition testimony.  That

17   testimony is not in the record evidence in this case.

18             THE COURT:  Oh, you can't use it to do that,

19   obviously.

20             MS. IRWIN:  Okay.  I mean, I -- to me, it's

21   just like making oral argument when Mr. Kaczmarek

22   referenced what Ms. McPadden had said in her deposition,

23   things that were brought up in court or in her

24   deposition --

25             THE COURT:  Oh, if it's before the jury, you

1    can certainly point to it, but you can't now introduce a

2    quote from a deposition that has not been admitted in

3    into evidence in some way.

4              MS. IRWIN:  Do you mean that the deposition

5    testimony was not spoken about in the trial?

6              THE COURT:  Sure.  All you can refer to --

7              MS. IRWIN:  Yeah.

8              THE COURT:  -- is what has been admitted --

9              MS. IRWIN:  Right.

10             THE COURT:  -- into evidence.

11             MS. IRWIN:  Right.  And so --

12             THE COURT:  So extracurricular comments in a

13   deposition that were not admitted in evidence --

14             MS. IRWIN:  Okay.  But isn't it quite

15   similar -- and I -- I'm not going to die on this

16   mountain -- but when Attorney Kaczmarek said, oh, well,

17   Maureen, in her deposition, couldn't remember if it was

18   Saturday or Sunday, then she testified in court that she

19   thought it was Sunday --

20             THE COURT:  But he covered that with her.

21             MS. IRWIN:  Right.  And all of these -- that's

22   I was just trying to clarify.  All of the deposition

23   testimony that's in the charts was covered with

24   witnesses when they were on the witness stand.

25             THE COURT:  Oh, okay.

1          MR. KACZMAREK:  They're direct quotes, your

2    Honor, from deposition testimony, not --

3          THE COURT:  Were those direct quotes given to

4    the witness and asked about?

5          MR. FRADETTE:  Well, certainly the video

6    deposition --

7          MR. KACZMAREK:  Well, but we're -- sorry.

8    I'm -- I'm up here.  I haven't had a chance to review

9    all of this and that's certainly no fault of plaintiff's

10   counsel.

11         So we've got direct quotes from depositions

12   that were not presented into evidence; we've got

13   references to, among other things, you know, case --

14   Walmart transfer of the case to federal court.  I don't

15   see -- that certainly didn't come into evidence.  I

16   don't see how that's relevant and why the jury needs to

17   see it.

18         Certainly Attorney Irwin can reference

19   testimony, just like I did --

20         THE COURT:  Sure.

21         MR. KACZMAREK:  -- but to present direct

22   quotes from things that were not presented in evidence

23   in front of the jury I think is unfair, it's

24   prejudicial, and I just don't think it's appropriate.

25         THE COURT:  Yeah, I think the operative

1  principle is you may, in your closing, refer to all of

2  the evidence that is properly before the jury.

3          MS. IRWIN:  Yeah.

4          THE COURT:  You may not introduce evidence to

5  the jury that was -- has not been properly admitted into

6  evidence.

7          MS. IRWIN:  Right.

8          THE COURT:  That answers the question.

9          Now, if you're asking me what was and what

10  wasn't, I don't -- I don't have a clue.

11          MR. KACZMAREK:  Therefore, I would ask --

12  again, these were just presented this morning.

13          As I sit here, I don't know exactly what was

14  and wasn't, but it sure seems like a lot of it was not

15  covered.  And, therefore, I'd ask the Court that these

16  blow-ups be -- be stricken, that they not be allowed to

17  be used or referenced during Attorney Irwin's closing.

18          THE COURT:  Well, sure.  I'll give you an

19  equally unhelpful general order.  You may not refer to

20  evidence that was not admitted before the jury.

21          Now the ball's in your court.

22          MS. IRWIN:  I'm not going to risk it.  I'm

23  going to talk about my memory and we're all set.

24          MR. KACZMAREK:  Thank you, Your Honor.

25          THE COURT:  You can certainly use them, you

1  know, for your own reference if you want to turn it

2  over --

3          MS. IRWIN:  I'll just --

4          THE COURT:  Oh, you've got them.  But, again,

5  you're not going to quote from a deposition --

6  deposition testimony.

7          MS. IRWIN:  I'm going to do it the way

8  Mr. Kaczmarek did; he said this in his deposition, as

9  you heard in the court --

10          THE COURT:  Okay.

11              (IN OPEN COURT - JURY PRESENT)

12          THE COURT:  Attorney Irwin, whenever you're

13  ready.

14          MS. IRWIN:  Thank you, your Honor.

15          <u>CLOSING ARGUMENT BY ATTORNEY IRWIN</u>

16          MS. IRWIN:  Ladies and gentlemen of the jury,

17  Maureen McPadden, Attorney Fradette, and I thank you for

18  your attention to this case.  I want to warn you I may

19  take an hour and possibly a little bit more, but Maureen

20  McPadden has waited several years to have her case heard

21  and I want to make sure I do her case justice.

22          So I want to start out with why does the law

23  protect the activities of raising safety and other legal

24  concerns?  And the reason is that reporting these issues

25  is good for the public.  We want someone to stop Walmart

when its practices are unsafe, someone like a pharmacist

who can tell that the practices are unsafe.  We want

someone to raise an issue when patients' privacy is

being violated.  We also think it's good for the public

to take limited leaves of absence to address medical

reasons.  In Maureen's case, she took a leave of absence

to make sure that she could be safe to fill

prescriptions.

But if we all agree that this is important

activity, why would employees need legal protection when

they do it?  Well, the truth is that hearing someone

blow a whistle about your failures is unpleasant and

frustrating.  Imagine someone standing near you and

blowing a whistle to tell you that you're doing

something wrong, repeatedly, again and again.  That's

unpleasant.  And that would naturally lead someone to

want the person blowing the whistle to go away.  This is

especially true for a new manager who would feel more

threatened by criticism.

Mr. Certo was a brand-new market manager and

he had just hired a brand-new pharmacy manager, Josh

Varieur.  That was Mr. Certo's hire who clearly was not

up to the job.  Maureen's concerns and her raising those

concerns very likely made Mr. Certo feel defensive since

it was -- he was new, it was his decision to put Josh

1  Varieur in the position, and the pharmacy was clearly

2  operating under unsafe conditions.  Now add on that Mr.

3  Certo was covering two markets as a brand-new market

4  manager in the fall of 2012.  He's busy.  And as

5  Attorney Kaczmarek said, he's stretched thin.  He

6  doesn't want to hear someone raising safety and legal

7  concerns.

8         The same is true with the FMLA leave.  A leave

9  of absence, particularly unplanned, is, in fact,

10  inconvenient, especially for a new market manager like

11  Joe Certo who was facing staffing issues already.  Even

12  Mr. Certo had to agree that an unplanned leave of

13  absence creates a challenge for management.

14         So the law protects employees like Maureen

15  from being fired for doing the right thing.  The law

16  doesn't stop a manager from feeling the frustration; the

17  law stops the employer from acting on it by taking

18  adverse action against the employee.

19         Now, Walmart has stipulated, which means that

20  Walmart agrees, that Maureen had a reasonable and good

21  faith basis to raise safety concerns, to raise her HIPAA

22  concern, and also that she engaged in protected activity

23  under the FMLA.  So you do not need to decide those

24  issues because there's no dispute on those issues.

25         The evidence in this case demonstrates that

1    when Maureen raised those reasonable and good

2    faith beliefs about the unsafe conditions, including

3    Josh Varieur's synthroid error and the other conditions

4    at the pharmacy, the HIPAA violation, and when she took

5    and discussed her need for FMLA leave, Joe Certo

6    eventually got frustrated and he used that frustration

7    to seize on the loss of the key as an excuse to fire

8    Maureen.  And he influenced the decision so that he

9    could get her fired.  That was the real reason.

10          Now, I am not the first person to come up with

11    an idea of what type of evidence can be used in an

12    employment discrimination case.  There's a body of law

13    that has been developed on this and Judge McAuliffe is

14    going to tell you what that law is.  And so one of the

15    ways that you can prove discrimination or retaliation is

16    through circumstantial evidence.  And the shifting or

17    consistent reasons and the timing, those are all ways

18    that the law has found legitimate, perfectly good ways

19    to prove these cases.  That's not my idea.  That's what

20    the law says.  And so I would just ask you to please

21    pay -- listen to the judge on those instructions and I

22    will try to summarize the evidence in a way that's

23    consistent with that law.

24          The evidence in this case demonstrates that

25    when Maureen raised her good faith beliefs, he got

frustrated and he seized on the key as an excuse.  And

Walmart is defending the case by essentially saying Joe

Certo and Walmart may have not been the best, but they

did the best they could, they don't have really good

memories, and they didn't discriminate or retaliate.

But, ladies and gentlemen of the jury, Mr. Certo is not

stupid.  He went from being a pharmacist to a pharmacy

manager to a market manager to now a regional manager in

less than five years.  He knows what to do and he knows

what he wants.

Judge McAuliffe will instruct you that Maureen

McPadden does not need direct evidence of Walmart's

unlawful motive.  A company and a person like Mr. Certo

or Ms. McCaffrey or Ms. Kulwicki, for that matter, will

never -- in my experience, will never admit that they

violated the law.  That's why you are allowed to look at

circumstantial evidence and you can rely exclusively on

circumstantial evidence.  There are several types that

you may consider in the case.

The first type is called temporal proximity,

which is the timing.  And the reason for that is when

you see a lot of protected activity happening close in

time to when the termination happens, that's evidence

that the decision was motivated by the unlawful reasons.

So let's look at the timing.

1          Maureen reported the dispensing error, which

2     was a patient safety issue, on August 13th, 2012.

3     Maureen then e-mailed Mr. Certo about safety concerns on

4     August 29th, 2012.  And let's imagine each one of these

5     things is a blowing of a whistle.

6          Maureen took FMLA leave from November 19th

7     (sic) through October 3rd and when she returned, she

8     alerted Mr. Certo that she wanted a meeting to discuss

9     the HIPAA violation.  That one-hour meeting took place

10    in mid to late October.  During that meeting, she

11    reported the HIPAA violation, the FMLA leave that she'd

12    taken and she'd likely need more, and she reiterated her

13    safety concerns.  Maureen e-mailed Mr. Certo with her

14    serious safety concerns again on November 16th, 2012.

15         By November 26th, 2012, Maureen had -- was

16    again raising concerns that the technicians were not

17    being given bathroom breaks.  And you'll be looking at

18    Exhibit 47.  It is very clear that Mr. Varieur is saying

19    that Maureen is resisting him.  And when Mr. Certo says

20    he understands the frustration, the e-mail is about

21    Maureen not stopping the technicians from taking breaks

22    when it was outside of their scheduled 15-minute break.

23         So, again, Maureen is standing up for the --

24    for someone, raising a concern, and by this point -- and

25    obviously these things can build -- by this point,

Mr. Varieur is describing Maureen's reporting as
resistance and Mr. Certo, most importantly, is saying, I
understand your frustration.

That very same day, Mr. Certo is involved in
the decision to issue the second-level coaching to
terminate Maureen.  Well, the defense questioned why not
earlier.  First of all, these issues do build.  There's
a new manager, she's repeatedly raising concerns and
raising concerns from the very end of August until
November.  It's not a very long time period and there
are quite a few concerns raised.  So certainly it would
be -- his frustration would naturally be building.

Secondly, as I discussed earlier, Mr. Certo is
not stupid.  Ms. McPadden had raised her concerns in
writing, said that she was documenting.  He would know
that human resources had a record of her FMLA leave.  If
he's going to do something to her, he's going to do it
carefully.  He's risen amazingly fast at Walmart.  He
knows what he's doing.  He was going to do it carefully
and he was going to do it with cover from his peers and
from his manager.  So there's compelling evidence based
on the timing alone.

The second type of circumstantial evidence
you may consider is called pretext.  Pretext means false
or -- or although true, not the real reason for the

action taken.  A pretext is an excuse to hide the
unlawful reason.  One way to show pretext, which the
judge will tell you is the law, is to show that
Walmart's explanation for issuing the second-level
coaching to Maureen is weak, inconsistent, and/or has
contradictions in it.  That's not a theory that I'm
raising for the first time in history.  That's what the
law says about this and so you are allowed to consider
that evidence.

There's no dispute that Maureen lost her key
and immediately and properly reported the loss.  There's
no dispute on that.  And we agree that Walmart does not
need a policy to terminate an at-will employee.  We
agree with that.  But there is compelling evidence of
Walmart's shifting, weak, and contradictory
explanations.

Now, Mr. Certo, being a witness at the Human
Rights Commission, didn't say, hey, you know, she lost
the key, we consider that important, that's why she got
a second level.  He actually -- he could have said, we
don't have a policy that covers this, but we wanted to
do this.  But that's not what he did.  He -- he said it
was the AP-05 policy.  And he actually said, I believe
in court and also at his deposition, that it was that
AP-05 policy that was discussed with Ms. McCaffrey and

Ms. Kulwicki. Well, Walmart didn't like that policy because it's not a policy -- when you look at it, it doesn't justify any discipline for losing a key and properly reporting it.

So Walmart changed it to POM 902, which, by the way, POM stands for Pharmacy Operation Manual. So that's what a POM is. So they changed to 902 and then eventually up pops this idea of a matrix, which does not have a POM at the top of it. It's a matrix. And Ms. Kulwicki loved to talk about the matrix because she believed that allowed her to say she didn't have to consider any other comparators, whether anyone had ever lost a key in the history of Walmart before, because the matrix made it a whole new world, so she didn't have to do her job of assuring that there was consistency to avoid violations of the law.

Now, you can see that when you look at the interrogatory answers and the other exhibits that you have, the matrix was never mentioned in written statements under oath at all. So they tried to use a policy to justify a termination. When it didn't work, they testified under oath that they were really using a different policy.

Now, I'll just respond to one issue Attorney Kaczmarek raised. If they wanted to say that different

1  people had different memories, they certainly could have

2  done that.  You'll see in some of the sworn testimony

3  they actually say, Mr. Certo recalls.  They could have

4  said Mr. Certo recalls this, Ms. Kulwicki recalls that,

5  Ms. McCaffrey recalls the other thing.  That's not what

6  they said.  They gave an official answer of what was

7  Walmart's answer and they had their people sign it under

8  oath.

9          And so they switch around which policy, none

10  of the policies actually tell you that anybody would be

11  disciplined or how much the discipline would be for

12  losing a key.  And, of course, the problem with being

13  dishonest is that it's hard to keep your story straight.

14  And in the end, Mr. Certo and Ms. McCaffrey and

15  Ms. Kulwicki, among themselves, could not decide which

16  policy they were using to justify the discipline, which

17  policy they had discussed when they were deciding on the

18  discipline.  And remember Ms. Kulwicki finally had to

19  admit that no policy actually justified the discipline,

20  so she went back to saying, we don't need a policy.

21          Now, Walmart doesn't need a policy, but they

22  spent a lot of time being dishonest about it to try to

23  cover themselves.  And shifting around and being

24  inconsistent is evidence that they were trying to cover

25  up the discriminatory and retaliatory reasons for the

termination.

And, finally, I would remind you that Andy Tau, in his short video deposition, testified that he was told that he was disciplined for losing his key because it cost Walmart money to change the locks.

Now, on the issue -- another inconsistency is on the issue of who decided to issue the second-level coaching. Again, shifting inconsistent reasons. First, Mr. Certo clearly stated at the Human Rights Commission that he was one of the three who conferred and determined and that he was one of the three who was ultimately responsible for the decision to terminate. And that's in Exhibit 10, number 18. So it wasn't a tricky question. It was who was responsible for making that termination decision, and he listed that he was one of the three.

Then Walmart decided since Mr. Certo knew all about Maureen's protected activity and Ms. McCaffrey and Kulwicki maybe did not, it would be bad for Walmart if Mr. Certo was a decision-maker. So what did they do? They rewrote history and said only McCaffrey and Kulwicki decided. That's Exhibit 11. It really couldn't be stated more clearly. It's not a tricky question. They said they decided it and then they said Mr. Certo only executed the decision. Big change. Not

1    by accident.

2          And as I said before, the problem with being

3    dishonest is it is hard to keep the story straight.  And

4    when he's on the stand, Mr. Certo eventually went back

5    to saying he was a decision-maker and then he wasn't

6    sure if he was a decision-maker and then he was a

7    decision-maker and then Ms. Kulwicki really couldn't

8    decide if she was a decision-maker or not, even though

9    she had done a sworn statement under oath in written

10   documents that Walmart submitted.

11         And, eventually, Ms. McCaffrey testified

12   that -- finally testified -- that Mr. Certo had clearly

13   influenced her decision.  And one of the things that I

14   find striking about the differences in the way we

15   describe the case in closing, which obviously is not

16   evidence, but there's one key conversation that

17   Attorney Kaczmarek did not discuss.  And that was the

18   conversation after Mr. Certo sent his nice, innocent

19   e-mail, is there accountability for a lost key, question

20   mark, there was a call.  Ms. McCaffrey said, I didn't

21   e-mail him back, I called him.  And this was before the

22   conference call.  She's got to get the scoop for what

23   are we going to be talking about, what are we going to

24   be doing here.  That wasn't mentioned at all.

25         Well, that was a pretty big part of

Ms. McCaffrey's testimony and, by the way, she was the
most adamant and unshakeable witness, in my opinion,
that Walmart had.  So there's the call.

And during that call, Ms. McCaffrey says
Mr. Certo influenced her decision because he told her
that Ms. McPadden did not take it seriously.  And that's
why she went into the conference call with the idea that
she thought second level was -- was a good idea.  And,
remember, she said there are only two reasons that she
thought second level was appropriate, not that she
thought termination was okay to go ahead the next day.
She said there were two reasons for second level.  One,
losing a key is bad; and, number two, Mr. Certo told her
Maureen did not take it seriously.  And that was before
the conference call.

And, by the way, one could certainly -- if we
want to try to synthesize information, one could
certainly imagine when Mr. Certo called Ms. McCaffrey
back the next day to finally tell her that it actually
was going to be a termination, he very likely would have
reiterated again that he didn't think that Maureen took
it seriously.  So is it possible he said it twice?
Absolutely.  But we know he said it on that -- on
November 26th to Ms. McCaffrey.  She's not -- got no
reason to make that up.

1        Judge McAuliffe will instruct you that Walmart

2   can be liable for discrimination and retaliation if

3   Mr. Certo had a discriminatory or retaliatory motive and

4   influenced a neutral decision-maker like Ms. McCaffrey

5   or Ms. Kulwicki.  So even if they didn't know about the

6   protected activity, if Mr. Certo did his work to

7   influence the decision -- which clearly he did,

8   Ms. McCaffrey said his input was one of the two reasons

9   that she gave a second level -- then Walmart is

10  responsible.

11        And I would -- finally, on the

12  inconsistencies, a final issue is even what reason they

13  state for the second-level coaching.  They actually

14  don't list in any of their sworn answers that one of the

15  reasons was that Mr. Certo told Ms. McPadden that

16  Maureen didn't take it seriously.  They just say it's

17  the loss of the key is the loss of the key is the loss

18  of the key.  It's only when Ms. McCaffrey slips up or

19  discloses that information we see that in deposition

20  testimony.  It's not in their sworn answers.

21        Now, remember Mr. Certo clearly testified he

22  had absolutely no basis to suggest that Maureen didn't

23  take the loss seriously and, in particular, when he

24  first spoke to Ms. McCaffrey, all he had were e-mails

25  from Maureen where she said, I've lost my key, I've

1    notified the store manager, a locksmith's on the way.

2            And certainly, perhaps, Mr. Certo knew that he

3    had no basis for that.  He had told Ms. McCaffrey this.

4    And when he went to seal the deal on November 27th, he

5    wanted to have it -- in case she asked, what's your

6    basis for seriousness.  He had called Maureen, he had

7    told her to look for a key that didn't work anymore.  We

8    all know she looked very hard for the key.  But he says,

9    somehow, that she didn't -- indicated in some way that

10   she didn't take it seriously.  Perhaps she may have said

11   to him that we all understand I've gotten the pharmacy

12   rekeyed, just to make sure -- you know, which was a

13   fact.  But

14   every -- there is no dispute that she took it very

15   seriously and she turned her house upside down.

16           So why was Mr. Certo dishonest about Maureen

17   when he spoke to Ms. McCaffrey?  Mr. Certo was tired of

18   Maureen's complaints, he was tired of the time it was

19   costing him to deal with her concerns and her FMLA

20   leave, and he jumps on this issue like nothing we have

21   seen in this case.  He's involved in a flurry of

22   e-mails.  So how is he going to -- how is he going to

23   get this done?

24           Well, we know through e-mails that he

25   originally thought she was already on a third level.  So

1  he just needs a first level.  But he knows she's put

2  some concerns in writing recently.  He knows her FMLA

3  leave is up with HR.  So he's going to get some cover.

4  He thinks he only needs first level.  He goes to his

5  peers.  He -- he gets a first level.

6         And we know, and I believe Attorney Kaczmarek

7  admitted very likely, and certainly according to

8  Mr. Kelly, absolutely company practice.  He actually

9  looks it up.  He's into this issue.  There were tons of

10  e-mails on this issue.  During that time, he looked up

11  what her status was.  He said to Mr. Wallis, I'll -- I

12  think she's on third level.  I'll get back to you.  He

13  looked up her status and he saw he needed second level.

14  But now he's agreed to first level.  He's got to do

15  something to get up to second level.  And that's why

16  he's dishonest about Maureen not taking the issue

17  seriously.

18         Now, Mr. Certo told a rather tortured story

19  about asking Maureen to look for the key that no longer

20  worked because he was feeling badly for Maureen and

21  thinking that the second level was too harsh.  Well,

22  this story doesn't work for two reasons.  One,

23  Mr. Certo's e-mail, which is Exhibit 57, shows that he

24  thought Maureen was on a third level at 11:53 in the

25  morning.  Okay?  If he thought -- and he testified he

1  thought she was on a third level all day long.  It

2  wasn't till the next day that he realized that she was

3  only on second.  So, you know, he had nothing to do with

4  this problem.

5        But he -- his e-mail shows he thought she was

6  on third level on the 26th.  So if he thought she was on

7  third level, he wouldn't care whether she got one more

8  level or two more levels because even one more level

9  would have gotten her fired.  If she's already on third,

10  which is what he says he thought, all he needs is a one

11  level.  So why is he feeling badly that the coaching is

12  too harsh?  It doesn't make any sense at all based on

13  his own e-mails that he thought she was already on a

14  third level.

15        Second, if Mr. Certo was actually sympathetic

16  to Maureen and trying to save her job, as he wants you

17  to believe, why would he fail to advocate for her for a

18  lesser discipline and why instead would he tell his

19  manager something negative about her, that -- give an

20  opinion, an unsupported opinion, that she didn't take it

21  seriously.  His story makes no sense because it's a

22  cover-up for what he really did, which was he got

23  Maureen fired.  He got the job done.

24        Walmart was also inconsistent with its

25  standard practice -- deviated or was inconsistent from

1   its standard practice when it came to Maureen.  That's

2   additional evidence of pretext.  You heard Mr. Kelly

3   testify this morning that the custom and practice was

4   for a market manager to accurately lay all the facts on

5   the table and advocate for the discipline that he

6   wanted.

7        And, actually, Rick, if you could just pull up

8   82, I'm going to go low-tech and just show you one of

9   the exhibits on a blowup.

10        So you heard Mr. Kelly testify this morning

11  that it would be standard practice for the market

12  manager to advocate for what he or she wanted as a

13  discipline.  And that's exactly what we see here.  This

14  is a different market manager, not Mr. Certo, and what

15  does this market manager do?  First of all, she puts

16  right on the table that she checked with the peers and

17  that they thought it should be first level and that she

18  agreed, I would totally agree this would be next level

19  of coaching.  Right?  She -- she says that this

20  pharmacist informed them as soon as possible and that

21  she really thought that first level was appropriate.

22  That's the custom and practice of Walmart, to advocate

23  for what you want.  But what do we see here?  We have

24  evidence that Mr. Certo advocated for a second level by

25  saying Maureen didn't take it seriously, but Mr. Certo

1  tries to say, I didn't do anything; I -- I didn't

2  advocate one way or the other; I thought this was too

3  harsh, but I didn't say anything because, you know, that

4  was my boss.  That's just not credible.

5          And this is extremely strong evidence that

6  Mr. Certo wanted Maureen fired.  He did not give

7  Ms. McCaffrey the full facts.  He didn't talk about what

8  the peers had recommended, that he had agreed, he claims

9  he didn't talk about the protected activity, and he

10 didn't advocate in her favor.  Instead, he falsely

11 suggested that she didn't take it seriously.  This is

12 just the type of circumstantial evidence that allows you

13 to conclude that Maureen was fired for unlawful reasons

14 even though Walmart won't admit it.

15         In addition to that pretext evidence that I've

16 just spoken about, we also have some key additional

17 pieces of evidence.  You heard Mr. Certo admit in court

18 that he viewed Maureen's raising of complaints as

19 aggressive.  Remember when they were trying to have him

20 agree that Mr. Varieur had raised a concern before, too,

21 and Mr. Certo said, well, that was different, and

22 Maureen's was aggressive?  Maureen testified -- so we

23 know that Mr. Certo saw Maureen as different and he saw

24 her concerns as aggressive, which obviously is a

25 negative word which would be -- which would lead someone

1    to view her negatively.

2          We also had Maureen testify very credibly that

3    by the time of her termination, Mr. Certo was indicating

4    in his way of speaking to her, his lack of interest in

5    issues, and his body language that he was all done with

6    her.

7          We also know that Mr. Certo was trained on

8    HIPAA.  He'd been a pharmacy manager for two years

9    before he was a market manager.  He knew all about HIPAA

10    issues.  And yet he did nothing to investigate Maureen's

11    serious HIPAA violation.  And then he was dishonest

12    about it in court, trying to claim that he had done some

13    sort of informal investigation that involved asking the

14    store manager how things were going at the pharmacy.

15    Does that make sense?

16          Not to mention that even if we were to somehow

17    think that made sense, that he didn't know what he was

18    doing because he was brand-new, he'd -- he escalated --

19    he testified that he went to regional because he was new

20    and he had questions.  He didn't go to regional and ask

21    questions about this.  He just didn't investigate it.

22    He decided to wing it on his own.  The truth is he did

23    nothing on that.  Both Deb Genna and even Josh Varieur

24    testified that he absolutely never spoke to them about

25    this serious HIPAA issue.

Finally, as we've talked about the November 26th e-mail, about Maureen raising concerns, demonstrates that Mr. Certo was frustrated. And I'm not sure if you caught it, but Mr. Certo tried to say that he was being supportive of Maureen in that e-mail. If you read that e-mail, Mr. Certo was clearly not being supportive of Maureen. He was saying she needs to be retrained so that she can stop technicians from taking breaks when they want to. That's what the e-mail said. And that's what he meant. And for him to try to say that that meant he was supportive calls his credibility into question yet again.

Now, the gender discrimination claim is a bit separate because Maureen was not complaining about gender discrimination while she worked for Walmart. She didn't know that it had happened and she had been treated differently until she was fired, but the evidence on that remains clear as well. And I would also say to you the reason that Mr. Certo is the important actor for the retaliation claims is because he's the one who knew of the protected activity, but for gender, Walmart is not allowed to discipline women more harshly than men for the same conduct. That's Walmart. It doesn't have to be just Certo. It's Walmart as a whole.

1          But first we see Mr. Certo's preferential

2    treatment of Mr. Varieur demonstrates gender

3    discrimination.  Mr. Certo didn't bother to discipline

4    Mr. Varieur for log copies or even when Mr. Varieur

5    failed to submit a report for a serious dispensing error

6    and even when Mr. Certo saw on an e-mail from

7    Mr. Varieur that it had involved an intentional

8    switching of generic -- brand-name to generic because of

9    insurance, which is absolutely not allowed.

10          But Mr. Certo didn't discipline Mr. Varieur at

11   all.  When Maureen raised concerns, Mr. Certo saw it as

12   aggressive and when Mr. Varieur talked about errors,

13   Mr. Certo complimented Mr. Varieur on his great detail

14   into his business.  That's classic gender

15   discrimination.

16          And, finally, we have Andy Tau, which we have

17   this exhibit up here.  Now, Mr. Certo wasn't involved in

18   disciplining Mr. Tau more leniently.  He was involved in

19   getting Maureen disciplined more harshly.  But everyone

20   knew of Maureen's gender, including Barbara Kulwicki.

21   The evidence could not be clearer.  Maureen, who is

22   female, got a harsher discipline than Andy, who is male,

23   about a year apart.

24          Ms. Kulwicki tried to avoid responsibility for

25   her role in approving that lesser discipline for the

very same conduct.  She first tried to say that she was
only asked about it after the fact and if she'd been
asked about it before, she would have said second level.
But then Walmart turned over this e-mail just a couple
weeks before trial and we can tell that that was not
true.  Ms. Kulwicki was notified before the discipline
was imposed, before the decision was made.  So then
she's consulted about it, so then what does she do?  She
says, well, after this there was there was a phone call,
because I hadn't remembered Maureen -- this is the
person who said she never remembered a pharmacist ever
losing her pharmacy key before and Maureen was the first
one.  But even a year later, less than a year later,
she'd completely forgotten about Maureen losing her key.
That's what she said.

So when she's reminded about Maureen in the
phone call, she says, oh, well, I think it had already
been done, so I really didn't want to go back and change
that.

And then I had to show her exhibit -- I
believe it's Exhibit 3, which showed that actually
Mr. Tau was not disciplined for several more days, not
till December 19th.  So even though she got this e-mail
on a Sunday and she was, you know, all confused because
it was a Sunday and she couldn't be at work and figure

1    it out, by the time he was disciplined, she'd had

2    several days and she'd been reminded, because she needed

3    reminding about Maureen's second-level discipline.

4         So she had all the information in front of

5    her.  She didn't look -- she says she didn't look at her

6    matrix where she'd written second level right on it

7    after she had agreed to the discipline for Maureen and

8    she allowed a male pharmacist to get a lesser discipline

9    for the same conduct.

10        And then, finally, she tried to distinguish

11   Mr. Tau by talking something about a crazy snowstorm

12   excuse.  Certainly this e-mail tells her the store had

13   not been rekeyed yet for Mr. Tau.  If he lost his key in

14   the Walmart parking lot in the snow and the key still

15   worked, how does that justify a lesser discipline?  It

16   makes absolutely no sense and there is no snowstorm

17   defense to gender discrimination.

18        Ms. Kulwicki tried to suggest that she doesn't

19   have to abide by the law because she's responsible for a

20   thousand stores.  Well, it's Walmart's choice to not put

21   enough people in the human resources department and they

22   need enough people to make sure that they abide by the

23   law.  Ms. Kulwicki did not do her job to ensure that

24   Walmart followed the law.

25        Mr. Certo was Walmart's 30(b)(6) company

1   representative on this issue and he also agreed that

2   while second-level discipline was appropriate for

3   Maureen, first level was appropriate for Andy Tau.  And

4   Mr. Certo told you the reason was that Mr. Tau's key was

5   in the possession of the parking lot.  It makes no sense

6   and is evidence of gender discrimination.

7            I would submit to you that it all comes down

8   to who's credible and who has demonstrated integrity in

9   the case.  Maureen has integrity and credibility.  She's

10  worked as a capable pharmacist for Walmart for 13 years.

11  Maureen had previously reported concerns to different

12  supervisors and those supervisors had worked to fix

13  things.  They did not retaliate.  But then Joe Certo and

14  Josh Varieur came on board and conditions got worse.

15  Maureen had called the central office in Arkansas before

16  when she had concerns and she'd been directed back to

17  work with her market manager.  She viewed that as using

18  the open door policy and she followed directions on that

19  issue.

20           Finally, there's no dispute Maureen properly

21  reported the key loss and she spent a lot of the night

22  trying to find that key.  Maureen has integrity and she

23  did the right thing and her testimony was credible.

24           Maureen even spoke to you about performance

25  evaluations, even though performance evaluations are not

a reason for termination in this case. She wanted you to have the full story. And she has to rely on the documents that Walmart produced in the case. And she talked about the fact that she had very good, she had some medium, she had some issues that she could work on. She wanted you to have the full story. And obviously that's not the reason for her termination, but she wanted to be complete.

Now, on the issue of the coaching, the first time -- you heard Maureen tell you the first time that she saw what Walmart has submitted as the coaching documents in this case, the previous coachings, was at her deposition. She thought she had had a verbal coaching with no document from her manager in 2011. So she would understandably be surprised to see something called a First Written Coaching. It doesn't have her signature on it, had never seen it before, and the date tells you that it was changed after the coaching -- the verbal was given to her. It makes sense that she would have been surprised and not understand why -- what that coaching was called. She did not dispute that Ms. Urbanski had spoken to her verbally about getting caught up on log copies. That was never disputed anywhere.

And then the second-level coaching, same

thing.  She had thought it was a first level, because

that's what she was told at the time.  They changed it

after the fact.  As soon as everybody got clear that

Walmart had changed their documentation, she readily

admitted to you she was on a second level in November of

2012.  There's no dispute about that and Maureen didn't

try to dispute it.  There's no loss of memory.  It was a

change in the documents.

And Maureen didn't exaggerate.  She didn't say

that Mr. Certo said, I'm going to get you.  She told you

the truth.  She told you how his lack of response and

his demeanor, especially at the one-hour meeting and

after, demonstrated that, to her, she felt that he was

all done with her.  She told you how his having her look

for a key that no longer worked demonstrated to her that

he was going to use this key issue as an excuse to get

her fired.  She told you the truth.

Walmart does not have credibility.  Joe Certo

is handling so many pharmacies that he just couldn't be

bothered to get to the bottom of really much of anything

during that fall.  Not serious safety concerns, not

dispensing errors, nothing.  He never escalates anything

of these concerns or these errors up to his regional

until he's got an issue with Maureen's key that he wants

to use and he knows that she's been recently raising

1  concerns.

2      After months of inaction, he is a tornado of

3  activity as soon as he finds an excuse to get rid of

4  Maureen.  Look at how quickly that happened.  It was

5  within a matter of hours.  Multiple e-mails, he's

6  e-mailing, he's meeting, he's talking on the phone with

7  Ms. McCaffery, he's joining on the conference call.

8  He's got her fired within three hours of her reporting

9  that the key is lost.

10      As to the timing of those e-mails, we know

11  that some of Mr. Certo's e-mails were one hour off.

12  They may have been central time instead of eastern

13  standard.  I would represent to you that when you look

14  at Exhibit 57, it appears that when the e-mails say "On

15  behalf of Joe Certo," they're eastern standard time and

16  when they just say "Joe Certo," they're central time,

17  which is one hour earlier.

18      And Joe Certo actually admitted in court that

19  he may have contacted Ms. McCaffrey after he had agreed

20  to a first -- that a first level was appropriate and

21  Mr. Kaczmarek just pointed out a few minutes ago a point

22  that I was going to make, which is the title of the

23  e-mails changes from Lost Key to Key Control after

24  Mr. Wallis brings up the key control policy.  So it

25  makes sense that Mr. Certo is talking about key control

1  after the two-minute exchange he has with Mr. Wallis
2  where he agrees that first level is appropriate.
3          The reason that that's important is that it
4  shows that after Joe agrees that first level's
5  appropriate, which at the time he thinks will get
6  Maureen fired, he looks up her discipline and he knows
7  he needs second level and that's when he speaks with
8  Ms. McCaffrey and says that Maureen did not take it
9  seriously.
10          He also in the conference call didn't tell
11  them that he discussed it with his peers and he'd agreed
12  that first level was appropriate.  He doesn't say a word
13  about that like the other market managers do.
14          He also doesn't tell them about the example
15  that he was given of someone being disciplined for
16  failing to report the loss of a key.  And, of course, he
17  most likely doesn't tell them that he's frustrated about
18  Maureen's reports of concerns and her need for medical
19  leave when they're short-staffed.  He does more than not
20  provide full information.  He provides false information
21  about Maureen's lack of seriousness.
22          Now, we believe the evidence will show that
23  Mr. Certo knew that Maureen was going to be fired by
24  November 26th, by the afternoon, when he tells his
25  peers, it's going to be second level, and he's going to

partner with Mr. Hamilton.  In fact, again, it was
Ms. McCaffrey who was extremely solid on that point.
She said, you partner with Hamilton or you would partner
with Hamilton for a termination meeting.  She couldn't
have been clearer on that issue.

And, again, Ms. Kulwicki, her job is to be the
last protection for employees to make sure that Walmart
follows the law before an employee is fired to make sure
that it was a lawful termination.  What does she do to
fulfill that duty?  Absolutely nothing.  She actually
testifies that it's just a goal; she really can't do it;
it's not just an unattainable goal.  That's the law.

I'm trying to skip through a little bit.

And, finally, Walmart fired a 13-year employee
for unlawful reasons.  They took away her livelihood,
they caused her to suffer emotional distress, and then
they tried to say that she was eligible for rehire so it
would look better somehow.  Well, we know that Maureen
reapplied for a perfect position with Walmart and didn't
even get called for an interview.  Walmart has no
integrity or credibility.  Walmart violated the law.

Now, I just want to talk briefly about the
specific legal claims.  There are several separate legal
claims and that's because different laws protect
different types of activities and status.

1          There is a gender claim under both state and

2    federal law.  It's the same evidence for gender

3    discrimination.  They're just different types of

4    damages.  You will see that on a verdict form that the

5    judge is going to give you.

6          Also Maureen was engaging in protected

7    activity that was covered both by New Hampshire's common

8    law wrongful termination and New Hampshire's

9    whistleblower protection law.  Essentially, the same

10   thing because Walmart has agreed that Maureen had good

11   faith and reasonable beliefs to raise these safety --

12   which were legal -- concerns, but they're different

13   damages.  So you'll see them separately on the verdict

14   form.

15         And the FMLA is separate because it's a

16   separate law.

17         Now, you may recall that we originally spoke

18   to you about a disability claim.  Although Dr. Howe's

19   testimony, we believe, established that Maureen has

20   disabilities, as the evidence unfolded at trial, we did

21   not feel that we could prove by a preponderance of the

22   evidence that Mr. Certo was motivated to fire Maureen

23   because of the disabilities, so we voluntarily withdrew

24   that claim because we want you to consider the claims

25   that have the strong evidence.  I just wanted to explain

 1    that to you.

 2            Now, you must decide what motivated Walmart to

 3    fire Maureen.  You may find that it was her

 4    whistleblowing, also wrongful termination law, her FMLA

 5    leave, and/or her gender.  You can find in Maureen's

 6    favor on some of her claims but not others or all of her

 7    claims or none of her claims.  Each unlawful reason does

 8    not have to be the only or sole reason for the

 9    termination.  You do not have to pick one reason as the

10    reason.

11            We believe the evidence demonstrates that all

12    of Maureen's protected activity was happening at the

13    same time and it frustrated Mr. Certo and it motivated

14    him to get her fired and also that Walmart clearly

15    treats men more favorably than women.  But it's up to

16    you to decide.

17            And as Attorney Fradette mentioned in the

18    opening argument, this is not a criminal case.  This is

19    not a beyond a reasonable doubt standard.  It is a

20    preponderance of the evidence standard.  And that means

21    that you find that the issues are proven more probable

22    than not, more probably than not, that the elements of

23    the claims occurred.  A good way to think of this is to

24    imagine the scales of justice.  Place all of the

25    evidence in Maureen's favor on one side, all of the

1    evidence in Walmart's favor on the other.  If the tip --

2    scales tip ever so slightly in Maureen McPadden's favor,

3    then she has met her burden of proof.

4          And, finally, I want to talk very briefly

5    about damages.  I know this has been a long morning for

6    you and I want you to be able to get to lunch.

7          But the easy part is the economic damages.  We

8    had an undisputed expert, Dr. Moore, here to testify.

9    He told you how he calculated the damages.  He reduced

10    them to present value, which is what's required by the

11    law, and he told you that despite Maureen's efforts to

12    find -- diligent efforts to find comparable work, even

13    reapplying to Walmart, the best job that Maureen has

14    been able to find is the floating pharmacist position

15    with CVS which pays her significantly less.

16          Dr. Moore calculated the economic damages from

17    the date of termination to the date of trial, the wages

18    to be to be about $164,000, and $19,670 of lost benefits

19    for a total of back pay of $183,700 -- sorry --

20    $183,763.

21          You are going to have those exhibits in there

22    in the jury room.  They're Exhibits 69 to 73.

23          Dr. Moore calculated that the economic losses

24    from the date of trial until retirement age are about

25    $558,392.  This is what's called front pay.  So the

1 total economic losses that we are claiming are $742,155.

2 And you will have that information with you.

3      And, by the way, since Mr. Varieur and

4 Mr. Certo are both gone -- no longer connected with the

5 Seabrook pharmacy store by early 2013, if Maureen had

6 not been fired, she would have -- we would all have

7 every reason to believe that Maureen could continue

8 working at Seabrook until her retirement.

9      The harder part for you to determine is

10 noneconomic losses.  The first category is called

11 compensatory damages, to compensate Maureen for

12 emotional upset, loss of enjoyment of life, what did she

13 feel and experience because of the termination.

14      You heard that Maureen has never been

15 terminated from any job before in her life and she

16 was terminated for unlawful reasons.

17      You heard Maureen -- and I would say

18 particularly Ken McDevitt tried to describe how

19 devastating this was for Maureen.  I'm not going to go

20 over that again, but I would ask you to please fully and

21 fairly compensate Maureen for that emotional distress.

22      And you heard Maureen describe that she's

23 grateful to have the job at CVS, but it is really

24 different from the job she had at Walmart.  She's a

25 floater.  She never has a schedule, she's not guaranteed

1    full-time hours, she often has a very long commute, and

2    she never gets to know the people that she works with or

3    the patients who come into the pharmacy, which was one

4    of the things she really enjoined when she worked for

5    Walmart.  You are also allowed to consider that when you

6    consider compensatory damages.

7           I would submit to you that Maureen's

8    noneconomic damages are at least as significant as her

9    economic damages and would ask that you award an amount

10   that fully compensates her for emotional distress that

11   she continues to experience to this day.

12          The judge will instruct you that you are also

13   allowed to award enhanced compensatory damages on the

14   State gender discrimination claim if you find that

15   Walmart recklessly disregarded Maureen's rights under

16   that law.  I would submit to you that both Mr. Certo's

17   unlawful disparate treatment of men versus women and

18   Ms. Kulwicki's failure to even try to ensure that the

19   laws were abided by or to know that there is an

20   antidiscrimination law in New Hampshire would support an

21   award of enhanced compensatory damages in this case.

22          Finally, the federal discrimination claim.

23   The gender discrimination claim allows you to award

24   punitive damages.  That is the only claim where you are

25   allowed to award punitive damages.  Those are awarded if

1   you find that Walmart recklessly disregarded the law as

2   well and those damages allow you to consider what will

3   stop a huge company like Walmart from doing this again

4   and to punish Walmart for its unlawful behavior.  The

5   evidence in this case justifies an award of punitive

6   damages.

7           You will be receiving, as I've talked about,

8   something called a special verdict form from the judge

9   that helps you walk through each claim separately and to

10  determine liability and damages.

11          We truly appreciate the attention you've paid

12  to this case.  We know that it's not easy to take time

13  out of your schedules to sit on a jury and I want you to

14  know that this case is very important to Maureen

15  McPadden and we hope that you will use this opportunity

16  to correct this injustice.

17          Thank you.

18          THE COURT:  All right.  Thank you

19  Attorney Irwin.

20          Would you mind taking that -- ladies and

21  gentlemen, that concludes the closing arguments in the

22  case.  So let me again just remind you that closing

23  arguments, like opening statements, are not evidence.

24  To the extent the lawyers have made reference to

25  evidence or facts in the case that differ from what you

1    recall, it's your memory and your view that counts.

2            Similarly, both counsel made references to the

3    applicable law.  Let me just remind you the jury takes

4    the law not from the advocates, obviously, but from the

5    Court in the instructions that I'll give you shortly.

6            Why don't we take a -- we'll take a brief

7    recess and then we'll come back and I'll instruct you on

8    the law that you're to apply in returning a verdict in

9    the case and then the case will be given to you to

10   deliberate and return a verdict.

11                    (Jury excused.)

12            (IN OPEN COURT - NO JURY PRESENT)

13            THE COURT:  I think Judy has copies -- you

14   have copies, right?  Why don't you give the lawyers

15   copies and -- of the instructions and verdict form and

16   you can take a look at those.

17            MS. IRWIN:  I just need to go get the last

18   copy -- could I just go get the last draft that we had?

19            THE COURT:  Oh, sure.  No, I'm going to give

20   you time during the break.  We're going to take a little

21   break.  And then you can just take a look at it to --

22   yeah, if you have a your copy marked up, you know what

23   to look for.

24            MS. IRWIN:  Okay.

25            THE COURT:  I think all the changes have been

 1    made.

 2            And then when I come back -- you don't have to

 3    come up to sidebar.  You can put on your objections to

 4    the instructions before I give them and then I'll invite

 5    you back up after I give the instructions to register

 6    objections.

 7            Okay.  Good closings.  Well done by both of

 8    you.  Well done.  I'm pleased that they have all the

 9    evidence and they have good closings.  So it's up to

10    them.

11            MS. IRWIN:  Thank you, your Honor.

12                        (Recess.)

13            THE COURT:  You probably noticed -- did you

14    get the verdict form as well?

15            MS. IRWIN:  We did.

16            THE COURT:  Yeah, we made some structural --

17    structural overstates it -- some organizational changes

18    that just make it a little more clear, I think.  But

19    there were no substantive differences.  But you can look

20    that over before the exhibits go in and if you do have

21    an issue, we can talk about it then.

22            All right.  Would either side like to make

23    objections to the proposed charge?

24            MS. IRWIN:  Your Honor, our only objection

25    would be that in the pretext instruction that goes on

1  pages 10 to 12, we think it would be an accurate

2  statement of the law to quote the *Harrington vs.*

3  *Aggregate Industries Northeast Region, Inc.* case, 668

4  F.3d 25 at page 33, First Circuit 2012, that talks about

5  in a retaliation case, a whole is sometimes greater than

6  the sum of the parts; the bits and pieces of evidence

7  taken collectively have significantly probative value.

8        Thank you, your Honor.

9        THE COURT:  All right.  Any objection to

10  giving that?

11        MR. KACZMAREK:  Yes, your Honor.

12        THE COURT:  All right.

13        Yeah, I've thought about it.  I should say on

14  the record we've had one or two -- two, I guess --

15  informal charging conferences off the record to work out

16  agreements, disagreements, and so forth and I've given

17  some thought to that.

18        I find that language argumentative and I think

19  would confuse the jury.  I think the instructions that

20  we have adequately inform them of what the applicable

21  law is.

22        MR. KACZMAREK:  Thank you, your Honor.

23        Defendants have a number of objections to the

24  jury instructions, beginning with the comparative

25  evidence instruction that begins on page 8.

1      THE COURT:  Page 8?

2      MR. KACZMAREK:  Page -- goes from page 8 to

3  page 9.

4      THE COURT:  All right.

5      MR. KACZMAREK:  Defendant believes that the

6  comparative instruction to comply with the First Circuit

7  precedent must state that the comparator must be -- have

8  been disciplined by the same decision-maker as the

9  plaintiff.  And among other cases, we'd cite the

10  *Champagne vs. Servistar* case, 138 F.3d 7 as support for

11  that, although there are certainly many other First

12  Circuit cases out there.

13      In addition, within the comparator

14  instruction, we don't believe there's a need, both

15  factually and a legally, for a companywide policy

16  instruction as in currently in there.  There simply --

17  it's simply inappropriate in this context.

18      THE COURT:  All right.  Objection overruled.

19  This -- this strikes me as a classic case where the

20  evidence was very clear that there's an effort at least

21  by the company to have companywide policies, companywide

22  standardized discipline to the extent achievable, and,

23  in fact, the -- I guess Kulwicki was a common

24  denominator and a major -- major player in the decision

25  with respect to both the defendant -- I mean the

1    plaintiff and Mr. Tau.

2            Okay.  Objection overruled.

3            MR. KACZMAREK:  Thank you, Your Honor.

4            Moving on to the cat's paw instruction, under

5    *Ameen vs. Amphenol Printed Circuits*, a First Circuit

6    case from 2015, corporate liability can only attach if

7    the neutral decision-makers, when deciding to terminate

8    an employee, rely on information that is inaccurate,

9    misleading, or incomplete because of another employee's

10   discriminatory animus.

11           We don't believe the instruction accurately

12   captures that, your Honor.

13           THE COURT:  All right.

14           MS. IRWIN:  Well, your Honor, first of all,

15   there's a U.S. Supreme Court case which is *Staub*, which

16   was quoted in this instruction; and, secondly, we

17   certainly have evidence that's been presented to the

18   jury of both incomplete information and inaccurate

19   information.

20           THE COURT:  Compared to Riel; is that it?

21           MS. IRWIN:  Excuse me?

22           THE COURT:  Compared to the Riel information

23   that was passed down; is that what you're saying?

24           MS. IRWIN:  Correct.

25           THE COURT:  All right.  Objection overruled.

1           Okay.

2           MR. KACZMAREK:  In addition, with regard to

3   the cat's paw instruction, we believe that the plaintiff

4   must provide specific evidence of unlawful animus by the

5   employee reporting information to the neutral

6   decision-maker.  That's also the *Ameen* case.

7           THE COURT:  Okay.  Objection overruled.

8           MR. KACZMAREK:  Moving on to the FMLA

9   instruction, your Honor, it's the defendant's position

10  that the causation standard for FMLA is significantly

11  higher than is articulated in the FMLA instruction.  And

12  we cite to *Palmquist vs. Shinseki*, a First Circuit 2012

13  case, holding that, you know, but for causation applies

14  to retaliation claims under the retaliation -- or

15  Rehabilitation Act.  And because the FMLA does not

16  reference the motivating factors standard that a but for

17  causation standard is more applicable.

18          And we'd also cite the *Chase vs. U.S. Postal*

19  *Service* case, a District of Mass case from 2013,

20  regarding that issue as well.

21          THE COURT:  All right.  Objection overruled.

22          MR. KACZMAREK:  Thank you.

23          Moving on to the damages instruction regarding

24  the New Hampshire Law Against Discrimination, 354-a,

25  your Honor, it is defendant's position that the Court

1   decides the issue of enhanced compensatory damages, not

2   the jury.  And there in support of that proposition we

3   cite *Hair Excitement vs. L'Oreal*, 153 NH 363, in which

4   the New Hampshire Supreme Court states that in its

5   ordinary meaning, the word "Court" refers to a judge

6   rather than a jury.  We believe that that applies

7   equally in this --

8           THE COURT:  Well, juries decide enhanced

9   compensatory damages under the New Hampshire common law.

10  The judge decides whether to give the instruction.

11  That's discretionary.  I think, as we discussed last

12  evening, in this case, the statute incorporates

13  something the statute refers to as enhanced compensatory

14  damages, but then modifies it to the common law, with

15  understanding of it, I believe, to provide that in this

16  case, it's meant as a substitute or subject to a fine,

17  administrative fine.

18          And in this case, court damages normally are

19  determined by the -- by the jury and I find in this case

20  that the jury, as they would in the common law situation

21  in New Hampshire law, should properly determine the

22  damages.

23          But, if it makes you feel any better, I'll

24  treat it as an advisory verdict if they return damages

25  on that score and probably will go along with it.  But

1    I'll consider it.

2           MR. KACZMAREK:  Thank you, Your Honor.

3           Moving on to the punitive damages instruction,

4    defendant believes that there's no basis for a punitive

5    damages instruction in this case.  The only statute --

6    statutory claim remaining for which punitive damages are

7    available is Title VII.  And a plaintiff in a Title VII

8    case is not entitled to a punitive damages instruction

9    when the plaintiff has presented no evidence from which

10   a reasonable jury can conclude that an employer acted

11   with malice or reckless indifference to federally

12   protected rights.

13          THE COURT:  All right.  I -- thank you.

14   Any -- oh, go ahead.

15          MR. KACZMAREK:  Sorry.  I'll give you the case

16   cite, if you like, your Honor.  422 F.3d 8, *McDonough*

17   *vs. City of Quincy*.

18          THE COURT:  All right.  I disagree.  Objection

19   overruled.

20          Any other objections?

21          MR. KACZMAREK:  Two more quick objections,

22   your Honor.

23          With regard to pretext and temporal proximity,

24   we believe that there's no basis here for an instruction

25   regarding customary and usual business practices.

1          THE COURT:  Okay.  Objection overruled.

2          MR. KACZMAREK:  And we reiterate our request

3     for a mitigation of damages instruction, your Honor.

4          THE COURT:  All right.  As I explained off the

5     record and I'll explain on the record, I don't find it

6     appropriate to give a mitigation of damages instruction

7     on behalf of the defendant in this case because there's

8     no evidence of any failure by the plaintiff to make an

9     effort to reasonably mitigate damages, first and

10    foremost; second, there's rather overwhelming evidence

11    that she exerted more than reasonable efforts to

12    mitigate damages, in fact, super efforts to mitigate

13    damages; and, finally, ironically, and perhaps somewhat

14    humorously in a case such as this, Walmart itself had

15    within its power the ability to mitigate damages in this

16    case completely by rehiring her when she applied for

17    reinstatement.  And for reasons best satisfactory to

18    Walmart, whatever they might have been, they decided not

19    to assist the plaintiff in mitigating her damages by

20    hiring her.

21         So I'm not going to give that instruction.

22         MR. KACZMAREK:  All right.

23         THE COURT:  Objection overruled.

24         Okay.

25         MR. KACZMAREK:  Thank you, Your Honor.

1          MR. FRADETTE:  Your Honor, the exemplified

2    copies of the decisions in the other cases with respect

3    to punitives, should I present that to the Court now or

4    is that --

5          THE COURT:  It's a little late.  The case is

6    over.  The evidence is closed.

7          All right.  Anything else?

8          MR. KACZMAREK:  No, your Honor.

9          THE COURT:  Okay.  I'll instruct the jury and

10   then I'll invite you back to the sidebar and you can

11   make -- put your objections -- you're required under the

12   rule to put your objections again on the record.

13              (IN OPEN COURT - JURY PRESENT)

14         THE COURT:  All right.  Ladies and gentlemen,

15   we've reached that part of the trial when I'm to

16   instruct you on the law that you're to apply in

17   resolving the dispute between plaintiff and the

18   defendant.

19         You've each found on your seat a written copy

20   of the instructions on the law that I'm about to give

21   you.  Some people do well just listening.  Some people

22   do well reading along.  Whatever's best for you as an

23   individual is fine with me.  You can either just listen

24   or you can read along.  But please don't read ahead.

25   That's the only request.

1    What was I going to say about this?  I don't

2  know.  That should be it.  If it occurs to me, I'll

3  cover it later.

4    All right.  I'll now instruct the jury.

5    JURY INSTRUCTIONS

6    THE COURT:  At this stage of the trial, it is

7  my duty to instruct you on the principles of law that

8  you must apply in deciding this case.  It is your duty

9  to follow these instructions during your deliberations.

10  You should not single out any one instruction but

11  instead apply these instructions as a whole to the

12  evidence in this case.

13    You are the exclusive judges of the facts.

14  You must weigh the evidence that has been presented

15  impartially, without bias, without prejudice, and

16  without sympathy.  You must determine what the facts are

17  and what the truth is, based upon the evidence presented

18  in the case.  You will decide the case by applying the

19  law as I give it to you in these instructions to the

20  facts as you find them to be from the evidence.

21    In determining what the facts are, what the

22  truth is, you should -- you must necessarily assess the

23  credibility of each witness and determine what weight

24  you will give to each witness's testimony.  By

25  credibility I mean the believability or the truthfulness

1    of a witness.

2         You should carefully scrutinize all the

3    testimony given, the circumstances under which each

4    witness has testified, and every matter in evidence

5    which tends to show whether a witness is worthy of

6    belief or not worthy of belief.  You should also

7    consider the extent, if any, to which the testimony of

8    each witness is either supported or contradicted by

9    other evidence in the case.

10        After assessing the credibility of each

11   witness, you will assign to the testimony of each

12   witness, both under direct and cross-examination, such

13   weight as you deem proper.  You are not required to

14   believe the testimony of a witness simply because that

15   witness was under oath.  You may believe or disbelieve

16   all or part of the testimony of any witness.  It is

17   within your province to determine what testimony is

18   worthy of belief and what testimony may not be worthy of

19   belief.

20        The testimony of a witness may be discredited

21   or, as we sometimes say, impeached, by showing that the

22   witness previously made statements that are different

23   than or inconsistent with his testimony -- his or her

24   testimony here in court.  You must decide what weight,

25   if any, should be given to the testimony of a witness

who has made prior inconsistent or contradictory

statements.  In making that determination, you may

consider whether the witness purposely made a false

statement or whether it was an innocent mistake; whether

the inconsistency concerns an important fact or whether

it had to do with a small detail; whether the witness

had an explanation for the inconsistency and whether

the -- that explanation appealed to your common sense.

If a person is shown to have knowingly

testified falsely about any important matter, you

obviously have a right to distrust the testimony of that

person concerning other matters.  You may reject all of

the testimony of that witness or give it such weight as

you may think it deserves.

You have heard testimony from witnesses who

were permitted to testify as experts.  An expert is

allowed to express an opinion on those matters about

which he or she has special knowledge and training.

Expert testimony is presented to you based on the belief

that someone who is experienced in a particular field

can assist you in understanding the evidence or in

reaching an independent decision on the facts.

In weighing an expert's testimony, you may

consider the expert's qualifications, experience,

training, the reasons for testifying, as well as all of

1   the other considerations that ordinarily apply when you

2   are deciding whether or not to believe a witness's

3   testimony.  You may give the expert testimony such

4   weight, if any, as you find it deserves in light of the

5   all of the evidence in this case.  You should not,

6   however, accept the testimony of an expert witness

7   merely because that witness is an expert, nor should you

8   substitute the opinions of an expert for your own

9   reason, judgment, and common sense.  In the end, the

10   determination of the facts in the case rests solely with

11   you.

12           The weight of the evidence is not necessarily

13   determined by the number of witnesses testifying on

14   either side.  You will consider all the facts and

15   circumstances in evidence to determine which of the

16   witnesses are worthy of belief.  You may find that the

17   testimony of a small number of witnesses on a particular

18   issue is more credible than the testimony of a greater

19   number of witnesses on the other side of the same issue.

20   It is not the number of witnesses or the quantity of

21   testimony that is important, but the quality of the

22   evidence that has been produced that is important.

23           There are two types of evidence that you may

24   properly use in deciding this case.

25           Direct evidence is the testimony given by a

1  witness about what that witness has seen, heard, or

2  observed or what that witness knows based on personal

3  knowledge.  Direct evidence also includes any exhibits

4  that have been admitted and any stipulations that have

5  been agreed to by the lawyers.  During the course of the

6  trial, you were told that the parties agreed or

7  stipulated to certain facts.  This simply means that

8  both sides accept those facts to be true.  Because there

9  is no disagreement regarding those facts, there was no

10 need for either side to introduce evidence relating to

11 them.  You must accept as true the facts to which the

12 parties have stipulated.

13         So, for example, you have heard that the

14 parties stipulated that Ms. McPadden was engaged in

15 conduct protected by the FMLA when she requested leave

16 time and notified Walmart that she might need additional

17 leave time in the future.  Similarly, the parties have

18 stipulated that Ms. McPadden reported in good faith what

19 she actually and reasonably believed constituted

20 violations of the law.

21         Evidence may also be used to prove a fact by

22 implication and this is referred to as circumstantial

23 evidence.  In other words, from examining direct

24 evidence, you may be able to draw certain inferences

25 that are reasonable and justified in light of your daily

1  experience and common sense.  Such reasonable inferences

2  constitute circumstantial evidence.

3          The law makes no difference -- no distinction

4  between the weight to be given to either direct or

5  circumstantial evidence.  It is up to you to decide how

6  to weigh the evidence in this case.

7          The evidence in this case consists of:  One,

8  the sworn testimony of the witnesses, both on direct and

9  cross-examination, regardless of who may have called

10  those witnesses; two, the exhibits that have been

11  admitted into evidence, regardless of who may have

12  produced them; and, three, any facts to which the

13  lawyers have agreed or stipulated.

14          Certain things are not evidence and you cannot

15  consider them as evidence.

16          Arguments, statements, and questions by the

17  lawyers are not evidence.  Questions asked by the

18  lawyers and what the lawyers have said in their opening

19  statements, closing arguments, and at other times during

20  the course of the trial is intended to help you

21  interpret the evidence, but it is not evidence.  If the

22  facts as you remember them differ from the way the

23  lawyers have stated them, your memory controls.

24          Objections by the lawyers are not evidence.

25  Lawyers have a duty to object when they believe a

question is improper under the rules of evidence.  I

must rule on objections and I have not intended to

indicate in any way by my rulings or by what I have said

what the verdict should be in this case.  You should not

be influenced by the lawyers' objections or by my

rulings on those objections.

Testimony that has been excluded or stricken

or that I have instructed you to disregard is not

evidence and must not be considered in any way in your

deliberations.

Anything you may have seen or heard when the

court was not in session is not evidence.  You must

decide the case solely on the evidence received at

trial.

As you know, the defendant in this case,

Walmart, is a corporation.  Because a corporation can

only act through its employees and agents, any act or

failure to act by an employee, officer, representative,

or other agent of Walmart in the performance of his or

her duty is held by the law to be the act or failure to

act of Walmart.  Therefore, whenever I use the term

"defendant" or speak of Walmart, I am referring to

Walmart acting through its employees, officers,

representatives, and agents.

In all other respects, a corporation must be

1  treated no differently from an individual litigant.

2  Walmart is to be treated in the same manner as any other

3  party that is involved in litigation.  All litigants are

4  equal before the law and corporations, big and small,

5  are entitled to the same fair consideration as you would

6  give any other individual party.

7         Ms. McPadden has sought to establish her claim

8  of gender-based discrimination by arguing that similarly

9  situated male employees did not receive the same level

10  of discipline as Ms. McPadden for similar conduct.  For

11  those to be valid comparators, Ms. McPadden must

12  establish that those other employees were similarly

13  situated in all relevant respects.  That, for example,

14  they were subject to the same companywide policies or

15  standards and that they engaged in the same conduct

16  without mitigating circumstances that would distinguish

17  their conduct or Walmart's treatment of them for it.

18  The comparators need not be perfect replicas.  The

19  question is whether a prudent person looking objectively

20  at the facts would think them roughly equivalent.

21         As the plaintiff in this case, Ms. McPadden

22  bears the burden of proving by a preponderance of the

23  evidence each of the essential elements of her claims.

24  A preponderance of the evidence simply means that

25  quantity and quality of evidence necessary to persuade

1   you that a party's claim is more likely true than not

2   true.  Think of a set of scales.  At the beginning of

3   the trial, they are perfectly balanced and even.  At the

4   end of the trial, if they have been tilted by the

5   evidence ever so slightly toward Ms. McPadden on a

6   particular element, then she has met her burden as to

7   that element.  If, on the other hand, the scales remain

8   even or if they tip ever so slightly in the defendant's

9   favor, then the plaintiff has not met her burden.

10         In deciding whether any fact has been proven

11   by a preponderance of the evidence, you may, unless

12   otherwise instructed, consider the testimony of all

13   witnesses, regardless of who may have called them, and

14   all exhibits admitted into evidence, regardless of who

15   may have produced them.

16         Ms. McPadden is not required to produce direct

17   evidence of an unlawful motive to terminate her

18   employment.  She may instead produce circumstantial

19   evidence of unlawful motive.  That means you may infer

20   knowledge and/or motive as a matter of reason and common

21   sense from the existence of other facts, for example,

22   temporal proximity between the plaintiff's exercise of a

23   protected right and the retaliatory acts she claims

24   Walmart committed, and/or explanations that Walmart gave

25   for its actions that you find were really pretextual.

 1    Pretextual means false or, although true, not the real

 2    reason for the action taken.  Ms. McPadden claims that

 3    Walmart's stated reason for firing her for having lost

 4    the pharmacy key while on a second-level coaching is not

 5    the true reason, but is instead a pretext to cover up

 6    for unlawful discrimination and/or retaliation.  A

 7    plaintiff can establish pretext -- that "is" should be

 8    stricken.

 9            A plaintiff can establish pretext by showing

10    weaknesses, inconsistencies, and/or contradictions in

11    the employer's proffered explanation for its decision to

12    discipline or fire the employee.  A plaintiff may also

13    establish pretext by showing that the employer departed

14    from its customary and usual practices.

15            If you do not believe the reason Walmart has

16    given for terminating Ms. McPadden's employment, then

17    you may, but are not required to, infer that

18    Ms. McPadden's protected status, her gender, and/or her

19    protected conduct, requesting FMLA leave and/or

20    reporting alleged violations of the law, was a factor

21    that influenced Walmart's decision to fire her.  But

22    remember that as to each of her individual claims,

23    Ms. McPadden bears the burden of persuading you by a

24    preponderance of the evidence that Walmart terminated

25    her employment because of the claimed unlawful

1  discrimination and/or retaliation and that it would not

2  have fired her were it not for that particular unlawful

3  motive.  Ms. McPadden must do more than merely impugn

4  the veracity of Walmart's explanation for disciplining

5  and ultimately firing her.  She must also persuade you

6  by a preponderance of the evidence that Walmart's stated

7  explanation is not only false, but also that it is

8  intended to cover up its true unlawful discriminatory

9  and/or retaliatory motive.

10          So if you credit the reasons offered by

11  Walmart for its decision to fire Ms. McPadden as true,

12  then you must return a verdict for Walmart on each of

13  Ms. McPadden's discrimination and retaliation claims.

14          If, however, you determine that Walmart's

15  proffered explanation is false, then you may, but are

16  not required to, infer the existence of discrimination

17  and/or retaliation from the falsity of Walmart's

18  explanation.  If you determine that Walmart's

19  explanation is not worthy of credence and if you also

20  find that a preponderance of the evidence, whether

21  direct or circumstantial, supports one or more of

22  Ms. McPadden's claims that Walmart unlawfully

23  discriminated and/or retaliated against her, you must

24  return a verdict in favor of the plaintiff on that claim

25  or those claims.

1    In its defense to Ms. McPadden's claims of

2  retaliation, Walmart says that Ms. Barbara Kulwicki,

3  divisional senior human resources manager, and

4  Ms. Heather McCaffrey, market manager, were the only

5  people who made the decision to fire Ms. McPadden.

6  Walmart also claims that Ms. Kulwicki and Ms. McCaffrey

7  were unaware of Ms. McPadden's reports of public safety

8  concerns.  It also says Ms. Kulwicki was aware of

9  Ms. McPadden's FMLA leave, but Ms. McCaffrey was not.

10  Mr. Certo was aware of Ms. McPadden's FMLA leave and

11  reports of public safety concerns and her report of a

12  HIPAA privacy violation.  Ms. McPadden claims that

13  Mr. Certo was a decision-maker with respect to her

14  termination.  Whether Mr. Certo was a decision-maker is

15  an issue in dispute which you must resolve.

16    If you find that Ms. Kulwicki and

17  Ms. McCaffrey were the people that made the final

18  decision to terminate Ms. McPadden's employment, and if

19  you find that they were unaware of Ms. McPadden's FMLA

20  protected activity and her reports of public safety and

21  legal concerns, I instruct you that a corporation such

22  as Walmart is nevertheless liable for unlawful

23  discrimination and/or retaliation even when so-called

24  neutral decision-makers such as Ms. Kulwicki and

25  Ms. McCaffrey made the final termination decision if you

find by a preponderance of the evidence that a
supervisor, like Mr. Certo, performed an act motivated
by retaliatory animus that he intended to cause the
adverse employment action and if that act caused Walmart
to take adverse action that it would not have otherwise
taken.

In other words, if you find that Ms. Kulwicki
and Ms. McCaffrey did not personally have a retaliatory
motive for terminating Ms. McPadden's employment,
Walmart can be liable for retaliatory termination if you
find by a preponderance of the evidence that Mr. Certo
was motivated by retaliation and performed an act that
was intended to cause Ms. Kulwicki or Ms. McCaffrey to
fire Ms. McPadden and you also find that Mr. Certo's act
actually caused them to fire Ms. McPadden.

When assessing Ms. McPadden's claim that the
reason given by Walmart for her termination is not true,
you should focus on Walmart's motivation for firing her,
not its business judgment.  As I will discuss in more
detail in a moment, Ms. McPadden was what is known as an
employee at will.  That means she did not have an
employment contract with Walmart and an employer may
fire or discipline an employee at will for any
nondiscriminatory reason it sees fit, just as an
employee at will may quit her job at any time for any

1  reason she sees fit.

2          While an employer's judgment or treatment of

3  an employee at will may seem unwise or erroneous to

4  outside observers, the relevant question presented to

5  you with respect to each of Ms. McPadden's individual

6  claims is simply whether Walmart's stated reason for

7  firing Ms. Ms. McPadden was actually a pretext for

8  unlawful discrimination or retaliation.  To be

9  legitimate, an employer's reason for terminating an

10 employee must be nondiscriminatory, but it does not have

11 to be a reason that you, the jury, would necessarily

12 approve or act on.  An employer is entitled to make its

13 own policy and business judgments as long as they are

14 not a pretext for unlawful discrimination or

15 retaliation.  In that regard, Ms. McPadden's personal

16 opinions and assessment of her own qualifications and

17 job performance are not relevant.  Instead, you must

18 focus on Walmart's perceptions, judgment, and motivation

19 in determining whether it acted unlawfully.

20          Ms. McPadden advances three categories of

21 claims against Walmart:  One, unlawful discrimination

22 based upon her gender; two, retaliation based upon her

23 invocation of leave time under the Family and Medical

24 Leave Act, the FMLA, and based upon her having reported

25 that she reasonably and in good faith believed -- what

1  she reasonably and in good faith believed were

2  violations of the law; and, three, wrongful termination

3  in response to her having reported allegedly unsafe

4  working conditions in the pharmacy.  I will instruct you

5  on the law applicable to each claim you must resolve.

6  You must consider each claim separately.  Your verdict

7  with respect to a particular legal claim should not

8  control your verdict as to any other claim.

9          Gender discrimination.  Ms. McPadden alleges

10  that Walmart discriminated against her on the basis of

11  her gender in violation of a federal law known as

12  Title VII of the Civil Rights Act.  To prevail on that

13  claim, Ms. McPadden must prove by a preponderance of the

14  evidence that Walmart terminated her employment because

15  of her gender.  In these instructions I will refer to

16  this link between Ms. McPadden's status and/or her

17  protected conduct as Walmart's decision to terminate her

18  employment -- and Walmart's decision to terminate her

19  employment as a causal connection.  So, as to her gender

20  discrimination claim, Ms. McPadden must prove by a

21  preponderance of the evidence a causal connection

22  between her gender and Walmart's decision to terminate

23  her employment.  That is, that Walmart would not have

24  fired her if she were not a woman.

25          Ms. McPadden need not prove that gender

1   discrimination was the only or even the predominant

2   factor that motivated Walmart.  In fact, you may decide

3   that other factors were involved as well in Walmart's

4   decision-making process.  But, in order to return a

5   verdict in favor of plaintiff on her Title VII gender

6   discrimination claim, you must conclude that she has

7   proved by a preponderance of the evidence that although

8   there may have been other factors, she would not have

9   been fired but for the gender discrimination.

10          As I mentioned a moment ago, an employer is

11  free to fire an employee for any nondiscriminatory

12  reason it wishes, even if its business judgment seems

13  objectively unwise.  But you may consider the

14  believability of an explanation in determining whether

15  it is a cover-up or pretext for discrimination.

16          Next Ms. McPadden alleges that Walmart

17  discriminated against her on the basis of her gender in

18  violation of New Hampshire's Law Against Discrimination.

19  That law makes it unlawful for an employer to

20  discriminate against an employee based upon that --

21  because of that person's gender.

22          In determining whether Ms. McPadden has proved

23  her claim under New Hampshire's Law Against

24  Discrimination, you shall apply the same standards and

25  the same definitions you applied in resolving her

federal gender discrimination claims.  Again,
Ms. McPadden must prove by a preponderance of the
evidence a causal connection between her gender and
Walmart's decision to terminate her employment.

Ms. McPadden advances both a state and a
federal claim that Walmart unlawfully retaliated against
her.  First, she alleges that Walmart unlawfully
retaliated against her in violation of the Family and
Medical Leave Act for having taken FMLA leave and
indicating that she would likely require FMLA leave in
the future for her serious medical condition.  She also
alleges that Walmart unlawfully retaliated against her
in violation of New Hampshire's Whistleblowers'
Protection Act for having reported what she reasonably
and in good faith believed were violations of the law.

The Family and Medical Leave Act makes it
unlawful for an employer to retaliate against an
employee who requests and/or takes leave authorized by
the FMLA.  To prevail on her claim that Walmart
retaliated against her for having invoked her FMLA
rights, Ms. McPadden must prove by a preponderance of
the evidence each of the following essential elements:
A, that she engaged in a protected activity under the
FMLA; that is, she requested and took leave and
indicated that she might need leave in the future for

1  her serious medical condition; and, B, that she was

2  subjected to an adverse job action, that is, she was

3  disciplined, resulting in the termination of her

4  employment; and, C, that although there may have been

5  other factors, were it not for her protected FMLA

6  activity, Walmart would not have fired her.

7  　　　　　Protected activity.  As to the first element

8  of her FMLA retaliation claim, the parties have agreed

9  or stipulated that Ms. McPadden was engaged in activity

10  protected under the FMLA when she requested and took

11  leave and indicated that she might need additional leave

12  in the future.  Again, Ms. McPadden need not prove

13  termination because of protected conduct.

14  　　　　　Again, Ms. McPadden need not prove that her

15  request for FMLA leave was the only or even the

16  predominant factor that motivated Walmart to fire her.

17  In fact, you may decide that other factors were also

18  involved in Walmart's decision-making process.  But in

19  order to return a verdict in favor of plaintiff on her

20  FMLA retaliation claim, you must conclude that she has

21  proved by a preponderance of the evidence a causal

22  connection between her discharge and her invocation of

23  rights under the FMLA; that although there may have been

24  other factors, she would not have been fired if Walmart

25  had not retaliated against her for invoking her FMLA

1    rights.

2            Elements of the whistleblower claim.

3    New Hampshire law provides that an employer cannot

4    discharge, threaten, or otherwise discriminate against

5    an employee because the employee in good faith reports

6    what the employee has reasonable cause to believe is a

7    violation of any law or regulation.  Here Ms. McPadden

8    claims she was fired because she reported to Walmart

9    what she reasonably believed to be a violation of the

10   law when other employee -- when another employee of

11   Walmart disclosed her confidential medical and

12   prescription information and when she reported what she

13   believed were safety issues in the pharmacy.

14           To prevail on her state Whistleblowers'

15   Protection Act claim, Ms. McPadden must prove by a

16   preponderance of the evidence that:  A, Ms. McPadden,

17   acting in good faith, reported what she actually and

18   reasonably believed constituted violations of the law;

19   and, B, Walmart terminated Ms. McPadden's employment

20   because of her report or reports.

21           As to the first element of Ms. McPadden's

22   whistleblower claim, the parties have stipulated that

23   she reported in good faith what she both actually and

24   reasonably believed constituted violations of the law.

25   Accordingly, the parties were not required to offer

1    evidence on that element.

2            To satisfy the second element of her claim,

3    Ms. McPadden must prove that Walmart terminated her

4    employment because she made the report.  That is to say,

5    Ms. McPadden must prove, by a preponderance of the

6    evidence, that there was a causal connection between her

7    making a report and Walmart's subsequent decision to

8    discipline her, resulting in her termination; that were

9    it not for her having made the report, Walmart would not

10   have terminated her -- her employment.

11           Ms. McPadden need not prove that she -- that

12   her having made those reports was the only or even the

13   predominant factor that motivated Walmart.  In fact, you

14   may decide that other factors were involved as well in

15   Walmart's decision-making process, but in order to

16   return a verdict in favor of plaintiff on her

17   whistleblower claim, you must conclude that she has

18   proved by a preponderance of the evidence that although

19   there may have been other factors, she would not have

20   been fired but for her having made those reports.

21           Wrongful termination.  Ms. McPadden did not

22   have an employment contract with Walmart.  She was there

23   for what is known as an employee at will.  When parties

24   agree on employment at will, either party may terminate

25   that agreement at any time with or without cause or

1  justification.  So as I mentioned earlier, an employer

2  may fire an at-will -- an employee at will at any time

3  for any nondiscriminatory reason or for no reason at

4  all, as the employer sees fit.  The same is true for the

5  employee who may quit at any time with or without a

6  reason.

7         There is, however, an important exception to

8  the general rule.  The law attempts to balance the

9  employer's interest in running its business as it sees

10  fit with the employee's interest in maintaining her

11  employment.  So to maintain a proper balance between

12  those two interests, it is necessary to consider the

13  public interest.  This gives an employee the right to

14  seek recovery of damages claiming what is known as

15  wrongful termination of an at-will employee --

16  employment in certain specific circumstances.

17         To prevail on her claim that Walmart

18  wrongfully terminated her at-will employment,

19  Ms. McPadden must prove by a preponderance of the

20  evidence the following two essential elements:  A, that

21  Walmart's decision to fire her was motivated by bad

22  faith, malice, or retaliation; and, B, that Walmart

23  fired her because she performed some act that public

24  policy would encourage.

25         Bad faith is, of course, the opposite of good

1  faith.  It is the act of doing something not by mistake,

2  but because of some sinister motive.  An act done with

3  malice is done with malice if it is undertaken not only

4  with ill will, evil motive, or an intent to injure, but

5  also with a wanton disregard for the rights of others

6  and the consequences likely to follow.

7        Retaliation is the act of doing something in

8  order to punish a person because of some wrong, real or

9  imagined, that the person supposedly committed against

10  the person retaliating.  It is described in the

11  vernacular as getting even.

12        As to the first element of plaintiff's burden

13  of proof, it is sufficient if she proves by a

14  preponderance that Walmart acted with any one or more of

15  those unlawful motives:  Bad faith, malice, or

16  retaliation.

17        The second element that Ms. McPadden must

18  prove is what I've called the public policy exception.

19  That is, Ms. McPadden must prove that Walmart fired her

20  because she performed an act that public policy would

21  encourage.  For example, reporting for jury duty.

22        Here, Ms. McPadden claims that she was engaged

23  in conduct that public policy encourages, reporting what

24  she reasonably believed were HIPAA and safety issues in

25  the Seabrook pharmacy.  The parties have stipulated that

1   she reported in good faith what she both actually and

2   reasonably believed constituted violations of the law.

3   Accordingly, the parties were not required to offer

4   evidence on that element.

5          Ms. McPadden claims that Walmart, motivated by

6   bad faith, malice, or retaliation, fired her because she

7   made those reports.  Again, to prevail on that claim,

8   Ms. McPadden must prove, by a preponderance of the

9   evidence, that Walmart was motivated by bad faith,

10  malice, or retaliation and it would not have fired her

11  if she had not reported those alleged safety issues.

12         You should consider all of the evidence that

13  has been presented to you in determining whether or not

14  Ms. McPadden has proved by a preponderance of the

15  evidence any one or more of her claims.  If you find

16  that she has met her burden of proof on the issue of

17  liability on one or more claims, then you will go on to

18  consider the proper measure of damages.  If, on the

19  other hand, you find that Ms. McPadden has not met her

20  burden of proof on the issue of liability on any of her

21  claims, then you will conclude your deliberations and

22  return a verdict for the defendant.

23         You must not compromise between the liability

24  issue and the damages issue.  You must determine the

25  issue of liability first; that is, whether Ms. McPadden

1  has proved each of the essential elements of one or more

2  of her claims against Walmart.  You should proceed to

3  the damages issue only if you have determined that the

4  plaintiff has proved at least one of her claims by a

5  preponderance of the evidence.

6          I will now instruct you on the law applicable

7  to awarding damages.  You should not consider the fact

8  that I am instructing you as to the proper measure of

9  damages as indicating in any way that the plaintiff is

10  entitled to damages.  These instructions as to the

11  measure of damages are given to you for your guidance in

12  the event that you should find in favor of the plaintiff

13  on one or more of her claims in accordance with the

14  instructions I've just given you.

15          The principal or paramount rule in awarding

16  damages is that every person unjustly deprived of his or

17  her rights should be fully and fairly compensated for

18  the injuries sustained.  The object of damages is to

19  give compensation to the party injured for the actual

20  loss sustained.  It is a rational and legal principle

21  that the compensation should be equivalent to the

22  injury.

23          Even though she has advanced a number of legal

24  theories of recovery, Ms. McPadden can only recover once

25  for any particular loss or injury.  Therefore, if

Ms. McPadden's claims arise out of a common core of facts, only a single recovery will be made even if you find for Ms. McPadden on one or more -- on more than one of her claims.

If you find that Ms. McPadden is entitled to damages in accordance with these instructions, then you should award her that sum of money that will fairly, justly, and reasonably compensate her for all of the damage suffered as a direct result of Walmart's wrongful conduct. Ms. McPadden is entitled to full, fair, and adequate compensation for the injuries and the results of the injuries sustained. No more and no less.

A person who seeks damages has the burden of proving that it is more probable than not that the damages for which compensation is sought were caused as a direct result of the conduct of the defendant. Additionally, she must show the nature, extent, and amount of those damages. So the burden is on Ms. McPadden to prove by a preponderance of the evidence each item of damage she says she suffered and to prove that each item was caused by Walmart's unlawful conduct. Ms. McPadden is not required to prove the exact amount of her damages, but she must introduce sufficient evidence to permit you to make a reasonable estimate of each item. If Ms. McPadden fails to do so, then she

1    cannot recover for that item.

2           In determining the amount of damages, if any,

3    to allow Ms. McPadden, you may draw such inferences from

4    the evidence of the nature of her injuries and the

5    results thereof as are justified by your common

6    experience.  Damages are not to be awarded on the basis

7    of guesswork or speculation or on the basis of passion,

8    prejudice, or sympathy.  Instead, they must be awarded,

9    if at all, based upon your assessment of what full and

10   fair compensation should be.

11          You may award compensatory damages only for

12   injuries that Ms. McPadden has proved were proximately

13   caused by Walmart's alleged wrongful conduct.

14   Compensatory damages are not allowed as a punishment and

15   cannot be imposed or increased to penalize the

16   defendant, nor should you award compensatory damages for

17   speculative injuries.  They may be awarded only for

18   injuries that Ms. McPadden has actually suffered or that

19   she is reasonably likely to suffer in the future as a

20   consequence of Walmart's allegedly unlawful conduct.

21          You may consider the following elements of

22   compensatory damages:  Pain and suffering, reasonable

23   compensation for pain, suffering, and mental anguish

24   which you find from a preponderance of the evidence was

25   caused by Walmart's unlawful termination of Ms. McPadden

1   and which Ms. McPadden has experienced to date and any

2   such pain, suffering, and mental anguish which you find

3   from a preponderance of the evidence she will probably

4   experience in the future.  There is no standard

5   prescribed by law by which to fix reasonable

6   compensation for pain, suffering, and mental anguish.

7   In making an award for this element, you should exercise

8   your reasonable judgment and determine damages that are

9   full, fair and adequate in light of the evidence.

10  Ms. McPadden may not recover for any pain, suffering, or

11  mental anguish which she suffered as a result of factors

12  other than her allegedly unlawful termination by

13  Walmart.

14          If you find that Walmart unlawfully fired

15  Ms. McPadden in violation of the FMLA, Title VII,

16  New Hampshire's Law Against Discrimination, the

17  Whistleblowers' Protection Act and/or wrongfully

18  terminated her employment, she is entitled to the back

19  pay she would have earned if she had not been wrongfully

20  fired from the date of her termination, November 27,

21  2012, through the date of your verdict.  This amount

22  consists of the wages and employee benefits Ms. McPadden

23  would have received but for her wrongful discharge.  It

24  includes not only wages, salary, and fringe benefits,

25  but also raises, vacation and sick pay, bonuses,

1 cost-of-living expenses, group life contributions,

2 profit-sharing and retirement or pension plans.

3 　　　　To calculate the amount of back pay to which

4 plaintiff is entitled, you should first determine the

5 wages and employee benefits she would have received from

6 Walmart from the time she was fired through your

7 verdict.  Then you should subtract from that amount the

8 wages and employee benefits Ms. McPadden received from

9 other employment during that period of time.

10 Ms. McPadden must prove the amount of her back pay

11 damages by a preponderance of the evidence.  In making

12 that determination, you may, to the extent you find it

13 credible and reliable, rely on the testimony of

14 Dr. Craig Moore who Ms. McPadden retained as an

15 economist in this case.

16 　　　　Front pay.  If you find that Ms. McPadden has

17 proved by a preponderance of the evidence that Walmart

18 wrongfully terminated her employment and/or that it

19 terminated her employment in violation of the FMLA,

20 New Hampshire's Law Against Discrimination, Title VII,

21 and/or Whistleblowers' Protection Act, then you should

22 also determine the amount of damages that will fairly

23 compensate her for the amount of wages and fringe

24 benefits she reasonably would have received in her

25 employment with Walmart in the future.  That is, from

1  the date of your verdict forward.  This is referred to
2  as front pay.  To calculate the amount of front pay to
3  which Ms. McPadden is entitled, you should determine the
4  wages and employee benefits she reasonably would have
5  received from Walmart from the date of your verdict
6  until the date on which Ms. McPadden would have left her
7  employment with Walmart.  Ms. McPadden must prove the
8  amount of front pay damages by a preponderance of the
9  evidence.

10         An award of front pay for future wages and
11  employee benefits necessarily requires that payment be
12  made now for a loss that Ms. McPadden will not actually
13  suffer until some future date.  So if you find that
14  Ms. McPadden is entitled to damages for front pay, then
15  you must determine the present value in dollars of such
16  damages.

17         To calculate the present value of future wages
18  and employee benefits, you must reduce the front pay
19  award by the amount of interest that Ms. McPadden could
20  earn on the amount of the award if she made a relatively
21  risk-free investment.  The reason why you must make this
22  reduction is because an award of an amount representing
23  future wages and employee benefits is more valuable to
24  Ms. McPadden if she receives it today than if she
25  received it in the future.  It is more valuable because

1   she can earn interest on it for the period of time

2   between the date of the award and the date on which she

3   would have actually earned the money had she not been

4   terminated.  Thus, you should adjust the amount of any

5   award for front pay by the amount of interest that

6   Ms. McPadden can earn on that amount over time.

7           Again, in making that determination, you may,

8   to the extent you find it credible and reliable, rely on

9   the testimony of Dr. Craig Moore.

10          Ms. McPadden has brought her claims under both

11  state and federal law.  Each of those laws permit a

12  different type of damage award.  Under certain

13  circumstances, federal law permits you to award

14  Ms. McPadden what are known as punitive damages.  Under

15  certain circumstance, state law permits you to award

16  Ms. McPadden what are known as enhanced compensatory

17  damages.  Finally, under certain circumstances, the FMLA

18  permits you to award Ms. McPadden what are known as

19  liquidated damages.  I will now explain those different

20  types of damages for you.

21          Liquidated damages under the FMLA are damages

22  equal in amount to the wages, salary, employment

23  benefits, or other compensation that Ms. McPadden has

24  proved by a preponderance of the evidence she lost or

25  was denied by reason of Walmart's retaliation against

her in violation of the FMLA.  In addition to
compensatory damages, you may award Ms. McPadden
liquidated damages as described above, if you conclude
that she has demonstrated that Walmart either knew its
conduct was prohibited by the FMLA or that it showed a
reckless disregard for whether its conduct was
prohibited by the FMLA.

Punitive damages are available in limited
circumstances as a punishment to defendants and as a
warning to others to discourage them from following the
defendant's example.  If you find in favor of
Ms. McPadden on her federal gender discrimination claim
under Title VII, then you must also consider whether an
award of punitive damages is justified.

You may award punitive damages only if you
determine by a preponderance of the evidence that
Walmart discriminated against Ms. McPadden in violation
of federal law and that those discriminatory actions
were done maliciously or with reckless indifference to
Ms. McPadden's federally protected rights.  In other
words, you may award punitive damages only if you
determine by a preponderance of the evidence that
Walmart discriminated against Ms. McPadden despite
knowing its conduct was illegal or that it acted with
reckless disregard for the laws prohibiting such

discrimination.

Additionally, Ms. McPadden bears the burden of proving that the Walmart employee who acted with malice or with reckless indifference to her federally protected rights was at the time a managerial or supervisory employee who was acting within the scope of his or her employment.

For its part, Walmart may avoid the imposition of an award of punitive damages under Title VII if it demonstrates by a preponderance of the evidence that it engaged in good faith efforts to implement policies that prohibited gender discrimination.

If you determine that the facts justify an award of punitive damages, you should try to determine a fair, just, and reasonable amount for Ms. McPadden under all the circumstances. Punitive damages are not intended to compensate a plaintiff for her injuries, but are, instead, intended to punish the defendant and to prevent similar conduct in the future. Thus, if you award punitive damages, you may consider Walmart's financial status and the impact of its having to pay such an award.

Punitive damages must bear a reasonable relationship to Ms. McPadden's actual injury. However, no single numerical equation has been made to easily

1   link punitive damages to other damages.  In determining

2   a reasonable relationship to the actual injury, you may

3   consider, among other relevant factors, the following:

4   The impact or the severity of Walmart's conduct; whether

5   the punitive damages have a reasonable relationship

6   to the other damages awarded to Ms. McPadden; and

7   whether -- and the deterrent effect, given Walmart's

8   financial condition, that a punitive damages award will

9   have on Walmart's future conduct and on the conduct of

10  others.

11          If you find in favor of Ms. McPadden on her

12  claim that Walmart discriminated against her in

13  violation of New Hampshire's Law Against Discrimination,

14  then you may also consider whether an award of enhanced

15  compensatory damages is justified.

16          Enhanced compensatory damages, unlike punitive

17  damages, may not be awarded in any -- may not be awarded

18  in an effort to punish the defendant.  Instead, you may

19  award enhanced compensatory damages only if you find

20  that Walmart's conduct was especially egregious.

21          If you found in plaintiff's favor on her state

22  law discrimination claim under New Hampshire's Law

23  Against Discrimination, then you may award her enhanced

24  compensatory damages if you find that Walmart's conduct

25  was, more probably than not, willful or reckless.  A

1    defendant acts willfully if -- if the law imposes a duty

2    on it, it knows of that duty, and it voluntarily and

3    intentionally violates that duty.  Reckless means

4    intentional conduct that a person knew or reasonably

5    should have known was unlawful; that is, acting with a

6    conscious disregard of or willful blindness to what the

7    law requires.

8         The amount -- the amount of damages mentioned

9    by counsel is not evidence in this case.  A specific

10    request for a total dollar amount made by Ms. McPadden's

11    counsel is simply a request for recovery.  In the event

12    you find in favor of Ms. McPadden on one or more of her

13    claims, the amount of the verdict must be based solely

14    on the evidence presented during the course of trial and

15    the law as I've given it to you.

16         When you retire to the jury room to

17    deliberate, you may take with you this charge and the

18    exhibits that the Court has admitted into evidence.  The

19    principles of law set forth in these instructions are

20    intended to guide you in reaching a fair and just result

21    in this case, which is important to all the parties.

22    You are to exercise your judgment and common sense

23    without prejudice and without sympathy, but with honesty

24    and understanding.  You should be conscientious in your

25    deliberations and seek to reach a just result in this

case because that is your highest duty as judges of the

facts and as officers of this court.

When you retire, you should elect -- you

should elect one member of the jury as your foreperson.

That individual will act very much like the chairman

person of a committee, seeing to it that the

deliberations are conducted in an ordinarily fashion and

that each juror has a full and fair opportunity to

express his or her views, positions, and arguments on

the evidence and on the law.

The verdict must represent the considered

judgment of each juror.  In order to return a verdict,

each juror must agree to it.  That is to say your

verdict on each of Ms. McPadden's claims, regardless of

whether it is in favor of Ms. McPadden or Walmart, must

be unanimous.

It is your duty as jurors to consult with one

another and to deliberate with a view to reaching an

agreement if you can do so without violence to

individual judgment.  Each of you must decide the case

for yourself, but do so only after an impartial

consideration of the evidence in the case with the other

jurors.  In the course of your deliberations, do not

hesitate to reexamine your own views or to change your

opinion if you become convinced it is erroneous.  But do

1    not surrender your honest conviction as to the weight or

2    effect of the evidence solely based on the opinion of

3    the other jurors or merely for the purpose of returning

4    a verdict.  Remember at all times that you are not

5    partisans.  You are judges.  Judges of the facts.  Your

6    only interest is to seek the truth from the evidence in

7    the case.

8            If during your deliberations it becomes

9    necessary to communicate with me, please give a written

10   message to the court security officer, who will bring it

11   to me.  I will then respond as promptly as possible,

12   either in writing or by meeting with you here in the

13   courtroom.  I will always first show the attorneys your

14   question and my response before I answer your question.

15           Now, this is very important.  You must not --

16   you must never disclose to anyone, including the Court,

17   me, how the jury stands numerically or otherwise on the

18   matters you are deciding until after you have reached a

19   unanimous verdict or have been discharged.  In other

20   words, if the jury is split, say, five to three on some

21   issue, the existence of that split or the number on one

22   side or the other must not be disclosed to anyone,

23   including me.

24           If we recess during your deliberations, please

25   follow all of the instructions that I've given you

1  concerning your conduct during the trial.  In

2  particular, do not discuss the case with anyone other

3  than your fellow jurors in the jury room when everyone

4  is present.

5          So if someone goes out for a smoke break, you

6  should stop your deliberations.

7          After you've reached a unanimous verdict, your

8  foreperson must complete, sign, and date the verdict

9  form you will be given.  Return this charge together

10 with any written answers to your questions.  After you

11 have reached a verdict, you are not required to talk to

12 anyone about the case unless I direct you to do so.

13         At the risk of being repetitive, let me once

14 again tell you that nothing said in these instructions

15 is intended to suggest in any way what your verdict

16 should be.  The verdict is the exclusive responsibility

17 of the jury, not the judge.  When you have arrived at a

18 verdict, please notify the court security officer and

19 you will be returned to the courtroom.

20         All right.  I'll see counsel at sidebar.

21 Actually, you're -- you don't have return these.  You're

22 free to take the instructions with you, if you'd like,

23 at the end.

24                     (AT SIDEBAR)

25         THE COURT:  Objections to the instructions?

1          MS. IRWIN:  There was one error -- and first

2     I'd just like to say you and the law clerk and the court

3     did a fabulous job with complicated instructions --

4          THE COURT:  However ...

5          MS. IRWIN:  -- but on page 29 there was just

6     one error.  And we can tell because it's inconsistent

7     with the verdict form for front pay.

8          MR. KACZMAREK:  That reference?

9          MS. IRWIN:  Yeah.

10         MR. KACZMAREK:  Yeah.

11         MS. IRWIN:  It should say wrongful termination

12    instead of FMLA.

13         THE COURT:  Oh, I see.  Okay.  All right.

14         Any objections?

15         MS. IRWIN:  And then the only other objection

16    is as we stated before the instructions, we believe that

17    there should be an instruction as part of the pretext

18    and temporal proximity instruction that in retaliation

19    cases, while there is -- based on the *Harrington vs.*

20    *Aggregate Industries Northeast Region Inc.* case, 668

21    F.3d 25 at page 33, First Circuit 2012, that in

22    retaliation cases, while something -- something greater

23    than the sum of parts, the bits and pieces of evidence

24    taken collectively, have significantly probative value.

25         And, your Honor, I don't know if we're too

1  late for this, but we did state before that we think

2  there should be an enhanced compensatory damages for the

3  wrongful termination claim.

4          THE COURT:  Okay.  Yes, I've exercised my

5  discretion not to instruct on enhanced compensatory

6  damages under the state common law cause of action

7  because I don't find this to be an exceptional case

8  warranting such an instruction.

9          Okay.

10          MR. KACZMAREK:  Yes, your Honor.  We have a

11  number of objections to the --

12          THE COURT:  Your objection is overruled, by

13  the way.

14          MS. IRWIN:  Thank you, your Honor.  And am

15  I -- may I just be permitted to say the basis a little

16  bit more specifically on that one?

17          THE COURT:  On --

18          MS. IRWIN:  On the wrongful -- the enhanced

19  compensatory --

20          THE COURT:  Sure, but -- I guess for your

21  protection.  I'm aware of your argument earlier.

22          MS. IRWIN:  Okay.

23          THE COURT:  I'm not sure -- was that on the

24  record?

25          MS. IRWIN:  That's what I'm not sure about.

1          THE COURT:  Okay.  Sure.  Go ahead.

2          MS. IRWIN:  I would just say because wrongful

3  termination is an intentional tort, it does require bad

4  faith, malice, or retaliation as part of the element of

5  the claim.  We would say that it meets the standard for

6  enhanced compensatory damages.

7          THE COURT:  Okay.

8          MS. IRWIN:  Thank you, Your Honor.

9          MR. KACZMAREK:  Thank you, Your Honor.

10         As previously indicated, defendant objects to

11  the cat's paw instruction.  It should state that if a

12  neutral decision-maker, when deciding to terminate an

13  employee, must rely on information that's inaccurate,

14  misleading, or incomplete because of another employee's

15  discriminatory animus as indicated at the *Ameen* case,

16  First Circuit 2015, and that the plaintiff must provide

17  specific evidence of unlawful animus by the employee

18  reporting information to the neutral decision-maker.

19         We don't believe that's accurately reflected

20  in the current jury instructions.

21         THE COURT:  Okay.  Objection's overruled.

22         MR. KACZMAREK:  Okay.  With regard to the

23  comparator instruction, the defendant objects to that

24  instruction because, among other reasons, it doesn't

25  indicate that the comparator must be disciplined by the

1  same decision-maker.  And we believe that's well

2  established by First Circuit law, including *Champagne*

3  *vs. Servistar*.  We also believe that the comparator

4  instruction is inadequate, given that it refers to a

5  companywide policy.

6          THE COURT:  Okay.  Objection overruled.

7          MR. KACZMAREK:  With regard to the FMLA

8  instruction, your Honor, we believe, as we indicated on

9  the record earlier, that the causation standard is

10  inaccurate and it should be the but for causation

11  standard.

12          THE COURT:  Okay.  Objection overruled.

13          MR. KACZMAREK:  With regard to New Hampshire

14  Law Against Discrimination, 354-a, we object and we

15  would reiterate our argument that the Court decides

16  enhanced compensatory damages, not the jury.

17          THE COURT:  Okay.  Objection overruled.

18          MR. KACZMAREK:  With regard to the punitive

19  damages instruction, we believe -- we object to that

20  instruction in its entirety and believe that no such

21  instruction is warranted here, given as we stated on the

22  record earlier that a plaintiff in a Title VII

23  discrimination case is not entitled to a punitive

24  damages instruction when the plaintiff has presented no

25  evidence from which a reasonable jury could conclude

1  that an employer acted with malice or reckless

2  indifference to federally protected rights.

3          THE COURT:  Okay.  Objection overruled.

4          I don't think I put in the record, so let me

5  do it now.  I did put on the record earlier that with

6  respect to your objection to the -- oh, you think the

7  Court should decide it.  I'll be happy to decide it, but

8  I'll treat the jury's verdict as advisory verdict --

9          MS. IRWIN:  And --

10         THE COURT:  -- in that respect.  And with

11  respect to a front pay award, any front pay award under

12  Title VII, I believe that's the province of the Court to

13  determine.  And I'm submitting it to the jury on an

14  advisory basis and I'll consider their verdict in

15  determining whether front pay should be awarded and to

16  what extent.

17         MS. IRWIN:  Your Honor, I would just --

18         MR. KACZMAREK:  Two --

19         MS. IRWIN:  Sorry.

20         MR. KACZMAREK:  That's okay.  Go ahead,

21  Lauren.

22         MS. IRWIN:  I would just raise an objection to

23  the first issue that you said being advisory.  I think

24  it's --

25         THE COURT:  Enhanced compensatory damages?

1      MS. IRWIN:  -- enhanced compensatory.

2      We believe that the statute was indicating the

3  difference between the Human Rights Commission and the

4  court --

5      THE COURT:  Right.

6      MS. IRWIN:  -- proceeding.  We believe that is

7  a jury question and so --

8      THE COURT:  Well --

9      MS. IRWIN:  -- you know, obviously --

10     THE COURT:  -- it's being submitted to the

11  jury.  So no harm, no foul.

12     MS. IRWIN:  Thank you, your Honor.

13     MR. KACZMAREK:  Just two remaining objections,

14  your Honor.

15     THE COURT:  Oh, I'm sorry.

16     MR. KACZMAREK:  That's okay.

17     As previously indicated on the record,

18  defendant rejects -- objects to the absence of a

19  mitigation of damages instruction.

20     THE COURT:  Okay.  Objection overruled for the

21  same reasons I gave earlier.

22     MR. KACZMAREK:  Okay.  And last but not least,

23  the defendant objects to the pretext instruction with

24  regard to customary and usual business practices.

25     THE COURT:  Okay.  Objection overruled.

```
 1              MR. KACZMAREK:  Okay.

 2              MS. IRWIN:  Thank you, Your Honor.

 3              MR. KACZMAREK:  Thank you, your Honor.

 4    Appreciate it.

 5                   (BEFORE THE JURY)

 6              THE COURT:  Ms. Hamilton, I'm going to impose

 7    on you.  Would you -- on page 29 -- do you have a pen,

 8    by any chance?

 9              On page 29, in the front pay instruction on

10    number 3, if you go down four lines and the words are

11    "employment in violation of the FMLA," would you please

12    strike out FMLA and write in "wrongful termination" with

13    a comma after it.  And that's a -- that's a

14    typographical error.

15              So -- well, it's more than that, I suppose.

16    It may have wrongly conveyed the notion that FMLA is

17    related to front pay.  It's not.  But the wrongful

18    termination claim is.  So front pay may be awarded under

19    the wrongful termination claim, but not under the FMLA

20    claim.

21              And then, if I could, just task you to make

22    sure that all of the other jurors have conformed their

23    copies of the written instruction to your -- with that

24    change.

25              THE JUROR:  I will.
```

1          THE COURT:  Great.  Thank you.

2          All right.  You may swear the court security

3    officer.

4              (Court security officer sworn.)

5          THE COURT:  Just a matter of scheduling before

6    you go.

7          My practice is to allow you to basically set

8    your own schedule.  Obviously we'll expect you to kind

9    of put a full-time effort into it.  But your schedule,

10   when you report -- if you adjourn tonight, for example,

11   adjourn when you feel appropriate, return tomorrow when

12   you feel appropriate, and set your break schedules and

13   lunch schedules as you like.

14         However, before you adjourn for the evening,

15   if you would, please, let the deputy clerk -- or the

16   court security officer know and he'll let the deputy

17   clerk know, because by local rule, the Court and

18   counsel -- we all have to be in the building while

19   you're in the building.  And sometimes the jury has gone

20   home and not told us and we've been waiting.  So just

21   let us know before you leave.

22         Anything else?

23         THE CLERK:  I just have to go over the

24   exhibits with counsel.

25         THE COURT:  All right.  Oh, yes.  In a few

1   minutes, counsel and the deputy clerk are going to go

2   over the exhibits just to make sure everything that

3   gets -- goes in to you has, in fact, been admitted into

4   the evidence in the case during the course of the trial

5   and they're going to go over the special verdict form

6   that you'll be given that will guide you through the

7   verdict process to make sure that that's perfectly good.

8        And then -- so it'll take a few minutes, but

9   then you'll have all the exhibits and then you'll get

10   the special verdict form to guide you in returning a

11   verdict.

12        (Jury retired to deliberate at 2:38 p.m.)

13          (IN OPEN COURT - NO JURY PRESENT)

14        THE COURT:  All right.  As I've said, maybe

15   you're aware of it, maybe you're not, there's a local

16   rule that does require you to be in the courthouse while

17   the jury's deliberating.  If, however, you want to go

18   back to your office or somewhere close by, if you'd just

19   leave your cell phone number and an absolute no --

20   no-possibility-of-not-reaching-you phone number with

21   Judy, then that's -- that's fine and we'll call you.  If

22   you really need to do that, we're happy to call you.  I

23   wouldn't take advantage of that for the next hour or

24   two, just in case they have questions, but I leave that

25   up to you.  If you're confident, feel free.

1          Again, well tried case and well argued.  And

2    good luck to both of you.

3          MS. IRWIN:  Thank you, your Honor.

4                    (Recess.)

5              (Jury begins deliberations.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

       I, Liza W. Dubois, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted:  2/12/16

Liza Dubois, LCR, RMR, CRR
Licensed Court Reporter No. 104
State of New Hampshire

LIZA W. DUBOIS, LCR, CRR