UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| MAUREEN MCPADDEN, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:14-cv-00475-SM |
| | ) | |
| WAL-MART STORES EAST, L.P., | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW, A NEW TRIAL, OR REMITTITUR**

After denying defendant Walmart Stores East, L.P.'s motion for judgment as a matter of law, the Court characterized this case as "probably the weakest case that I can remember ever sending to a jury." Now, with the benefit of a written transcript, it is clear that plaintiff Maureen McPadden failed to introduce sufficient evidence to satisfy her burden of showing that Walmart discriminated and/or retaliated against her. Therefore, the Court should grant Walmart's renewed motion for judgment as a matter of law.

Alternatively, the Court should exercise its discretion and independently weigh the evidence. Given the flimsy nature of the evidence offered by McPadden, the jury's $31 million verdict clearly was excessive, against the great weight of the evidence, and so mistaken as to constitute a miscarriage of justice. Accordingly, the Court should order a new trial.

If the Court denies both of those motions, it should nonetheless substantially reduce the jury's awards of front pay and compensatory damages and completely eliminate the awards of enhanced compensatory damages and punitive damages.

## I.        STANDARD OF REVIEW

The Court may grant a motion for judgment as a matter of law where, after "having examined the evidence as well as all permissible inferences drawn therefrom in the light most favorable to [the] non-movant, the court finds that a reasonable jury could not render a verdict in that party's favor." Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 316 (1st Cir. 1999) (internal citations omitted).  To defeat such a motion, "the party carrying the burden of proof must have introduced at trial sufficiently adequate evidence for the jury to determine the plausibility of a particular fact." Id. at 317.  "A mere scintilla of evidence will not rise to a triable issue of fact necessary to avoid dismissal under Rule 50." Id. (internal citations omitted). See Town of Concord v. Boston Edison Co., 915 F.2d 17, 19 (1st Cir. 1990) (denial of judgment as a matter of law reversed on appeal where "the evidence does not support a critical jury finding").  Thus, where the plaintiff failed to present sufficient evidence at trial to support an element of her claim, a verdict in favor of the plaintiff cannot stand. See, e.g., Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 26-27 (1st Cir. 1998) (affirming entry of judgment as a matter of law for the defendant/employer because the plaintiff failed to introduce evidence to support a finding that he had been discriminated against because of his age).

Unlike a motion for judgment as a matter of law, "[w]hen deciding whether to grant a new trial, a district court is free to independently weigh the evidence." Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009) (internal citations omitted). See Ins. Co. of N. Am. v. Musa, 785 F.2d 370, 375 (1st Cir. 1986).  Indeed, the Court has broad discretion in deciding whether to grant a motion for a new trial. See, e.g., Ahern v. Scholz, 85 F.3d 774, 780 (1st Cir. 1996). "This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." Gasperini v. Ctr. For Humanities, Inc., 518 U.S. 415, 433 (1996). See Sprague v. Boston & Me.

Corp., 769 F.2d 26, 28 (1st Cir. 1985) ("The trial judge is afforded broad latitude to review jury awards that are asserted to be either excessive or inadequate. . .").  The court also may order a new trial if the verdict is either (a) against the great weight of the evidence, or (b) so mistaken as to constitute a miscarriage of justice.  See Ahern, 85 F.3d at 780.

A district court has discretion to order a remittitur if such an action is warranted in light of the evidence adduced at trial.  See Kelley v. Airborne Freight Corp., 140 F.3d 335, 355 (1st Cir. 1998).  "In exercising this discretion, the court is obliged to impose a remittitur . . . 'when the award exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'"  Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 29 (1st Cir. 2012) (quoting Wortley v. Camplin, 333 F.3d 284, 297 (1st Cir. 2003)).

## II.  ARGUMENT

### A.  The Court Should Enter Judgment As A Matter Of Law For Walmart

At trial, Walmart introduced undisputed evidence that it had a legitimate, non-discriminatory and non-retaliatory reason for terminating McPadden's employment:  she received a skip-level coaching for losing her pharmacy key while she was on an active second written coaching.  See, e.g., Def.'s Exhs. A, B, E; Tr. Day 2, Vol. I at 13-14, 46, 55-56, 80; Tr. Day 3, Vol. II at 34-36; McCaffrey Test. at 146-47, 157-58; Tr. Day 4, Vol. I at 46-47.[1] Moreover, the individuals who made that decision – Heather Harris McCaffrey and Barbara Kulwicki – were unaware of McPadden's complaints about conditions in the Seabrook pharmacy

---

[1] The trial transcripts are cited herein as "Tr. Day _, Vol. _."  The testimony of Heather Harris McCaffrey was presented to the jury via video on days 3 and 4 of the trial; it is cited herein as "McCaffrey Test." This testimony was not transcribed when it was presented at trial.  Accordingly, those portions of McCaffrey's testimony that were presented to the jury are attached hereto as Exhibit A.

or her complaint about a possible HIPAA violation.[2]  McCaffrey Test. at 102, 156-57; Tr. Day 4, Vol. I at 26, 30.  Thus, there is no evidence of a causal connection between McPadden's protected activity and her termination.  See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013) ("one cannot have been motivated to retaliate by something he was unaware of") (internal citations omitted).

In addition, McCaffrey and Kulwicki were unaware, at the time they made their decision, that a skip-level coaching would result in McPadden's termination.  McCaffrey Test. at 157; Tr. Day 4, Vol. I at 39-40, 43-44.  Further, they are both women.  See, e.g., Demesme v. Montgomery County Gov't, 63 F. Supp. 2d 678, 683 (D. Md. 1999) ("The fact that the decision makers were of the same protected class suggests no discriminatory motivation").  Moreover, there is absolutely no evidence that McCaffrey (who had the ultimate authority to make the decision to coach McPadden and could have chosen not to accept any recommendation made by Kulwicki) harbored any discriminatory or retaliatory animus whatsoever.  See McCaffrey Test. at 145-46; 156-57; Tr. Day 4, Vol. I at 46-47.

Thus, McPadden's burden at trial was to introduce evidence sufficient to establish that (a) Walmart's articulated reason for its decision was pretextual, and (b) the real reason for Walmart's decision was discriminatory and/or retaliatory animus.  Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015).  See Ronda-Perez v. Banco Bilbao Vizcaya Argentaria, P.R., 404 F.3d 42, 44 (1st Cir. 2005) (discussing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) and concluding that evidence of pretext alone will not always be sufficient to carry the plaintiff's burden).

McPadden sought to satisfy this burden by advancing a "cat's paw" theory of liability at

---

[2] The jury ruled in Walmart's favor on McPadden's claim of FMLA retaliation.  Therefore, Walmart presumes that the jury also concluded that McPadden failed to state a common law claim of wrongful discharge based on her FMLA-related activity.

trial.  Specifically, McPadden argued that Market Health & Wellness Director Joseph Certo seized upon McPadden's loss of her pharmacy key as an excuse to terminate her employment. See Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 71, 73 (1st Cir. 2015) (to prevail on a cat's paw theory, a plaintiff must provide specific evidence of unlawful animus by the employee reporting information to the neutral decision maker).  The problem with this theory is that McPadden admitted that she never heard Certo say anything that made her think she was being discriminated against on the basis of her gender.  Tr. Day 2, Vol. I at 80-81.  Moreover, Certo replaced McPadden as the Staff Pharmacist in the Seabrook pharmacy with a woman, Diane Libby.  Tr. Day 3, Vol. II at 38.  In addition, Certo received complaints from other associates (including female associates) regarding conditions in the Seabrook pharmacy, but did not discipline them.  See Tr. Day 2, Vol. I at 110-11; Tr. Day 3, Vol. I at 26-27, 129-30; Tr. Day 3, Vol. II at 8-11, 15.  Further, the evidence clearly shows that Certo attempted to remedy the staffing problems in Seabrook.  E.g., Tr. Day 3, Vol. I at 14-16; Tr. Day 3, Vol. II at 5-7, 10, 13-14.

Notwithstanding this evidence, McPadden relied upon a hodgepodge of statements and actions to support her cat's paw theory.  As discussed below, the evidence relied upon by McPadden, both individually and collectively, is insufficient to support a finding that Certo – or anyone else at Walmart – acted out of discriminatory and/or retaliatory animus.

**1.   Certo's response to McPadden's HIPAA complaint is not evidence of discrimination or retaliation.**

First, McPadden testified that upon returning from her leave of absence in October 2012, Deborah Genna, a pharmacy technician in Seabrook, informed her that she had overheard another pharmacy technician mention to others in the pharmacy that McPadden's doctor had called in a prescription for lorazepam and that she must have had a "nervous breakdown".  Tr.

Day 1, Vol. III at 92-93.  She subsequently raised this issue with Certo.  Tr. Day 1, Vol. III at 94-95.

At trial, Certo admitted that he should have referred McPadden's complaint to Walmart's HIPAA team, which is responsible for investigating such issues.  Tr. Day 3, Vol. II at 46. Instead, he testified that he believed at the time that it was his responsibility to try and substantiate McPadden's allegations before initiating a formal investigation of any kind.  Tr. Day 3, Vol. II at 19-20, 43-44.  Accordingly, he made some generalized inquiries to Seabrook pharmacy personnel, none of whom could confirm the allegations against Fonseca.  Tr. Day 3, Vol. II at 19-20, 44.

Certo's handling of this complaint is not evidence of discrimination or retaliation.  There is absolutely no evidence in the record that Certo had ever become aware of another potential HIPAA violation and followed the applicable policy by referring the issue to Walmart's HIPAA team.   Instead, Certo testified that he had never received a HIPAA complaint before and was unfamiliar with the HIPAA team.  Tr. Day 3, Vol. II at 22.  In the absence of any comparative evidence, this incident simply is not probative on the issue of whether Certo harbored discriminatory or retaliatory animus.[3]  See, e.g., Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989) (holding that a plaintiff must compare herself to "persons situated similarly in all relevant aspects") (internal quotations and citations omitted).

---

[3] McPadden testified that, when she raised her concerns to Certo about conditions in the pharmacy and the apparent violation of her HIPAA rights by Fonseca, Certo's body language gave her "the overall feeling" that she was "talking to a wall."  Tr. Day 1, Vol. III at 96-97.  The fact that McPadden may have subjectively perceived Certo's body language or inaction as discriminatory or retaliatory is not evidence of discriminatory or retaliatory animus that would support a verdict in her favor.  See, e.g., Ameen, 777 F.3d at 72 ("subjective belief in retaliation is not enough to show animus") (internal punctuation omitted); Pilgrim v. Tr. of Tufts Coll., 118 F.3d 864, 871 (1st Cir. 1997) ("although . . . [the supervisor's] behavior left [plaintiff] with the perception he had been discriminated against, [plaintiff's] perception is not enough to withstand summary judgment").

### 2. Certo's decision not to advocate on behalf of McPadden is not evidence of discrimination or retaliation.

McPadden next argued that Certo's decision not to (a) disclose to McCaffrey that he had agreed with his Division One colleagues that McPadden's loss of her pharmacy key only warranted a one-level coaching, and (b) advocate for a one-level coaching, constitutes evidence of discrimination and/or retaliation. This argument is meritless.

This argument is premised on McPadden's assertion that Certo's behavior constituted a deviation from Walmart's customary practice with regard to coaching decisions. Specifically, she relies on the testimony of David Kelly (Certo's predecessor), who testified that it was customary for Market Health & Wellness Directors to make a recommendation and to advocate for their subordinates when discussing coaching decisions with the Regional Health & Wellness Director. The fundamental problem with this argument is that there is no evidence that Certo was ever aware of such a "practice," nor is there any evidence that Walmart ever expected or encouraged such a "practice." See Tr. Day 5, Vol. I at 8. See also Ameen, 777 F.3d at 71 ("mere reporting of [plaintiff] up the corporate food chain is insufficient to demonstrate animus").

Moreover, there is no evidence that Certo ever treated any similarly-situated male employee (or any other employee, for that matter) differently than McPadden. For example, there is no evidence that he recommended a specific level of coaching for another associate to McCaffrey, but failed to follow that "practice" with regard to McPadden. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999) (for comparator evidence to be relevant, a plaintiff must compare her employer's treatment of her to its treatment of an employee who was "similarly situated to h[er] in all relevant respects"); Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994) ("for us to compare [plaintiff's] treatment with that of [other

employees] in a meaningful way, [plaintiff] would have to show that she was similarly situated to those [employees] in terms of performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations").

Instead, McPadden mistakenly attempts to compare the discipline meted out to Andy Tau with her situation.  However, because he was not involved in the decision to discipline Andy Tau in any way (and did not even learn of his situation until McPadden initiated this litigation), the comparison of Lurene Reil's response to Tau's loss of his pharmacy key to Certo's handling of McPadden's loss of her pharmacy key is not probative on the issue of discriminatory animus.  See Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 126 (1st Cir. 2011) ("When assessing a claim of pretext in an employment discrimination case, the court must focus on the motivations and perceptions of the employer's decisionmaker.").

In any event, McCaffrey (herself a pharmacist) testified that, although she had never heard of a pharmacist losing her pharmacy key, when she learned that McPadden had lost her key, she was immediately thinking of a skip-level coaching because of the closest analogous situation she could recall:  a vision center manager who received a skip-level for losing her key.  McCaffrey Test. at 152-54.  She further testified that the recommendations of Certo's Division One colleagues would not have influenced her decision.  McCaffrey Test. at 147-49.

In light of the foregoing, Certo's decisions not to advocate on McPadden's behalf, or to inform McCaffrey of his communications with his Division One colleagues, are not evidence of discriminatory or retaliatory animus.

### 3.    The "seriously" comment is not evidence of animus.

In addition, McPadden argues that Certo told McCaffrey that McPadden was not taking her loss of the key "seriously," and that this alleged comment is evidence of discriminatory

and/or retaliatory animus.  Certo's statement, however, does not refer to McPadden's gender or the fact that she previously complained about conditions in the Seabrook pharmacy or the possible violation of her HIPAA rights.  Thus, on its face, this comment is completely irrelevant to the question of whether Certo harbored any kind of discriminatory or retaliatory bias.

Nonetheless, McPadden argues that Certo's statement was false and, therefore, evidence of bias.  Certo, however, testified that he made this statement to McCaffrey the day *after* McCaffrey and Kulwicki made the decision to issue a skip-level coaching to McPadden.  Tr. Day 3, Vol. I at 78-80, Tr. Day 3, Vol. II at 49-51, 54-56.  Certo previously had asked McPadden to find the key (in the hope that, if she found the key, he might be able to advocate for a one-level coaching) even though the key no longer worked and without explaining the reason for his request.  Tr. Day 3, Vol. II at 53-55.  Thus, it was not surprising that, under the circumstances, McPadden did not appear to take his request very seriously.  Tr. Day 3, Vol. II at 33-34, 50-51.  Accordingly, his statement was true and, therefore, not evidence of animus.[4]

McCaffrey and Kulwicki independently discussed McPadden's loss of the pharmacy key and came to the conclusion that her conduct warranted a skip-level coaching.  McCaffrey Test. at 93-95, 147; Tr. Day 4, Vol. I at 33, 36-37, 40, 44, 46-47.  They based their decision on the few arguably analogous situations of which they were aware, i.e., a vision center manager who had received a skip-level coaching for losing her key and store managers who had been terminated for losing their keys.  McCaffrey Test. at 147; Tr. Day 4, Vol. I at 33, 36-37.  Indeed, as noted above, McCaffrey testified that, although she had never heard of a pharmacist losing her

---

[4] In her testimony, McCaffrey initially seemed to suggest that Certo had told her that McPadden was not taking the *loss* of the key seriously before the conference call with Kulwicki.  McCaffrey Test. at 145.  She later made it clear that what Certo had told her was that McPadden was not taking her *search* for the key seriously.  Id. at 155.  It is undisputed that Certo did not ask McPadden to search for the key until *after* the decision to issue a skip-level coaching had been made.  Tr. Day 2, Vol. I at 16-17; Tr. Day 3, Vol. I at 78-80, Tr. Day 3, Vol. II at 49-51, 54-56.  Thus, Certo's statement about McPadden not taking the issue seriously was true.

pharmacy key, once Certo told her about McPadden's loss of her pharmacy key, she immediately was thinking of a skip-level coaching because a vision center manager in her region had received a skip-level for losing her key.  McCaffrey Test. at 152-54.

McCaffrey and Kulwicki also discussed the fact that Walmart recently had distributed the professional accountability matrix, which emphasized the importance of maintaining the security of the pharmacy.  See McCaffrey Test. at 67, 93, 149; Tr. Day 4, Vol. I at 34, 36, 39; Pl.'s Exh. 15.  Thus, they did not simply rely on the information provided by Certo, but instead conducted their own independent deliberations regarding the appropriate level of coaching to be issued, relying upon other disciplinary situations about which Certo was unaware.   Under these circumstances, any alleged "animus" injected by Certo into the deliberations clearly falls away. Cf., e.g., Brewer v. Bd. of Tr. of Univ. of Ill., 479 F.3d 908, 917-18 (7th Cir. 2007) ("For a nominal non-decision-maker's influence to put an employer in violation of Title VII, the employee must possess so much influence as to basically be herself the true 'functional[] . . . decision-maker.'") (internal citation omitted).   Therefore, Certo's comment is not evidence of animus.

> **4. The "I understand your frustration" comment is a stray remark, unrelated to the decision to coach McPaddden and, as such, has limited, if any, probative value.**

McPadden's next argument is that Certo's email to Varrieur on November 26, 2012 (Pl.'s Exh. 47) is evidence of animus.  This argument is untenable.

On Friday, November 23, 2012, Varieur sent Certo an email complaining about the negative attitude of the technicians in Seabrook and his inability to get McPadden to help turn things around.  Certo responded on the morning of Monday, November 26th, stating that he "understood [his] frustration" and supported Varieur's attempts to turn things around in

Seabrook.

When read in context, no reasonable person could conclude that Certo's comment ("I understand your frustration") reflected animus on account of McPadden's gender and/or her prior complaints. Instead, this comment evidences Certo's empathy for Varieur's attempts to deal with the challenges he was confronting in the pharmacy on account of the technicians' negative attitudes and McPadden's lack of assistance in helping change those attitudes, not any negative view on Certo's part against women, in general, or against McPadden's gender or complaints, specifically. Thus, this is the sort of "stray remark" that has no real probative value. See Rivera-Aponte v. Rest. Metropol #3, Inc., 338 F.3d 9, 12 (1st Cir. 2003) ("'stray workplace remarks' are generally insufficient, standing on their own to establish discriminatory animus" (quoting Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002)). In this case, "[t]he lack of a direct connection between [Certo's] words and the employment action significantly weakens their probative value." Id. (citing Schuster v. Lucent Techs., Inc., 327 F.3d 569, 576 (7th Cir. 2003)). See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) ("But though such 'stray remarks' may be material to the pretext inquiry, 'their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or ... were not related to the employment decision in question, or were made by nondecisionmakers.'") (internal punctuation and citation omitted). Thus, Certo's comment has limited, if any, probative value here.

### 5. Certo's characterization of McPadden's complaints as "aggressive" is not evidence of animus.

The evidence introduced at trial shows that many Walmart employees complained about conditions in the Seabrook pharmacy, and there is no evidence that Certo or anyone else at Walmart took any adverse action against those employees because of their complaints. Tr. Day

2, Vol. I at 110-11; Tr. Day 3, Vol. I at 26-27, 129-30; Tr. Day 3, Vol. II at 8-11, 15.  McPadden, however, argues that Certo's characterization of McPadden's complaints as "aggressive" and using "pointed language," suggests that he viewed her complaints as being different than those of other employees.  See Tr. Day 3, Vol. II at 42.  This testimony fails to support the conclusion that Certo harbored any gender-based animus or animus based on McPadden's comments, particularly in light of his testimony that he (a) thought it was completely appropriate for McPadden to bring such concerns to him, (b) received complaints from others (none of whom were terminated, and some of whom were women), and (c) hired a woman to replace McPadden as the Staff Pharmacist in Seabrook.[5]  Tr. Day 2, Vol. I at 110-11; Tr. Day 3, Vol. I at 26-27, 129-30; Tr. Day 3, Vol. II at 8-11, 15, 38.

### 6.  McPadden's alternative theory of liability is untenable.

Given the absence of *any* evidence of animus on the part of McCaffrey, McPadden advanced an alternative theory to support her gender discrimination claims, namely, that Kulwicki, not Certo, discriminated against McPadden on the basis of gender.  The only evidence McPadden can reasonably rely upon to support this alternative theory of liability is the fact that, one year **after** Kulwicki was involved in the decision to issue McPadden a skip-level coaching for losing her pharmacy key, Kulwicki approved the decision to issue Andy Tau, a male Staff Pharmacist in another pharmacy within the same region, a first level coaching for losing his pharmacy key.

Kulwicki's involvement in the decision to give Tau a first level coaching, as opposed to a

---

[5] McPadden also argued that Walmart changed the reason given for McPadden's termination and that this "change" is evidence of discrimination and/or retaliation.  That simply is not true.  It is undisputed that Certo told McPadden that she was being terminated because she lost her pharmacy key while on a second written coaching.  Tr. Day 3, Vol. II at 35-36; Tr. Day 2, Vol. I at 80; Def.'s Ex. E.  Walmart has consistently identified McPadden's loss of that key as the basis for its decision.  E.g., Tr. Day 2, Vol. I at 80; Tr. Day 3, Vol. II at 35-36; Pl.'s Exh. 10 at pp. 8-9, 11; Pl.'s Exh. 11 at pp. 21-22.

skip level coaching, is insufficient to create a triable issue on McPadden's gender discrimination claims because she (a) is in the same protected category as McPadden, and (b) had no reason to believe at the time of the decision that the issuance of a skip level coaching would result in McPadden's termination or have any other tangible impact on the terms, conditions, or privileges of McPadden's employment.  See Tr. Day 4, Vol. I at 39-40, 43-44.

For the reasons discussed above, McPadden failed to introduce sufficient evidence to support the jury's conclusion that Walmart discriminated and/or retaliated against her. Therefore, the Court should enter judgment as a matter of law for Walmart.  See Alvarez-Fonseca, 152 F.3d at 26-27.

### B.    The Court Should Order A New Trial

If the Court declines to enter judgment as a matter of law for Walmart, it should order a new trial because the jury's verdict was excessive, against the great weight of the evidence, and so mistaken as to constitute a miscarriage of justice.  Even taking the evidence in the light most favorable to McPadden, no reasonable jury could have reached a verdict in her favor.  When the court independently weighs the evidence, as it may do when evaluating a motion for a new trial, that conclusion is even more stark.  See Jennings, 587 F.3d at 436.  The verdict should not stand and the Court should order a new trial.

In addition, the court may set aside a verdict as excessive if it was "grossly excessive, inordinate, shocking to the conscience of the court or so high that it would be a denial of justice to permit it to stand."  Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 578 (1st Cir. 1989) (internal quotations and citations omitted); McDonald v. Fed. Labs., Inc., 724 F.2d 243, 246 (1st Cir. 1984) (citing Grunenthal v. Long Island R.R. Co., 393 U.S. 156, 159 n. 4 (1968)).  See Fenner v. Dependable Trucking Co., Inc., 716 F.2d 598, 603 (9th Cir. 1983) (where "the trial court finds a verdict excessive, the court cannot allow it to stand").

In this case – a case that the Court repeatedly characterized as "weak" – the jury's award of $31,222,485.87 was so grossly excessive that it shocks the conscience.  The magnitude of this damages award is so extravagant that it indicates bias, passion, prejudice, corruption, or improper motive, such that it calls into question the entire verdict and thereby warrants a new trial.  See, e.g., Auster Oil & Gas, Inc., v. Stream, 835 F.2d 597, 603 (5th Cir. 1988) ("at some point on the scale an excessive award becomes so large that it no longer can be  considered merely excessive.  At that point, when an award is 'so exaggerated as to indicate bias, passion, prejudice, corruption, or improper motive,' remittitur is inappropriate and the only proper remedy is a new trial.") (quoting Wells v. Dallas Indep. Sch. Dist. 793 F.2d 679, 683-84 (5th Cir. 1986)); Atencio v. City of Albuquerque, 911 F. Supp. 1433, 1437-1438 (D.N.M. 1995) (if excessiveness gives rise to an "inescapable inference" that the award resulted from jury passion or prejudice, the "court must grant a new trial, since the prejudice may have infected the jury's liability determination as well"); Scagnelli v. Whiting, 554 F.Supp. 77, 82 (M.D.N.C. 1982) (new trial in an employment discrimination case granted where the verdict's "inordinate size called into question the validity of the entire verdict").  Indeed, courts have found a new trial to be appropriate where the jury returned a far smaller award of damages.  See, e.g., Levitant v. City of N.Y. Human Res. Admin., 914 F. Supp. 2d 281, 310-11 (E.D.N.Y. 2012) (finding that the jury's award of $250,000 in compensatory damages in an employment discrimination case shocked the conscience).

Therefore, it is crystal clear that the Court should order a new trial in this case.

### C.     The Court Should Grant Walmart's Motion For Remittitur

If the Court does not enter judgment as a matter of law for Walmart or order a new trial, it should nonetheless substantially reduce the jury's awards of front pay and compensatory damages and completely eliminate the awards of enhanced compensatory damages and punitive

damages.  Each issue is addressed in turn.

### 1.      The jury's award of front pay was excessive.

The jury awarded McPadden 16 years of front pay at the rate of $36,197 per year, for a total award of $558,392.87.  This award was based on the testimony of Craig Moore, who calculated McPadden's front pay damages based on the assumption that she would remain at Walmart until she retires at age 67.  Tr. Day 4, Vol. II at 28, 37-38.  Because this award is excessive, and based on unsupported speculation, the Court should enter a remittitur.  See Tr. Day 5, Vol. I at 158 (submitting the issue of front pay under Title VII to the jury "on an advisory basis"); Lussier v. Runyon, 50 F.3d 1103, 1108 (1st Cir. 1995) ("statutes such as Title VII . . . afford trial courts wide latitude to award or withhold front pay according to established principles of equity").

The First Circuit has cautioned that "[a]n award of front pay that extends over many years to an estimated retirement date should be examined carefully . . . since the greater the period of time upon which a front pay award is calculated in a case involving an at-will employee the less likely it is that the loss of future earnings can be demonstrated with any degree of certainty or can reasonably [be] attributed to the illegal conduct of the employer."  Cummings v. Standard Register Co., 265 F.3d 56, 66 (1st Cir. 2001) (citing and applying Massachusetts law to uphold an award of 14 years' front pay but stating "[u]nder federal law, we have grave doubts as to the sustainability of a front pay award of so great a duration").  Thus, to sustain the jury's award of 16 years of front pay to McPadden, "the jury must have sufficient evidence to conclude that [McPadden] would be unable to find employment comparable to [her position with Walmart as a Staff Pharmacist] until [her] estimated retirement date, and that the date specified was a plausible one."  Id.  See Selgas v. Am. Airlines, Inc., 104 F.3d 9, 12 (1st Cir. 1997) ("front pay is available as an alternative to compensate the plaintiff from the conclusion of trial through the

point at which the plaintiff can either return to the employer or obtain comparable employment elsewhere") (internal citations omitted).  Because there was no such evidence here, remittitur is appropriate.

First, there is no evidence in the record that McPadden (who is 50 years old) intends to work until she reaches age 67.  Nonetheless, in his expert report, Moore assumed that McPadden would work until she turned 67.  Pl.'s Exhs. 69, 73; Tr. Day 4, Vol. II at 28.  On cross-examination, however, Moore conceded that McPadden had no definite plan to retire.  Tr. Day 4, Vol. II at 38.  Thus, Moore's entire damages model is based on his speculative assumption that McPadden would continue to work until age 67.

Second, there is no evidence in the record that McPadden intended to remain employed with Walmart on a full-time basis for the next 16 years until she retired.  Indeed, she previously had left Walmart for five years to work at The Medicine Shoppe because she wanted to experience a different work atmosphere; and it certainly is possible that she would do so again.  Tr. Day 1, Vol. III at 33-34.  Moreover, the jury's award ignores the vagaries of at-will employment, including the possibility that the Seabrook pharmacy would close or that McPadden's employment would be terminated for some other reason.  See Tr. Day 4, Vol. II at 45-46.  Thus, the jury's implicit assumption that she would have remained at Walmart for another 16 years is unduly speculative.

Third, the front pay award is excessive because it grossly overstates the amount of time it will take McPadden to earn wages at CVS that are equal to the wages she earned at Walmart or to find employment at a comparable or higher rate than what she was earning at Walmart.  McPadden currently works as a floater pharmacist at CVS.  Tr. Day 1, Vol. III at 82.  If she applies for and receives a staff pharmacist or pharmacy manager position at CVS or another

company, she could earn substantially more than she currently earns as a floater.  See Tr. Day 4, Vol. II at 40-42.  Indeed, McPadden previously moved to a staff pharmacist position at Walmart after working as a floater pharmacist for just two years.  Tr. Day 1, Vol. III at 34-35, 41-42.  It certainly is reasonable to assume that McPadden, an experienced pharmacist with management experience, would obtain such a position at CVS in the next five to six years.  See Carter v. Sedgwick County, 929 F.2d 1501, 1505 (10th Cir. 1991) (holding that a front pay award "must take into account any amount that the plaintiff could earn using reasonable efforts").

Therefore, in light of the foregoing, the jury's award of front pay is excessive.  Based on the record evidence, McPadden should receive no more than six years of front pay.

## 2.    The compensatory damages award is excessive.

The jury's award of $500,000 in compensatory damages also is excessive.  Although McPadden introduced evidence that she suffered a reoccurrence of her pre-existing depression and/or anxiety in September/October of 2013, that episode resulted from the fact that the pharmacy was short-staffed, not from any discriminatory or retaliatory actions taken by Walmart. E.g., Tr. Day 2, Vol. II at 26 ("she felt as though she was understaffed in her job and it had sort of worsened her anxiety and depression").  Thus, consistent with the Court's instructions to the jury, she cannot recover any compensatory damages resulting from this episode.[6]  See Tr. at 142-43 ("McPadden may not recover for any pain, suffering, or mental anguish which she suffered as a result of factors other than her allegedly unlawful termination by Walmart.").

Accordingly, her emotional distress damages are limited to the emotions she experienced as a result of the termination of her employment in November of 2012.  Notably, however, the

---

[6] Although the record contains passing references to other events that might have formed a basis for an award of compensatory damages (e.g., McPadden's sale of her house), McPadden failed to introduce evidence discussing those events in any detail or quantifying the extent of her alleged damages.  Thus, her compensatory damages award is based exclusively on her alleged emotional distress.

record shows that McPadden's condition actually <u>improved</u> between September 2012 and March 2013, and it steadily improved thereafter.  Tr. Day 2, Vol. II at 49, 59-60.  Moreover, McPadden never saw a mental health professional (or any health care practitioner other than her primary care physician, Dr. Howe) and was able to return to work less than two months after her termination.  <u>See</u> Tr. Day 2, Vol. I at 23-24, 81; Tr. Day 2, Vol. II at 49-50, 59-60.  Thus, whatever emotional distress she experienced as a result of her termination was only "garden variety" in nature.  In that light, the jury's award far exceeds what has been found to be permissible awards of compensatory damages in comparable cases.  <u>See, e.g.</u>, <u>Rodriguez-Garcia v. Miranda-Marin</u>, 610 F.3d 756, 773-74 (1st Cir. 2010) (affirming an award of $350,000 in compensatory damages where the plaintiff saw a psychiatrist and was repeatedly hospitalized over a period of years because her depression increased over time).  Based on the record evidence and the awards rendered in other cases, McPadden should receive no more than $200,000 in compensatory damages.

### 3.     The jury's award of enhanced compensatory damages should be reduced to zero.

At trial, the Court informed counsel that any award of "enhanced compensatory damages" under the New Hampshire Law Against Discrimination (the "NHLAD") would be treated as "advisory" in nature.  Tr. Day 5, Vol. I at 112-114, 157-59.  The jury subsequently awarded McPadden $15 million in enhanced compensatory damages.  For the reasons discussed below, the Court should eliminate that award in its entirety.

### a.     The plain language of the NHLAD dictates that enhanced compensatory damages are not available to McPadden.

The NHLAD states in relevant part as follows:

> Any party alleging to be aggrieved by any practice made unlawful under this chapter may, at the expiration of 180 days after the timely filing of a complaint with the commission, or sooner if the

> commission assents in writing, but not later than 3 years after the alleged unlawful practice occurred, bring a civil action for damages or injunctive relief or both, in the superior court for the county in which the alleged unlawful practice occurred or in the county of residence of the party. *Any party alleged to have committed any practice made unlawful under this chapter may, in any case in which a determination of probable cause has been made by the investigating commissioner, remove said complaint to superior court for trial. A court in cases so removed may award all damages and relief which could have been awarded by the commission, except that in lieu of an administrative fine, enhanced compensatory damages may be awarded when the court finds the respondent's discriminatory conduct to have been taken with willful or reckless disregard of the charging party's rights under this chapter.* A superior court trial shall not be available to any party if a hearing before the commission has begun or has concluded pursuant to RSA 354-A:21, II(b), or to a complainant whose charge has been dismissed as lacking in probable cause who has not prevailed on an appeal to superior court pursuant to RSA 354-A:21, II(a). In superior court, either party is entitled to a trial by jury on any issue of fact in an action for damages regardless of whether the complaining party seeks affirmative relief.

N.H. RSA 354-A:21-a, I (emphasis added). The italicized language above was added to the statute in 2006.

The NHLAD, like all statutes, must be construed in accordance with its plain meaning. See Appeal of Michele, 123 A.3d 255, 258 (N.H. 2015) ("We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning.") (quoting Appeal of Local Gov't Ctr., 165 N.H. 790, 804 (2014)). The plain meaning of the NHLAD is that enhanced compensatory damages are available to a prevailing plaintiff only if **the defendant has removed** the case to court after the New Hampshire Commission for Human Rights (the "Commission") has entered a finding of probable cause against that defendant.

Under the NHLAD, a plaintiff has the right to bring a civil action in court at any time between the 181st day after she filed her complaint with the Commission and the three-year

anniversary of the alleged unlawful act.  See N.H. RSA 354-A:21-a, I.  A defendant's right to proceed in court is much more limited:  the statute provides that "[a]ny party alleged to have committed any practice made unlawful under this chapter may, in any case in which a determination of probable cause has been made by the investigating commissioner, remove said complaint to superior court for trial."  Id.  Thus, a defendant may only remove a case to court if the Commission has issued a finding of probable cause against such defendant.  Id.

The statute goes on to state as follows:  "A court in cases *so removed* may award all damages and relief which could have been awarded by the commission, except that in lieu of an administrative fine, enhanced compensatory damages may be awarded when the court finds the respondent's discriminatory conduct to have been taken with willful or reckless disregard of the charging party's rights under this chapter."  N.H. RSA 354-A:21-a, I (emphasis added).  The phrase "so removed," which is contained in the sentence immediately after the sentence that describes a defendant's limited right to removal, clearly means that enhanced compensatory damages are available **only** in cases where a **defendant** has removed a case from the Commission to a court after the Commission entered a finding of probable cause.  See Appeal of Michele, 123 A.3d at 258 ("We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include . . .  Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole.") (internal citations omitted).

In this case, the Commission never issued a finding of probable cause against Walmart.  Moreover, McPadden, not Walmart, removed this case from the Commission to court.  Therefore, under basic canons of statutory construction, McPadden is not eligible to receive

enhanced compensatory damages under the NHLAD.[7]

> **b.     If enhanced compensatory damages are available, the Court, not the jury, decides whether they should be awarded to McPadden.**

Alternatively, if McPadden is eligible for an award of enhanced compensatory damages under the NHLAD, the Court, not the jury, decides whether such an award is warranted.

As noted above, the Legislature amended the NHLAD in 2006 to include the availability of enhanced compensatory damages.  The revised statute provides as follows:  "A **<u>court</u>** in cases so removed may award all damages and relief which could have been awarded by the commission, except that in lieu of an administrative fine, enhanced compensatory damages may be awarded when the **<u>court</u>** finds the respondent's discriminatory conduct to have been taken with willful or reckless disregard of the charging party's rights under this chapter."  N.H. RSA 354-A:21-a, I (emphasis added).  This language compels the conclusion that the Court, not the jury, decides the issue of enhanced compensatory damages.

First, the New Hampshire Supreme Court has held "[i]n its ordinary meaning, the word 'court'" refers to a judge rather than a jury."  <u>Hair Excitement, Inc. v. L'Oreal U.S.A., Inc.</u>, 158 N.H. 363, 369 (2009).  Second, the Legislature used the word "jury" elsewhere in the NHLAD. <u>See</u> N.H. RSA 354-A:21-a, I ("[i]n superior court, either party is entitled to a trial by **<u>jury</u>** on any issue of fact in an action for damages") (emphasis added).  The Legislature chose to use specific words that have well-established meanings, and the court must interpret those words in accordance with their plain meaning.  <u>See</u> <u>Green Crow Corp. v. Town of New Ipswich</u>, 157 N.H. 344, 349 (2008) (holding that the intent of the Legislature must be determined "by examining the

---

[7]  Because the language of the NHLAD is clear, the Court need not consult the relevant legislative history.  <u>See</u> <u>Monahan-Fortin Props. v. Town of Hudson</u>, 148 N.H. 769, 771 (2002) ("Unless we find statutory language to be ambiguous, we will not examine legislative history.").  To the extent the Court is inclined to consult the legislative history of the 2006 amendments, that history does not directly address this issue.

construction of the statute as a whole, and not simply by examining isolate words and phrases")
(internal quotation and citation omitted); Weare Land Use Ass'n. v. Town of Weare, 153 N.H.
510, 511 (2006) (holding that courts may not "consider what the legislature might have said, or
add words not included in the statute").

Because the Court decides the issue of whether McPadden was entitled to an award of
compensatory damages, the Court need not defer to the jury's award in this case.  Moreover, as
discussed below, there is absolutely no basis in the record for an award of enhanced
compensatory damages here.

**c.      There is absolutely no evidentiary basis for an award of enhanced compensatory damages in this case.**

As the Court instructed the jury, enhanced compensatory damages are available "only if .
. . Walmart's conduct was especially egregious."  Tr. Day 5, Vol. I at 149.  This instruction is
consistent with the well-established common law principle that enhanced compensatory damages
"are awarded *only* in exceptional cases, and not even in every case involving an intentional tort."
Figlioli v. R.J. Moreau Cos., Inc., 151 N.H. 618, 621 (2005) (emphasis in original).  See DCPB,
Inc. v. City of Lebanon, 957 F.2d 913, 915 (1st Cir. 1992) ("the remedy has been reserved for
intentional torts committed under exceptionally unsavory circumstances") (internal citations
omitted); McKinnon v. Harris, No. 1:05-cv-93-JAW, 2005 U.S. Dist. LEXIS 21095 (D.N.H.
Sept. 21, 2005) (Woodcock, J.) (concluding that enhanced compensatory damages were not
available for a claim based on the defendant's operation of a motor vehicle while under the
influence of alcohol which resulted in a fatal head-on collision); Stewart v. Bader, 154 N.H. 75,
87 (2006).  See also Roberts v. Town of Windham, 165 N.H. 186, 190 (2013) ("We also presume
that the legislature knew the meaning of the words it chose, and that it used those words
advisedly.")  (internal citation omitted).

Instead, the New Hampshire Supreme Court "has recognized that in cases where the acts complained of were wanton, malicious, or oppressive, the compensatory damages for the resulting actual material loss can be increased to compensate for the vexation and distress caused the plaintiff by the character of the defendant's conduct."  Vratsenes v. N.H. Auto, Inc., 112 N.H. 71, 72 (1972).  As the New Hampshire Court explained:

> "In a civil action founded on a tort, nothing but compensatory damages can be awarded, but the injured party is entitled to full compensation for all the injury sustained, mental as well as material.  In some cases, compensation for the actual material damage sustained will be full compensation.  In other cases, the material damages may be trivial, and the principal injury [may] be to the wounded feelings from the insult, degradation, and other aggravating circumstances attending the act."

Id. at 73 (quoting Kimball v. Holmes, 60 N.H. 163, 164 (1880)).

Thus, at common law, enhanced compensatory damages may be awarded to reflect the "aggravating circumstances" of the particular case.  Figlioli, 151 N.H. at 621; Vratsenes, 112 N.H. at 73.  See also DCPB, Inc., 957 F.2d at 915 (enhanced compensatory damages are "designed not to punish the wrongdoer but to reflect the aggravating circumstances of an injury caused to the plaintiff.").

There is simply no evidence in the record to support a finding that Walmart's actions were "especially egregious."  The Court itself described this case as "probably the weakest case that [he] can remember ever sending to a jury."  Tr. Day 5, Vol. I at 18.  In fact, McPadden's gender discrimination claim was based on almost entirely the same evidence that she used to support her common law wrongful termination claim, a claim that the Court found could not support an award of enhanced compensatory damages.  See Tr. Day 5, Vol. I at 155 ("I don't find this to be an exceptional case warranting such an instruction.").

The only arguable evidentiary difference between the two claims is that McPadden relies

on Kulwicki's involvement in the decision to discipline Tau to support her gender discrimination claim, but not her wrongful termination claim.  Indeed, that is the only evidence suggesting gender animus on the part of Kulwicki.  But, the record clearly establishes that Kulwicki had no knowledge of McPadden's coaching status at the time that she was involved in the decision to issue McPadden a skip level coaching.  Tr. Day 4, Vol. I at 39-40, 43-44.  Thus, she had no knowledge that this decision would result in any tangible harm to McPadden.  Therefore, her actions cannot be categorized as "especially egregious."   Nor can her actions be characterized as willful or reckless in any way.  See Tr. Day 5, Vol. I at 149-50; Hickingbotham v. Burke, 140 N.H. 28, 33-34 (1995) (citing Black's Law Dictionary 1270 (6th ed. 1990) and W. Keeton et al., Prosser and Keeton on the Law of Torts § 34, at 214 (5th ed. 1984) and defining "reckless" as acting in "a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation"); Ives v. Manchester Subaru, Inc., 126 N.H. 796, 801 (1985) ("A willful act is a voluntary act committed with an intent to cause its results." (citing Black's Law Dictionary 1434 (rev. 5th ed. 1979)).

Moreover, McPadden already has been made whole by the jury's overly generous awards of back pay, front pay, and compensatory damages.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) ("It should be presumed that a plaintiff has been made whole . . . by compensatory damages.").  Thus, to the extent there were any "aggravating circumstances" present here (such as emotional distress), McPadden has obtained relief that more than compensates her for those circumstances.  See Figlioli, 151 N.H. at 621; Vratsenes, 112 N.H. at 73; DCPB, Inc., 957 F.2d at 915.  Therefore, there is no basis or need for an award of enhanced compensatory damages and the award should be reduced to zero.

### d.     The jury's award was impermissibly punitive and violates Due Process.

The fact that the jury issued the same amount in enhanced compensatory damages ($15 million) for McPadden's NHLAD gender discrimination claim that it issued in punitive damages for McPadden's Title VII gender discrimination claim ($15 million) strongly suggests that the jury disregarded the Court's instructions and issued an award that was intended to be punitive in nature.[8]  See Nollet v. Palmer, No. 02-265-JD, 2002 U.S. Dist. LEXIS 13564, at *10 (D.N.H. July 18, 2002) (DiClerico, J.) ("awarding enhanced compensatory damages ten times the amount of the actual damages would appear impermissibly punitive").  Because punitive damages are prohibited by New Hampshire law, the Court should overturn this award.  See N.H. Rev. Stat. Ann. § 507:16 ("No punitive damages shall be awarded in any action, unless otherwise provided by statute.");  Vratsenes, 112 N.H. at 72 ("in New Hampshire, the punitive function of exemplary damages has been rejected in forceful and colorful language." (citing Fay v. Parker, 53 N.H. 342, 382 (1872)).  See also DCPB, Inc., 957 F.2d at 915 (enhanced compensatory damages are "designed not to punish the wrongdoer but to reflect the aggravating circumstances of an injury caused to the plaintiff.").

Moreover, the award is grossly excessive.  As discussed above, the NHLAD permits the Court to award enhanced compensatory damages "in lieu of an administrative fine."  The administrative fines available under the NHLAD range between $10,000 and $50,000, depending on whether the respondent has been previously adjudged to have committed a discriminatory practice, and if so, how often and how recently.  See N.H. RSA § 354-A:21, II(d).  Thus, the jury's award of $15 million in enhanced compensatory damages is more than 300 times the maximum fine permissible under the NHLAD and, therefore, grossly excessive.

---

[8]  The Court specifically instructed the jury that enhanced compensatory damages, unlike punitive damages, "may not be awarded in an effort to punish the defendant."  Tr. Day 5, Vol. I at 149.

Assuming McPadden's actual damages in this case were $1,222,485.80 (the total value of her back pay, front pay, and compensatory damages awards), the jury's award of $15 million in enhanced compensatory damages is approximately 15 times that amount.  Courts typically have upheld awards with enhanced compensatory-to-compensatory damages ratios of 1:1 or less.  See e.g., Stewart, 154 N.H. at 77-78; Schneider v. Plymouth State Coll., 144 N.H. 458, 461 (1999).  Also, not only is the ratio well beyond the acceptable range, but the total amount of damages, $15 million, is grossly in excess of awards issued in cases involving truly malicious, gruesome acts.  See Stewart, 154 N.H. at 77-78 (awarding $2,190,544 in enhanced compensatory damages after a former husband engaged in various acts for over one year in an effort to get his former wife to commit suicide before finally shooting his former wife in the head); Schneider, 144 N.H. at 461, 466 (awarding $15,000 in enhanced compensatory damages after a professor sexually harassed and assaulted a student and the university failed to investigate despite numerous reports of harassment); Aubert v. Aubert, 129 N.H. 422, 425, 431 (1987) (awarding $343,000 in total damages after a wife shot her husband in the face and the husband sustained permanent injuries).

Moreover, the grossly excessive nature of the enhanced compensatory damages award violates the Due Process clause of the Constitution.  In State Farm Mut. Auto. Ins. Co. v. Campbell, the Supreme Court held that "grossly excessive or arbitrary" punitive damage awards violate the Due Process Clause.  538 U.S. 408, 416 (2003).  In reviewing the reasonableness of punitive damages, the Court held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  Id. at 425.  "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  Id.  In this case, the jury's award is grossly excessive because the enhanced compensatory damages-to-

compensatory damages ratio is 15:1, well beyond single digits.  See id. at 425, 429 (reducing award with 145:1 punitive-to-compensatory ratio).

Finally, the amount of the award violates the Eighth Amendment's prohibition against excessive fines.  See, e.g., U.S. v. Bajakajian, 524 U.S. 321, 336-37 (1998) (holding that fines which are "grossly disproportionatal to the gravity of the defendant's offense" are unconstitutional).

In light of the foregoing, the jury's award of enhanced compensatory damages should be eliminated completely.

### 4.    The punitive damages award should be reduced to zero.

The Court should completely eliminate the jury's award of punitive damages because (a) there is no evidence that Walmart acted with "malice and reckless indifference," and (b) the evidence establishes that Walmart made a good-faith effort to comply with Title VII.

Under Title VII, "a finding of intentional discrimination, which is the basis for a compensatory damages award, does not by itself establish a basis for awarding punitive damages . . . Rather, the plaintiff must make the additional showing that the employer acted with malice or reckless indifference to federally protected rights."  McDonough v. City of Quincy, 452 F.3d 8, 23 (1st Cir. 2006) (citing Kolstad v. Am. Dental Ass'n., 527 U.S. 526, 534, 536 (1999)).  According to the First Circuit, "malice and reckless indifference concern, not the employer's awareness that it is discriminating, but the employer's knowledge that it is acting in violation of federal law."  Id. at 24.  See Kolstad, 527 U.S. at 536-37 (observing that "intentional discrimination does not give rise to punitive damages liability . . . [when] . . . the employer may simply be unaware of the relevant federal prohibition"); Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 254 (1st Cir. 2000).

In this case, there is simply no evidence in the record that Certo acted with malice and

27

reckless indifference.  Indeed, there is no evidence in the record suggesting that he was aware of Title VII or any other federal law that prohibits gender discrimination.  The closest thing to such evidence in the record is the following exchange:

> Q:      Okay.  And you know that it's actually unlawful to discriminate or retaliate against an employee?
>
> A.      Yes.

Tr. Day 3, Vol. I at 12.

This exchange contains no reference to Title VII, federal law, or gender discrimination. Therefore, it is insufficient to support the jury's award of punitive damages.

Indeed, this exchange is almost identical to the evidence in Aly v. Mohegan Council, Boy Scouts of Am., 871 F. Supp. 2d 19 (D. Mass. 2012).  In that case, "[t]he only evidence from which the jury could infer that defendant knew that its actions would violate federal law was [one of the two decisionmakers'] testimony that he was generally aware of federal and state anti-discrimination laws in 2005."  Id. at 27.  Specifically, one of the decisionmakers testified "that he was aware of federal and state laws providing that employment decisions may not be based on national origin or religion."  Id. at 27 n. 12.

The Court found this evidence insufficient to support a punitive damages award.  Id. at 27.  In reaching this conclusion, the Court stated that "[a] party's mere awareness of the existence of anti-discrimination laws, without more, is not enough to prove that defendant subjectively perceived that its actions could violate plaintiff's federal rights. . . . If such awareness were sufficient to subject an employer to punitive damages, then punitive damages would be appropriate virtually every time a jury finds discrimination."  Id.  (citing Kolstad, 527 U.S. at 534-37 ("Congress plainly sought to impose two standards of liability – one for establishing a right to compensatory damages and another, higher standard that a plaintiff must

satisfy to qualify for a punitive award.")).

Here, like in <u>Aly</u>, there was no evidence that Certo was aware of any federal law that prohibits gender discrimination.[9]   <u>See</u> <u>Kolstad</u>, 527 U.S. at 536 ("an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages").   Indeed, the Court's statement in <u>Aly</u> is equally applicable here:

> given the thin evidence of discriminatory animus, this case barely survived summary judgment, a motion for directed verdict, and a motion for a new trial.   In other words, making all possible inferences in plaintiff's favor, this Court determined that there was just enough evidence [to] go to trial and sustain the jury's verdict. Such meager evidence falls far short of showing the sort of 'reckless or callous indifference to the federally protected rights of others' necessary to subject defendant to punitive damages.

<u>Aly</u>, 871 F. Supp. 2d at 27 (quoting <u>Kolstad</u>, 527 U.S. at 536)).

Even if there was a basis for an award of punitive damages, the evidence in the record establishes that Walmart made a good-faith effort to comply with Title VII.   Therefore, the Court should eliminate the jury's award of punitive damages.

"[I]n the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII."   <u>Kolstad</u>, 527 U.S. at 545 (internal punctuation and citation omitted).   <u>See</u> <u>Romano v. U-Haul Int'l</u>, 233 F.3d 655, 670 (1st Cir. 2000).   There is more than ample evidence in the record to establish that Walmart made such efforts.

First, Walmart has a written Discrimination & Harassment Prevention Policy which

---

[9] In addition, as discussed above, the record establishes that Kulwicki had no knowledge of McPadden's coaching status at the time that she was involved in the decision to issue McPadden a skip level coaching. Tr. Day 4, Vol. I at 39-40, 43-44.   Thus, she had no knowledge that this decision would result in any tangible harm to McPadden.   Accordingly, her actions cannot support an award of punitive damages either.

clearly prohibits discrimination on the basis of sex.  See Pl.'s Exh. 66; Romano, 233 F.3d at 670 ("a written non-discrimination policy is one indication of an employer's efforts to comply with Title VII").  That Policy provides that associates may raise concerns about perceived discrimination to any salaried member of management or anonymously through the Global Ethics Hotline (1-800-WMETHIC).  See Pl.'s Exh. 66.  In addition, the Policy provides that reported violations will be promptly and thoroughly investigated.  See Pl.'s Exh. 66.

Moreover, Walmart makes this Policy available to all associates on the company's intranet (known as the "Wire").  Tr. Day 4, Vol. II at 4-5, 8-9.  McPadden herself testified that she was aware of the existence of the Policy, received training on the Policy, and was aware of how she could raise complaints about discrimination.  Tr. Day 2, Vol. I at 45-46.  See Marcano-Rivera, 232 F.3d at 254 (" . . . the plaintiffs have not identified any facts that would support an award of punitive damages under the principles announced in Kolstad.  The record is replete, on the other hand, with evidence that [defendant] instituted policies prohibiting any type of discrimination, trained its personnel to ensure equal treatment of employees with disabilities, and took good faith efforts to comply with the ADA.").

Indeed, the Policy provides that there are multiple channels associates may use to complain about alleged discrimination.  See Pl.'s Exh. 66.  For example, Kulwicki testified, consistent with the Policy, that discrimination complaints may be raised to any member of management or via the Global Ethics Office's toll-free telephone number; and that those complaints get investigated.  Tr. Day 4, Vol. II at 8-9.  Kulwicki also testified that each Walmart store should have a poster reminding associates of the Global Ethics Office's toll-free telephone number.  Tr. Day 4, Vol. II at 9-10.

Because the evidence shows that Walmart made a good-faith effort to comply with Title

VII, the Court should eliminate the jury's award of punitive damages.

## III.   CONCLUSION

For the reasons set forth above, the Court should grant Walmart's renewed motion for judgment as a matter of law or, in the alternative, order a new trial or a remittitur.

Respectfully submitted,

**WAL-MART STORES EAST, L.P.**

By its attorneys,

/s/ Christopher B. Kaczmarek

Christopher B. Kaczmarek (Bar No. 17890)
Joseph A. Lazazzero (*admitted pro hac vice*)
**LITTLER MENDELSON, P.C.**
One International Place
Suite 2700
Boston, MA  02110
Phone 617.378.6000
Fax 617.737.0052
ckaczmarek@littler.com
March 1, 2016                                    jlazazzaro@littler.com

## CERTIFICATE OF SERVICE

I, Christopher B. Kaczmarek, hereby certify that on this 1st day of March, 2016, the foregoing document was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ Christopher B. Kaczmarek

Christopher B. Kaczmarek

Firmwide:138580189.2 080000.1051