## 1

VOLUME:  I
PAGES:   1-175
EXHIBITS:  3-32

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
NO. 1:14CV00475-SM

_____
MAUREEN McPADDEN,                )
        Plaintiff,        )
        vs.                )
WAL-MART STORES EAST, L.P.,       )
        Defendant.        )
_____)

        VIDEOTAPED DEPOSITION OF HEATHER HARRIS
McCAFFREY, called as a witness by and on behalf of
the Plaintiff, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before P. Jodi Ohnemus, RPR, RMR, CRR,
CA-CSR #13192, NH-LCR #91, MA-CSR #123193, and RI
Commissioner of Deeds, at the offices of Littler
Mendelson, P.C., One Financial Plaza, Providence,
Rhode Island, on Monday, November 9, 2015,
commencing at 1:41 p.m.

## 2

 1     APPEARANCES:
 2
 3        BELIVEAU FRADETTE DOYLE & GALLANT
 4        BY:  Richard E. Fradette, Esq.
 5        91 Bay Street
 6        PO Box 3150
 7        Manchester, NH  03105-3150
 8        603 623-1234
 9        Rick@beliveau-fradette.com
10            -and-
11        UPTON & HATFIELD, LLP
12        BY:  Lauren Simon Irwin, Esq.
13        10 Centre Street
14        PO Box 1090
15        Concord, NH  03302-1090
16        603 224-7791
17        Lirwin@upton-hatfield.com
18        For the Plaintiff
19
20
21
22
23
24

## 3

 1     APPEARANCES:  (CONT'D)
 2
 3
 4        LITTLER MENDELSON, P.C.
 5        BY:  Christopher B. Kaczmarek, Esq.
 6        One International Place
 7        Boston, MA  02110
 8        617 378-6017
 9        Ckaczmarek@littler.com
10        For the Defendant
11
12     ALSO PRESENT:
13
14        Jason Martin, CLVS, Video Operator
15
16
17
18
19
20
21
22
23
24

## 4

 1              I N D E X
 2
 3     TESTIMONY OF:                    PAGE
 4
 5     HEATHER HARRIS MCCAFFREY
 6
 7     (By Mr. Fradette)              8, 166
 8     (By Mr. Kaczmarek)               131
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

KACZYNSKI REPORTING

6e848235-3153-43fe-9654-08adf9b84d34

## Page 5

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Exhibit P-5 | email, 8/29/12 | 17 |
| Exhibit P-6 | email, 11/16/12, 2689-2690 | 18 |
| Exhibit P-7 | job description, 3346 | 22 |
| Exhibit P-8 | Coaching for Improvement, 521-523 | 39 |
| Exhibit P-9 | McCaffrey affidavit, 4/30/15 | 42 |
| Exhibit P-10 | Certo HRC interrogatory answers, 9/27/13 | 45 |
| Exhibit P-11 | USDC interrogatory answers, 12/14/13 | 51 |
| Exhibit P-12 | Key and Door Control Policy, 172-179 | 58 |
| Exhibit P-13 | POM-902, 483-490 | 60 |
| Exhibit P-14 | Position Statement, 6/7/13 | 65 |
| Exhibit P-15 | Professional Accountability Matrix | 67 |
| Exhibit P-16 | POM-206, 1461-1462 | 68 |
| Exhibit P-17 | Maria Holder exit interview, 792 | 78 |
| Exhibit P-18 | Susan Carroll exit interview, 614 | 80 |

## Page 6

| Exhibit P-19 | Shawn Wood email, 2907 | 85 |
|---------|-------------|------|
| Exhibit P-20 | Jesse Slater email, 2833 | 88 |
| Exhibit P-21 | Don Wallis email, 2889 | 90 |
| Exhibit P-22 | Certo email, 2915 | 91 |
| Exhibit P-23 | Certo email, 2913 | 92 |
| Exhibit P-24 | previously marked | 100 |
| Exhibit P-25 | previously marked | 103 |
| Exhibit P-26 | previously marked | 103 |
| Exhibit P-27 | Varieur Annual Performance Evaluation, 1083-1087 | 109 |
| Exhibit P-28 | Varieur coachings, 1154-1157 | 110 |
| Exhibit P-29 | Varieur decision to step down, 1110 | 115 |
| Exhibit P-30 | Varieur demotion request, 6/29/13, 1107 | 115 |
| Exhibit P-31 | Varieur log-on violation case detail, 1492-1502 | 120 |
| Exhibit P-32 | Tau transfer approval, 12/21/12, 2590 | 127 |
| Exhibit P-33 | Tau coaching, 2624-2627 | 127 |
| Exhibit P-3, | previously marked | 128 |
| Exhibit D-1 | WALMART (C McPadden) 002676 | 131 |

(Exhibits retained by Attorney Fradette.)

## Page 7

1  VIDEO OPERATOR:  We are now recording
2  and on the record.  My name is Jason Martin.  I am
3  a Certified Legal Video Specialist for National
4  Video Reporters, Inc., in association with
5  Kaczynski Reporting.  Our business address is 7
6  Cedar Drive, Woburn, Massachusetts 01808.
7  Today is November 9th, 2015.  The time
8  is 1:41 p.m.  This is the deposition of Heather
9  McCaffrey in the matter of Maureen McPadden,
10  Plaintiff, versus WalMart Stores East, LP,
11  Defendant, in the US District Court, District of
12  New Hampshire, Case No. 14CV475-SM.  This
13  deposition is being taken at One Financial Plaza,
14  Providence, Rhode Island 02903.  The court
15  reporter is Jodi Ohnemus of Kaczynski Reporting.
16  Counsel will state their appearances,
17  and the court reporter will administer the oath.
18  MR. FRADETTE:  My name is Richard
19  Fradette.  I appear here on behalf of the
20  Plaintiff with Attorney Lauren Irwin.
21  MR. KACZMAREK:  My name is Chris
22  Kaczmarek.  I represent the Defendant WalMart.
23  HEATHER HARRIS MCCAFFREY, having
24  first been duly sworn, was

## Page 8

1  examined and testified as
2  follows to interrogatories
3  BY MR. FRADETTE:
4  Q.  Good afternoon, Ms. McCaffrey.  As we've spoken
5  before, my name's Rick Fradette.  I appear here
6  for Ms. McPadden.
7  Could you please state your name for the
8  record.
9  A.  Heather Harris McCaffrey.
10  Q.  And you are here today as a witness on behalf of
11  WalMart; is that correct?
12  A.  Yes.
13  Q.  And you -- your current capacity is -- tell the
14  jury what your current capacity is.
15  A.  I'm a market manager for Walmart Stores.
16  Q.  And this case involves the termination of Maureen
17  McPadden.
18  At the time of Ms. McPadden's
19  termination in November 2012, what was your
20  position?
21  A.  I was a regional health and wellness director.
22  Q.  So can you tell us when you graduated from
23  pharmacy school?
24  A.  May of 2004.

**9**

1  Q.  And what school was that?
2  A.  The University of Rhode Island.
3  Q.  And you went to work as a staff pharmacist for
4      Walmart in Putnam, Connecticut; is that correct?
5  A.  Yes.
6  Q.  And you became the pharmacy manager of that store?
7  A.  No.
8  Q.  What -- did you ever serve as a pharmacy manager
9      of a Walmart pharmacy?
10 A.  Yes.
11 Q.  Where was that?
12 A.  In Warwick, Rhode Island, and Coventry, Rhode
13     Island.
14 Q.  The duties of a pharmacy manager are different
15     than the duties of a staff pharmacist; correct?
16 A.  Yes.
17 Q.  But as it relates to the actual filling of
18     prescriptions, the duties of a pharmacy manager
19     and the duties of a staff pharmacist are
20     essentially the same; correct?
21 A.  Correct.
22 Q.  You are not licensed to practice pharmacy in the
23     State of New Hampshire; correct?
24 A.  Correct.

**10**

1  Q.  And you never were?
2  A.  Correct.
3  Q.  And you actually practiced pharmacy -- that is,
4      filling prescriptions for patients -- from 2004 to
5      2008, approximately four years; is that correct?
6  A.  Correct.
7  Q.  And you no longer practice pharmacy since becoming
8      a market director in November or December 2008?
9  A.  Correct.
10 Q.  You agree that for New Hampshire pharmacists, the
11     New Hampshire pharmacist owes a duty to the
12     patient not to practice under terms and conditions
13     that would interfere with or impair a pharmacist's
14     ability to exercise their professional judgment;
15     correct?
16 A.  Any pharmacist.
17 Q.  You agree with that statement?
18 A.  Yes.

**11**

20 Q.  And I understand that your training in management
21     has been exclusively through your affiliation with
22     Walmart; correct?
23 A.  Correct.
24 Q.  And that includes training on how to conduct an

**12**

1      investigation if an employee is suspected or
2      reported to have violated Walmart policy.
3  A.  Correct.

21 Q.  And is it not the case that when considering
22     whether to coach an employee, it's important to
23     have all of the facts before making a decision.
24 A.  Yes.

6e848235-3153-43fe-9654-08adf9b84d34

### 13

1  Q.  And it is also important that the investigator
2      document what they learn in the investigation;
3      correct?
4  A.  Yes.
5  Q.  And this would include any interviews of witnesses
6      in the investigation.
7  A.  Yes.
8  Q.  And we learned this morning that when an
9      investigation is done, the investigator actually
10     has a witness with them to conduct the
11     investigation; correct?
12 A.  They should; yes.
13 Q.  And so it should be two members of management
14     involved in an investigation of a complained or
15     reported violation of Walmart policy.
16 A.  Yes.
17 Q.  And you agree that if it's not documented -- the
18     investigation or the interview -- that means
19     essentially that the individual investigator will
20     not be able to prove that what was alleged to have
21     happened actually happened.
22 A.  No.  I stated this morning, if the witness was
23     there as well, we could talk to both of them.
24 Q.  Okay.  But you would document -- either a note or

### 14

1      an email -- but some evidence of having that
2      conversation with that witness; correct?
3  A.  I would assume so.
4  Q.  You would expect so?
5  A.  Assume.
6  Q.  Okay.
7          Is that your experience; that you would,
8      in fact, have either an email or your own personal
9      notes or some type of writing about what you
10     learned in your investigation?
11 A.  That's how I would conduct -- conduct it.
12 Q.  And you've learned that documentation is a very
13     important part of doing an investigation; correct?
14 A.  It's a part of it; yes.
15 Q.  And it's important when making coaching
16     decisions -- particularly decisions that involve
17     termination -- that you document an investigation;
18     correct?
19 A.  It's part of the investigation.  I don't know how
20     important I would rate it --
21 Q.  Okay.
22 A.  -- but it's part of the investigation.
23 Q.  Okay.  As we sit here today -- and we're not sure
24     exactly when your testimony will be presented to

### 15

1      the jury -- but as we sit here today, do you have
2      an independent recollection of Maureen McPadden?
3  A.  I met her a few times on some store tours that I
4      did, but I never really had any interactions other
5      than that with her; no.
6  Q.  So it's fair for the jury to conclude that you did
7      not supervise Ms. McPadden; correct?
8  A.  No.
9  Q.  And you did not and cannot really assess her
10     effectiveness as a pharmacist; correct?
11 A.  Correct.
12 Q.  And you don't recall having any criticisms of Ms.
13     McPadden; correct?
14 A.  Not me personally; no.
15 Q.  Now, is it my understanding that the pharmacist's
16     personnel file and history with the company are
17     not factors in making a decision with respect to
18     coaching?
19         Is that your testimony?
20 A.  Can you repeat that.
21 Q.  Sure.  When you're making a decision about whether
22     or not to coach a person -- an employee, is it not
23     your testimony that the pharmacist's personnel
24     file and history with the company are not factors

### 16

1      considered in making the decision?
2  A.  The only time that would be a factor is if they
3      had done the same offense previously.
4  Q.  All right.  How -- I'm trying to understand that
5      testimony.
6          How would you know if they had done the
7      same offense previously if you didn't look at
8      their personnel file?
9  A.  It would be based on what was presented to me by
10     the market director.
11 Q.  All right.  All right.
12         So your experience with respect to
13     decisions about coaching is that you do not review
14     the pharmacist's personnel file or history with
15     the company.
16 A.  Correct.
17 Q.  Now, specific to this case, I think you testified
18     that it is a serious matter if a market director
19     is placed on written notice of a concern for
20     patient safety; correct?
21 A.  Correct.
22 Q.  You would want to know that there were concerns
23     about a patient's safety; correct?
24 A.  Correct.

4 (Pages 13 to 16)

6e848235-3153-43fe-9654-08adf9b84d34

## 17

1   Q.   You would expect that the market director would
2        make you aware of concerns raised about patient
3        safety; correct?
4   A.   They should.
5   Q.   They should?
6   A.   They don't have to.  They manage their own market,
7        but I would suspect they would.
8   Q.   Yeah.  And I think you testified that patient
9        safety is Walmart's No. 1 priority at all times.
10  A.   Yes.
11  Q.    Now, I'm going to show you, actually, what's been
12       marked as Plaintiffs' Exhibit No. 5, and that is
13       an email dated August 29th, 2012, from Ms.
14       McPadden to Mr. Certo.
15            (Exhibit P-5, email, 8/29/12.)
16  Q.    You have never seen that email prior to the
17       deposition involved in this case; correct?
18  A.   Correct.

## 18

17  Q.    Now, what's been marked as exhibit -- Plaintiffs'
18       Exhibit No. 6 -- I'm sorry.
19            Could I have that back, No. 6.  I'm
20       sorry.
21            (Exhibit P-6, email, 11/16/12,
22            2689-2690.)
23  Q.   No. 6 is an email.  And this one is also from Ms.
24       McPadden to Mr. Certo; and this one's dated

## 19

1        November 16th, 2012; is that correct?
2   A.   Yes.
3   Q.    And prior to this -- the deposition that I took of
4        you back in August, you had not previously seen
5        this email; correct?
6   A.   I don't believe so.

## 20

20  Q.    And just, again, so we're clear, it's not her job,
21       as a staff pharmacist, to staff the pharmacy.
22            That's the pharmacy manager's job;
23       correct?
24  A.   Not necessarily.

21

1  Q.  The pharmacy manager isn't specifically
2      responsible for hiring and training technicians?
3  A.  Staff pharmacists can do that as well.
4  Q.  They can hire?
5  A.  They're a member of -- yeah.  They're a member of
6      management.
7  Q.  So it's your testimony that a staff pharmacist
8      like Maureen McPadden can hire a technician?
9  A.  Yes, they could.
10 Q.  Mr. Certo responds to Ms. McPadden's email by
11     saying -- and if you look at his response, it says
12     "Sent out communications to Rochester, Portsmouth,
13     and Epping.  Please reach out to them."
14         Did I read that correctly?
15 A.  Yes.
16 Q.  And now Mr. Certo is essentially telling Ms.
17     McPadden to try and find support staff from some
18     other Walmart pharmacy.
19 A.  That's what it looks like.
20 Q.  And then Ms. McPadden responds that "It is very,
21     very bad here.  Vicky may leave.  Pam and Debbie
22     are barely holding it together.  This is a very
23     bad situation in this pharmacy right now."
24         Did I read that correctly?

22

1  A.  Yes.
2  Q.  And did you -- were you ever made aware of this
3      circumstance at the time?
4  A.  I don't recall if I was made aware of this
5      specific circumstance.
6  Q.  Okay.  Did Mr. Certo ever report to you at the
7      time that the staffing was -- there were
8      complaints about understaffing at this particular
9      store?
10 A.  At one point when I had the store, we -- we had
11     staffing opportunities in the store.  But
12     throughout the time that I had that store, we
13     actually overstaffed the store to help them.
14 Q.  I'm going to show you what's now been marked as
15     Plaintiffs' Exhibit No. 7.
16         (Exhibit P-7, job description, 3346.)
17 Q.  And that is the regional health and wellness
18     director job description.
19         That's essentially your position at the
20     time; correct?
21 A.  Yes.
22 Q.  On that very first page -- say about halfway
23     down -- it says that you "oversee compliance with
24     applicable state, federal, and local laws and

23

1      company policies to ensure the safety and
2      well-being of patients."
3          Did I read that correctly?
4  A.  Yes.
5  Q.  And that -- you did consider that to be part of
6      your job?
7  A.  Yes.
8  Q.  Continuing to read in that paragraph.  A little
9      further on, it says that you "oversee safety,
10     operational and quality assurance."
11         Is that through all of the pharmacies
12     that you're responsible for?
13 A.  I would oversee all pharmacies that I'm
14     responsible for.
15 Q.  And then it encourages you, as part of your job,
16     to "develop and ensure implementation of best
17     practices to ensure patient safety"; correct?
18 A.  I don't see where you're reading that.
19 Q.  In that same paragraph.
20 A.  Yes.
21 Q.  And at the very end of that same paragraph, it
22     reads that you should "ensure training and
23     guidance on the execution of company procedures
24     and policies"; right?

24

1  A.  Yes.
2  Q.  And, then, on the next page, the second paragraph,
3      as a regional director you're responsible to
4      oversee investigations and ensure "reports of
5      health and welfare policy violations are
6      appropriately investigated"; is that correct?
7  A.  Where do you see that?
8          I don't see that specifically.
9  Q.  It says in the second paragraph, it says "Oversees
10     investigations."
11         Do you see that?
12 A.  Yup.
13 Q.  And it says "ensures reports of health and welfare
14     policy and procedure violations are properly
15     investigated."
16         Is it -- do you see that?
17 A.  Yes.
18 Q.  That would be part of your job?
19 A.  Yes.
20 Q.  And Mr. Certo in this instance was the market
21     director for the seacoast -- the Seabrook -- I'm
22     sorry -- Seabrook pharmacy; and so he would be
23     under your supervision; correct?
24 A.  Correct.

6 (Pages 21 to 24)

6e848235-3153-43fe-9654-08adf9b84d34

## 25

1  Q.  And that you're to "monitor the progression of the
2      investigation and ensure appropriate action is
3      taken at the conclusion of the investigation";
4      correct?
5  A.  Correct.
6  Q.  And then you're to "ensure appropriate
7      communication with and training for the region and
8      market associates to prevent potential
9      violations"; correct?
10 A.  Correct.
11 Q.  That's all part of your job description.
12 A.  Yes.
13 Q.  And that would include investigations into a
14     violation of a HIPAA policy; correct?
15 A.  Correct.
16 Q.  And it would include a potential violation of an
17     FMLA policy; correct?
18 A.  I probably wouldn't be involved in an FMLA
19     situation as a regional health and wellness
20     director.
21 Q.  And -- and that is because what would happen to
22     the investigation of a potential FMLA policy?
23     What would you do?
24 A.  I would refer that to an HR -- that wouldn't be

## 26

1      something that I would handle.
2  Q.  HR in Bentonville?
3  A.  HR -- yeah.  Probably I would talk to the
4      divisional HR.
5  Q.  Okay.  Just so the jury has an appreciation for
6      your role, there are approximately 4,200 stores --
7      Walmart pharmacies -- in 2012; is that correct?
8  A.  Approximately.
9  Q.  And I understand there were anywhere from three to
10     ten pharmacists per store?
11 A.  That's -- that's accurate; yeah.
12 Q.  And as a regional manager, you were responsible
13     for 112 pharmacies?
14 A.  I believe I had 110 at that time.
15 Q.  And, you know, say 110, depending on whether it's
16     three pharmacies or -- I'm sorry -- three
17     pharmacists or ten pharmacists, essentially you're
18     responsible for 6, 7, 800 -- any large number of
19     pharmacists; correct?
20 A.  Correct.
21 Q.  And, then, you were also responsible for the
22     employees at the vision centers of all of these
23     pharmacies?
24 A.  Vision center employees wouldn't be in the

## 27

1      pharmacy.
2  Q.  I'm sorry.  Vision center employees in the store.
3  A.  Yes.
4  Q.  And there were two to five employees per vision
5      center?
6  A.  At least.  There could be much more than that.
7  Q.  And -- and how many vision centers do you have?
8  A.  I think I had somewhere around -- maybe 65.  I
9      can't remember exactly off the top of my head.
10 Q.  And just so the jury understands, when you
11     corrected me about it's not in the -- vision
12     center's not in the pharmacy, there's a
13     distinction within Walmart that separates the
14     pharmacy and the rest of the store; correct?
15 A.  We are a separate divis on.
16 Q.  It's an entirely separate division.
17 A.  Correct.
18 Q.  When you say, We are an entirely separate
19     division, you mean the pharmacy is entirely
20     separate division?
21 A.  Pharmacy and vis on center is a separate divis on.
22 Q.  And that division is identified as health and
23     wellness?
24 A.  Yes.

## 28

17         You were involved in the promotion of
18     Mr. Certo to the market director position in 2012;
19     correct?
20 A.  Yes.
21 Q.  And, in fact, he was promoted for the first time
22     essentially by you; right?
23 A.  To what position?
24 Q.  To the market director position.

29

1   A.   Yes.
2   Q.   And that was in April of 2012?
3   A.   I don't remember exactly.
4   Q.   Do you know that -- whether the Seabrook pharmacy
5        district -- wherever Seabrook pharmacy district
6        happens to be -- was his first assignment as a
7        market director?
8   A.   It was, I believe.
9   Q.   Okay.  And I believe you testified that you had
10       the most influence on Mr. Certo being promoted to
11       regional director; correct?
12  A.   I was his reg onal health and wellness
13       director at the time.
14  Q.   So I interpret that to be correct.  You had the
15       influence in getting him promoted to be the
16       regional director.
17  A.   I helped train him.
18  Q.   Okay.  Did you recommend him for the position?
19  A.   I wasn't in health and wellness when he was
20       promoted.  The hiring manager did ask if I felt
21       that he was ready, and I d d say I thought he was.
22  Q.   Okay.  And Mr. Certo, do you know how long he had
23       been a pharmacy manager before he was promoted to
24       regional -- district manager or market manager?

30

1   A.   I don't know exactly.
2   Q.   But we agree that managers gain experience and
3        they get better at their job as time goes on;
4        right?
5   A.   Everyone gets better with experience.
6   Q.   Incidentally, Mr. Certo also is a graduate of URI;
7        correct?
8   A.   Yes.
9   Q.   And Mr. Certo, as a market director, has authority
10       to make disciplinary decisions; correct?
11  A.   Correct.
12  Q.   And Mr. Certo could have decided on his own
13       whether to issue a one-level coaching or not
14       involving Ms. McPadden; correct?
15  A.   He could have.
16  Q.   And he didn't have to consult you to make that
17       decision; correct?
18  A.   He didn't have to; no.
19  Q.   And I understand that you participate in decisions
20       to discipline or terminate pharmacists when it's
21       not black and white or when the market director
22       raises the issue to your attention; correct?
23  A.   Correct.  When they have questions, they would
24       come to me.

31

1   Q.   And, generally speaking, you don't personally
2        terminate pharmacists; correct?
3   A.   Correct.
4   Q.   Now, both as a market director and as a regional
5        manager, would you agree that you are trained in
6        the following areas:  You are trained on the ADA;
7        correct?
8   A.   Correct.
9   Q.   You are trained on the FMLA.
10  A.   I wasn't necessarily trained on FMLA.  It was
11       based on my experience that I dealt with
12       s tuat ons that I learned about it.
13  Q.   Okay.  You were trained on Title VII gender
14       discrimination and the laws that prohibit gender
15       discrimination; correct?
16  A.   Again, I don't believe we had specific T tle VII
17       training.  So, no, I can't say I've had specific
18       Title VII training.
19  Q.   Do you know that it is unlawful to discriminate
20       against an individual in the terms and conditions
21       of their employment based on their gender?
22  A.   Yes.  We don't discriminate against anyone at
23       Walmart for any reason.
24  Q.   You were trained -- either directly or

32

1        indirectly -- on New Hampshire's equivalent
2        antidiscrimination laws; correct?
3   A.   No.  I was not trained on any specif c New
4        Hampshire laws.
5   Q.   Would you understand that New Hampshire would
6        similarly have laws that prohibit discrimination
7        based on either disability, gender, race, or any
8        other protected class?
9   A.   Yeah.  At Walmart, we don't discriminate against
10       anyone for any reason.
11  Q.   Do you know what "protected class" means?
12  A.   I do.
13  Q.   What do you understand that to mean?
14  A.   Any -- there's different protected classes:  so
15       med cal.  It could be physical.  It could be -- a
16       lot of different things.
17  Q.   Could be emotional?
18  A.   Could be.
19  Q.   Psychological?
20  A.   Uh-huh.
21  Q.   I'm sorry?
22  A.   That would be med cal.
23  Q.   Okay.  You were trained on H-I-P-A-A, the Health
24       Insurance Portability and Accountability Act;

8 (Pages 29 to 32)

6e848235-3153-43fe-9654-08adf9b84d34

---

33

1    correct?
2  A.  Yes.
3  Q.  You were trained that it's wrong to terminate an
4      employee because of a whistleblower or the concept
5      involving whistleblowers.
6  A.  Yes.
7  Q.  And you understand that Walmart cannot lawfully
8      retaliate against an employee for raising safety
9      concerns within the pharmacy; correct?
10 A.  Yes.
11 Q.  I'm sorry?
12 A.  Yes.
13 Q.  And you understand that Walmart cannot lawfully
14     retaliate against an employee for raising a HIPAA
15     violation; correct?
16 A.  Correct.
17 Q.  And you understand that Walmart cannot lawfully
18     retaliate against an employee because she
19     requested FMLA, or used FMLA, or because she may
20     need FMLA in the future; correct?
21 A.  Yes.
22 Q.  And I believe we established that -- this morning
23     -- you would consider it to be an adverse action
24     if you took action against an employee --

---

34

1      disciplinary action against an employee for an
2      event that would not otherwise be a disciplinary
3      event; correct?
4  A.  Correct.
5  Q.  And the example I used -- or we used -- was if an
6      employee inadvertently puts my prescription in
7      another customer's bag and the customer opens it
8      and sees my prescription, technically that's a
9      violation of HIPAA; right?
10 A.  Yes.
11 Q.  But because it was an inadvertent or unintentional
12     oversight, that may not discipline -- it may not
13     result in disciplinary action; correct?
14 A.  Correct.
15 Q.  And Mr. Certo has the judgment to decide whether
16     or not to issue discipline on any given fact
17     pattern; correct?
18 A.  No.  We have the accountability matrix that's very
19     specific about things that have to be held --
20     people held to the same standard.  But that's,
21     again, why they would confer w th me to make sure
22     that we're consistent throughout the region.
23 Q.  My question, though, is Mr. Certo doesn't have to
24     consult with you to make a decision about issuing

---

35

1      a coaching; correct?
2  A.  Correct.  But given that he was new and that he
3      wanted to make sure that he was doing the right
4      thing, that -- he conferred with me very
5      frequently.
6  Q.  You agree that an adverse action would include
7      escalating an event -- or raising an event to
8      upper management unnecessarily; correct?
9  A.  It could be.
10 Q.  And then I think you agreed this morning that an
11     adverse action would include seeking or imposing a
12     more severe discipline because the employee had
13     used FMLA; correct?
14 A.  Correct.
15 Q.  And you understand that Walmart cannot fire an
16     employee because of her disability if she can
17     perform the essential functions of the job;
18     correct?
19 A.  Correct.
20 Q.  You understand that Walmart cannot discipline a
21     female pharmacist more harshly than a male
22     pharmacist with respect to discipline for the same
23     conduct; correct?
24 A.  Correct.

---

36

1  Q.  So if the real reason that a manager wanted a
2      pharmacist to be fired or disciplined was because
3      he was tired of her safety complaints or her use
4      of FMLA or because she had a disability, that
5      would be unlawful; right?
6  A.  Can you repeat the question.
7  Q.  If the real reason that a manager wanted a
8      pharmacist to be fired was because he was tired of
9      her raising safety complaints or her use of
10     FMLA -- either past or present or future -- or
11     because she had a disability, that would be
12     unlawful.
13 A.  If that was the true reason for terminat on; yes.
14 Q.  Ms. Kulwicki is a name that the jury will become
15     familiar with.
16         I understand that she is an HR person in
17     Bentonville; is that correct?
18 A.  She's in Bentonville now.  She was not at the
19     time.
20 Q.  Oh.  She was in Philadelphia?
21 A.  She was in Philadelphia.
22 Q.  And we learned this morning that you have used her
23     as a resource for HR issues as far back as 2007.
24 A.  Yes.

---

## 37

1 Q. And, in fact, you consulted her in the decision to
2 discipline pharmacist McPadden, Ms. McPadden;
3 correct?
4 A. Yes.
5 Q. Her role was, as an HR person, to make sure that
6 Walmart policies and state and federal laws were
7 being followed; correct?
8 A. She was a divisional HR. So she had a broader
9 spectrum on consistency within the company for
10 accountability.
11 Q. Was she also responsible or part of her
12 responsible -- responsibilities were to make sure
13 that Walmart policies and state and federal laws
14 were being followed?
15 A. Yes.
16 Q. She has -- I'm sorry.
17 And you would consult her before making
18 any decisions relative to terminating a
19 pharmacist; correct?
20 A. No. I didn't have to consult her.
21 Q. Could you take a look at page 75 of your
22 deposition.
23 And I will call your attention
24 specifically to lines 7 through 13. And I ask in

## 38

1 your deposition: "Do you have a definite
2 recollection that the telephone call occurred?"
3 And you say you do.
4 Do you see that?
5 A. Yes.
6 Q. And here we're talking about the fact that you
7 have no notes of the telephone call that you had
8 with Ms. McCaffrey [verbatim] and Mr. Certo on the
9 day that the decision was made to discipline Ms.
10 McPadden; correct?
11 A. You mean Ms. Kulwicki?
12 Q. No, you, Ms. McCaffrey, as the regional director,
13 you have no notes of the telephone call that
14 occurred between yourself, Ms. Kulwicki, and Mr.
15 Certo where the decision was made to discipline
16 Ms. McPadden.
17 A. Correct.
18 Q. Yeah. So I'm asking you -- but you have a
19 definite recollection that the call occurred.
20 A. Yes.
21 Q. And I ask you why. And you say "Because I
22 remember talking about it with Barb, coming up
23 with the accountability. I wouldn't do it on my
24 own."

## 39

1 Did I read that correctly?
2 A. Yes.
3 Q. So you conferred and would not have issued the
4 discipline on your own; correct?
5 A. In this circumstance.
6 Q. Okay.
7 A. I don't have to confer with her.
8 Q. Okay. And you have no knowledge of what Ms.
9 Kulwicki reviewed when you were on the telephone
10 call with her that day; correct?
11 A. Correct.
12 Q. Now, I want to talk about the actual decision that
13 was made in this case to issue a coaching to Ms.
14 McPadden.
15 You would agree with me that coaching
16 decisions include many factors that could include
17 the intent of the individual or the level of the
18 offense; correct?
19 A. Correct.
20 Q. And there's coaching, which has been marked as
21 Exhibit No. 8...
22 (Exhibit P-8, Coaching for Improvement,
23 521-523.)
24 Q. ...is a tool that you use -- and other Walmart

## 40

1 managers -- use to ostensibly improve performance;
2 right?
3 A. Yes.
4 Q. And it's actually called "Coaching for
5 Improvement"; right?
6 A. Yes.
7 Q. Have you ever heard it referred to as anything
8 other than "Coaching for Improvement"?
9 A. No.
10 Q. And as I understand this policy within Walmart,
11 it's an opportunity to "identify, acknowledge, and
12 change unacceptable performance or conduct"; is
13 that true?
14 A. Yes.
15 Q. And it also, again, ostensibly, is used as a means
16 of retaining employees who demonstrate a
17 "interest, ability, and desire to be successful."
18 Did I read that correctly?
19 A. I don't know where you're reading it from.
20 Q. In that second full paragraph at the last
21 sentence. "It enables us to retain those
22 associates who demonstrate the interest, ability,
23 and desire to be successful."
24 A. Yes.

**41**

1  Q.   Now, with respect to Ms. McPadden, she had always
2      expressed an interest and an ability and a desire
3      to remain an employee with Walmart; correct?
4           MR. KACZMAREK:  Objection.
5  A.   I don't know.
6  Q.   Have you ever interviewed Ms. McPadden?
7  A.   No.
8  Q.   This Coaching for Improvement goes on to say that
9      "The supervisor manager determines the appropriate
10      level of coaching, depending on the
11      circumstances."
12           Is that your experience as well?
13  A.   Yes.
14  Q.   We agree that termination is the most severe
15      consequence of a Coaching for Improvement; right?
16  A.   Yes.
17  Q.   And I think you testified this morning that an
18      employee's intent is important in making
19      disciplinary decisions; correct?
20  A.   Usually.
21  Q.   And an inadvertent policy violation may result in
22      no coaching; correct?
23  A.   Depending on the situat on.
24  Q.   Okay.  I think I made reference to this just a

**42**

1      moment ago, but you have no notes, no emails, or
2      any other records explaining the decision made to
3      issue a two-level coaching to Ms. McPadden on
4      November 26, 2012; correct?
5  A.   Correct.
6  Q.   What's been marked now as Exhibit No. 9 is your
7      affidavit that was prepared in connection with
8      this case.
9           Do you recognize that document?
10           (Exhibit P-9, McCaffrey affidavit,
11           4/30/15.)
12  A.   (Witness reviews document.)  Could be; yeah.  I
13      don't know.
14  Q.   Is that your signature?  Actually, it's --
15  A.   There's no signature.
16  Q.   Okay.  Well, I -- I don't want the jury to get --
17      you know, be misled or anything.
18           That is produced.
19           Is that a document that you have seen
20      before?
21           Take your time to review it to make
22      sure.
23  A.   (Witness reviews document.)  Yeah.  This is the
24      information that I would have prov ded.

**43**

1  Q.   And you consider that to be your -- your sworn
2      testimony under oath?
3  A.   It -- t must be.  It's not signed by me, but I'm
4      assuming this is what I gave.
5  Q.   Okay.  And you've reviewed it carefully.
6  A.   I reviewed it.
7  Q.   Now, as I understand it from reading this
8      affidavit, you received an email from Mr. Certo
9      in -- sometime in late November; right?
10  A.   Yes.
11  Q.   You have no recollection of time of day that you
12      received the email; correct?
13  A.   Correct.
14  Q.   You did not answer the email in writing; correct?
15  A.   Correct.
16  Q.   You convened a telephone call between yourself,
17      Mr. Certo, and Ms. Kulwicki?
18  A.   At some point.
19  Q.   At some point that day.
20  A.   I don't recall if t was that day or the next day.
21  Q.   Okay.  And I understand that you don't recall the
22      time of day that the call was made; correct?
23  A.   Correct.
24  Q.   In fact, you don't even recall whether Mr. Certo

**44**

1      participated in the call?
2  A.   Correct.
3  Q.   But you have seen his testimony under oath that he
4      was on that call; correct?
5  A.   I don't know if I've seen his testimony.
6  Q.   Well, you would not dispute Certo's testimony that
7      he was on the call?
8  A.   If he says he was on the call, I'm sure he was on
9      the call.
10  Q.   Okay.  And you also don't know how long the call
11      lasted.
12  A.   No.
13  Q.   And there was only one conference call; correct?
14  A.   As far as I can remember.
15  Q.   And you would not dispute Mr. Certo's sworn
16      testimony before the human rights commission that
17      he was one of the persons ultimately responsible
18      in making the decision to terminate Ms. McPadden;
19      correct?
20
21  A.   If he was on the phone with us, he could have been
22      part of the conversat on.  I don't recall if he
23      was or was not.
24  Q.   I'm going to show you -- excuse me -- what's

45

1    marked as Plaintiff's Exhibit No. 10.
2        (Exhibit P-10, Certo HRC interrogatory
3        Answers, 9/27/13.)

46

6        And page 14 -- the second page 14 -- has
7    a date September 27th, 2013, with Mr. Certo's
8    signature.
9        And do you recognize that as Mr. Certo's
10    signature?
11    A.   I wouldn't be able to recognize Joe's signature.
12    Q.   You've never seen it before?
13    A.   I probably have not seen his signature before.
14    Q.   Why?  You've been working with him for over 10
15    years, and you've never seen his signature?
16    A.   I haven't been working with him for 10 years.  And
17        I wouldn't have some -- I don't know somebody's
18        signature from another one.
19    Q.   Okay.  All right.
20        Well, let me represent to you that it's
21    been represented to me, anyway, under oath, Mr.
22    Certo signed these interrogatories.  And if you go
23    to No. 18, which is on page 13 -- and there's only
24    one page 13 --

47

1    A.   Okay.
2    Q.   -- that interrogatory asks that Mr. Certo
3        identify -- or, actually, Walmart -- identify the
4        name -- "full name, title, business address, phone
5        number, and email address of persons ultimately
6        responsible for making the decision to terminate
7        the complainant."
8        Did I read that correctly?
9    A.   Yes.
10    Q.   And the response is to "See interrogatory response
11        No. 14:  The individuals named in response to
12        interrogatory No. 14 may be contacted through
13        counsel"; correct?
14    A.   Yes.
15    Q.   Now, let's look at interrogatory No. 14, and that
16        actually appears on page 11.
17        Do you see that?
18    A.   Yes.
19    Q.   And about halfway paper down it reads:  "Subject
20        to and without waiving the foregoing objections
21        and the general objections set forth above,
22        Respondents states that Joe Certo, market health
23        and wellness director, Heather Harris McCaffrey,
24        health and wellness regional manager --" which

48

1        would be you "-- and Barbara Kulwicki, senior
2        resource professional, conferred and determined
3        that pursuant to Walmart's policies, Ms.
4        McPadden's employment should be terminated on
5        November 27th, after she admitted losing her keys
6        while on a second written coaching."
7        Did I read that correctly?
8    A.   Yes.
9    Q.   So Mr. Certo, anyways, believes that he was both
10        on the call in which the decision to issue that
11        discipline that resulted in her termination was
12        made; correct?
13
14    A.   It doesn't say that here.
15    Q.   It says that he, as well as you and Ms. Kulwicki,
16        "conferred and determined"; correct?
17    A.   It doesn't mean we conferred all together.
18    Q.   Was there ever a time when the three of you
19        conferred together, other than in the telephone
20        conference call?
21    A.   No.  Like I sa d, I don't remember if Joe was on
22        the phone.
23    Q.   Is there any response in this interrogatory that
24        suggests the conferring occurred on a day other

49

1      than the 26th of November --
2           MR. KACZMAREK:  Objection.
3   Q.   -- resulting in a termination on the 27th of
4      November?
5   A.   It could have been done on another day.  I don't
6      know when t was taking place.
7   Q.   Well, you do agree that Ms. McPadden lost her key
8      on the 26th of November 2012.
9   A.   I don't -- if that's the date, I don't recall.
10      But it could be the date.
11   Q.   I'm sorry.
12   A.   That could be the date.
13   Q.   And she was terminated on the 27th of November.
14           Do you recall that?
15   A.   I don't remember the exact date of her
16      termination.
17   Q.   Now, your affidavit -- I'm sorry.
18           You can put that one away and take your
19      affidavit back, please, which is the previous one.
20   A.   (W tness reviews document.)
21   Q.   Yeah.  That affidavit makes no reference to the
22      key and control -- key and door control policy,
23      AP-05; correct?
24   A.   (W tness reviews document.)  I'd have to read

50

1      through it.
2   Q.   Take your time.
3   A.   (W tness reviews document.)  No, it doesn't.
4   Q.   So your affidavit doesn't make reference to the
5      key -- the AP-05 -- we'll refer to it as AP-05;
6      correct?
7   A.   Correct.
8   Q.   And your affidavit does not make reference to the
9      prescription area security policy POM-902;
10      correct?
11   A.   Correct.
12   Q.   And your affidavit does not make reference to the
13      Professional Accountability Matrix; correct?
14   A.   Correct.
15   Q.   In fact, your affidavit only refers to -- as it
16      relates to what you considered when making the
17      decision to discipline -- a vision center manager
18      who lost her key and was terminated at paragraph
19      7; correct?
20   A.   Correct.
21   Q.   Now, Exhibit No. 11 is interrogatory answers.  And
22      I'll call your attention to -- well, let me first
23      ask you:  Have you reviewed the -- your answers to
24      interrogatories?

51

1           (Exhibit P-11, USDC interrogatory
2      answers, 12/14/13.)
3   A.   My personal answers?
4   Q.   Correct.
5   A.   Yes.
6   Q.   So in regards to -- let me just make sure.
7           Can you show that?  Is that the United
8      States District Court?
9   A.   (Indicating.)
10   Q.   It is.  Okay.
11           At the very top it says "United States
12      District Court, State of New Hampshire"; correct?
13   A.   "District of New Hampshire."
14   Q.   "District of New Hampshire."
15           At page 3, interrogatory response No. 1,
16      you are identified, along with Mr. Certo and Ms.
17      McCaffrey, as at least three of the individuals --
18      I'm sorry -- Kulwicki -- as three of the
19      individuals responsible for providing answers
20      to -- or helping in providing answers to these
21      interrogatories; correct?
22   A.   Yeah.
23   Q.   And if you go to page 27 -- and hopefully this
24      time your page 27 is the same as mine.

52

1   A.   (Indicating.)
2   Q.   -- that has Mr. Certo's signature under oath, but
3      you don't recognize his signature.
4   A.   I couldn't recognize his signature.
5   Q.   But you don't dispute -- if Mr. Certo says that
6      that's his signature, you would go with Mr. Certo
7      testimony?
8   A.   I would believe him.
9   Q.   All right.  You would believe him.
10           And with respect to specifically now
11      these interrogatories, go to interrogatory No. 22,
12      please, which is on page 21.
13           Are you there?
14   A.   My 21 isn't labeled.
15   Q.   Oh.  At the bottom.  Okay.
16           But at the very top, do you see
17      "Interrogatory No. 22"?
18   A.   Yes.
19   Q.   It asks "for each reason the Plaintiff was
20      terminated and for each reason the policy or
21      policies materially related to the reason, and
22      then identify any other policies that might have
23      been violated."
24           Do you see that?

53

1  A.  Yes.
2  Q.  Okay.  And, then, if you go to the answer, about
3     halfway down, again, it says "Defendant refers
4     Plaintiff to Defendant's Coaching for Improvement
5     policy."
6        And we've reviewed that; right?
7  A.  Yes.
8  Q.  And then it talks about Defendant's policy "AP-05,
9     key and door control policy."
10       Do you see that?
11 A.  Yes.
12 Q.  And it talks about Plaintiff's exit interview;
13    correct?
14 A.  Yes.
15 Q.  Then the answer says "These policies speak for
16    themselves."
17       Did I read that correctly?
18 A.  Yes.
19 Q.  And these would be the policies -- is it your
20    testimony that these would be the policies relied
21    upon in making the decision to discipline and then
22    ultimately terminate Ms. McPadden?
23
24 A.  No.

54

1  Q.  Okay.  But that's what this interrogatory says;
2     right?
3
4  A.  That's what you just read me.
5  Q.  Okay.  The interrogatory answer No. 22 does not
6     make reference to POM-902; correct -- prescription
7     area security?
8  A.  Correct.
9  Q.  And it does not make reference to a Professional
10    Accountability Matrix; does it?
11 A.  Not that I see.
12 Q.  But you were involved in providing the answers to
13    these interrogatories, correct?
14
15 Q.  At least it says so in answer to No. 1.
16 A.  These are not the interrogatories that I signed.
17    We read through the ones that I signed.
18 Q.  That was your affidavit.
19 A.  Or my aff dav t.
20 Q.  Right.  But your affidavit didn't make reference
21    to the accountability matrix; did it?
22
23 A.  What exhibit is that?
24 Q.  Your affidavit is --

55

1        MS. IRWIN:  9.
2  Q.  -- is Exhibit No. 9.
3  A.  (Witness reviews document.)
4        (Counsel confer.)
5  A.  I don't see a quest on asking me what we
6     referenced in here.  So I don't have  t referenced
7     in here.
8  Q.  In that affidavit, you're explaining how the
9     decision was made to discipline and then to
10    ultimately terminate Ms. McPadden; correct?
11 A.  Correct.
12 Q.  And it does not make reference to an
13    accountability matrix; does it?
14 A.  No.
15 Q.  And it does not make reference to POM-902; does
16    it?
17
18 A.  No.
19 Q.  And in interrogatories that we just showed you,
20    which has been marked as Exhibit 10, interrogatory
21    No. 22, which you participated in providing
22    answers, does not make reference to the
23    accountability matrix -- Professional
24    Accountability Matrix; does it?

56

2  A.  I have to read through Exhib t 10 completely.  I
3     don't know if it's in here.  I mean, that's 27
4     pages.
5  Q.  Well, look, how about interrogatory -- just
6     interrogatory No. 22, which asks for the specific
7     policies?
8  A.  Are you talking about Exhibit 10 or 11?
9
10
11
12 Q.  I'm sorry.  11.  Thank you.
13 A.  No.  22 does not talk about those two.
14 Q.  About a matrix or 902.
15 A.  Correct.
16 Q.  If Mr. Certo signs under oath that you
17    participated in providing the answers to these
18    interrogatories, are you disputing that?
19
20 A.  No.
21 Q.  All right.  It is clear -- at least from my
22    reading of the responses -- that you are
23    identified as providing assistance in answering
24    these interrogatories.

14 (Pages 53 to 56)

6e848235-3153-43fe-9654-08adf9b84d34

## 57

1    Is that your reading of No. -- the
2    question to No. 1, that you provided assistance in
3    answering these interrogatories?
4  A.  Queston on No. 1?
5    (W tness reviews document.)  Yes.  It
6    references me.
7  Q.  So it's -- it's appropriate for me to rely on you
8    participating in providing answers to these
9    interrogatories?
10  A.  I believe so.
11  Q.  All right.  Now, I think you testified that with
12    respect to AP-05, the key and door control policy,
13    you have no idea why that policy was produced,
14    period; is that true?
15  A.  Correct.
16  Q.  It certainly was not relied upon, from your
17    perspective, in making the decision to discipline
18    and then ultimately terminate Ms. McPadden;
19    correct?
20  A.  Correct.
21  Q.  And you actually have no idea why it was produced.
22  A.  Correct.
23  Q.  Because this policy has been produced as a policy
24    -- I'm going to show it to you; it's policy No. 12

## 58

1    -- I mean, Exhibit No. 12 -- it's the key and door
2    control's policy, AP-05.  And if you could turn to
3    the third page of 8 -- and I understand and
4    appreciate that you did not rely on this policy
5    and didn't even look at the policy at the time the
6    decision was made with respect to disciplining Ms.
7    McPadden for accidentally losing her key; correct?
8  A.  Correct.
9    (Exhibit P-12, Key and Door Control
10    Pol cy, 172-179.)
11  Q.  Page 3, when you're auditing keys and their
12    whereabouts, specifically excepts from an audit a
13    lost key.
14    Do you see that under "Key Audit Form:
15    Exceptions"?
16  A.  This policy is not pertaining to health and
17    wellness.
18  Q.  Does it say that somewhere?
19  A.  It's not a POM, wh ch would be pharmacy.  This is
20    AP, which has to do with divis on 1.
21  Q.  And is the pharmacy within division 1?
22  A.  No.
23  Q.  Do you have any idea why this -- I think you
24    testified you don't know why it was produced.

## 59

1  A.  I don't.
2  Q.  But it has been produced by Walmart as a policy in
3    the decision to terminate; correct?
4
5  A.  I believe so.
6  Q.  And had you referred to this policy, which is a
7    Walmart policy, you would have seen that -- at
8    least in terms of auditing where keys are, the
9    lost key is specifically excepted.
10    You don't have to worry about it.
11    Do you see that?
12
13  A.  No.  It doesn't call out pharmacy specif c.  It
14    calls out all the departments on here
15    specif cally, and pharmacy is not one of them.  In
16    fact, it calls out pharmacy separately.
17  Q.  Okay.  So let's go then to POM-902, recognizing
18    that AP-05 -- it is your testimony -- is not
19    relied upon -- let me ask, just to clarify before
20    I move off AP-05:  That was not -- AP-05 -- a real
21    reason for the violation of that policy, anyways,
22    is not, in your opinion, a real reason why Ms.
23    McPadden was disciplined and then terminated;
24    correct?

## 60

1  A.  Correct.
2  Q.  Now, let's go to 902, which, if you could take a
3    look at that one -- and that's marked as No. 13.
4    This, again, was produced by Walmart.
5    And I believe your testimony is that you don't
6    recall if you actually physically pulled POM-902,
7    but you may have referenced it during the decision
8    in 2012; correct?
9    (Exhibit P-13, POM-902, 483-490.)
10  A.  I'm very familiar with this POM.  I wouldn't need
11    to pull it to be able to reference it.
12  Q.  So you're sufficiently familiar with the POM --
13    meaning P-O-M -- you wouldn't need to look at it.
14  A.  Correct.
15  Q.  And you agree that 902 -- POM-902 -- does not
16    specifically state that losing a key is a policy
17    violation; right?
18  A.  It speaks to the pharmacy keys, who can have the
19    keys on them; and it speaks to overall security of
20    the pharmacy area and what would happen if that
21    was to be violative of the policy.
22  Q.  And when it speaks to the pharmacy keys, you're
23    referring there to page 4 of 8; correct?
24  A.  Yes.

6e848235-3153-43fe-9654-08adf9b84d34

61

1  Q.  And that subheading is "Pharmacy Keys."  And it
2       talks about pharmacists keeping the key on their
3       person at all times.  And then it explains what
4       happens in the event of a lost key; correct?
5  A.  Correct.
6  Q.  And in the event of a lost key, the MHWD and AP
7       are to be contacted to review key handling
8       procedures, change the locks, and distribute new
9       keys; correct?
10 A.  Correct.
11 Q.  And it's your information from Mr. Certo that Ms.
12      McPadden, in fact, contacted him -- and he's the
13      MHWD; right?
14 A.  Yes.
15 Q.  And AP -- or asset protection -- was contacted as
16      well; right?
17 A.  I believe so.
18 Q.  And the key -- or locks were rekeyed; the pharmacy
19      locks were rekeyed that very day; correct?
20 A.  I believe so.
21 Q.  And new keys were distributed that very day;
22      correct?
23 A.  I believe so.
24 Q.  So, essentially, this procedure was followed by

62

1       Ms. McPadden; correct?
2  A.  Yeah.  I mean, it was followed by who needed to
3       follow the procedures.
4  Q.  Okay.  And I think you testified that the policy
5       itself doesn't say, one way or the other, that
6       losing a key is a violation of POM-902; right?
7  A.  I don't believe we found that specifically.  It
8       just does state...
9            (Witness reviews document.)  Where is
10      it?
11           It says "All associates and managers are
12      required to comply with the guidelines, policies,
13      and procedures related to prescription area
14      security" -- which losing your key would not keep
15      an area secure -- "Violations are subject to
16      disciplinary action, up to and including
17      termination, as outlined in the corporate Coaching
18      for Improvement policy."
19 Q.  You kind of tucked in there a little editorial;
20      and that is -- I will call it an editorial -- that
21      accidentally losing a key creates unsecure
22      circumstances.
23           Is that your -- is that your testimony?
24 A.  Yes.

63

1  Q.  So the policy, POM-902, actually talks about what
2       it takes to secure the pharmacy on page 1.
3            Do you see that?
4  A.  What are you referencing?
5  Q.  It says "Pharmacist's Duty"; and it has five
6       bullet points.  And it talks about "Whenever there
7       is not a pharmacist present in the pharmacy, the
8       prescription area must be secured."
9            Do you see that?
10 A.  Yes.
11 Q.  And securing the pharmacies says "Relocate the
12      will-call bin to the inside of the
13      prescription-filling area; Ensure that all
14      associates vacate the prescription area; Close and
15      lock all pharmacy windows and doors; Ensure the
16      prescription-filling area lights are on"; and
17      "Ensure that the pharmacy alarm is set."
18           Did I read that correctly?
19 A.  Yes.
20 Q.  Those five bullet points, if they have been met or
21      complied with, then the pharmacy is secure,
22      correct, by this policy?
23 A.  Well, if you don't have your key, then anyone
24      could unlock the door that has the key.  So then

64

1       that would be --
2  Q.  And set the alarm, and then the alarm would go off
3       if somebody tried to unlock the door with the
4       alarm set; correct?
5  A.  Well, you still have time before someone can
6       respond to an alarm.
7  Q.  Incidentally, the key itself is not identifiable
8       or there's no unique characteristics; right?
9            If I found a key that had been lost, I
10      wouldn't pick it up and say, This belongs to
11      Seabrook pharmacy in Seabrook, New Hampshire?
12 A.  I don't know what the key looked like that they
13      had.
14 Q.  In your experience, are these keys identifiable?
15 A.  Depends.  Somebody could put a marking on  t that
16      could  detify it.  I don't know what the key had
17      on it.
18 Q.  So we'd have to conclude that the key -- in order
19      for somebody to pick it up and drive over to the
20      Seabrook pharmacy -- that the key had a little
21      mark on it that says this is the pharmacy key that
22      will open Seabrook pharmacy?  Is that --
23 A.  Well --
24 Q.  Is that what you're -- is that your concern?

6e848235-3153-43fe-9654-08adf9b84d34

Page 65

1  A.  No.  The key says not duplicatable.  And if I knew
2      where someone worked,  t's not too hard to figure
3      out with wh ch key is a pharmacy key, based on
4      what they look like.
5  Q.  But this policy, as far as Walmart's policy for
6      what defines securing the pharmacy, these five
7      bullet points are what Walmart's written policy is
8      to secure the pharmacy; correct?
9  A.  That's what  t says right there.
10 Q.  Now, as I understand it, you did not investigate
11     beyond Mr. Certo telling you that Maureen had
12     accidentally lost her key; correct?
13 A.  Correct.
14 Q.  And I'm going to show you what's been marked as
15     Plaintiffs' Exhibit No. 14.
16         (Exhibit P-14, Position Statement,
17         6/7/13.)
18 Q.  If you go to page 3 of that document, this is --
19     again, this is a document presented to the human
20     rights commission.
21
22
23
24 Q.  And, actually, here, again, if you go to the last

Page 66

1      page, that is a verification by Mr. Certo that,
2      "To the extent that I, Joe Certo, have personal
3      knowledge of such facts, I hereby certify and
4      affirm that such facts are true and accurate to
5      the best of my knowledge."  And that is Mr.
6      Certo's signature.
7          If he said that's his signature, you're
8      going to go with what he says.
9  A.  If he says so.
10 Q.  And at page 3, the very last paragraph -- and,
11     actually, the last couple of sentences -- Mr.
12     Certo reports to the human rights commission that
13     he called Ms. McPadden and asked how it
14     happened -- the loss of her key.
15         "Ms McPadden said that she was moving
16     and thought her keys fell somewhere at her house.
17     Ms. McPadden told him that she had the keys on
18     Sunday, and now couldn't find them, and that was
19     Monday."
20         Do you see that?
21 A.  Yes.
22 Q.  So did Mr. Certo tell you that Ms. McPadden had
23     her keys on the Sunday prior to the Monday morning
24     when she went to unlock the pharmacy?

Page 67

1  A.  He told me she was moving and could not locate her
2      keys.
3  Q.  Okay.  So he didn't mention that she had the keys
4      as recent as that day before, within the previous
5      24 hours?
6  A.  It really d dn't matter.
7  Q.  Okay.  Now, it's my understanding that you believe
8      that you referred to what's been marked as Exhibit
9      15, the Professional Accountability Matrix, when
10     investigating whether Maureen's accidental loss of
11     her key was a policy violation.
12         Is that your testimony?
13         (Exhibit P-15, Professional
14         Accountability Matrix.)
15 A.  Can you repeat that?
16 Q.  Sure.  I understand it's your testimony that you
17     relied on or referred to Exhibit No. 15, the
18     health and wellness Professional Accountability
19     Matrix when the making the decision to discipline
20     Ms. McPadden because she accidentally lost her key
21     and that that was a policy violation?
22 A.  Yes.
23 Q.  And that policy, No. -- Exhibit No. 15, was first
24     produced -- this matrix was first produced the day

Page 68

1      before your deposition; August 26, 2015; is that
2      correct?
3  A.  Yes.
4  Q.  This matrix actually has a POM associated with it,
5      POM-206, which is now marked as 16.
6          Have you reviewed the POM-206?
7          (Exhibit P-16, POM-206, 1461-1462.)
8  A.  No.
9  Q.  You haven't reviewed that?
10 A.  Not today.
11 Q.  Do you agree that this Professional Accountability
12     Matrix guidelines is a Walmart policy that was in
13     effect in November 2012?
14 A.  Yes.
15 Q.  So it would be a policy that you would have to
16     follow.
17 A.  Yes.
18 Q.  And if you look at the definition of the
19     professional accountability matrix guideline, it
20     talks about -- and I'll read it -- "As a licensed
21     professional and/or member of management, it is
22     your responsibility to monitor, identify, and
23     report any activity that is suspected to violate
24     state or federal healthcare law or regulation or

17  (Pages 65 to 68)

---

69

1  the corporate policies put in place to ensure
2  compliance with these laws and regulations."
3      Did I read that correctly?
4  A.   Yes.
5  Q.   So you understand that POM-206 is intended to
6  govern the use of the matrix.
7  A.   I believe they go together; yes.
8  Q.   Okay.  Now, we can agree, I hope, that
9  accidentally losing a pharmacy key does not
10  violate any healthcare law or regulation; does it?
11  A.   It violates keeping a pharmacy secure.  That is
12      the law.
13  Q.   Right.  There is -- there is nothing in the law
14  that says accidentally losing a key violates the
15  law; is there?
16  A.   It says a pharmacist must keep the pharmacy secure
17      at all times.
18          So losing a key does not allow the
19      pharmacy to be secure.
20  Q.   So -- and you've said that many times now.  And
21  I'm curious, where -- what policy are you relying
22  on that says losing a key causes a pharmacy to be
23  unsecure?
24  A.   It has the potential to be unsecure.

---

70

1  Q.   And so --
2  A.   When a key is not under your -- when a key is not
3      in your possession, you have the abil ty to leave
4      the pharmacy unsecure.
5  Q.   Well, so that's your definition.  If the key is
6  not in your possession, the pharmacy potentially
7  is unsecure.
8  A.   If the key is -- is not able to be found and is
9      unlocatable,  t is not secure; yes.
10  Q.   The -- but you don't have any specific paperwork
11  or POM or any other document to point to for
12  authority for that opinion; correct?
13  A.   Well, No. 11 in the accountability matrix says
14      "Leaving the pharmacy unsecured when no pharmacist
15      is present, including at lunch, during breaks, or
16      after business hours."

23          No. 11 does define what unsecured means.
24      And unsecured means "losing visible sight of the

---

71

1  pharmacy," as it relates to paragraph 11; correct?
2  A.   In that specific --
3  Q.   Right.
4  A.   There's two different situations that they're
5      talking about.
6  Q.   Well, as it relates, certainly, to what we're
7  looking at, "Unsecured means losing visible site
8  of the pharmacy while the pharmacy's still open";
9  right?
10  A.   You could also reference 3, which is "Leaving the
11      facility, store, or club, and leaving the pharmacy
12      unsecured when no pharmacist is present, including
13      lunch, during breaks, and after business hours."
14  Q.   But we agreed in your deposition that the
15  infraction in No. 3 of the matrix does not apply,
16  because leaving the facility is very different
17  than losing the key; agreed?
18  A.   Well, no.  The facil ty is still unsecured.
19  Q.   All right.  Let's take a look at your deposition
20  at page 66, line 10 through 25, and I'll read:
21  "No. 3 says 'Leaving the pharmacy --' or
22  '-- facility --' rather '-- and leaving the
23  pharmacy unsecured when no pharmacist is present,
24  including at lunch, during breaks, and after

---

72

1  business hours.  Did I read that correctly?"  And
2  you answer:  "Yes."
3          And then I said "So you viewed losing
4  the key as something equivalent to No. 3?"
5          And what's your answer?
6  A.   It says "No."
7  Q.   So in your deposition you said that No. 3 does not
8  apply and was not relied upon in your decision;
9  correct?
10  A.   That's what I said in the depos tion; yes.
11  Q.   All right.  And we went on to say because -- leave
12  it at that.
13          You agree that accidentally losing the
14  key does not fall under No. 3 in your deposition;
15  correct?
16  A.   In the deposition; yes.
17  Q.   You're not changing your testimony, cause you were
18  under oath when you were in your deposition;
19  right?
20  A.   Yes.
21  Q.   All right.  The -- the fact that this policy
22  matrix, No. 11, apparently is what you're
23  primarily relying on, it doesn't say losing a key
24  is a violation, and it doesn't say losing the key

---

18  (Pages 69 to 72)

---

**73**

1      creates an unsecure pharmacy; right?

2  A.  Well, we don't have a policy for everything that

3      happens.

4  Q.  All right.

5  A.  We have to be able to make some sort of call based

6      on the s tuat on.

7  Q.  And in No. 11, what they're really talking about

8      there is when the pharmacy is still open and there

9      are technicians in the pharmacy and potentially

10     customers having access to the pharmacy.

11        But that pharmacy is still open, and

12     that's why you can't leave -- the pharmacist can't

13     leave beyond visual sight of the pharmacy.

14        Isn't that the intent of No. 11?

15  A.  It doesn't say that.  That's your assumption.

16  Q.  Well, it does say -- I'm sorry?

17  A.  That's your assumption.  It doesn't say that at

18      all.

19  Q.  It does say "Unsecured means leaving visible sight

20     of the pharmacy."

21        It says that right there.

22  A.  That doesn't mean it has to be open.

23        The pharmacy wouldn't be open after

24     business hours.

---

**74**

1  Q.  All right.  But even say No. 11, the first offense

2     for No. 11 -- if you assume loading a key violates

3     No. 11, first offense is a coaching; right?

4  A.  It doesn't have to be.

5  Q.  Well, isn't that what is recommended?

6  A.  It could be.  But if you read down below, t says

7      that "Each infraction will be reviewed

8      independently and the level of discipline imposed

9      may vary from the first offense column" on the

10     chart.

11  Q.  Where are you reading, 'cause --

12  A.  The fine print on the bottom.

13  Q.  Oh, yeah.  I don't know -- let me see.  I have to

14     take my glasses off for that.

15  A.  "This list is not all inclusive, and associates

16      may be disciplined for any reason not consistent

17      with appl cable laws and company policy."

18  Q.  All right.  So by reading POM-206, we can agree

19     that it's intended to enforce -- the matrix,

20     anyways, and the policy -- is intended to enforce

21     the laws, rules, and regulations and any policies

22     related to laws, rules, and regulations with

23     respect to healthcare; right?

24  A.  Right.  And like I stated before, t is a -- a law

---

**75**

1      that we need to keep our pharmacy secure.

2  Q.  And the matrix -- and with respect to keeping it

3     secure, we established that Walmart's policy,

4     anyways, in writing, has those five bullet points

5     for what creates a secure pharmacy; right?

6  A.  But that's not all encompassing --

7  Q.  All right.

8  A.  -- encompassing.

9  Q.  I understand that now, although I wouldn't have by

10     just reading the policy.

11        And, then, when we look at Exhibit 15,

12     again, by just reading the policy, you would

13     expect for a first offense of accidentally losing

14     your key, assuming that violates No. 11, to have a

15     coaching, a one-level or next-level coaching; is

16     that correct?

18  A.  No.

19  Q.  Subject to, of course, it could be more if there

20     were some circumstances that warranted it being

21     more.

22  A.  Well, no.  The reason why it was a second level

23     was because we had a similar situation within the

24     region previously with a vision center manager.

---

**76**

1      So to be consistent, we went w th the two levels.

2  Q.  Okay.  We'll get to the vision center person

3     eventually.

4        But I -- I just want to make sure that

5     from reading this policy as it -- 'cause that

6     vision center person is not a pharmacist; right?

7  A.  Correct.

8  Q.  And the coaching -- for the Professional

9     Accountability Matrix guidelines anyways --

10     involves "licensed professionals."

11        Pharmacists are licensed; right?

12  A.  Opticians are licensed too.

13  Q.  Okay.  Are opticians or vision center managers

14     licensed?

15  A.  She was.

16  Q.  Oh.  This particular one?

17  A.  Yes.

18  Q.  All right.  But, again, getting back to that No.

19     11, we can agree that there's still alarm that

20     secures the pharmacy; right?

21  A.  But you -- anybody can -- once you open a door,

22     the alarm doesn't matter.

23  Q.  All right.  But there is an alarm at the pharmacy;

24     right?

6e848235-3153-43fe-9654-08adf9b84d34

77

1　A.　There is.
2　Q.　And there's video surveillance of the pharmacy as
3　　　well; correct?
4　A.　There is.
5　Q.　And there is a lock on the store, correct, the
6　　　whole store.
7　　　　　If the store is closed, you can't get
8　　　into the pharmacy; right?
9　A.　Well, I don't know if this is a 24-hour -- I don't
10　　remember if this was a 24-hour store.
11　Q.　And there's surveillance cameras throughout the
12　　store as well.
13　A.　There is.
14　Q.　Yeah.　And just to make certain, you never made
15　　inquiry of Ms. McPadden to ascertain whether or
16　　not -- how this lost of the key occurred.
17　　　　She's been practicing for over 15, 20
18　　years.　She'd been with Walmart for 13 years in
19　　four or five different states.　You never made
20　　inquiry whether she had ever lost her key before.
21　　　　None of that factored into the decision
22　　of issuing a two-level discipline when you made
23　　that decision; correct?
24　A.　Correct.

78

1　　　　Now, d d you make reference to Susan
2　　Carroll -- so let's -- that's, actually, the very
3　　next exhibit.
4　　　　I'm sorry.　Before we get to Carroll, I
5　　do want to show you Maria Holder.　That's Exhib t
6　　17.
7　　　　(Exhib t P-17, Maria Holder
8　　　　exit interview, 792.)
9　Q.　Maria Holder -- and I'll represent to you, in the
10　　interest of time, that in the answers to
11　　interrogatories, Maria Holder is identified as
12　　another individual who was disciplined under
13　　AP-05.
14　　　　Do you know who Maria Holder is?
15　A.　No, I don't.
16　Q.　Do you know whether Maria Holder, who was a
17　　Seabrook pharmacy employee -- or Seabrook Walmart
18　　employee -- why her name was disclosed in answers
19　　to interrogatories?
20　A.　I do not.
21　Q.　Do you know whether the situation involving Maria
22　　Holder was considered by anyone in the decision to
23　　discipline Ms. McPadden?
24　A.　It was not.

79

1　Q.　In your opinion, it was not?
2　A.　It was not.
3　Q.　And in the case of Ms. Holder, if you look under
4　　the "Manager Comments," she was actually
5　　disciplined for not reporting the missing key.
6　　　　Did I read that correctly?
7　A.　She's an electronics associate.　So this has
8　　nothing to do with the pharmacy.
9　Q.　I understand that, but, again, to be consistent,
10　　if you want -- I mean, if a key is not reported as
11　　having been missed -- having been lost, rather,
12　　would you discipline an electronics employee
13　　different than a pharmacy employee or a vision
14　　center employee?
15　A.　I had no jurisdict on over the rest of the store
16　　at that point.　It was specifically health and
17　　wellness.
18　Q.　All right.　But, in any event, Maria did not
19　　report the loss of a key, and she ends up being
20　　terminated because "her next level of coaching is
21　　termination, since she was already on a decision
22　　day."
23　　　　Did I read that correctly?
24　A.　Yes.

80

1　Q.　So for not reporting a missing key or lost key,
2　　she got a one-level discipline; right?
3　A.　Well, it wouldn't have mattered if she got one or
4　　four.　She had only one more to go before she was
5　　terminated.
6　Q.　So the reason that she got terminated, then, is
7　　because she was on decision day.
8　A.　Yes.　Just like in our s tuat on, Maureen already
9　　had two.　So if she only got the two levels, she'd
10　　only have two levels currently.
11　Q.　Okay.　Ms. McPadden -- now, let's get back to Ms.
12　　Carroll.　On her exhibit interview, which is
13　　Exhibit No. 18, what actually happened in her case
14　　is that the key was left in the lock.
15　　　　She didn't lose her key; right?
16　A.　I don't have an exhib t.
17　Q.　Didn't I give it to you?
18　A.　No.
19　Q.　I'm sorry.　I gave you the other one.
20　　　　No. 18.
21　　　　(Exhibit P-18, Susan Carroll
22　　　　exit interview, 614.)
23　Q.　Under "Manager Comments."
24　A.　(W tness reviews document.)　So her infraction

## 81

1      actually was less than losing a pharmacy key, and
2      she got two levels.
3   Q.   You consider leaving the key in the lock as being
4      less than accidently losing a key?
5   A.   We could watch video and know that that key was
6      not left unattended, 'cause we could see the key
7      in the lock the whole time.
8   Q.   Are you aware that pharmacists have -- in this
9      case have testified -- including Mr. Certo -- that
10      he leaves his pharmacy key at home when he goes on
11      vacation. Ms. Urbansky, other pharmacists leave
12      their pharmacy key in a drawer. Mr. -- Pharmacist
13      Tau leaves it in a drawer.
14        Are you aware of that testimony?
15   A.   No.
16   Q.   And I could certainly take a pharmacy key out of a
17      drawer if I happen to be out Mr. Tau's home for a
18      cocktail party and go and open the pharmacy;
19      couldn't I?
20   A.   But they knew where their key was. They didn't
21      lose it.
22        (Counsel confer.)
23   Q.   In Ms. Carroll's case, not only did she leave
24      the -- key in the lock, she left a spare set

## 82

1      of keys in a drawer -- in an unlocked drawer in
2      the vision center; and that had patient
3      confidential information or access to patient
4      confidential information; correct?
5   A.   The drawer d dn't have any. By accessing the key,
6      they would have had -- same as if someone got
7      ahold of Maureen's key, they would have still had
8      access to HIPAA information.
9   Q.   Right. So did you discuss with anyone -- before
10      arriving at your definition of unsecure, did you
11      discuss that with anyone other than Mr. Certo and
12      Ms. Kulwicki at all?
13   A.   No.
14   Q.   And you were told by Mr. Certo that she
15      accidentally lost her key, and you've now been a
16      regional manager for several years involving
17      several hundred pharmacies -- thousands -- I won't
18      exaggerate -- but many pharmacies, many
19      pharmacists.
20        Did you call anyone to say, Have you
21      ever experienced a pharmacist losing their key,
22      and what should happen?
23   A.   I called Barbara Kulw cki.
24   Q.   That's it?

## 83

1   A.   She had all of the east coast. So she had
2      thousands of pharmacies.
3   Q.   Okay. It's not curious to you that no pharmacist
4      other than Ms. McPadden -- or prior to Ms.
5      McPadden -- had been disciplined for accidentally
6      losing their key?
7   A.   Pharmacists are actually very responsible people.
8      So they probably don't lose their key.
9   Q.   You don't -- you think Ms. McPadden's the first
10      pharmacist in Walmart's history to have lost their
11      key?
12   A.   It's the first in this region since I had  t in
13      seven years.
14   Q.   First that you became aware of.
15   A.   Right.
16   Q.   Right. And you've told me already that a pharmacy
17      district manager or market manager could deal with
18      that situation without involving you; right?
19   A.   No. They would have had involved me if a
20      pharmacist lost their keys --
21   Q.   Well, I thought you --
22   A.   -- because they have to get the pharmacy rekeyed.
23   Q.   Is this, Ms. McPadden, the first time that a
24      pharmacy has been rekeyed?

## 84

1   A.   No.
2   Q.   All right. So in the request or permission you --
3      I think you've testified previously that you
4      essentially approved -- like, Mr. Tau's hire, that
5      was an automatic approval, relatively speaking;
6      correct?
7   A.   I don't know what you're referencing.
8   Q.   Are your -- is it going to be your testimony -- or
9      is it your testimony to this jury that you
10      believe, in the seven years that you were regional
11      manager for umpteen stores, nobody lost their key?
12      No pharmacist accidentally lost their key?
13   A.   That I'm aware of; no. This is the first one.
14   Q.   And it's entirely possible that it happened, but
15      it never got called to your attention; correct?
16   A.   No, because the coaching would have been able to
17      be found, and we couldn't find one.
18   Q.   Well, it could be that a pharmacist lost their key
19      and didn't receive any coaching; isn't that
20      possible?
21   A.   Anything's possible --
22   Q.   Okay.
23   A.   -- but not probable.
24   Q.   Now, you consulted Shawn Wood's boss when you made

85

1    the decision involving Ms. Carroll; correct?
2    A.   Yes.
3    Q.   And that's -- Shawn Wood's boss is the divisional
4         asset protection manager, who happened to be in
5         your office; right?
6    A.   No.
7    Q.   Oh.  I'm sorry.
8             What -- who is the -- the boss?
9    A.   She's a regional asset protect on manager.
10   Q.   Oh, I'm sorry.  I'm going to show you what's
11        marked as Exhibit 19.  And this is an email from
12        Mr. Shawn Wood, who is identified as the asset
13        protection manager, and he's responding to Mr.
14        Certo.
15            Have you seen that email before?
16            (Exhibit P-19, Shawn Wood email, 2907.)
17   A.   Just during my depos t on.
18   Q.   So Mr. Certo never showed you this email; correct?
19   A.   Correct.
20   Q.   And he never told you about this email; correct?
21   A.   Correct.
22   Q.   And Mr. Certo is asking Mr. Wood, the asset
23        protection manager, what does he believe should
24        happen about a, quote, "lost key."

86

1             And Mr. Wood's first response was to
2         rekey the pharmacy; right?
3             "My experience has been rekey
4         immediately."
5             Do you see that?
6    A.   Yeah.  So Shawn Wood wouldn't have any kind of --
7         well, no.  That email came from -- not Joe.
8             That email came from whoever Tami
9         Boronski is.
10   Q.   Okay.  And Mr. Certo's copied on it?
11   A.   Yeah.  And the question is what happens in the event of a
12   Q.   And the question is what happens in the event of a
13        lost key; right?
14   A.   No.  That's not the quest on.
15   Q.   "Our pharmacist has lost her keys and cannot
16        locate them."
17            Do you see that?
18   A.   There's no question there.
19   Q.   Well, his response, anyways, is "My experience is
20        rekey immediately.  Thoughts?"
21            That's his response; right?
22   A.   That's Shawn's response; yes.
23   Q.   And, then, Mr. Certo, who's copied on those,
24        responds "Yes.  I've sent that direction to the

87

1         store"; correct?
2    A.   Yes.
3    Q.   So Mr. Certo is engaged in this exchange.
4    A.   Yes.
5    Q.   So Mr. Certo thought enough about Mr. Wood to
6         respond to his opinion; right?
7    A.   Well, he d dn't in tiate the quest on.
8    Q.   I understand.
9    A.   He was just responding to an email that someone
10        sent him.
11   Q.   I understand.
12            And, then, Mr. Wood asks Mr. Certo:
13        "Are you looking at accountability or no";
14        correct?
15   A.   Shawn asked Joe if he's looking for
16        accountabil ty.
17   Q.   Right.  And then Mr. Certo says "I have to look at
18        what's been done in the past.  Has she done this
19        before?"
20            Do you see that question?
21   A.   Yes.
22   Q.   And we know that the answer to that is no; right?
23            Ms. McPadden has not previously lost a
24        pharmacy key; correct?

88

1    A.   As far as we know.
2    Q.   And by your testimony, if she had, we would know;
3         right?
4    A.   I would think so.
5    Q.   And then Mr. Wood responds that he let an
6         assistant manager go for losing the key and not
7         reporting it.
8             Do you see that?
9    A.   Yes.
10   Q.   And then Mr. Wood says to Mr. Certo, "My feeling
11        would be next level," which would be a -- just a
12        next-level coaching; right?
13   A.   But Shawn Wood is an asset protect on for division
14        1.  He has nothing to do w th health and wellness.
15   Q.   I understand.
16   A.   And that's why Joe confers with me, because he was
17        not aware of the Susan Carroll incident.  I have a
18        broader knowledge than he does.  Barb has a
19        broader knowledge than I do.  That's why we
20        conferred with her.
21   Q.   Now, I'm going to show you Exhibit 20.
22            (Exhibit P-20, Jesse Slater
23            email, 2833.)
24   Q.   Mr. Slater is the store manager; right?

22 (Pages 85 to 88)

6e848235-3153-43fe-9654-08adf9b84d34

89

1   A.   Yes.
2   Q.   Jesse Slater?
3        And Mr. Certo consults Jesse Slater as
4   well; right?
5   A.   (Witness reviews document.)  He just let Jesse
6   know that he needed to rekey the pharmacy.
7   Q.   We see on the first email is a copy of Ms.
8   McPadden's notice to Mr. Certo at 11:20 that she
9   had misplaced her key on November 26, 11:20 a.m.
10       Do you see that?
11  A.   Yes.
12  Q.   I'm sorry?
13  A.   Yes.
14  Q.   All right.  And then ultimately Mr. Slater,
15  somehow he gets involved -- he's on the chain
16  anyways -- responds to Mr. Certo "This would be
17  next level for her, and I am not sure where that
18  puts her."
19       Did I read that correctly?
20  A.   Again, Jesse has no bearing over health and
21  wellness.  He's a division 1 store manager.
22  Q.   He's the store manager for the Seabrook pharmacy?
23  A.   He does not oversee the pharmacy.
24  Q.   Oh.  He oversees the store in which the pharmacy

90

1   is located.
2   A.   But he does not oversee the pharmacy.  That's the
3   market director.

16  Q.   Okay.  Exhibit 21 is Mr. Wallis.  Donald Wallis is
17  identified as a market manager.
18       Do you see that?
19       (Exhibit P-21, Don Wallis email, 2889.)
20  A.   Yes.
21  Q.   Now, Mr. Wallis explains or responds to Mr. Certo
22  and says "According to our key control policy,
23  this would be first level, up to termination.  I
24  would think first written would be appropriate.

91

1   Does everyone agree?"
2        Did I read that correctly?
3   A.   Yes.
4   Q.   So Mr. Wallis -- have you previously been informed
5   of this opinion?
6   A.   No.  But, again, he's division 1.  So he has no
7   bearing over health and wellness.
8   Q.   So Mr. Certo didn't tell you about what Mr.
9   Wallis's recommendation was, what Mr. Slater's
10  recommendation was, or what Mr. Wall's -- Wood's
11  recommendation was; correct?
12  A.   No.
13  Q.   That's correct?
14  A.   Correct.
15  Q.   And, then, as the next exhibit, No. 21, which is
16  about -- well -- 21.
17       MS. IRWIN:  She has 21.
18       (Exhibit P-22, Certo email, 2915.)
19  Q.   I'm sorry.  Could you give me that one back.
20  A.   (Witness complies.)
21  Q.   Thank you.  We have the -- I'm sorry.
22       Did I just give you 22?  I did?
23  A.   22.
24  Q.   22.

92

1        We have an email from Mr. Certo or on
2   behalf of Mr. Certo that he agrees with Mr.
3   Wallis; correct?  "I agree, but I believe she is
4   on a third written currently.  I will get back to
5   you."
6        Did I read that correctly?
7   A.   Yes.
8   Q.   So that's Mr. Certo communicating with Mr. Wallis
9   about what would be an appropriate accountability
10  under these circumstances; correct?
11  A.   Yes.
12  Q.   And then I'll show you No. 23.
13       (Exhibit P-23, Certo email, 2913.)
14  Q.   And that is Mr. Certo -- or at least on behalf of
15  Mr. Certo -- a few hours later responding to Mr.
16  Wallis and to Mr. Wood and to Mr. Slater, as well
17  as now a Mr. Hamilton, who is an MBA and SPHR
18  "Upon review and to be consistent in the region,
19  this will be a second level coaching.  Henry, I
20  will call you shortly to review and partner with
21  you on this."
22       Did I review that correctly?
23  A.   Yes.
24  Q.   So Mr. Hamilton, incidentally now, is HR, and he's

93

1      partnering with Mr. Certo, because it involves the
2      termination of a pharmacist; correct?
3              MR. KACZMAREK: Objection.
4   A.  Yes.
5   Q.  I'm sorry?
6   A.  Yes.
7   Q.  Yeah.
8   A.  He needed a witness for the termination.
9   Q.  Okay. I just want to -- kind of -- summarize
10     everything you did in regards to the decision to
11     issue a two-level coaching is that you spoke with
12     Mr. Certo and Ms. Kulwicki; correct?
13  A.  Yes.
14  Q.  You looked at the accountability matrix --
15     although it's not mentioned in your affidavit or
16     your answers to interrogatories; correct?
17  A.  Yes.
18  Q.  You recall policy 902, but you didn't actually
19     call it up; correct?
20  A.  Yeah. I don't believe I physically pulled t up.
21     I know that well enough.
22  Q.  Okay. And -- and it is not mentioned in your
23     affidavit; correct?
24  A.  Correct.

94

1   Q.  And you independently recalled an incident
2      involving Susan Carroll, but you didn't review any
3      documents involving Susan Carroll; correct?
4   A.  Correct.
5   Q.  You didn't look at her exit interview or anything
6      like that.
7   A.  No.
8   Q.  You did not review AP-05 --
9   A.  No.
10  Q.  -- right?
11         And you did not independently, you,
12     yourself, investigate what happened to other
13     pharmacists that had lost their keys; correct?
14  A.  I asked Barbara Kulwicki. Like I said, she has
15     thousands of stores, so she had a broad
16     perspective on that.
17  Q.  You admit that Ms. Kulwicki and Mr. Certo were
18     involved in the decision to issue Ms. McPadden a
19     coaching that led to her termination; correct?
20  A.  Yes.
21         MR. KACZMAREK: Objection.
22  Q.  I'm sorry?
23  A.  I believe -- like I sa d, I don't remember if Joe
24     was on the call.

95

1   Q.  Right.
2   A.  But t was at least Barb and I.
3   Q.  If you look at deposition page 88, when I took
4      your deposition, line 20 and 24, I ask you:
5      "Aside from Barbara Kulwicki, Heather McCaffrey,
6      and Joe Certo, do you know of any other Walmart
7      individuals involved in the decision to issue a
8      coaching that led to her termination?" And you
9      say, "No"; correct?
10  A.  Right.
11  Q.  Correct?
12  A.  That's what I just said.
13  Q.  All right. Now, I think you've said a couple of
14     times that this notion of discipline being applied
15     consistently throughout the company, that is a
16     goal of the company; right?
17  A.  Consistency would always be a goal of the company;
18     yes.
19  Q.  Okay. And Walmart regional managers are trained
20     in that regard -- to be consistent?
21  A.  Yes.
22  Q.  And so are the market directors; right? Correct?
23  A.  Yes.

96

9   Q.  The objective is to have accountability to be
10     consistent within at least the region, as, in this
11     case, certainly within New Hampshire; correct?
12  A.  No. My regions span from Maine to Rhode Island.
13  Q.  All right. So is it all six New England states?
14  A.  Yes.
15  Q.  And would you expect or hope that the
16     accountability would be consistent within that
17     region.
18  A.  Yes.
19  Q.  And that's -- consistency is to prevent
20     disciplinary actions being made more harsh on
21     females than males, for example; correct?
22  A.  Correct.
23  Q.  It's also to make sure that pharmacists who report
24     and document safety concerns are not disciplined

KACZYNSKI REPORTING

6e848235-3153-43fe-9654-08adf9b84d34

**97**

1    more harshly than other pharmacists; correct?
2  A.   Correct.
3  Q.   And it's also intended for employees with
4       disabilities not being disciplined more harshly
5       than others; correct?
6  A.   It's for everyone to be disciplined the same --
7  Q.   And --
8  A.   -- regardless of their situation.
9  Q.   All right.  So that would also involve employees
10      with need for FMLA -- you wouldn't want to have
11      them disciplined more harshly than others;
12      correct?
13 A.   No.
14 Q.   And if a pharmacist is coached for log copies not
15      being filed at the end of the day, you would
16      expect, within the same area, that a male
17      pharmacist that doesn't have log copies completed
18      at the end of his shift would be coached as well;
19      correct?
20 A.   So a pharmacist would not be coached for leaving
21      log copies not done one day.  That would be
22      something consistently discussed with someone.  So
23      I'd need to have more informat on on that.
24 Q.   Was -- Mr. Certo ever tell that you Mr. Varieur,

**98**

1       the pharmacy manager, was not getting log copies
2       completed at the end of the day -- at the end of
3       his shift?
4  A.   I don't recall.
5  Q.   Incidentally, you were the witness that --
6       designated by Walmart as knowing what Walmart did
7       or did not do relative to the -- issued the
8       decision in this case to Ms. McPadden; right?  You
9       were the 30(b)(6) witness on that, the decision to
10      terminate -- discipline and then terminate Ms.
11      McPadden?
12 A.   Yes.
13 Q.   And in that regard, you did not conduct an
14      investigation about whether a lost key was a
15      violation of any particular policy; correct?
16 A.   Like we've gone through before, there's multiple
17      things that we looked at to discuss.  We don't
18      have a specific pol cy pertaining to lost keys.
19 Q.   Well, what you're -- what you're specifically
20      referring to now is this notion that because the
21      key is lost, it's unsecured --
22 A.   Correct.
23 Q.   -- right?
24      There's no other policy that you're

**99**

1       relying on, other than this -- again, this notion
2       of it being, quote, "unsecure"; right?
3  A.   We can't have a policy for everything that
4       happens.
5  Q.   But Walmart tries.
6  A.   We're pretty good.  Not that good, obv ously.
7  Q.   At page 62 of your deposition, if you turn to
8       that.  Page 62, at line 13 -- and now we're
9       talking about you as the 30(b)(6) witness -- I ask
10      you "Tell me what you did to investigate whether
11      losing a pharmacy key was a policy violation."
12      And you answer:  "I didn't investigate.
13      Joe was the investigator."
14      Did I read that correctly?
15 A.   Yes.
16 Q.   So you relied on Mr. Certo; correct?
17 A.   Correct.
18 Q.   And in terms of the alarm having gone off, if
19      somebody had found the key and tried to access it,
20      the alarm, presumably, would have gone off.  And
21      you didn't investigate whether there was an alarm
22      at that pharmacy; correct?
23 A.   I did not.
24 Q.   We talked a little bit about the HIPAA policy

**100**

1       earlier this morning, and I want to thank you for
2       cooperating in that regard.  So it makes this
3       deposition now a little easier.
4       I'll show you what's marked as No. 24.
5       That's the same HIPAA policy that we had this
6       morning; correct?
7       (Exhibit P-24, previously marked.)
8  A.   Yes.
9  Q.   And under "Reporting a Violation" on the very
10      first page -- excuse me -- Walmart makes it clear
11      that it is "committed to preventing improper use
12      or disclosure of protected health information";
13      correct?
14 A.   (Witness reviews document.)  You're reading under
15      "Reporting a V olat on"?
16 Q.   Yes.  "Reporting a Violation"; correct.
17 A.   Say that again.
18 Q.   It's important -- Walmart makes it clear that it,
19      Walmart, is "committed to preventing improper use
20      or disclosure of protected health information."
21 A.   Yeah.  We -- we protect PHI as best we can.
22 Q.   And -- and "PHI" is protected health information?
23 A.   Yes.
24 Q.   And then it goes on to say that "If an associate

25 (Pages 97 to 100)

6e848235-3153-43fe-9654-08adf9b84d34

**101**

1    becomes aware of any conduct that may violate the
2    policy, it's to be reported immediately to a
3    salaried member of management; correct?
4    A.   Yes.
5    Q.   On the second page, under "Investigations and
6    Appropriate Action," Walmart states that it's --
7    it "takes any reported violation of the policy
8    very seriously."
9         Do you see that?
10   A.   Yes, we do.
11   Q.   And that's because patients rely on their
12   prescription records being kept private; right?
13   A.   Yes.
14   Q.   Walmart goes on to say that "It will promptly
15   investigate and resolve complaints regarding
16   potential improper use or disclosure of PHI";
17   correct?
18   A.   Yes.
19   Q.   And that's your experience?
20   A.   Yes.
21   Q.   And you agree that a technician should not be
22   discussing prescription information for purposes
23   other than to fill the prescription; and to do so
24   would actually violate the HIPAA policy; correct?

**102**

1    A.   Correct.
2    Q.   And you agree that a prescription is, in fact,
3    PHI.
4    A.   Yes.
5    Q.   And whether the customer is a patient or another
6    employee, they're entitled to that protection.
7    A.   Yes.
8    Q.   And Mr. Certo did not tell you that Ms. McPadden
9    complained of a HIPAA violation in October, just a
10   month before she was fired; did he?
11   A.   No.
12   Q.   That's correct?
13   A.   That's correct.
14   Q.   And if Mr. Certo failed to investigate a HIPAA
15   violation, he would be in violation of Walmart's
16   policy; right?
17   A.   Yes.
18   Q.   If there was an investigation, it should be
19   documented somewhere, correct -- of Ms. McPadden's
20   complaint?
21   A.   It should be.
22   Q.   And I think you testified, but I want to make
23   sure, there is always another witness to an
24   investigation -- another member of management;

**103**

1    correct?
2    A.   There's another -- there's a witness when we're
3    talking to someone; yes.
4    Q.   And, now, I'd like to talk to you about Exhibit
5    No. 25, which is the Family Medical Leave Act.
6    That's FMLA? You're familiar with that?
7         (Exhibit P-25, previously marked.)
8    A.   Yes.
9    Q.   And here, again, any complaint of a violation of
10   this policy would be something that would be
11   investigated; correct?
12   A.   It should be; yes.
13   Q.   And employees are entitled to time off if they
14   have a medical condition that qualifies them under
15   FMLA; correct?
16   A.   Yes.
17   Q.   And now No. 26.
18        (Exhibit P-26, previously marked.)
19   Q.   That's an email that involved Ms. McPadden
20   reporting -- if you look at the very bottom --
21   that her leave of absence, which we understand and
22   the jury will know by now that Ms. McPadden took a
23   leave of absence from September 19th to October
24   3rd for a serious medical condition -- she viewed

**104**

1    that as FMLA, and it was being classified as
2    personal leave.
3         And this email actually raises the
4    question that she has -- why it is improperly
5    labeled.
6         Do you see that?
7    A.   Yes.  She called us in HR SS --
8    Q.   Okay.
9    A.   -- and let them know.
10   Q.   All right.  And Mr. Certo is copied on that email;
11   correct?
12   A.   I believe so.
13   Q.   Now, did Mr. Certo tell you on the date --
14   A.   Actually, no.  He's not.
15   Q.   I think if you take the next page -- look at the
16   next page.
17   A.   That says on 9/25.  He wasn't copied on that one.
18   Q.   He's not copied on this string?
19   A.   He might be on the string, but he wasn't copied on
20   that specific email.  'Cause you can see it was at
21   9/26/12 -- 9/26/12 at 8:19:44, whoever K3Schul is
22   where it went.  It didn't go to Joe.
23   Q.   Wouldn't --
24   A.   It might have eventually, but that specific one

26  (Pages 101 to 104)

6e848235-3153-43fe-9654-08adf9b84d34

## 105

1     did not go to him.
2  Q.  So it might have been on the 27th.
3  A.  It could have -- no --
4  Q.  Well, let me ask you --
5  A.  -- it didn't.
6  Q.  Does it not -- does it not say on the 25th --
7  A.  She called in on the 26th, though.
8  Q.  Right.  But on the 25th it says that Ms. McPadden
9      advised that MHWD Joseph Certo has the information
10     and she will reach out to him; correct?
11 A.  She faxed  t to his office.
12 Q.  Right.
13 A.  That doesn't mean he received it.
14 Q.  And, then, at the very top, actually, on 9/26, it
15     says "From:  AR system."  And it says "To:  Joseph
16     Certo."
17         Do you see that?
18 A.  Yeah.  But that's in eastern time, and this is in
19     central time.  So he wouldn't have gotten that.
20 Q.  How would I know that that's in eastern time, as
21     opposed to central time?
22 A.  Because we had that on another email that you sent
23     that the times d dn't match up.  And when they
24     send  t from home off ce, it shows central time.

## 106

1  Q.  Well, that's only a difference of an hour; right?
2  A.  Right.  So  t was a minute and 30 seconds off.
3  Q.  Is it your testimony that you believe Mr. Certo
4      didn't know that Maureen McPadden wanted her leave
5      of absence designated as FMLA?
6  A.  I don't know what he knows.  But he may not have
7      gotten this email, based on what this shows.
8  Q.  Did you ask Mr. Certo whether he knew that Ms.
9      McPadden wanted it FMLA and not personal leave?
10 A.  I would have had no idea that this even happened.
11 Q.  Right.
12 A.  I wasn't on this.
13 Q.  Would you, as a manager of many, many employees
14     for several years now, expect that if a person
15     goes out on a two-week leave of absence under
16     doctor's advice with a certification from the
17     doctor, would you expect that employee to have
18     that designated FMLA?
19 A.  It depends on their circumstances.
20 Q.  Uh-huh.  Okay.
21         In any event, the email that we see here
22     evidences Ms. McPadden's intent that it be
23     designated FMLA, not personal; correct?
24 A.  Yeah.  She let HR SS know that.

## 107

1  Q.  All right.  And HR SS is a part of Walmart.
2  A.  Right.
3  Q.  And Mr. Certo never told you that Ms. McPadden had
4      an issue and complained about the fact that this
5      was not properly -- her time was not properly
6      classified -- her time off was not properly
7      classified?
8  A.  He may not have known.
9  Q.  Well, let's -- let's take what he knew or didn't
10     know out of the equation.
11         He never told you.
12 A.  He never told me.
13 Q.  All right.  In fact, you recently learned that
14     Walmart made an error, and it should have actually
15     been designated FMLA; right?
16 A.  Yes.  It was put in as personal, and she was still
17     paid the way that she would have been.
18 Q.  And when I say "recently," that could have been as
19     recent as within the last month or two months.
20 A.  Can you repeat the question?
21 Q.  Sure.  I -- I said that you recently learned that
22     Walmart made an error with respect to this
23     classification of her leave of absence as personal
24     time and not FMLA.  That could have been as recent

## 108

1      as in the last two months.
2  A.  Yes.  That's when I was made aware.
3  Q.  All right.  Mr. Certo, in the decision -- when
4      this decision is made to issue the discipline,
5      didn't tell you that he had a one-hour meeting
6      with Ms. McPadden in mid-October, when she
7      returned from her leave of absence, and she told
8      him at that time about her medical condition; that
9      she may need more medical leave in the future; did
10     he?
11 A.  No.
12 Q.  And we've already established that he didn't tell
13     you that she raised the safety concerns more than
14     once, and most recently November 16th; correct?
15 A.  Correct.
16 Q.  All Mr. Certo really told you is that she had lost
17     her key, and he was looking for a level of
18     accountability; right?
19 A.  We had discussed Seabrook pharmacy and not Maureen
20     specifically.
21 Q.  All right.  And he didn't tell you about the
22     opinions that he received from his peers -- Mr.
23     Wallis, Mr. Slater, or Mr. Wood; correct?
24 A.  Well, they're not his peers.

27  (Pages 105 to 108)

109

1    Q.   Well, you didn't -- I didn't -- whatever you want
2         to call them, he didn't tell you about them --
3    A.   No.
4    Q.   -- right?
5              Now, are you aware of Josh Varieur, the
6    pharmacy manager at the store at the time of this
7    termination?
8    A.   I know the name.  I don't know him very well at
9         all; no.

110

111

112

9    Q.   And Mr. Varieur was the pharmacy manager at the
10        Seabrook store, correct, in 2012?

12   Q.   May 2012, May through the end of the year?
13   A.   I don't --
14   Q.   You don't --
15   A.   I don't know the dates that he was the pharmacy
16        manager.
17   Q.   And you have no information or Mr. Certo never
18        told you that Ms. McPadden was having difficulty
19        with Mr. Certo as the pharmacy manager; correct?
20   A.   Mr. Certo was not the pharmacy manager.
21   Q.   I'm sorry.  Maybe I named the names wrong.
22             What I'm asking you is Mr. Certo never
23        told you that Ms. McPadden was having difficulty
24        with Mr. Varieur, as the pharmacy manager of the

6e848235-3153-43fe-9654-08adf9b84d34

113

1      **Seabrook pharmacy; correct?**
2   A.   I don't believe so.
3   **Q.   Okay.  And he never told -- Mr. Certo never told**
4        **you about the reports of those serious**
5        **patient-filling concerns or safety concerns;**
6        **correct?**
7   A.   No.  'Cause, like I said before, we discussed
8        Seabrook pharmacy.  We overstaffed the pharmacy,
9        because they weren't able to handle the workload
10       that they had, given the staffing that they were
11       given.  So we overstaffed that pharmacy for them.

115

114

116

117

6  Q.   And Walmart personnel documents actually say that
7       it was a mutual decision to remove Mr. Varieur
8       from the store; right?
9  A.   Where are you reading?
10  Q.   I'm not reading anything specific.  I'm just
11      saying, if I were to read -- be looking at hiring
12      Mr. Varieur, and I looked at Exhibits 29 and 30, I
13      would -- I would lead -- it would lead me to the
14      conclusion that Mr. Varieur requested the
15      transfer, and Walmart agreed to it.
16  A.   That's what it appears.
17  Q.   But that's not what happened; is it?
18           Mr. Varieur didn't have a choice; did
19      he?
20  A.   He had a choice.  He signed this.
21  Q.   Well, didn't you testify that he did not have a
22      choice at your deposition, page 121?
23  A.   He always had a choice.  I think he knew it was
24      probably the best thing for him.

118

1  Q.   Take a look at page 121, line 5 through 7.
2  A.   (W tness reviews document.)
3  Q.   I ask "Whose decision was it to remove Josh?"  And
4       you testify "I believe we talked with Barb
5       Kulwicki and Joe and I -- I think was at a time --
6       I think -- I can't remember who the market
7       director was -- but I would have had a discussion
8       with the market director, and I believe they had a
9       conversation with Josh.  And it was a mutual
10      decision to remove him from the store."
11           Did I read that correctly?
12  A.   Yes.
13  Q.   All right.  So then I say "A mutual decision, Josh
14      agreed?"  And you say "Yes."  And I say "Not
15      mutual as you and Certo."  And you say "Right.
16      Josh agreed."
17           And then I ask you "Was he given a
18      choice?"  And you say "Not really."
19           What did you mean there?
20  A.   Well, I think he knew that he wasn't going to be
21      successful where he was.  So he's always given a
22      choice.  I mean, he had to sign this.  You know,
23      he didn't have to move.  But he knew it was the
24      best thing for him to do so.

119

120

KACZYNSKI REPORTING

121

123

122

124

KACZYNSKI REPORTING

6e848235-3153-43fe-9654-08adf9b84d34

125

6    Q.   All right.  And if you go back to Coaching for
7         Improvement, policy No. 8 -- I mean, Exhibit No.
8         8, that's that Coaching for Improvement.
9              Do you have it in front of you?
10             Go to the last page, if you would, under
11        "Termination."
12             Are you there?
13   A.   Yes.
14   Q.   There are circumstances where behavior is so
15        egregious that it warrants going directly to
16        termination; correct?
17   A.   Yes.
18   Q.   And this gives examples of situations where
19        behavior or misbehavior is so serious it should
20        result in immediate termination; correct?
21   A.   Yes.

126

14   Q.   And another example is the "intentional failure to
15        follow Walmart policy.
16             Did I read that correctly?
17   A.   Yeah.  Well, that can be anything.
18   Q.   All right.  So if Mr. Certo, for example, just for
19        purposes of this question, is asked to investigate
20        a HIPAA violation and he intentionally fails to
21        investigate a reported HIPAA violation, that would
22        be a violation -- intentional violation, right, if
23        that happened?
24   A.   That would be intentional; yes.

127

1    Q.   All right.  And I surmise by your answers intent
2         plays a fact in accountability; correct?
3    A.   Usually; yes.

13   Q.   All right.  Both Mr. Certo and Mr. Varieur
14        continue to be employed by Walmart today?
15   A.   I'm not sure about Mr. Varieur.
16   Q.   Now, last exhibit here is -- or two -- Exhibit No.
17        32, is Tau, Andy Tau.
18             You're familiar with Pharmacist Andy
19        Tau?
20             (Exhibit P-32, Tau transfer approval,
21             12/21/12, 2590.)
22             (Exhibit P-33, Tau coaching, 2624-2627.)
23   A.   Vaguely.
24   Q.   And Exhibit No. 32 is actually your approving the

128

1         transfer of Mr. Tau to the Plaistow, New Hampshire
2         pharmacy in December 2012.
3              Do you see that?
4    A.   Yes.  I approved his hire.
5    Q.   You approved his hire.  And that's just about a
6         month after Ms. McPadden gets fired; right?
7    A.   I guess; yeah.
8    Q.   December 21st.  She's fired on December 27th --
9         November 27th.
10             Then I'll show you what's been
11        marked as Exhibit 3.
12             (Exhibit P-3, previously marked.)

16   Q.   And this is a coaching of Mr. Tau for accidentally
17        losing his pharmacy key.
18             Do you see that?
19   A.   (Witness reviews document.)  Yes.
20   Q.   So on December 14th, 2012, just a little over a
21        year after Ms. McPadden lost her key, Mr. Tau, in
22        New Hampshire, a male pharmacist, accidentally
23        lost his key; right?
24   A.   No.  It was 2013.

**129**

1  Q.   I'm sorry.  So he lost it in 2013.  A year after
2       McPadden.
3  A.   Yes.
4  Q.   And Mr. Tau received a first-level coaching;
5       correct?
6            MR. KACZMAREK:  Objection.
7  A.   (Witness reviews document.)  I believe so -- by
8       Loreen Riel.
9  Q.   And Loreen Riel is Mr. Certo's level; right?  Mr.
10      Certo is a market director.  Loreen Riel was the
11      market director.  And Ms. Riel issues a
12      first-level coaching to Mr. Tau; correct?
13 A.   I believe so; yes.
14 Q.   There's no evidence that you know of that Ms. Riel
15      consulted regional; correct?
16 A.   Well, I was on maternity leave at the time, so she
17      wouldn't have consulted me.
18 Q.   Yeah.  But is there any evidence, to your
19      knowledge, that she consulted regional --
20      whatever, a regional director with respect to the
21      decision to issue a one-level coaching?
22 A.   I don't recall at this time who she --
23 Q.   Mrs. Tau was allowed to actually go home and that
24      pharmacy was not rekeyed for two days.

**130**

1            Are you aware of that?
2  A.   No.  Like I said, I was on maternity, so I wasn't
3       part of this.
4  Q.   And in Mr. Tau's case, if you look at Bates 2625,
5       although he lost the key on December 14th, he's
6       not coached until December 19th -- five days
7       later.  There was no --
8  A.   He might not have been working.
9  Q.   Well, if Mr. Tau testifies that he came to work
10      two days after he lost the key, he would have been
11      working for at least a few days -- couple of
12      days -- before being coached; right?
13 A.   It's possible; yeah.
14 Q.   And is it your experience that Walmart calls
15      people in -- even when they're not working -- if
16      they intend to coach individuals?
17 A.   Not usually.
18 Q.   But that does happen.
19 A.   It can.
20 Q.   And referring to Exhibit No. 32, again, which is
21      the authorization to -- your approval of hiring
22      Mr. Tau, Mr. Certo is copied on that, as well as
23      Ms. Riel; correct?
24 A.   Yes.

**131**

1            MR. FRADETTE:  All right.  I have
2  nothing further at this time.  Thank you.
3            MR. KACZMAREK:  With counsel's
4  permission, we've been at it for a while.  I think
5  it's an appropriate time to take a quick break for
6  everyone, and we can instruct the witness that
7  she's not to have any contact with counsel during
8  a break.
9            MR. FRADETTE:  Thank you very much.
10 That's fine.
11           MR. KACZMAREK:  Thank you.  We're off
12 the record.
13           VIDEO OPERATOR:  The time is 4:07 p.m.;
14 and we are off the record.
15           (Recess was taken.)
16           (Exhibit D-1, WALMART
17           (C McPadden) 002676.)
18           VIDEO OPERATOR:  The time is 4:15 p.m.,
19 and we are on the record.
20              EXAMINATION
21 BY MR. KACZMAREK:
22 Q.   Good afternoon, Ms. McCaffrey.
23           I wanted to start things off by asking
24 you, could you explain to the jury why they're

**132**

1  seeing you through videotape, as opposed to being
2  live at trial?
3  A.   So I am due with my second baby in about two
4       weeks.  So I won't be here for the trial.
5  Q.   You'll be here in Rhode Island --
6  A.   I will be here in Rhode Island, but I will not be
7       at the trial.
8  Q.   Are you expecting to a take a leave of absence
9       after you give birth?
10 A.   I am; yes.
11 Q.   And about how long will that leave of absence
12      last?
13 A.   Probably about 13 to 15 weeks.
14 Q.   So certainly through the end of January and
15      probably longer.
16 A.   Probably end of February; yeah.
17 Q.   Is this the first leave of absence that you've
18      taken from Walmart?
19 A.   No.
20 Q.   Did you take a leave of absence when your first
21      child was born?
22 A.   Yes.  I've had, actually, two leaves of absence
23      with Walmart.
24 Q.   Two leave of absences, not including the one that

133

1      you're about to take?
2   A.   Correct.

134

4   Q.   And you testified earlier that you're currently a
5      market manager; correct?
6   A.   Yes.
7   Q.   And you've been in that position since March?
8   A.   Since March.
9   Q.   And previously I believe you testified that you
10      were a regional health and wellness director; is
11      that right?
12  A.   Yes.
13  Q.   And what was the geographic scope of your
14      responsibilities as a regional health and wellness
15      director?
16  A.   When I first had the job, I just had Massachusetts
17      and a little of southern New Hampshire, and then
18      my region expanded to Maine, New Hampshire,
19      Vermont, Mass., and Rhode Island.
20  Q.   And at least for some period of time your
21      responsibilities included the Seabrook pharmacy.
22  A.   I had them the entire time; yes.
23  Q.   And while you were the regional health and
24      wellness director, who was your direct supervisor?

135

1   A.   I had two different ones.
2   Q.   Who were they?
3   A.   I had Emily Almeida and Paresh Patel.
4   Q.   Did they both have the same job title?
5   A.   Yes.
6   Q.   And what was that?
7   A.   Divis onal health and wellness director.
8   Q.   And while you were the regional health and
9      wellness director, did you directly supervise any
10      associates?
11  A.   Yes.
12  Q.   What were the job titles of the associates that
13      you directly supervised?
14  A.   I had the market directors and I had a health and
15      wellness coordinator.
16  Q.   Approximately how many associates did you directly
17      supervise at any given time?
18  A.   I had about ten.
19  Q.   And that included Joe Certo for a period of time?
20  A.   Yes.
21  Q.   And Mr. Certo's title was market health and
22      wellness director; correct?
23  A.   Yes.
24  Q.   And what sort of employees reported directly to

136

1      him?
2   A.   The pharmacy managers and division center managers
3      reported directly to him.
4   Q.   And who did the pharmacy managers directly
5      supervise?
6   A.   The staff pharmacists, hourly pharmacists,
7      techn cians, cashiers, OTC manager.
8   Q.   Essentially the pharmacy manager supervised
9      everyone who worked in the pharmacy?
10  A.   Yes.
11  Q.   When Attorney Fradette asked you some questions,
12      there was some testimony about health and wellness
13      and division 1.  And I want to explore that
14      distinction a little bit.
15          What areas of Walmart's business does
16      the health and wellness division cover?
17  A.   Health and wellness covers pharmacy, vis on
18      center, and, then, if you have any clin cs --
19      wh ch we don't around here -- but that would be
20      the health and wellness divis on.
21  Q.   And you're no longer in the health and wellness
22      division; correct?
23  A.   Correct.
24  Q.   You're now a division 1 market manager?

137

1   A.   Yes.
2   **Q.  And what -- in Walmart, what does division 1 refer**
3   **to.**
4   A.   So divis on 1 is entire store.  So I oversee the
5   entire store for Walmart for all of Rhode Island.
6   **Q.  So you're essentially responsible for managing all**
7   **the stores in Rhode Island?**
8   A.   Yes.
9   **Q.  And who's responsible for overseeing the**
10   **pharmacies for the stores in Rhode Island?**
11   A.   I have a market health and wellness director who
12   oversees them.
13   **Q.  And approximately how many stores are there in**
14   **Rhode Island?**
15   A.   Nine.
16   **Q.  And to whom do you report now?**
17   A.   The regional general manager, who is Glenn
18   Spencer.
19   **Q.  And that's within the division 1 reporting**
20   **structure?**
21   A.   Yes.
22   **Q.  And division 1 has its own separate hierarchy, if**
23   **you will?**
24   A.   Correct.

138

1   **Q.  Its own reporting structure?**
2   A.   Yes.
3   **Q.  And are there some policies that are unique to**
4   **division 1?**
5   A.   Yes.
6   **Q.  And are there some policies that are unique to**
7   **health and wellness?**
8   A.   Yes.
9   **Q.  And is it also true that there are some policies**
10   **that are universal, that govern both division 1**
11   **and health and wellness?**
12   A.   Yes.

14   **When you were the regional director for**
15   **the health and wellness division, were there any**
16   **guidelines with respect to how Walmart staffed its**
17   **pharmacies?**
18   A.   Yes.
19   **Q.  And can you describe those generally for me.**
20   A.   So they changed throughout the years.  We
21   originally had coverage guidelines when I started,
22   and that was based on prescription volume.  As
23   your prescription volume grew, you would increase
24   in your -- your technician, your supportive

139

1   personnel staff, and your pharmacist staff.
2   As -- toward the end, we trans t oned
3   over to S3G, store-specific gu delines, which have
4   multiple factors that come into play, and it's --
5   it's specific to that store.
6   So no given store would have the same
7   gu deline.  It's all based on different criteria
8   of that store on how it was staffed -- still based
9   on prescript on volume primarily.
10   **Q.  And within any given pharmacy, was there always a**
11   **pharmacy manager, a staff pharmacist, and at least**
12   **one technician?**
13   A.   Yes.
14   **Q.  And were there any other job titles of associates**
15   **who work within a pharmacy?**
16   A.   Yeah.  There could be an hourly -- an hourly staff
17   pharmacist.  There could be an assistant pharmacy
18   manager, could be a certified techn cian, a
19   pharmacy cashier.
20   I think that's about t.
21   **Q.  And within the pharmacy, what was the role of the**
22   **pharmacy technician?**
23   A.   They're supportive personnel to the pharmacists.
24   So they would take in a prescription, input the

140

1   prescript on, count the prescription, cash out
2   a -- a patient.  Now they can -- they can bag
3   prescript ons.

17   **Q.  Now, when you were in the health and wellness**
18   **division, you testified earlier that part of your**
19   **responsibilities included directly supervising**
20   **some associates; correct?**
21   A.   Yes.
22   **Q.  Did you have a role in disciplining those**
23   **associates?**
24   A.   Yes.

6e848235-3153-43fe-9654-08adf9b84d34

141

1  Q.   And there was some discussion when you were asked
2       by Attorney Fradette about the Coaching for
3       Improvement policy, and you recall just talking
4       about that just a few minutes ago; right?
5  A.   Yes.
6  Q.   And you talked about what a coaching is.
7           Are there different levels of coaching
8       within Walmart?
9  A.   Yes.
10 Q.   And is it permissible, under Walmart policy, to
11      skip a coaching level?
12 A.   Yes.
13 Q.   And how does one decide whether or not to skip a
14      coaching level?
15 A.   It's based on the -- the infraction.
16 Q.   But who decides whether to skip a level?
17 A.   It's typically the -- the associate's manager, or,
18      you know, next-level supervisor.  So in this case
19      with the market director, if they're not sure,
20      they would come to me, and then I would help them,
21      you know, with HR, if I needed their assistance as
22      well.
23 Q.   So in the first instance, is it -- is it true that
24      the manager issuing the discipline can decide

142

1       whether to skip a level?
2  A.   Yes.
3  Q.   But if he or she is not sure whether that's
4       appropriate, they could escalate it to someone
5       higher up in the hierarchy?
6  A.   They could.  And if the associate doesn't agree
7       with the level of discipline, they can always use
8       the open door policy and -- talk to that
9       person's supervisor and -- and challenge it.
10 Q.   And in your experience, does every Walmart policy
11      specify the level of coaching that an associate
12      should receive for violating that policy?
13 A.   No, we couldn't.
14 Q.   When you say you couldn't, what do you mean?
15 A.   The list would be way too long.
16 Q.   You testified earlier that you met the Plaintiff
17      in this case, Maureen McPadden, on a few
18      occasions.
19 A.   Yes.
20 Q.   Those are times when you visited the Seabrook
21      pharmacy?
22 A.   Yes.
23 Q.   Did you ever directly supervise her?
24 A.   No.

143

1  Q.   Do you recall how you learned that Ms. -- Ms.
2       McPadden had lost her key to the pharmacy?
3  A.   Joe -- I believe Joe had sent me an email that she
4       had lost her key.
5  Q.   I'm going to hand you what we've marked as
6       Defendant's Exhibit 1.
7           Do you recognize that document?
8  A.   Yes.
9  Q.   What is it?
10 A.   It's an email from Joe to myself, asking if there
11      is accountability if a pharmacist loses their key.
12 Q.   And is this the far -- is this the email that
13      alerted you to the fact that Ms. McPadden had lost
14      her key?
15 A.   Yes, I believe so.
16 Q.   You didn't respond to this email with another
17      email.
18 A.   No.  I called him.
19 Q.   Why didn't you respond by email?
20 A.   It's just easier to call him on the phone than go
21      back and forth via email.  I could get the
22      information I needed from him.
23 Q.   And the email is dated November 26, 2012; correct?
24 A.   Yes.

144

1  Q.   Do you recall how long Joe Certo had been in his
2       role as market health and wellness director as of
3       November 26, 2012?
4  A.   I don't remember.
5  Q.   In this email Mr. Certo refers to
6       "accountability."  He specifically says "Is there
7       accountability on that?"
8           When you got this email, did you have a
9       sense of what he meant by that?
10 A.   He was referring to coaching.
11 Q.   So when -- your belief is that when he said
12      "accountability," he was referring to coaching?
13 A.   Yeah.  We use that word interchangeably a lot of
14      times.
15 Q.   Did Mr. Certo have the authority to discipline Ms.
16      McPadden on his own?
17 A.   Yes.
18 Q.   He didn't have to contact you?
19 A.   No.  Actually, the pharmacy manager could have
20      held her accountable.  It didn't even have to be
21      Joe.
22 Q.   And Mr. Certo had the authority to discipline Ms.
23      McPadden, even if that discipline was her
24      termination?

36 (Pages 141 to 144)

6e848235-3153-43fe-9654-08adf9b84d34

145

1     A.   Yes.
2     Q.   Do you recall the phone call that you had with
3     Joseph Certo after you received this email?
4     A.   I do, vaguely.
5     Q.   What do you -- and what do you recall about that
6     phone call?
7     A.   He told me when she was moving, she lost her key.
8     She didn't really take it very seriously.  He told
9     her to go home and look for it.  She couldn't find
10    it.  And so he asked me, Well, what do I do at
11    this point?
12    Q.   And what did you say during that phone call with
13    Mr. Certo?
14    A.   I told him we need to put a call together with
15    Barb Kulwicki so that we could discuss the
16    accountability piece of it.
17    Q.   Now, you, as Joe Certo's direct supervisor at the
18    time, you certainly had the authority to tell Mr.
19    Certo what you believe should be the appropriate
20    discipline; correct?
21    A.   Yes.
22    Q.   And he would have had to listen to you?
23    A.   He wouldn't have to listen to me.  It would be a
24    good -- good idea on his part.  But, yeah, I

146

1     didn't have to confer with Barb.  I just did it
2     for consistency purposes.
3     Q.   What do you mean that you had to confer with
4     Barbara Kulwicki for consistency purposes?
5     A.   So because, you know, obviously, I had a broader
6     scope than Joe does.  She has a broader scope than
7     me, because she had -- she was in the divisional
8     level, and she had the entire eastern seaboard.
9     So she knew on a broad level the accountability
10    that would have happened on larger scale stores
11    than I did.
12    Q.   Did you think there was any need to investigate
13    Ms. McPadden's loss of her key?
14
15    A.   No.  Joe had the information that I needed.
16    Q.   What was that information?
17    A.   He had spoken with her.  She freely admitted that
18    she lost her key.  She sent it to him in an email.
19    And so there was really not much more to look
20    into.
21    Q.   And you had a follow-up phone call with Barbara
22    Kulwicki; correct?
23
24    A.   Yes.

147

1     Q.   And there was some testimony about that earlier.
2     You don't recall whether Joe Certo was on that
3     phone call.
4     A.   I don't remember specifically, no.
5     Q.   It's possible that he was?
6     A.   Yes.
7     Q.   As you sit here today, do you remember whether Mr.
8     Certo said anything during that phone call?
9     A.   I don't know.
10
11    Q.   What do you recall discussing during that phone
12    call with Barbara Kulwicki?
13    A.   I remember telling Barb the situation of what
14    happened, referencing Susan Carroll, referencing,
15    you know, what we're going to do next; and then we
16    came up with an accountability at that point.
17    Q.   And what accountability did you come up with?
18    A.   A second-level coaching.
19    Q.   All right.  Whose decision was it that Ms.
20    McPadden should receive a second-level coaching?
21    A.   I don't remember if it was Barb or myself, but I
22    think collectively we decided that a second level
23    was appropriate.
24    Q.   Did Joe Certo ever tell you that he had solicited

148

1     and received opinions from other Walmart employees
2     regarding whether Ms. McPadden should receive
3     discipline?
4
5     A.   No.
6     Q.   As you sit here today, you've heard -- you've been
7     asked questions by Attorney Fradette about the
8     email exchange between Joe Certo and those
9     individuals.
10         Do you recall that?
11    A.   Yes.
12    Q.   And do you recall -- you were told, rather, what
13    those other managers told Mr. Certo.
14         Do you recall that?
15    A.   Yes.
16    Q.   As you sit here today, to you think your decision
17    would have been any different if you had known
18    that information?
19
20
21    A.   No.

149

5  Q.  And the individuals with whom Mr. Certo was
6      emailing, those were division 1 employees?
7  A.  Yes.
8  Q.  I now you've got a large stack of documents that
9      Attorney Fradette showed you, I'd like you to find
10     for me Plaintiff's Exhibit 15, please.  It's the
11     health and wellness Professional Accountability
12     Matrix.
13 A.  (Witness reviews document.)  All right.
14 Q.  Was there any discussion of the accountability
15     matrix during your telephone call with Barbara
16     Kulwicki?
17 A.  I believe there was; yes.
18 Q.  Do you recall who brought it up?
19 A.  I don't.
20 Q.  Do you recall what was discussed regarding the
21     matrix?
22 A.  I don't.
23 Q.  Does the matrix specify -- strike that.
24         Attorney Fradette asked you some

150

1      questions about the different columns on the
2      matrix.  There was a column for infractions, a
3      column that references policies, and then a column
4      that references -- it says "First Offense."
5          Do you see that?
6  A.  Yes.
7  Q.  And there are some things that are labeled
8      "Termination for first offense" and some that say
9      you should receive a coaching for first offense;
10     is that right?
11 A.  Yes.
12 Q.  Does the accountability matrix specify what level
13     of coaching one should receive for these different
14     offenses?
15 A.  This one doesn't.  The newer one does.  But
16     t's -- it's all based on the situation as well.
17         So it can -- this is the minimum that
18     would happen.
19 Q.  So if the matrix said "coaching" for a first
20     offense, that would -- you read that to be the
21     minimum discipline that someone would receive for
22     that offense would be a coaching.
23
24 A.  Yes.

151

1  Q.  And is it possible that the coaching could be a
2      second-level coaching?
3
4  A.  It could be; yes.  It could be a third level.
5  Q.  I know you got asked a lot of questions about
6      security of the pharmacy.
7          Can you tell me why it is that's
8      important to keep the pharmacy secure, in your
9      opinion?
10 A.  You want to make sure that patient' informat on is
11     kept secure.  You want to make sure that there is
12     no divers on of medications, and just for
13     associate safety, in general, as well.
14 Q.  And when you say "diversion" what do you mean?
15 A.  Theft of pills.
16 Q.  Is that a concern at Walmart's pharmacies?
17 A.  Yes.
18 Q.  Is it a concern at all pharmacies, to the best of
19     your knowledge?
20
21 A.  Yes.
22 Q.  What kinds of drugs are kept in the pharmacy that
23     you might be concerned about someone stealing?
24 A.  Specifically controlled substance.

152

1  Q.  Such as?
2  A.  Xanax, Vicodin, Valium.  There's a lot of
3      different drugs of choice out there.
4  Q.  And at Walmart's pharmacy -- specifically the
5      pharmacy in Seabrook, there's an alarm; correct?
6  A.  Yes.
7  Q.  And there's also a key to get into the pharmacy.
8      The pharmacy is locked; correct?
9  A.  Yes.
10 Q.  And when you were a pharmacist -- a practicing
11     pharmacist with Walmart, did you have a key to
12     your pharmacy?
13 A.  I d d.
14 Q.  Were you ever given any instructions on what to do
15     with your key?
16 A.  Yes.
17 Q.  What were you told?
18 A.  Keep t on you at all times.
19 Q.  Were you told why?
20 A.  To keep the pharmacy secure and not give anyone
21     access that shouldn't have t.
22 Q.  When you first learned that Maureen McPadden had
23     lost her pharmacy key, were you surprised?

KACZYNSKI REPORTING

153

1  A.  It was the first time that I had a pharmacist lose
2     their key.  So I was a little surprised.
3  Q.  Had you ever heard of a pharmacist anywhere ever
4     losing their key?
5  A.  No, not at that point.
6  Q.  Before you spoke with Barbara Kulwicki regarding
7     the Maureen McPadden situation, did you form any
8     thoughts in your own mind as to what the
9     appropriate level of discipline might be for Ms.
10    McPadden?
11 A.  Yes.  I had a two-level in my head because of what
12    happened with Susan Carroll.
13 Q.  But Susan Carroll, she wasn't a pharmacist;
14    correct?
15 A.  Correct.
16 Q.  And she obviously didn't lose her pharmacy key.
17       Why did you find those two situations to
18    be comparable?
19
20 A.  She was a vision center manager.  She was a
21    licensed optician.  She had similar PHI and HIPAA
22    and -- not necessarily drugs, but they had contact
23    lenses and other things that were prescript on
24    things in their labs.  And so it was a similar

154

1     situat on.
2  Q.  Without denigrating the folks in the vision
3     center, do you believe it's more important to keep
4     a pharmacy secure than a vision center secure?
5
6  A.  Of course.
7  Q.  Why?
8  A.  Because, you know, if someone takes a pair of
9     glasses, they're not going to overdose on that.
10       If someone, you know, breaks into a
11    pharmacy and takes medication, they could sell it
12    to children.  They can take t themselves.
13    There's a lot of things that can happen if they
14    get access to med cation that they shouldn't have.
15 Q.  But in this situation with Maureen McPadden, I
16    mean, there's -- there's certainly no suggestion
17    that anyone accessed the pharmacy while her key
18    was lost; correct?
19 A.  Correct.
20 Q.  There's not even any suggestion that the alarm was
21    tripped while her key was missing; correct?
22 A.  Correct.
23 Q.  So why discipline her?
24 A.  I think for two reasons:  One, because we did have

155

1     the potential of it being unsecured.  So, you
2     know, that was one of them.
3        The other thing, you know, Joe felt that
4     she was taking it very -- not ser ously, like  t
5     wasn't a big deal.  And so, because of that, you
6     know, we wanted to make sure that, you know, she
7     was held accountable appropriately.
8  Q.  What did Joe Certo tell you that made you think
9     she wasn't taking it seriously?
10 A.  When he asked her, you know, "Do you know where  t
11    is?  Can you look for it?"  She just was -- kind
12    of --like, "No.  I don't know where it is."
13       And he said, "Can you go home?  Can you
14    try to find  t?"
15       He even gave her till the next day.  He
16    said, "Can you go home?  Can you try to find it?"
17    She just didn't really seem like it was an issue.
18 Q.  During your conversation was Mr. Certo, did he
19    ever provide any recommendation regarding the
20    discipline of Ms. McPadden?
21 A.  I don't remember that he did; no.
22 Q.  Did you ever -- and I take it that you never
23    talked about Ms. McPadden's coaching history with
24    Barbara Kulwicki; correct?

156

2  A.  Correct.
3  Q.  In your conversations with Barbara Kulwicki, did
4     you ever discuss Maureen McPadden's gender?
5  A.  No.
6  Q.  Did you ever discuss her medical condition?
7  A.  No.
8  Q.  Were you even aware of her medical condition at
9     the time?
10 A.  No.
11 Q.  Did you ever -- in your conversations with Barbara
12    Kulwicki, did you ever discuss the fact that
13    Maureen McPadden had taken a leave of absence?
14 A.  No.  I don't think I even knew.
15 Q.  In your conversations with Barbara Kulwicki, did
16    you ever discuss that Maureen McPadden had made
17    complaints about safety in the Seabrook pharmacy?
18 A.  No.
19 Q.  At the time that you made the decision, were you
20    even aware of those complaints?
21 A.  No.
22 Q.  In your conversations with Barbara Kulwicki, did
23    you discuss the fact that Maureen McPadden had
24    brought HIPAA concerns to the attention of Joe

157

1        Certo?

2   A.   No. I didn't know about that either.

3   Q.   When you and Barbara Kulwicki decided to issue a

4       second-level coaching to Maureen McPadden, did you

5       know what, if any, consequences might flow from

6       that decision?

8   A.   No. At the time I didn't know if she had any

9       other coachings.

10   Q.   At some point did you learn that she had other

11       coachings?

12   A.   Yes. Joe called me later and said that she had

13       two previous coachings -- two separate coachings

14       for different -- different things, and that this

15       would lead to termination. But because we had

16       already discussed t, you know, I'm not going to

17       change it based on the outcome.

158

4   Q.   Did he have to come back and tell you that this

5       second-level coaching would result in her

6       termination?

8   A.   No. He could have just terminated her.

9   Q.   And what did you tell Mr. Certo when he gave you

10       the information that her receiving this coaching

11       would result in her termination?

12   A.   Unfortunately, you know, that's why we give an

13       associate four levels to change their behavior if

14       things are necessary. And because she had two

15       previous coachings, that caused the termination,

16       not this specif cally.

17           I don't even know what the other

18       coachings were for.

19   Q.   Do you know who hired -- strike that.

20           Do you know who replaced Maureen

21       McPadden as the staff pharmacist?

22   A.   I don't.

23   Q.   Attorney Fradette asked you some questions about a

24       pharmacist by the name of Andy Tau.

159

1            Do you recall those questions?

2   A.   Yes.

3   Q.   Were you involved at all in the decision to

4       discipline Andy Tau?

5   A.   No. I was on matern ty leave.

6   Q.   When was that maternity leave?

7   A.   October 6, 2013, until sometime in late January.

8   Q.   When did you first learn about the fact that Mr.

9       Tau had lost his pharmacy key?

10   A.   When I was asked by one of the attorneys.

11   Q.   So it was after this lawsuit was filed?

12   A.   Yes.

160

20   Q.   And you felt that POM-902 was also implicated by

21       Ms. McPadden's loss of her pharmacy key.

22   A.   Yes.

23   Q.   And why is that?

24   A.   Because t had to do with the prescription area

6e848235-3153-43fe-9654-08adf9b84d34

161

1    security.
2    Q.   Are nonpharmacists allowed to possess keys to the
3         pharmacy?
4    A.   No.
5    Q.   Is that a Walmart rule?
6    A.   Yes.
7    Q.   Is it also a legal requirement of some kind, to
8         your knowledge?
9    A.   I don't know if it's a legal; I know it's
10        Walmart's pol cy.
11   Q.   Now, Attorney Fradette also asked you some
12        questions about the company's HIPAA policy.
13             Do you recall that?
14   A.   Yes.
15   Q.   And that's in Exhibit 24, if you can find that for
16        me, please.  I know we have a lot of papers.
17   A.   Should have put these in order.  (W tness reviews
18        document.)  Okay.
19   Q.   Now, a HIPAA policy identifies ways in which
20        employees -- who are referred to as "associates"
21        in Walmart -- can raise concerns about potential
22        HIPAA violations; correct?
23   A.   Yes.
24   Q.   And what are the ways that the policy says an

162

1         associate can use to raise a HIPAA concern?
2    A.   They can let a salaried member of management know,
3         or they can call into the ethics hot -- hotline
4         which is also posted in every pharmacy.
5    Q.   Is that a toll free number?
6    A.   Yes.  I believe so.
7    Q.   And is the -- is the number actually referenced in
8         the HIPAA policy?
9    A.   Yes.
10   Q.   Where?
11   A.   It's under "Reporting a V olat on" or "Retaliation
12        for Reporting."
13   Q.   Down at the bottom of the first page?
14   A.   Yes.
15   Q.   The ethics hotline, is that a number that
16        associates can use to raise concerns other than
17        potential HIPAA violations?
18   A.   Yes.  They can -- they can raise any concern they
19        have, and they can also do it anonymously.
20   Q.   So if I believe -- if I'm a Walmart associate and
21        I believe that I've been discriminated against, I
22        can call the ethics hotline?
23   A.   Yes.
24   Q.   And if I'm a Walmart associate and I believe that

163

1         I've been retaliated against, can I call the
2         ethics hotline?
3    A.   Yes.  That's what it's there for.

164

1    Q.   Do you recall when Ms. Riel replaced Joe Certo as
2         his manager?
3    A.   I don't.
4    Q.   You were --
5    A.   These were done in March, though.  Sometime around
6         March, if not before.
7    Q.   All right.  You were involved, to a certain
8         degree, in the decision for Mr. Varieur to step
9         down; correct?
10   A.   I wasn't -- I didn't have a conversation w th Josh
11        specifically, but I was consulted by Loreen on
12        what to do with the s tuat on.
13   Q.   Did you have any conversations with Joe Certo
14        about that situation?
15   A.   I don't remember.
16   Q.   And moving back just briefly to Andy Tau, I know
17        you were not involved in the decision to
18        terminate -- strike that -- the decision to
19        discipline Andy Tau.  Do you have any reason to
20        believe that Joe Certo was involved in that
21        decision?
22
23   A.   No.  He wouldn't have been.
24   Q.   Why not?

165

1  A.  Because Loreen was the market director at the
2      time, and Pam Dechelis was covering for me while I
3      was on maternity.  So he wouldn't have been
4      involved in that.
5  Q.  Was there ever any doubt in your mind that Maureen
6      McPadden deserved to be coached for her loss of
7      her pharmacy key?
9  A.  No.
10  Q.  Did you decide to discipline Ms. McPadden because
11      of her gender?
12  A.  No.
13  Q.  And did you decide to discipline her because she
14      went on a leave of absence?
15  A.  No.
16  Q.  Did you decide to discipline her because of her
17      medical condition?
18  A.  No.
19  Q.  Did you decide to discipline her because she had
20      complained about safety issues?
21  A.  No.
22  Q.  Did you decide to discipline her because she had
23      raised HIPAA concerns?
24  A.  No.

166

1          MR. KACZMAREK:  Thank you very much.  I
2      have no other questons.  Attorney Fradette may.
3          MR. FRADETTE:  Thank you very much, Mr.
4      Kaczmarek, and I do just have a couple of
5      follow-ups.
6          FURTHER EXAMINATION
7      BY MR. FRADETTE:
8  Q.  You mentioned on direct examination with Mr.
9      Kaczmarek that the health and wellness
10      Professional Accountability Matrix doesn't specify
11      the level of coaching for an alleged violation of
12      Exhibit -- of paragraph 11.
13          Do you remember that testimony?
14  A.  Yes.
15  Q.  It does specify, however, that there would be
16      coaching.
17  A.  Yes.
18  Q.  And I think you went on to say that there's some
19      other policies that specifically say, for example,
20      two levels coaching or second-level coaching;
21      correct?
22  A.  This has been updated.
23  Q.  All right.  So when Walmart intends that a
24      coaching should be second level, it knows how to

167

1      instruct, in its policies, that a second-level
2      coaching should be given; correct?
3  A.  No.  If you read the bottom, again --
4  Q.  I did read the bottom.
5  A.  Okay.  So it says "Each infraction will be
6      reviewed independently, and the level of
7      discipline imposed may vary from the first offense
8      column on the chart, depending on the severty of
9      the infraction and other relevant circumstances."
10  Q.  And on the policy that you're referring to where
11      it says "Minimum second-level coaching," that has
12      the same legend about it can vary -- what you just
13      read; correct?
14  A.  I don't know.  I don't have that in front of me.
15  Q.  But certainly you know that Walmart, when it
16      intends a second level coaching, you have seen
17      instances where it writes "Minimum second-level
18      coaching"; correct?
19  A.  Not always.
20  Q.  Have you seen instances where, when Walmart
21      intends a second-level coaching, it writes
22      "Second-level coaching"?
23  A.  At minimum.
24  Q.  Okay.  So you have seen specific instances when

168

1      they have -- "they," meaning Walmart -- has
2      written "Second-Level coaching minimum" in the
3      event you find an infraction of this particular
4      paragraph; correct?
5  A.  Yes.
6  Q.  Okay.  You testified that Mr. Certo told Maureen
7      to go home and find her key.  Now, the decision to
8      issue the second-level coaching was made the same
9      day, within hours of her reporting the lost key;
10      correct?
11  A.  I don't remember when the conversation occurred.
12  Q.  Well, we know from Mr. Certo's email to the group
13      that a decision had been made to issue a
14      second-level coaching on the same day that she
15      reported her lost key; correct?
16  A.  I believe so; yes.
17  Q.  And, in fact, it was within hours of her having
18      reported her lost key; correct?
19  A.  Could be; yeah.
20  Q.  All right.  And, yet, he told her to go home and
21      find a key, and the store had already been
22      rekeyed; is that correct?
23  A.  Yes.
24  Q.  And Ms. McPadden, in fact, went home and tried to

42  (Pages 165 to 168)

169

1      find the key.
2              Do you understand that that's the case?
3   A.   I believe she d d.
4   Q.   And the very next morning, before her shift
5      started, she reported back to Mr. Certo that she
6      couldn't find the key; correct?
7   A.   I believe so.
8   Q.   So she took it seriously; correct?
9   A.   Not originally.
10  Q.   Well, that's what Mr. Certo told you.
11  A.   Correct.
12  Q.   So you do recall some things that Mr. Certo told
13     you.
14  A.   Yes.
15  Q.   And you recall that he said to you that she -- in
16     his opinion, quote, "didn't take it seriously,"
17     close quote.
18  A.   Yes.
19  Q.   But you have no recollection of him telling you
20     that she had recently taken a two-week,
21     unscheduled medical leave of absence.
22  A.   He didn't tell me that.

170

8   Q.   And you have no recollection -- or he didn't tell
9      you that she had filed a complaint about -- or had
10     reported a HIPAA violation.
11  A.   Correct.
12  Q.   And you have no recollection of his telling you
13     about her repeated safety concerns -- the emails
14     that we saw earlier -- about the staffing
15     conditions and the experience of the technicians
16     in creating a public safety issue; correct?
17
18  A.   Like I said, we discussed Seabrook pharmacy
19     specif cally, not Ms. -- Ms. McPadden.
20  Q.   Okay.  And then, again, you have no experience --
21     no recollection of him telling you that Ms.
22     McPadden had a disability or had been treated for
23     a -- specifically a disability, depression and --
24     and stress reaction; correct?

171

1   A.   Correct.
2   Q.   But you do recall he told you that she didn't take
3      it seriously?
4   A.   I do; yes.
5   Q.   The ethics hotline, you testified, was something
6      that a person could call if they believed that
7      they had been retaliated against or discriminated
8      against; right?
9   A.   They can call for any reason.
10  Q.   Right.
11  A.   It's an independent party that will investigate.
12  Q.   And Ms. McPadden didn't know until the time that
13     she was actually fired that she was being fired;
14     correct?
15  A.   I don't know what she knew or didn't know.
16          MR. FRADETTE:  Thank you very much, Ms.
17     McCaffrey.  Appreciate you being here today.
18          MR. KACZMAREK:  Thank you very much for
19     your time today.  Good luck.
20          THE WITNESS:  Thanks.
21          MR. KACZMAREK:  Off the record.
22          VIDEO OPERATOR:  The time is 5 p.m.  The
23     depos tion is concluded, and we are off the
24     record.

172

1          (Whereupon the deposition ended at
2      5:00 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

43  (Pages 169 to 172)

173

1    DEPONENT'S ERRATA SHEET

2    AND SIGNATURE INSTRUCTIONS

3

4

5    The original of the Errata Sheet has been

6    delivered to Christopher Kaczmarek, Esq.

7    When the Errata Sheet has been completed

8    by the deponent and signed, a copy thereof should

9    be delivered to each party of record and the

10   ORIGINAL delivered to Richard Fradette, Esq. to

11   whom the original depos t on transcript was

12   delivered.

13

14

15   INSTRUCTIONS TO DEPONENT

16

17   After reading this volume of your

18   deposit on, ind cate any correct ons or changes to
     your testimony and the reasons therefor on the
     Errata Sheet supplied to you and sign it.  DO NOT

19   make marks or notations on the transcript volume
     tself.

20

21

22

23   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

24   COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

---

175

1    ATTACH TO DEPOSITION OF:  HEATHER HARRIS McCAFFREY
     CASE:  McPADDEN vs. WAL-MART STORES EAST

2

3    ERRATA SHEET

4    INSTRUCTIONS:  After reading the transcript of
     your deposition, note any change or correction to

5    your testimony and the reason therefor on this
     sheet.  DO NOT make any marks or notations on the

6    transcript volume itself.  Sign and date this
     errata sheet (before a Notary Publ c, if

7    required).  Refer to page 173 of the transcript
     for errata sheet distribution instructions.

8    PAGE LINE

9    _____ _____ CHANGE: _____
     _____ _____ REASON: _____

10   _____ _____ CHANGE: _____
     _____ _____ REASON: _____

11   _____ _____ CHANGE: _____
     _____ _____ REASON: _____

12   _____ _____ CHANGE: _____
     _____ _____ REASON: _____

13   _____ _____ CHANGE: _____
     _____ _____ REASON: _____

14   _____ _____ CHANGE: _____
     _____ _____ REASON: _____

15   _____ _____ CHANGE: _____
     _____ _____ REASON: _____

16   _____ _____ CHANGE: _____
     _____ _____ REASON: _____

17   _____ _____ CHANGE: _____
     _____ _____ REASON: _____

18   I have read the foregoing transcript
     of my depos tion and except for any corrections or

19   changes noted above, I hereby subscribe to the
     transcript as an accurate record of the statements

20   made by me.

21   _____

22   HEATHER HARRIS McCAFFREY
     Subscribed and sworn to before me this

23   _____ day of _____, 2015.

24   _____
     Notary Publ c

---

174

1    STATE OF RHODE ISLAND

2

3

4

5    I, P. Jodi Ohnemus, Rhode Island
     Commissioner of Deeds, do hereby certify that
     there came before me on the 9th day of November,

6    2015, the deponent herein, who was duly sworn by
     me; that the ensuing examination upon oath of the

7    said deponent was reported stenographically by me
     and transcribed into typewriting under my

8    direction and control; and that the within
     transcript is a true record of the questions asked

9    and answers given at said deposition.

10

11   I FURTHER CERTIFY that I am neither
     attorney nor counsel for, nor related to or

12   employed by any of the parties to the action
     in which this deposition is taken; and, further,

13   that I am not a relative or employee of any
     attorney or financially interested in the outcome
     of the action.

14

15   IN WITNESS WHEREOF I have hereunto set
     my hand this 17th day of November, 2015.

16

17   _____

18   _____

19   /s/ P. Jodi Ohnemus, RPR, RMR, CRR
     Rhode Island Commissioner

20   of Deeds

21

22

23

24