UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

MAUREEN MCPADDEN,
PLAINTIFF

v.

WAL-MART STORES EAST, L.P.,
DEFENDANT.

Civil Action No. 1:14-cv-00475-SM

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL OR REMITTITUR**

Plaintiff Maureen McPadden hereby submits her opposition to Wal-Mart's Motions for Judgment as a Matter of Law, New Trial or Remittitur. This properly instructed jury found that Wal-Mart fired McPadden because of her gender and reporting violations of pharmacy safety rules and HIPAA. McPadden, in the middle of her professional career, lost her self-confidence, became miserable, received medical treatment, believed her career was over, and could not find employment for over seven months; she was then forced to accept a lesser paying and unsecure position. The financial independence that McPadden enjoyed for over 20 years was taken away and, without this verdict, she will never recover financially. Wal-Mart intentionally discriminated against McPadden with malicious, willful and/or reckless disregard of her rights. The verdict should be upheld.

## I.  WAL-MART DOES NOT MEET THE DEMANDING STANDARD FOR POST-TRIAL MOTIONS WITH RESPECT TO GENDER DISCRIMINATION CLAIMS

In this case, there was ample evidence of gender discrimination, which is unlawful under both Title VII, 42 U.S.C., § 2000e-2(a)(1), and NH RSA 354-A:7. In ruling on a Rule 50 motion for Judgment as a Matter of Law (JNOV), the court must draw all reasonable inferences in favor of McPadden, and may not make credibility determinations or weigh evidence. Reeves v.

1

Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe," which requires ignoring the testimony of interested witnesses supporting the defendant. Id. at 151. A jury verdict must be upheld, unless the facts and inferences, viewed in the light most favorable to the verdict, and considered in totality, point so overwhelmingly in favor of the defendant that a reasonable jury could not have returned the verdict. Aly v. Mohegan Council, 711 F.3d 34, 45 (1st Cir. 2013); Harrington v. Aggr. Ind. NE Reg., Inc., 668 F.3d 25, 33 (1st Cir. 2012).

With regard to a motion for a new trial, pursuant to Fed. R. Civ. P. 59, the court may only grant such a motion if it is persuaded that "the verdict, though rationally based on the evidence, was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." Bogosian v. Mercedes-Benz of North America, Inc., 104 F.3d 472, 482 (1st Cir. 1997). A district court may not disturb a jury's verdict simply because it might have decided the case differently. Valazquez v. Figueroa-Gomez, 996 F.2d 425, 428 (1st Cir. 1993).

McPadden may demonstrate that her termination was based on gender where she establishes both a prima facie case of discrimination, and proves that the employer's asserted reason for the discharge is pretextual. Reeves, 530 U.S. at 146-47. A plaintiff's "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 147-148.

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

### A.    MCPADDEN HAS ESTABLISHED A PRIMA FACIE CASE

McPadden has established her four-part prima facie case of gender discrimination, by showing that: [1] she is female. 4Tr.vI, at 30; 1Tr.vII, at 20;[1] [2] she is qualified for her position. 1Tr.vII, at 20, 34-36, 56-61; Ex. D-I; 2Tr.vI, at 96-97; 2Tr.vI, at 104; 3Tr.vI, at 14; 2Tr.vII, at 83-84; [3] she was terminated. 2Tr.vI, at 19-20; and [4] she was replaced, showing a continuing need for her services. 3Tr.vII, at 38. <u>Velez v. Thermo King de P.R., Inc.</u>, 585 F.3d 441, 447 (1st Cir. 2009). McPadden has no obligation to demonstrate that her replacement was male. <u>Cumpiano v. Banco Sandander P.R.</u>, 902 F.2d 148, 155 (1st Cir. 1990).[2] This initial burden is "modest" and easy to surmount. Consequently, McPadden has established a prima facie case.

### B.    PRETEXT  ESTABLISHED  WITH  FALSE  REASONS  IMPLICATING POLICIES ALLEGEDLY RELIED UPON BUT PROVEN IRRELEVANT

Wal-Mart's multiple, shifting explanations, and attempts to malign McPadden as having violated inapplicable policies demonstrate pretext. <u>Velez</u>, 585 F.3d 449-450 (shifting explanations and termination based on inapplicable policy is pretext).

<u>Pretext No. 1 - Violation of Policy</u>:  Wal-Mart asserted under oath that McPadden was terminated "pursuant to Wal-Mart's policies," and "based on Defendant's policies and application thereof." Ex. P-10, at 11; Ex. P-11, at 10-11, 21. These assertions were knowingly false, as Wal-Mart had no policy requiring discipline or firing for losing keys, and the exit document failed to note any policy violation. McCaffrey Tr., at 98; 4Tr.vI at 39; Ex. D-E; 3Tr.vI, at 82-83.

---

[1]  Trial transcripts are cited noting the day and volume, <u>e.g.</u> 3Tr.vII (Day 3, volume 2).  The McCaffrey transcript is Exhibit A to Wal-Mart Bri.

[2] While Wal-Mart claims that Certo was "involved" in selecting a female replacement for McPadden, this evidence must be disregarded, as Certo failed to identify what role (if any) he took in the actual decision-making, whether he favored the hiring of the female replacement, and whether any male candidate was available. 3Tr.vII, at 38. A jury could disbelieve him entirely, as he could not identify anyone else who was involved in this decision. 3Tr.vII, at 38.

Pretext No. 2 - Violation of AP-05:   Wal-Mart stated under oath that McPadden's employment was "terminated for violation of Wal-Mart's Key and Door Control Policy," and that asserted explanation was communicated to McPadden on November 27, 2012. Ex. P-10, at 8, 9; see also Ex. P-11, at 10-11. Later, Wal-Mart was forced to admit that the loss of a key is not a violation of AP-05 and that AP-05 was not considered in the decision to discipline or fire. McCaffrey Tr., at 53-54, 49-50; 3Tr.vI, at 85; Ex. P-12.

Pretext No. 3 - Violation of POM 902:   Wal-Mart originally asserted that McPadden's violation of the "Pharmacy Operations Manual" (POM) caused her termination. Ex. P-11, at 10-11. However, POM 902 is inapplicable and Wal-Mart ultimately conceded that she complied with policy. 3Tr.vI, at 87-88; Ex. P-13; McCaffrey Tr., at 61-62; 2Tr.vII, at 78-79;

Pretext No. 4 - Violation of the Coaching for Improvement Policy:   Wal-Mart asserted that McPadden was terminated because she violated "Defendant's Coaching for Improvement Policy." Ex. P-11, at 10-11. Wal-Mart later admitted that violation of this policy was not a factor in McPadden's discipline or firing. McCaffrey Tr., at 49-50 53-54, 57-58; 4Tr.vI, at 38.

Pretext No. 5 - The Matrix:   Kulwicki asserted that the Matrix references a policy that justified the termination. 4Tr.vI, at 39. However, the Matrix was never considered the basis for McPadden's discharge, as the Matrix is not referenced in Wal-Mart's answers to interrogatory 9, which sought a description of every policy violation that led to McPadden's termination. Ex. P-11, at 10-11.[3] Wal-Mart was forced to admit that McPadden did not violate the Matrix, which plainly does not address her situation. 3Tr.vI, at 94; 4Tr.vI, at 35, 39; McCaffrey Tr., at 71-73;

---

[3]   In his June 25, 2015 deposition, Certo claimed that a Matrix was discussed during the conference call in which the disciplinary decision was finalized. 3Tr.vI, at 89-91. It was later demonstrated that the Matrix to which he referred was generated after the conference call, and could not have been the topic of discussion, and that his testimony was pretextual. 3Tr.vI, at 90-91. Wal-Mart then suggested an earlier version of the Matrix had been used. Ex. P-15. This is also pretextual, as it is inconsistent with interrogatory answers and testimony.

Ex. P-15.[4] The jury also rejected Wal-Mart's attempt to create applicability by suggesting the pharmacy became "unsecured" due to a lost key. 4Tr.vI, at 56-57; Tau Tr. at 11, 14-15, Ex. 2. Wal-Mart's false explanations amply demonstrate pretext. Velez, 585 F.3d 449-450.

### C.    PRETEXT ESTABLISHED WITH FALSE CLAIMS OF CONSISTENCY

Wal-Mart attempted to explain McPadden's second level coaching based on claims of consistency, but this reason for its decision is blatantly pretextual.

Pretext No. 6 - Two-Level Coaching was merited:  Wal-Mart asserted that the loss of keys "merited a two-level Coaching." Ex. P-11, at 12. That is false. Certo asserted that there were only two factors that he considered with respect to accountability:  whether McPadden lost her key before and consistency with other discipline. Ex. P-19, at 1. With respect to past misconduct, Certo was informed that McPadden had not lost her key in the past, and this point mitigates toward a lesser, if any, discipline. Ex. P-19, at 1. With respect to consistency, many people, including Donald Wallis, Market Manager, Shawn Wood, Asset Protection Manager, and Jesse Slater, Store Manager, recommended a one level coaching to Certo. Ex.s P-19, P-20, P-21; see Ex. P-57. Certo agreed with a one level coaching on November 26, 2012. Ex. P-22, at 1. Tau received a one level coaching for losing his key, and this one level was supported by many people, including Kulwicki, Tau's supervisor Riel, local Human Resources and Asset Protection, and Certo, as Wal-Mart's Rule 30(b)(6) witness. Ex. P-82; 3Tr.vI 110-111.[5] Maria Holder was given a one level discipline for not reporting the loss of a key, which is far more egregious conduct than McPadden's issue. McCaffrey Tr., at 78-80. McCaffrey testified that inadvertent

---

[4]  Kulwicki explained why she did not investigate past practice with respect to McPadden's discipline, because a new matrix controlled. 4Tr.vI, at 34, 41-42. However, this is an absurd, pretextual explanation, given that the Matrix did not address the situation at hand. 4Tr.vI, at 35, 39. Moreover, consistent practices are a crucial part of Kulwicki's job. WM Br. Ex. A, McCaffrey Tr., at 37.

[5] While Tau's discipline took place after McPadden's, Tau's situation undercuts the assertion that McPadden's discipline was "merited," and evidences disparate treatment of men and women. Tau's one level was ratified by Kulwicki and Certo at trial.

violations, such as key loss, may result in no discipline at all. McCaffrey Tr., at 41, 84. The idea that McPadden "merited" a second level coaching is knowingly false.

Pretext No. 7 - Consistency in the Region:  After Wallis, Slater and Wood asserted that a one level coaching would be appropriate, and after Certo agreed, Certo responded to these same individuals that a two level would be imposed "to be consistent in the Region." Ex. P-23, at 1. However, this justification was false, as there was no evidence that any other pharmacist received a two level coaching for merely losing her key. Kulwicki testified that considerations of consistency were actively ignored. 4Tr.vI, at 34, 41-42. The assertion of consistency is doubly dubious, as McCaffrey and Kulwicki failed to investigate past practice of discipline in similar situations, and Certo never reported the many recommendations he received for a one level discipline. 4Tr.vI, at 32, 34, 37-38, 48; McCaffrey Tr., at 15-16, 41, 65, 77. Thus, consistency was actively rejected, rendering this assertion pretextual.

### D.     PRETEXT ESTABLISHED WITH THE FALSE ASSERTION THAT MCPADDEN DID NOT TAKE THE KEY ISSUE SERIOUSLY

Pretext No. 8 - Taking Loss Seriously:  Wal-Mart asserted that it imposed a two level discipline because Certo reported that McPadden was taking the loss of the key "not seriously, like it wasn't a big deal." McCaffrey Tr., at 154-155. However, McPadden always took the loss of her key seriously, and Certo had no reason to doubt that, and so this explanation was false and pretextual. 3Tr.vI, at 79; 2Tr.vI, at 13-15, 97; 3Tr.vII, at 52-53.

Pretext No. 9 - Timing of Seriously Comment:  Wal-Mart then sought to distance itself from the pretextual explanation by asserting that the "seriously" comment was actually communicated the day after the decision was made. 3Tr.vII, at 56. This evasion is likewise pretextual, as McCaffrey's testimony was clear that the "not seriously" reason was reported by

6

Certo on November 26, prior to the conference call, and was an explicit basis for the two-level decision. McCaffrey Tr., at 145, 153-155, 168-169.

### E.    PRETEXT ESTABLISHED BY CONTRADICTORY ASSERTIONS OF WHO WAS THE DECISION-MAKER

An employer's changing story with regard to the identity of the decision-maker justifies a finding of pretext. Billings v. Town of Grafton, 515 F.3d 39, 56 (1st Cir. 2008). Likewise, an employer's inconsistent account of the termination process is sufficient for a jury to infer pretext. Zades v. Lowe's Home Centers, Inc., 446 F. Supp. 2d 29, 44 (D. Mass. 2006).

The jury reasonably concluded that Certo made the decision to impose a two level coaching leading to termination. It was within Certo's authority to make the decision. 3Tr.vI, at 67, 116; 3Tr.vII, at 28-29; McCaffrey Tr., at 29-30. On November 26, 2012, Certo, and not anyone else, initiated inquiries on whether there was accountability for losing a key. Ex. D-C. When Certo was asked whether he was "looking" at accountability, he replied, "I have to look up what has been done in the past. Has she done this before?"  Ex. P-53. This indicates that Certo intended to control the decision. Kulwicki described her role as providing advice to the "operators," of which Kulwicki recognized that Certo was one. 4Tr.vI, at 44, 47

The many recommendations from various peers for a one level discipline, which were communicated to Certo, were never forwarded along to others, which contradicts the idea that Certo delegated the decision. 4Tr.vI, at 32. Certo filled out the exit interview, which contained the alleged reason for discharge. Ex. D-E. 3Tr.vI, at 82. Certo alerted his peers of the decision, saying, "upon review, to be consistent in the Region, this will be a 2nd level coaching," which more than implies that Certo was the decision-maker. Ex. P-23. McCaffrey testified that the notion of a second level was "in her head" based on her call with Certo, which took place before

her call with Kulwicki. McCaffrey Tr., at 153. There was additional, complementary evidence that neither McCaffrey nor Kulwicki took on any decision-making role.[6]

Since Certo was the decision-maker, Wal-Mart's arguments with respect to the cat's paw theory are inapplicable.[7]   Moreover, in the alternative, McCaffrey and Kulwicki's lack of independent investigation (McCaffrey Tr., at 15-16, 41, 65, 77; 4Tr.vI, at 34, 37-38, 48), establishes that they relied on, and rubber stamped, the discriminatory assessments and falsehoods communicated by Certo, the true and fully tainted decision-maker, demonstrating liability under the cat's paw theory. Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 86-87 (1st Cir. 2004) (liability attaches where neutral decision-maker relies on information manipulated by another employee due to unlawful bias).

Pretext No. 10 - Certo Did Not Make the Decision:   Wal-Mart claimed at trial that Kulwicki and McCaffrey made the decision to issue a two level coaching, and that Certo did not participate in the decision. 3Tr.vI, at 99; Ex. P-11, at 15; 4Tr.vI, at 43, 45-48. In addition to the above evidence demonstrating Certo to be the decision-maker, Wal-Mart's answers to interrogatories stated that "Certo ... McCaffrey ... and ... Kulwicki ... determined that ... McPadden's employment should be terminated." P-10, at 11. Certo was also identified as an individual who was "ultimately responsible for making the decision to terminate [McPadden],"

---

[6]  McCaffrey had no notes of the alleged conference call, and Kulwicki's perfunctory note fails to hint at any decision-making role or process. McCaffrey Tr., at 38, 41-42; Ex. P-67, at 2. Neither McCaffrey nor Kulwicki investigated Plaintiff's situation, or her past history with respect to discipline or loss of key, or how others were disciplined for similar, inadvertent conduct. McCaffrey Tr., at 15-16, 41, 65, 77; 4Tr.vI, at 37-38, 48. Certo never communicated his recommendation on appropriate discipline to McCaffrey or Kulwicki. McCaffrey Tr., at 155. McCaffrey and Kulwicki could have, but failed to inquire of other people to determine past practice with respect to loss of a key. 4Tr.vI, at 34. Thus, neither McCaffrey nor Kulwicki engaged in the basic practices of a Wal-Mart decision-maker.

[7] Wal-Mart's assertion that McCaffrey and Kulwicki made the decision relies on biased witnesses, whom a jury was not required to believe. The fact that Kulwicki and McCaffrey are both women is irrelevant, since they were not decision-makers, and in the alternative, there is no required inference that women will not discriminate against other women, which inference is contradicted by social science. Ex. 1; see Wilson v. McClure, 135 F. Supp. 2d 66 (D. Mass. 2001) (same race discrimination). Finally, the cat's paw theory permits liability even where the ultimate decision-makers are innocent.

in response to another interrogatory. P-10, at 13; <u>see</u> McCaffrey Tr., at 94 (acknowledging Certo was a decision-maker); 3Tr.vI, at 100-101.

Pretext No. 11 - Kulwicki Made the Decision: Kulwicki's affidavit stated, with respect to the decision-makers involved, that McCaffrey <u>and</u> Kulwicki decided that McPadden's loss merited a two level coaching. 4Tr.vI, at 46. However, Kulwicki contradicted even that sworn statement, and testified that she does not make disciplinary decisions at all, and merely provides advice to "the operators," who in this case were Certo and McCaffrey. 4Tr.vI, at 44, 47. Thus, Kulwicki admitted that Certo was a decision-maker, and actively denied she was a decision-maker, which demonstrates pretext. 4Tr.vI, at 44-46.

## F. PRETEXT ESTABLISHED BY EVIDENCE OF HOSTILITY AND MANIPULATION OF DECISION-MAKING PROCESS

Pretext may be shown with evidence that the decision-making process was manipulated in order to bring about a desired end. <u>Miller-El v. Dretke</u>, 125 S. Ct. 2317, 2332-2333 (2005).

Pretext No. 12: On November 26, 2011, Certo agreed with a first level discipline, when he believed that McPadden was on a "Third Written," and, therefore, would be facing termination if one level was issued for the key loss. Ex. P-22. However, after he stated his belief that McPadden was on a third-level and said, "I will get back to you," he had the opportunity to find out that McPadden was only on a second level, and the accountability he supported jumped to two level discipline. Ex. P-22 and 23. Certo's change of mind, after his stated plan and opportunity to research the effect of discipline,[8] shows that he was engaging in a result-oriented process that would lead to McPadden's termination.

---

[8] Certo was caught in his false testimony when he tried to claim that he asked McPadden to look for the key after the conference call because he thought two level discipline was "harsh." 3Tr.vII at 31. If he actually believed that she was currently on a third-level at the time they were deciding discipline, the level of discipline determined during the call would not have mattered because either a one level or two level would have led to termination.

Pretext No. 13:  In a display of predatory sabotage, Certo falsely informed McCaffrey, prior to the conference call, that McPadden did not take seriously the loss of her key. 2Tr.vI, at 13-15, 97; 3Tr.vII, at 52-53; 3Tr.vI, at 34, 77, 79; McCaffrey Tr., at 145, 153-155, 168-169.

Pretext No. 14:  If Certo had actually thought that McCaffrey and Kulwicki had input in the decision, it is unbelievable and unconscionable that he did not communicate the many recommendations that he received for one level, or McPadden's lack of similar conduct in the past. 4Tr.vI, at 32; McCaffrey Tr., at 147. This silence was designed for one thing, to encourage an improperly severe discipline,[9] especially given the very apparent culture of Wal-Mart employees very freely sharing their recommendations for discipline. 5Tr.v.I at 7; Ex. P-82; Staub v. Proctor Hosp., 131 S. Ct. 1186, 11190 (2011) (liability attaches if supervisor performs an act motivated by animus, that is intended to, and does, cause an adverse action).

## G.   MCPADDEN ESTABLISHED DISCRIMINATION WITH COMPARATOR EVIDENCE OF MALES TREATED BETTER

Even if proof of pretext alone were insufficient to establish an inference of discrimination (it is sufficient), discrimination may also be inferred from evidence that males were treated better than the McPadden in the workplace. Kosereis v Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003). "An employer's disparate treatment of employees in response to behavior that legitimately offends the employer can provide evidence of discriminatory animus." Velez, 585 F.3d at 451. The proposed analogue must consider the comparator's situation to be "roughly equivalent," while exact correlation is unnecessary. Id., at 451. It is for the jury to determine whether differences in infractions render various scenarios to be comparable. Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 145 (1st Cir. 2012). Evidence of disparate treatment is

---

[9] In denying summary judgment, this Court found that, "By failing to fully inform McCaffrey and Kulwicki about the one-level recommendation he already obtained, a jury might conclude that Certo manipulated the situation to effect McPadden's discharge for reasons that were actually discriminatory." Doc. 94 (11/03/15 Order) at 17.

especially potent here, where Wal-Mart agents acknowledged their obligation to discipline employees in a consistent manner, that they were trained to act in that manner, and that they engaged in various practices that, theoretically, would cause them to act in a consistent fashion. 3Tr.vI, at 57, 69; 4Tr.vI, at 15, 47-48, 60-62, 66; McCaffrey Tr., at 34, 37, 95-97, 145-146. "Consistency would always be a goal of the company." McCaffrey Tr., at 95.

Male Comparator No. 1 - Tau[10]:  Tau was a male pharmacist in the same region, who lost both his pharmacy key and C-2 drawer key and the pharmacy was not rekeyed until two days later, and yet Tau was given only a one level coaching after a five day delay. 4Tr.vI, at 53, 57, 70; Tau Tr., at 12, 18, 21, Ex. 2; McCaffrey Tr., at 129-130; 3Tr.vI, at 110; Ex. P-11, at 32. Kulwicki, who oversaw both McPadden's and Tau's discipline, acknowledged that the two were treated inconsistently. 4Tr.vI, at 66; 3Tr.vI, at 107-108.[11] Moreover, there was ample evidence that the difference in treatment was conscious and intentional.[12]

Male Comparators No. 2 and 3 - Certo Not Disciplined for Failure to Investigate and Failure to Escalate HIPAA Violation:  Certo failed to investigate and/or escalate McPadden's complaint of HIPAA violations, both of which are terminable offenses.[13] However, Certo was

---

[10] This Court found that a properly instructed jury could find unlawful discrimination based upon the evidence that male pharmacist who lost his key received a lesser discipline. Doc. 94 at 17.

[11] The disparate treatment was further demonstrated by the fact that when McPadden reported losing her key, she was instructed not to lock up and leave the pharmacy unattended until there was a rekey, Ex. D-D, while Tau was permitted to lock up and leave for the evening, even though his pharmacy was not rekeyed for two days. Tau Tr., at 12, 18, 21, Ex. 2. In addition, while McPadden was asked to find her key after the pharmacy was rekeyed, 3Tr.v.II at 33, Tau was not given this absurd command. Tau Tr., at 20-21, Ex. 2.

[12] Kulwicki claimed, in testimony easily deemed false by the jury, that she did not recall McPadden's recent discipline when dealing with Tau, and did not consult her written notes developed to ensure consistent discipline. 4Tr.vI, at 66. Even when McPadden's situation was brought to her attention, Kulwicki failed to make the discipline consistent. 4Tr.vI, at 67. Kulwicki falsely claimed that she refused to make the discipline consistent, because Tau had already received his coaching; however, the evidence showed that she was aware of the inconsistency long before Tau received his coaching. 4Tr.vI, at 67-69; 4Tr.vII, at 14; Ex. P-3, 82.

[13] McPadden reported to Certo that a technician violated HIPAA by looking at her medical records and disclosing her medical information. 3Tr.vI, at 29-31, 34; 1Tr.vII, at 93-95; McCaffrey Tr., at 101-102; 2Tr.vII, at 81. Certo did

never disciplined, and he was, in fact, promoted after his malfeasance came to light. 3Tr.vI, at 111, 113.[14] Certo's various attempts to explain his lapses were themselves pretextual.[15] McPadden was terminated for an inadvertent lapse, but Certo, the male, was promoted after violating clearly written policies warranting termination.

<u>Male Comparator No. 4 and 5 – Varieur not disciplined for dispensing error or failure to report</u>:[16] Despite the fact that the improper dispensing of generic Synthroid was a serious safety issue, and that McPadden had reported the error, Certo never investigated who was to blame for the error as of the day of his deposition, and only later did he conclude that it was Varieur's fault. 3Tr.vI, at 23-24. Varieur was never coached or disciplined for this intentional and dangerous conduct. 3Tr.vI, at 23, 51; 3Tr.vI, at 109. Certo never informed McCaffrey or Kulwicki of Varieur's issues, as he did with McPadden. 4Tr.vI, at 24; 3Tr.vI, at 24-25, 51; 1Tr.vII, at 78-79. Varieur, a male Pharmacy Manager, was not even coached when he failed to fill out an incident

---

not take notes of the conversation. 1Tr.vII, at 96. Certo failed to escalate the HIPAA complaint to an appropriate manager, as required by policy. 3Tr.vI, at 34, 42-43, 52; McCaffrey Tr., at 102; 4Tr.vI, at 25, 26. Certo failed to investigate the HIPAA claim at all. 3Tr.vI, at 37, 42, 52; Ex. P-10, at 7-8; 3Tr.vII, at 21, 41-42, 44-45. Certo blatantly violated the HIPAA policy, evidencing a discriminatory motive. 3Tr.vII, at 45-46; <u>Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 97 S. Ct. 555, 564 (1977); <u>Hodgens v. General Dynamics Corp.</u>, 144 F.3d 151, 169 (1st Cir. 1999).

[14] Certo was responsible for compliance with Wal-Mart's HIPAA policy, on which he was trained, as were Kulwicki and McCaffrey. 3Tr.vI, at 11-12, 35; Ex. P-24, at 1-2; 4Tr.vI, at 17; McCaffrey Tr., at 32-33, 101. Wal-Mart's training makes it clear that suspected HIPAA violations must be the subject of a witnessed, documented investigation. Ex. P-24, at 1-2; 4Tr.vI, at 17-18, 25-26; McCaffrey Tr., at 102-103; 3Tr.vI, at 35. Certo's failure to investigate or report can result in immediate termination pursuant to written policy, as distinguished from a one or two level discipline for loss of a key. McCaffrey Tr., at 125-126; 1Tr.vII, at 94-95.

[15] Certo testified that his violation of the HIPAA policy was based on his erroneous understanding that he was the one who was supposed to investigate. 3Tr.vI, at 35. However, this assertion is nonsensical and pretextual, as Certo never investigated. Ex. P-10, at 7-8. Certo asserted that he spoke to Deb Genna, who witnessed the improper HIPAA disclosures. Genna testified that she was never interviewed. 2Tr.vI, at 108. Certo's self-serving statement is also proven false by Wal-Mart's answers to interrogatories, which acknowledged that no investigation was conducted. Ex. P-10, at 7-8, 9-10. Then Certo asserted that he asked Varieur to investigate, which Varieur denied. 3Tr.vI, at 39-40; 2Tr.vII, at 82. This Court found that a properly instructed jury could find unlawful discrimination based upon Certo's failure to investigate the HIPAA/privacy issue. Doc. 94 at p.16.

[16] This Court found that a properly instructed jury could find unlawful discrimination based upon evidence that Certo rarely disciplined employees for violation of WM policies but singled out McPadden for discipline and "pursued it with some vigor." Doc. 94 at 16-17. The jury came to the same conclusion.

report based on his dispensing error. Ex. D-O; 1Tr.vII, at 75. The report should have been filed within 24 hours, and failure to do so warrants discipline up to termination. 3Tr.vI, at 24; 1Tr.vII, at 78; 2Tr.vI, at 4. Certo was aware of this deficiency, as he referenced the record of the transaction, which included McPadden's appropriate report, but no report from Varieur. Ex. D-O; 3Tr.vI, at 23. Varieur's culpability was increased as he falsely asserted that he had submitted an incident report and his explanation indicated that he had *intentionally* switched the medication to generic (in violation of a doctor's orders) due to insurance. Ex. D-P. However, Varieur was never held responsible for his failure to enter a report, his intentional dispensing error or his false assertion that he had entered a report, and Certo never investigated. 3Tr.vI, at 23-24; 1Tr.vII, at 76-77.

Male Comparator No. 6 -Varieur:  McPadden was formally disciplined over her alleged deficiency in making sure that the technicians completed their log copies by the end of the day, despite the fact that the pharmacy was short staffed. 1Tr.vII, at 46-50; 2Tr.vI, at 46-47, 52. Varieur was only verbally admonished, and never disciplined for failing to have the technicians complete log copies at the end of the day. 3Tr.vI, at 109; 2Tr.vII, at 68, 80; 4Tr.vI, at 24.

Male Comparator No. 7 - Varieur:  On November 25, 2012, Varieur reported to Certo continuing staffing issues that lead to a "bombardment of errors [which] is incredibly dangerous for us." Ex. D-X; 3Tr.vII, at 12-13. In response, Certo wrote approvingly to Varieur, stating, "This is great detail . . . I would share this information with your team." Ex. D-X. 3Tr.vII, at 12-13. However, on November 21, 2012, just before her termination, after McPadden professionally reported the pharmacy being understaffed and Varieur's inappropriate refusal to allow bathroom breaks, Certo commiserated with Varieur about the "frustration" in dealing with "the resistance"

of the McPadden, a female. Ex. P-47, at 1-2.[17]   When Certo was specifically asked to compare the male (Varieur) and the female (McPadden) raising of safety concerns, he distinguished McPadden's conduct by describing it as "aggressive" and employing "pointed verbiage." 3Tr.vII, at 42; Bulwer v. Mount Auburn Hosp., 2016 Mass. Lexis 93, 29 (criticism that an employee is "too confident" can demonstrate a discriminatory stereotype that the employee should "know [her] place"). The jury concluded that Certo viewed McPadden's similar whistleblowing in a more negative light because of her gender.

There was more than enough evidence to demonstrate that McPadden was fired because she was female, and Wal-Mart's motions for JNOV and new trial should be denied.

## II.   THE COURT SHOULD DENY THE MOTIONS FOR JNOV AND NEW TRIAL WITH RESPECT TO THE RETALIATION CLAIMS

Likewise, there was ample evidence to support the jury's finding of liability with respect to McPadden's retaliation claims (wrongful termination and violation of RSA 275-E), for reporting safety concerns, and reporting the HIPAA violation. The standard for evaluating the evidence of retaliation follows a similar burden shifting approach as the gender discrimination claims, and therefore, McPadden incorporates by reference all of the evidence discussed above, involving the prima facie case, and overwhelming proof of pretext. Hodgens, 144 F.3d at 160-161; Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 32 (1st Cir. 2015) (retaliation standards track discrimination standards, and so evidence need not be repeated).

McPadden's protected status in these categories is demonstrated by the fact that [1] on August 29, 2012, November 16, 2012, and November 21, 2012, she raised, in good faith and with reasonable basis, concerns about safety in the pharmacy (3Tr.vI, at 16, 25, 51; 3Tr.vII, at 8 Day; 1Tr.vII, at 79-80, 123; Ex. P-16, P-47); and [2] in late-October 2012, McPadden

---

[17]   Wal-Mart ignores the potency of this comparative evidence, and instead attempts to deal with this information under the inapplicable "stray remark" doctrine, which applies to overtly sexist comments. Wal-Mart Bri., at 11.

complained about the violation of her HIPAA rights (3Tr.vI, at 29-30; 1Tr.vII, at 95). Certo characterized McPadden's repeated safety emails as unusual, "aggressive," and notable in their use of "pointed verbiage," demonstrating his hostility towards this protected conduct. 3Tr.vII, at 42. On the very day Certo orchestrated the termination of McPadden's employment, Certo described McPadden's pleas for safe practices as "frustration-" inducing. P-47.

Within three months of McPadden's protected conduct (and within days of some conduct) she was terminated for pretextual reasons, and with pretextual explanations of the termination process; this evidence of timing permits a jury to infer the existence of a retaliatory firing. Soto-Feliciano, 779 F.3d, at 32-33; Cooper v. Thompson Newspapers, Inc., 6 F. Supp. 109, 114 (D. N.H. 1998). Consequently, there was more than adequate evidence of retaliatory termination, and Defendant's motions for JNOV and new trial should be denied.

## III.    THE AWARDS OF DAMAGES WERE WELL-SUPPORTED BY THE EVIDENCE AND SHOULD NOT BE SUBJECT TO REMITTITUR

The trial judge's discretion to order a new trial or remittitur based on excessiveness of damages is triggered by "excessiveness" as defined in common law at the time of the adoption of the Seventh Amendment. The Seventh Amendment of the United States Constitution, enacted in 1791, asserts that the findings of a jury may be re-examined only "according to the rules of the common law." U.S. Const. amend. VII.[18]  The provision has "adopted the rules of the common law in respect to trial by jury as these rules existed in 1791." Dimick v. Schiedt, 293 U.S. 474, 487 (1935). According to common law, a new trial may be had on the basis of excessive damages, only when the damages are "outrageous" such that "all mankind at first blush must think so." Honda Motor Co. v. Oberg, 512 U.S. 415, 422 (1994). The review of a jury verdict

---

[18]    The Seventh Amendment states that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law"  U.S. CONST. amend. VII.

must "generally defer" to the jury, except where the damages are so "monstrous . . . as to be in themselves evidence of passion or partiality in the jury." Id., at 422. Deference to the jury is at its zenith, when it is tasked with awarding damages where there is no mathematical yardstick governing their calculation. Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 29 (1st Cir. 2010).

An award of damages will not be disturbed because it is extremely generous or because the court would have found the damages to be considerably less. Havinga v. Crowley Towing and Transp. Co., 24 F.3d 1480, 1484 (1st Cir. 1994). Wal-Mart bears a heavy burden to show that the jury's award of non-economic damages is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Id.

The court is obliged to review the evidence of damages in the light most favorable to the prevailing party. Eastern Mt. Platform Tennis v. Sherwin-Williams Co., 40 F.3d 492, 502 (1st Cir. 1994). Remittitur is a viable solution for issues of damages, and not issues of liability. Pelletier v. Somerset, 458 Mass. 504, 522 (2010). Thus, remittitur should not be used to address concerns about liability – e.g., as a compromise to reflect the underlying case's alleged weakness. Id. Even if excessive damages exist, remittitur should be set at the maximum amount recoverable. Merchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 704 (1st Cir. 1988).

## A.   THE JURY'S AWARD OF FRONT PAY WAS APPROPRIATE

The jury's award of $558,392.87 in front pay damages was well within the range of potential verdicts supported by the evidence. Porter v. Manchester, 151 N.H. 30, 45 (2004) (front pay award supported by chart identifying damages).[19] An award of front pay reflects an estimate of the losses a plaintiff will experience after the trial. Cummings v. Standard Register Co., 265

---

[19] Wal-Mart makes reference to front pay being at the discretion of the Court under Title VII; however it did not made the argument that the issue of front pay should not have been given to the jury in this case and therefore waives this argument. Wal-Mart Bri, at 15. Further, Plaintiff was awarded front pay damages in relation to two of her New Hampshire state law claims, and under New Hampshire law, front pay is an issue for the jury to determine. Porter, 151 N.H. at 45.

F.3d 56, 66 (1st Cir. 2001). Under New Hampshire law, a "'wrongfully discharged employee who has found new employment is generally entitled to recover lost future earnings which represent the difference between what the employee would have earned from his former employer and what he can expect to earn from his new employer, if the future earnings are reasonable ascertainable.'" Porter, 151 N.H. at 43. The amount should restore the plaintiff as nearly as possible to the position she would have been in if she had not been wronged. Id. Some lack of certainty in no way precludes an award. Kelley, 140 F. 3d at 355. A chart reflecting current wages, and comparing them to what the plaintiff would have earned had she been retained, is a sufficient basis for awarding front pay. Porter, 151 N.H. at 45. The Court's holding in Porter in no way suggests that longer durations of front pay damages make this calculation less certain or probable. Id. at. 43-45.

McPadden established future losses through an especially qualified expert, Dr. Craig Moore. 4Tr.vII, at 21-27, 34-35; Ex.s P-69, P-70, P-73. The evidence was presented through oral testimony and a chart, similar to that which was used in Porter, and is, therefore, sufficient for a jury to determine future lost income. Porter, 151 N.H. at 45. Moore's expert calculation took into account past and present earnings, as well as McPadden's age, and her intent to work at Wal-Mart through retirement. 4Tr.vII, at 28, 31, 34; Trainor v. HEI Hospitality, LLC, 669 F.3d 19, 31 (1st Cir. 2012) (intention to work until retirement). Moore's analysis also took into account his expert opinion with respect to McPadden's likely age of retirement, based on changes in social security and common practice. 4Tr.vII, at 28-29, 38. Moore's analysis is conservative, because it does not factor in cost-of-living increases, raises or promotions, which is an enormous concession, as McPadden forfeited thirteen years of seniority at Wal-Mart, reflecting enormous lost career opportunities. 4Tr.vII, at 33, 39-40, 42; 2Tr.vI, at 29.

The jury's award took into account McPadden's ample efforts to mitigate her damages, through immediate and diligent job search, whereby she looked for work every day. 4Tr.vII, at 66; 2Tr.vI, at 23, 82-83; Ex. P-41. McPadden had great difficulty in finding employment after she was fired. 2Tr.vI, at 24-26; Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 103 (2009) (front pay justified where comparable job is difficult to find). She applied for over 100 pharmacist positions in the course of seven months, in Maine, Massachusetts and New Hampshire, and only received about two interviews, and her reapplication to Wal-Mart was unsuccessful. Id. at 26-27; 4Tr.vII, at 67-68. McPadden was forced to accept a position as a floater pharmacist for CVS in July 2013. Id. at 24.

The jury decided that McPadden would likely stay with Wal-Mart until retirement, based on her love of her job, (1Tr.vII at 32-33, 37, 38), her 13 years of service with very good evaluations, the fact that she had never been fired before, (1Tr.vII at 33-34), and the fact that her commitment to Wal-Mart led to her accepting positions with the company in Nevada, Maine, New Hampshire and Massachusetts (1TR.v.II, at 25). Haddad, 455 Mass. at 103 (ten years at Wal-Mart would permit jury to reasonably assume an employee would remain there for another 19 years). Moore considered the scenario in which McPadden is hired as a staff pharmacist at CVS, which he calculated would not alter his analysis. 4Tr.vII, at 40.[20] Moore also calculated the present value of the losses. 4Tr.vII, at 35.

Moore calculated front pay using the customary methodology for economists trained in finance. 4Tr.vII, at 36. Moore's methodology has been validated in Haddad, 455 Mass. at 103-104, which upheld a $733,307 award for nineteen years of front pay, based expressly on Moore's expert testimony. Wal-Mart introduced no evidence contradicting the calculations and inferences

---

[20] There was no evidence that Plaintiff would be paid more as a staff pharmacist.

favoring McPadden; for example, Wal-Mart provided no history of its closing of pharmacies, or evidence of job opportunities that McPadden has been ignoring. Id. at 104. Many cases uphold front pay awards reflecting sixteen or more years of losses. Id. (19 years).[21]

The evidence introduced by McPadden was sufficient to prove her lost future earnings claim of $558,392.87 with reasonable certainty. Porter, 151 N.H. at 45. Therefore, Defendant's Motion for New Trial or Remittitur with regard to the front pay award should be denied.

## B.   THE JURY'S AWARD OF COMPENSATORY DAMAGES WAS APPROPRIATE

The award of $500,000 in compensatory damages should be upheld, just as this court upheld a $480,000 award in 2001. Howard v. Antilla, 160 F. Supp. 2d 169, 178 (D. N.H. 2001), reversed on other grounds, 294 F.3d 244 (1st Cir. 2002). When McPadden was fired, she was a 47 year old professional who had been working as a pharmacist for 20 years, 13 of those years were with Wal-Mart. 1Tr.vII, at 19-20, 35-36; 2Tr.vI, at 29; Ex. D-H. Prior to September 2012, McPadden had never taken a sick day while working for Wal-Mart. 1Tr.vII, at 84. This firing was very difficult for McPadden. 2Tr.vI, at 20. She was so humiliated that she "slipped out" the garden area door so as not be been seen leaving by any Wal-Mart associates. 2Tr.vI, at 20-21. She was visibly overcome with emotion. 2Tr.vII, at 95-96; 4Tr.vII, at 65-66. Merely thinking about the firing over three and a half years later still brought McPadden to tears. 2Tr.vI, at 17, 31 (The jury witnessed a tearful McPadden having to pause when overcome during her testimony as evidenced in the transcript when she provided no response to a question).

McPadden's emotional distress associated with her firing is far from "garden variety" as asserted by Wal-Mart, as she thought her career was over. Wal-Mart Bri, at 18; 4Tr.vII, at 66.

---

[21] Padilla v. Metro-North Commuter Railroad, 92 F.3d 117, 125-126 (2nd Cir. 1996) (20 year award of front pay); Cummings, 265 F.3d at 66-67 (14 years); Stephens v. Global NAPs, 70 Mass. App. 676, 685 (2007) (33.5 years); Handrahan v. Red Roof Inns, Inc., 48 Mass. App. 901, 902 (1999) (30 years); Ventresco v. Liberty Mutual Ins. Co., 55 Mass. App. 201 (2002), rev. denied 437 Mass. 1111 (2002) (14 years).

Her extensive, largely unsuccessful attempts to find a new job, were a tortuous experience, as it appeared to be the end of her career as a pharmacist, which she had loved, and of which she had been proud. 4Tr.vII, at 63-64, 66. McPadden was fired in late November 2012 just prior to the Christmas holiday. 2Tr.vI, at 28. She is very close to her family and it was extremely difficult for her to enjoy time with her family over the holidays because of her humiliation and embarrassment. Id. McPadden had been a financially independent person her entire life, and she identified herself with her career. Id. McPadden felt lost, and as though this was a loss of her career, not just a loss of her job. Id.; 4Tr.vII, at 66. She experienced a "loss of purpose in life." 2Tr.vI, at 32.

In the months that followed the firing, as McPadden continued to look for work, she felt increasingly depressed. 2Tr.vI, at 32. She sought treatment from her primary care physician, Dr. Howe. 2Tr.vI at 31; 2Tr.vII, at 48-9. Ex. P-43. She initially saw Dr. Howe on March 5, 2013, and was experiencing difficulty meeting home, work, and social obligations. Id. During this time, she had difficulty sleeping, would sit on the couch doing nothing, and gained weight. 4Tr.vII, at 67. She found it difficult to even be around family and friends. Id. Her personality changed from the confident, smart, funny, engaging and vibrant personality that she once had. 4Tr.vII, at 62-63. She lost her self-confidence and her sense of independence, having to rely on others financially. Id. at 67-68. She was miserable. 4Tr.vII, at 67. McPadden had no savings, as she spent money on her house, and she laid awake at night, worrying about bills and her credit rating. 4Tr.vII, at 68-69. She had to sell her house and feels her future is unsecure. 4Tr.vII at 69-71.

Prior to the termination, McPadden had a serious issue with anxiety and depression, for which she was taking medication, seeking treatment, and taking medical leave. Dr. Howe testified that McPadden suffered post-termination difficulty meeting home, work, and social

obligations, which are recognized symptoms particularly in someone who had chronic depression. 2Tr.vII, at 48-9. A jury could find that the unlawful termination subjected McPadden to more than typical emotional distress due to her chronic depression. McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 506 (1st Cir. 1996) (emotional distress victim taken as found, even if unusually sensitive).

Although, McPadden obtained employment from CVS in July 2013, she again saw Dr. Howe on October 7, 2013 due to ongoing depression. 2Tr.vI, at 24; Day 2 Afternoon Tran. (Howe), at 50-1; Ex. P-43. McPadden's depressive symptoms related to the firing were not alleviated by obtaining new employment. Id.; 2Tr.vI, at 33. Additionally, she continues to live in fear of losing her job, and she was plagued with financial worries even at the time of trial. 2Tr.vII, at 51, 59; 4Tr.vII, at 71. McPadden was actively treated, after her termination, with medication for anxiety and depression, as well as medication for sleeping issues. 2Tr.vII, 51-52. McPadden's emotional distress has only recently started to diminish. 2Tr.vI, at 33.

"Inconvenience" and "loss of enjoyment of life" caused by discrimination are recoverable. 42 U.S.C. § 1981(b)(3). Being a floater pharmacist at CVS has had an impact on McPadden's social, personal, and professional life. 2Tr.vI, at 30-1; 4Tr.vII, at 70. She does not have a regular schedule and is unable to make plans with friends, family, and/or her significant other. 2Tr.vI, at 31; 4Tr.vII, at 70. Her commute increased because as a floater, she has to travel where she is needed. 2Tr.vI, at 30; 4Tr.vII, at 70. McPadden no longer feels as though she is a part of a team, and she feels that she is not able to connect with the patients like she did working for Wal-Mart. 2Tr.vI, at 30, 33-4. McPadden never knows from week to week how many hours she will work, and where she will be assigned, as she is routinely given thirteen hour shifts with two hour commutes. 4Tr.vII, at 70-71. She is forced to do overnight shifts. 2Tr.vI, at 31.

Many cases have upheld $500,000 in compensatory damages, or more, thus placing this case in a range well within jury discretion. <u>Tuli v. Brigham & Women's Hosp.</u>, 656 F.3d 33, 44-45 (1st Cir. 2011) ($1 million for harassment claim and $600,000 for retaliation claim); <u>Tobin v. Liberty Mut. Ins.</u>, 553 F.3d 121, 144-5 (1st Cir. 2009) ($500,000 in emotional distress awarded in a c. 151B handicap/failure to accommodate case).[22] There was significant evidence of McPadden's emotional distress, undermined professional confidence, financial insecurity, and other compensatory damages, and therefore, the Defendant's Motion for New Trial and Remittitur should be denied.

## C.     THE JURY'S AWARD OF ENHANCED COMPENSATORY DAMAGES WAS APPROPRIATE

### 1.     Enhanced Compensatory Damages Apply When a Plaintiff Removes to Court

Wal-Mart argues that enhanced compensatory damages (ECD) are available only if a defendant removes a case from the Commission for trial in court. Wal-Mart did not raise this argument at any point during the trial and has, therefore, waived this argument. 5Tr.vI, at 10-20. Because Wal-Mart is making an argument that it prevails as a matter of law, it could have filed a motion for directed verdict during trial, and before the case was submitted to the jury. Fed. R. Civ. P. 50(a)(1) & (2). The directed verdict must specify the law and facts that entitle the defendant to judgment. Fed. R. Civ. P. 50(a)((2). A JNOV motion is considered a <u>renewed</u> motion for directed verdict. Fed. R. Civ. P. 50(b). The JNOV motion, therefore, should not contain *new* legal arguments not included in the motion for directed verdict. <u>Id</u>.; <u>Della Grota v.</u>

---

[22] <u>Ayash v. Dana-Farber Cancer Inst.</u>, 443 Mass. 367 (2005) ($1,800,000 awarded in defamation claim); <u>Murphy v. Boston Herald, Inc.</u>, 449 Mass. 42, 66-67 (2007) ($2,010,000 jury verdict upheld in defamation case); <u>Kelley v. Comm.</u>, 2014 Mass. Super Lexis 49, at 16-17 (refusing to remit emotional distress award of $500,000 for retaliatory transfer, not leading to termination); <u>Clifton v. MBTA</u>, 11 Mass. L. Rptr. No. 14, 316 (May 8, 2000) (jury awarded $500,000 in emotional distress on c. 151B race discrimination and retaliation, which was upheld by the now-Chief Justice of the Mass. Supreme Judicial Court as not excessive), <u>reversed on other grounds</u>, 445 Mass. 611 (2005).

Rhode Island, 781 F.2d 343, 349 & n.8 (1st Cir. 1986); Lewis v. Kendrick, 944 F.2d 949, 953 (1st Cir. 1991). When a defendant argues for the elimination of an entire category of damages, Rule 50 JNOV standards are implicated, and the Rule 59 new trial standards are not. Travers v. Flight Servs. & Sys., 808 F.3d 525, 544 (1st Cir. 2015). Consequently, this pure issue of law was waived, as it was not included in a motion for directed verdict.

Even if Wal-Mart had not waived that argument, RSA 354-A:21-a, I, does not restrict ECD in the manner suggested. The first sentence of RSA 354-A:21-a, I, permits plaintiffs to remove the case to court. The second sentence permits defendants to remove the case, upon a finding of probable cause. Id. ECD are permitted "in cases so removed." Id. Wal-Mart's interpretation of the words "in cases so removed," to apply solely to the second type of removal, and not the first, is irrational, unreasonably restrictive, and violates the requirement to interpret the statute in a broad, liberal fashion. RSA 354-A:25. It is absurd to interpret the language "in cases so removed," as excluding methods of removal that are described above, in the very same paragraph. RSA 354-A:21-a, I. Permitting ECD only when the defendant removes is absurd, violates the purpose of the statute, and the interpretation is so one-sided with power favoring the defendant that it leads to an equal protection defect in the statute that must be avoided, if possible. EEOC v. Fred Fuller Oil Co., 2016 N.H. LEXIS 15, at 13 (RSA 354-A will not be interpreted to lead to an illogical result). There is no logical explanation for awarding a different type of damages in an identical case just because it was a defendant who removed.[23]

In addition, the legislative history demonstrates that ECD are available to a plaintiff who brings suit in court. RSA 354-A:21-a was amended in 2006, in order to create substantial equivalency with federal housing law so that both state and federal housing discrimination

---

[23] To the extent that this court determines this pure legal argument constitutes a credible challenge to the award of ECD, McPadden requests that the issue be certified to the New Hampshire Supreme Court.

claims could be brought to the Commission.[24] The Executive Director of the Commission at the time of the 2006 amendment to the NHLAD was Katherine Daly, who testified before the House Commerce Committee about the proposed amendment (HB 689-FN) on February 15, 2005. Ex. 3. Daly stated:

> The next change has to do with the relief that can be awarded in court, if **a party elects to remove** to court for trial. Currently, the charging party **can remove** at any time, and the responding party **can remove** to court after a finding of probable cause.

Ex. 3 at 91, (emphasis added); see also Daly testimony at 35 ("…a charging party can remove to court rather than stay at the Commission…."). Thus, the legislative history demonstrates that "in cases so removed" means in cases removed to court by either a plaintiff or a defendant. Wal-Mart acknowledges that McPadden has removed this case to Court, and so, she is entitled to claim ECD. Doc. 158-1 at p. 20.

### 2. The Jury, Not the Judge, Decides Whether to Award ECD

Wal-Mart argues that because RSA 354-A:21-a states that "a court" may award ECD, it is for the judge, rather than the jury, to decide.[25] The statutory language clearly is distinguishing between the Court and the Commission, and is not distinguishing between a judge and jury, when it set forth the damages that can be awarded by a court. In fact, the end of the statutory section specifically states that either party is entitled to a trial by jury in the court action. Id. Thus, the statutory language requires the jury to determine ECD.[26]

---

[24] Federal housing discrimination law allows punitive damages when a plaintiff shows that a defendant acted with "reckless disregard or indifference" for the plaintiff's federally protected rights. Lincoln v. Case, 340 F.3d 283, 291 (5th Cir. 2003). RSA 354-A was amended to permit an equivalent type of damages.

[25] After finding that the jury should determine ECD, the Court went on to suggest that the verdict would be treated as advisory, to which the Plaintiff objected. 5Tr.vI, at 113, 158-159.

[26] This point is further proven by the case Wal-Mart cites in support of its position. Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363 (2009). In Hair Excitement, the Court considered whether or not there was a right to a jury trial under RSA 358-A (New Hampshire's Consumer Protection Act). The Court found that nothing in RSA

Also, the Seventh Amendment of the U.S. Constitution requires that a Federal District Court accord a jury trial, even when adjudicating a claim brought pursuant to a state's substantive law. <u>Gallagher v. Wilton Enters., Inc.</u>, 962 F.2d 120, 122 (1st Cir. 1992). A jury trial is required when the claim at issue is more analogous to a legal claim than an equitable claim. <u>Id</u>. In 1992, the First Circuit held that the trial of an employment discrimination claim arising under a Massachusetts statute must be accorded a jury trial, in part, because the potential award of punitive damages made the claim akin to a tort case arising in law. <u>Id</u>. at 123. In this case, the statutory claim for ECD uses almost literally the same standard as that for awarding punitive damages under Title VII. 42 U.S.C. § 1981a(b)(1). Consequently, the nature of the remedy militates toward a Seventh Amendment requirement for jury determination. <u>Gallagher</u>, 962 F.2d, at 123-124. "[F]ederal law characterizes punitive damages as legal remediation for Seventh Amendment purposes." <u>Id.</u> at 124. Moreover, N.H. law requires that the jury determine ECD. 5Tr.vI, at 113. Therefore, the jury was the required factfinder for determining ECD.

3. <u>There was Ample Evidence for the Award of ECD and Punitives.</u>

In the present case, there was ample evidence for the jury to find that Wal-Mart acted with "willful or reckless disregard" of McPadden's rights under RSA 354-A, and with "malice or reckless indifference" to her federally protected rights under Title VII. Wal-Mart did not object to the fact that the jury was given the opportunity to award ECD under RSA 354-A, and did not raise the issue in its Rule 50(a) Motion. 5Tr.vI, at 10-13. Thus, Wal-Mart's JNOV argument that there was no evidentiary basis permitting the award of ECD has been waived, as it failed to

---

358-A specifically provided for a right to jury trial. <u>Id.</u> at 369. In that context, the Court found that the term "court" in the statute referred to the judge rather than the jury. However, in so finding, the Court specifically *distinguished the express reference to a jury trial that is contained in RSA 354-A:21-a, I.* <u>Id.</u> Therefore, while a statute with no reference to jury trial could lead the court to interpret "court" to mean "judge," RSA 354-A:21-a's specific reference to the right to a jury trial necessarily leads to the conclusion that "court" is simply a term for a civil action, as opposed to an administrative action, and does not negate reliance on a jury.

include that specific argument in a motion for directed verdict filed during the trial. Fed. R. Civ. P. 50(a) & (b); Travers, 808 F.3d at 544 (seeking elimination of entirety of a category of damages is considered under Rule 50).

However, even if the issue were not waived, there was evidence of willful, malicious and/or reckless disregard of rights, sufficient to award ECD and punitive damages.  As stated above, proof of a prima facie case, along with proof of pretext and disparate treatment, demonstrates that Wal-Mart intentionally discriminated against McPadden based on her gender. St. Mary's Honor Center, 509 U.S. at 511. ECD and punitive damages are a proper response to intentional gender discrimination. "The 'intent' that is necessary to undergird an award of punitive damages in such a case is the same 'intent' that is required for a finding of discrimination in the first place." Dichner v. Liberty Travel, 141 F.3d 24, 34-35 (1st Cir. 1998) (interpreting similarly worded Federal punitive damages standard); Boisvert v. Sears, CV-96-495-M (07/27/98), 4-5 ("The standard for a permissive award of punitive damages…requires only a finding of intentional discrimination."). "Acts of intentional discrimination are just the sort of conduct that punitive damages are aimed to deter." Che, 342 F.3d at 41-42. The evidence of intentional discrimination cited above establishes that punitives and ECD were appropriate.

The standards of both "malice or reckless indifference" and "willful or reckless disregard" are satisfied where the relevant individuals knew of the existence of anti-discrimination laws and of the employer's policies which implement those laws. Bruso v. United Airlines, Inc., 239 F.3d 848, 858 & n. 6 (7th Cir. 2001). The First Circuit has held that knowledge of an employer's anti-discrimination policies places managers on notice of the law against discrimination for the purposes of punitive damages. Romano v. U-Haul Int'l, 233 F.3d 655, 669

(1st Cir. 2000) (discriminatory manager . . . "knew about U-Haul's anti-discrimination policies").[27] Many other courts hold the same.[28]

Here, there was ample evidence of malicious or willful or reckless violation of an understood standard. All actors here knew that gender discrimination is illegal, and they received explicit training on this fact. 3Tr.vI, at 12; McCaffrey Tr., at 31-32, 35; 4Tr.vI, at 19-20. They were trained on Wal-Mart policies prohibiting gender discrimination, which were freely available. 4Tr.vI, at 5; 4Tr.vII, at 8-9; Ex. P-66. Because the jury found intentional discrimination, it likewise must have found that the decision-maker(s) engaged in a willful violation of the law, and despite the "perceived risk" of violating N.H. and Federal laws. Dichner, 141 F.3d at 34-35; Kolstad, 527 U.S., at 536; Haddad, 455 Mass. at 108.

All the evidence described above, including multiple instances in which males were treated differently, and more favorably than McPadden, demonstrate a campaign of intentional violation of the law. Furthermore, the numerous examples of false reasons for the discharge, and false explanations of the termination process, demonstrate an intention to hide a consciously biased and illegal decision. Bruso, 239 F.3d at 858 (lies told to the jury to cover up discriminatory actions demonstrate knowing illegality for purposes of punitive damages); Criado v. IBM Corp., 145 F.3d 437, 445 (1st Cir. 1998) ("[t]he evidence in this case was sufficient to

---

[27]    The higher burden in Aly v. Mohegan Council, Boy Scouts of Am., 871 F. Supp. 2d 19 (D. Mass. 2012), is contrary to and superseded by the First Circuit's Romano decision. A higher burden is also unnecessary, as the anti-discrimination laws already provide sufficient incentive for employers to generate and enforce anti-discrimination policies. Kolstad v. ADA, 527 U.S. 526, 544-546 (1999) (good faith defense as incentive for employers to proscribe discrimination).

[28] Ogden v. Wax Works, Inc., 214 F.3d 999, 1010 (8th Cir. 2000); Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 443 (4th Cir. 2000), cert. denied, 531 U.S. 822 (2000); Alexander v. Fulton County, 207 F.3d 1303 (11th Cir. 2000) (finding that sheriff acted in the face of perceived risk of violation of federal law was supported by evidence that she knew differential treatment was illegal); Parrish v. Sollecito, 280 F. Supp. 2d 145 (S.D.N.Y. 2003) (evidence of general training in EEO protocol and hiring practices is sufficient to infer awareness of Title VII rights).

support a finding of intentional discrimination; therefore, it was also sufficient to support an award of punitive damages").

Indeed, the avalanche of false testimony provided by Wal-Mart's witnesses at trial supports a finding of intentional violation of the law. Hall v. Ochs, 817 F.2d 920, 928 (1st Cir. 1987) ("a factfinder might infer that the stark clash [of evidence at trial] could not have resulted from innocent misrecollection and that its *intentional* quality intensified any need the jury may have found for punishment and deterrence"). Certo lied to the jury when he testified that his "I understand your frustration" email was showing support for McPadden, 3Tr.vI, at 48-50; 2Tr.vII, at 92-94, when he reported that McPadden didn't take the key loss seriously, 3Tr.vI, at 79-80; when he claimed that he had investigated the HIPAA violation, or had the allegation investigated, 3Tr.vI, at 37-41, 52; 2Tr.vI, at 108; 3Tr.vI, at 40, when he hid his seeking and accepting opinions about 1-level discipline, 3Tr.vII, at 27-28, when he denied being the decisionmaker, 3Tr.vII, at 30, and when he claimed that he asked McPadden to look for the key because he wanted to help her, and that he received support to make this request during the conference call. 3Tr.vII, at 30-31; 3Tr.vI, at 81.

Certo engaged in outrageous behavior when he, as Rule 30(b)(6) witness, explained that Tau's lesser discipline was justified by the fact that Tau's lost keys were "in the possession of the parking lot." 3Tr.vI, at 110-111. In addition, the evidence taken in the light most favorable to McPadden showed that Kulwicki lied to the jury when she claimed that she allowed lesser discipline of Tau because the discipline had already been implemented, 4Tr.vI, at 53, 55,[29] and

---

[29] The jury was likely outraged by the tortured attempts to explain the differences in treatment between McPadden and Tau. Kulwicki first testified that she became involved in the Tau situation after first level discipline had been imposed on Tau, and did not want to undo the discipline that had been imposed. 4Tr.vI, at 53, 5. In fact, Kulwicki was consulted before the discipline was imposed; even after Kulwicki was specifically reminded that McPadden had been issued a second level discipline and was asked if the inconsistency should be remedied, Kulwicki continued to approve a first level discipline for Tau. 4Tr.vI, at 62-64. She did this, despite her claim that she had written "second

28

when Wal-Mart gave completely contradictory evidence with respect whether Certo and Kulwicki were decision-makers, 4Tr.vII, at 44-47.

The evidence also indicates that Wal-Mart was reckless in failing to provide any substantive check on the discriminatory decision/influence of Certo. McCaffrey and Kulwicki never investigated the situation other than to listen to the words of Certo. McCaffrey Tr., at 65-67. McCaffrey never determined whether McPadden had lost her keys before, and never reviewed McPadden's personnel file. McCaffrey Tr., at 16, 77. Kulwicki likewise testified that she did not do any investigation whatsoever to determine how other pharmacists were disciplined in similar situations, and instead stated that she would rely solely on Certo. 4Tr.vI, at 37-38, 48-49, 51. Kulwicki never investigated whether Certo was involved in the decision, and so there was no way that she could determine that the decision was made with an illegal motive. 4Tr.vI, at 49-50. Wal-Mart's processes simply provide no firewall to discrimination, and there was no independent process to obviate the cat's paw dynamic.

Kulwicki was the divisional Senior Human Resources Manager and her job required compliance with laws, and supporting standards of ethics and integrity. 4Tr.vI, at 13-14, 49. Her role was to make sure that people were treated consistently, and that women were not treated more harshly than men. Tr. 4Tr.vI, at 15. However, Kulwicki testified that preventing discriminatory or retaliatory disciplinary decisions was simply a "goal," and that because she is

---

level" on the Matrix after determining that a second level discipline was appropriate for the loss of McPadden's key, so that she would be consistent in the future. 4Tr.vI, at 47-48. 64-65. Kulwicki claimed that if she had recalled McPadden's second level discipline, she would have recommended second level for Tau, to be consistent. 4Tr.vI, at 66. However, even after she was specifically reminded, she did nothing to ensure equal treatment of the female and male pharmacists. 4Tr.vI, at 67. Kulwicki tried to defend her decision by claiming that Tau had already been disciplined by the time she was reminded of McPadden's discipline, but this, too, was proven to be false as Tau was not disciplined until several days after she was reminded of McPadden's discipline. Ex. P-3, at 4; 4Tr.vI, at 67-69; 4Tr.vII, at 14. Kulwicki also attempted to distinguish Tau's loss of the key with a nonsensical snowstorm explanation. 4Tr.vI at 55-56. Finally, Kulwicki tried to falsely claim that in Tau's case, the pharmacy was never unsecured even though she had been told that Tau did not have the pharmacy rekeyed for several days. Id. at 56-57, 59.

the only person responsible for 650 stores (over 1,000 stores in 2012), and 3,000 management associates, it made ensuring legal compliance impossible. 4Tr.vI, at 16-17, 52; 4Tr.vII, at 12. Thus, Kulwicki simply did not do anything to prevent this discriminatory decision.

Kulwicki testified that she has not attended any conference on wrongful termination or gender discrimination in the last ten years, and never reviewed NH law. 4Tr.vI, at 18-20. She let her certification with the National Society for Human Resources Management (SHRM) lapse. 4Tr.vI, at 18. That certification would have required that she have regular training. Id. Consequently, the jury properly found willful, malicious and/or reckless indifference to the discrimination laws, sufficient to support ECD and punitive damages.

>   4.   There is No Requirement to Prove Egregious Conduct; Nevertheless, There is Egregious Conduct Here

Wal-Mart incorrectly argues that the jury was required to find Wal-Mart's conduct "especially egregious" in order to award ECD. The statute contains no such requirement. RSA-A:21-a, I. New Hampshire permits the award of ECD, in the context of its discrimination statute, when the court finds the employer's "discriminatory conduct to have been taken with willful or reckless disregard" of the employee's rights under that chapter. Id. The legislative history indicates an intent to place the law in "substantial equivalency" with Federal law. Ex. 3 at 11 (HB 689-FN)) ("This bill makes various changes to certain discrimination laws to create substantial equivalency with federal law"). While eschewing the label of punitive damages, the ECD standard parallels the Title VII punitive damages standard, which applies where the employer acts "with malice or reckless indifference to the federally protected rights of an aggrieved individual."

In Kolstad v. ADA, 527 U.S. 526, 538 (1999), the Supreme Court interpreted the Title VII punitive damages standard, and found that the plaintiff need not show that the defendant's

misconduct was independently egregious. Employers need not "engage in conduct with some independent, 'egregious' quality before being subject to a punitive award." Id., at 538. The amendment to RSA 354 pertaining to ECD was adopted after the Kolstad decision, and so, Title VII is crucial in interpreting N.H. law. Madeja v. MPB Corp., 149 N.H. 371, 378 (2003).

It would violate the required liberal construction of the statute, to read into it a higher standard that has been omitted from the text, and that has been explicitly rejected for the parallel federal statute. RSA 354-A:25. Wal-Mart's citations to cases involving common law ECD, which apply a different standard, are simply inapplicable, in light of express statutory language paralleling the federal version.[30] While the Court erroneously included the "especially egregious" standard in its jury instructions, there was no harm, because the jury found that ECD were properly awarded. The Court should decline Wal-Mart's invitation to legislate from the bench, to add a new, unwritten definition for RSA 354-A's ECD.

Nevertheless, even if egregious conduct was a necessary factor (it is not), Wal-Mart did engage in conduct that a jury would be entitled to regard as egregious. Certo made sure that his unduly harsh discipline decision would be ratified by others, by falsely asserting that McPadden did not take the loss of her key seriously. 3Tr.vII, at 34, 49, 55. It is hard to imagine a more destructive charge against a pharmacist than that she does not take the idea of security seriously. This was an assertion designed to destroy a career. The failure of Certo to report along the multiple recommendations for a one step discipline, is jaw-dropping and outrageous.

Much of Wal-Mart's actions, in favoring males, manifested in ways that placed the safety and privacy of patients in jeopardy, as when Certo failed to discipline or fire Varieur for providing incorrect medication to a patient, trying to cajole the patient to accept the incorrect

---

[30] This Court acknowledged the difference between these two types of ECD when it refused to allow the jury to award ECD for the common law wrongful termination claim but did allow the jury to award ECD for the RSA 354-A claim. See Special Verdict Form.

medication, and failing to report the error while later lying about doing so. Certo disparaged and undermined McPadden to her co-workers for reporting safety concerns, and failed to respond to those concerns, thereby acting in a manner that would chill such honest reports. Also, Certo failed to respond in any substantive fashion to clear violations of HIPAA privacy. Discriminatory persecution is one thing, but here, the jury found that the unlawful desire to discriminate caused Certo to jeopardize the safety of the public. Wal-Mart ratified both Certo's discriminatory conduct and his penchant to sacrifice safety and security to further a discriminatory scheme when it retained Certo, and promoted him in 2015. 3Tr.vI, at 111, 113; McCaffrey Tr., at 127.

Moreover, the termination was undertaken with Certo's knowledge that McPadden was experiencing depression and anxiety that had caused a recent need for medical leave, and so it was done with the understanding that the unlawful firing would damage McPadden psychologically, as the jury found that it did. 3Tr.vI at 28, 32. Certo's intent was to harm the McPadden, and not just merely her career. Fishman v. Clancy, 763 F.2d 485, 490 (1st Cir. 1985) (emotional injury considered in punitive award). Wal-Mart acted in willful or reckless disregard and with malice or reckless indifference to McPadden's rights (as well as egregiously) permitting the award of ECD and punitive damages.

5.    Wal-Mart Failed to Establish its Good Faith Defense

Wal-Mart argues that the punitive damages should be reduced to zero because it allegedly made good-faith efforts to comply with Title VII. The jury was free to find that Wal-Mart failed to satisfy its affirmative defense that it made good-faith efforts to comply. Monteagudo v. Asociacion de Empleados del Estado Libre Asociado, 554 F.3d. 164, 176 (1st Cir. 2009), cert. denied, 130 S. Ct. 362 (2009). Having an anti-discrimination policy is not enough to demonstrate good faith. Monteagudo, 554 F.3d at 176. A record of active implementation of the policy and

enforcement is also required. <u>Romano</u>, 233 F.3d at 670. Moreover, even if Wal-Mart did provide some evidence on each required element of the defense (it absolutely did not), a jury was free to reject Wal-Mart's disputed evidence of good faith, and find the overall existence of bad faith. <u>Arrieta-Colon v. Wal-Mart P.R., Inc.</u>, 434 F.3d 75, 90 (1st Cir. 2006). While Wal-Mart asserts the defense based on the existence and accessibility of its discrimination policy, the First Circuit has explicitly held, on this precise issue, considering Wal-Mart's policies, that such policies fail to satisfy the affirmative defense. <u>Id</u>., at 90.

There was absolutely no evidence that Wal-Mart actively enforced its theoretical prohibitions against discrimination, and no examples of doing so were provided. As Kulwicki's testimony made clear, Wal-Mart views compliance with its anti-discrimination policies and the law as aspirational desire, as opposed to a realistic goal to be accomplished, because it failed to make the investment in HR personnel who would have any chance at catching and correcting such problems. 4Tr.vI, at 16-17, 52. It had one senior human resources individual responsible for so many stores (1,000 stores in 2012) that it could not have meaningful enforcement of its policies or the law. <u>Id.</u> at 16-17. Kulwicki admitted that she could not ensure that managers abided by the law. <u>Id.</u> at 16-17, 52. Kulwicki did not ask any questions about protected activity or statuses when approving discipline, <u>Id.</u> at 48-52, and didn't do anything to ensure consistency for McPadden's key loss. <u>Id.</u> at 34, 38. Even after being reminded that McPadden had been given a two level discipline for losing and properly reporting the loss of her Pharmacy key, Kulwicki still allowed a male Pharmacist to receive a lesser discipline for identical conduct. She made no good-faith effort to comply with RSA 354-A or Title VII. Wal-Mart failed to provide a single example, involving its 1.2 million employees, where it intervened in a discriminatory scheme, reversed the harm, and punished the wrongdoers. Indeed, nothing bad happened to Certo, after a

long legacy of misconduct. 3Tr.vI, at 111, 113; McCaffrey Tr., at 127. As such, the jury was free to find Wal-Mart ratified, covered-up and lied about its discriminatory decision, such that the good faith defense was not established, and the punitive and ECD awards should stand.

6. The ECD are Not Limited to the Amounts of Administrative Fines

Wal-Mart argues that the jury's award of ECD is, as a matter of law, legally bounded by the amount of statutory fines that the Commission may award. This argument fails for several reasons. First, if the Legislature intended to cap ECD, it could have expressly done so, but it did not. The Legislature amended RSA 354-A well after the administrative fines were included in the statute and well after Title VII statutory caps for compensatory and punitive damages existed, 42 U.S.C. § 1981a(b)(3)), so the Legislature intentionally rejected such limitations. Clifton v. MBTA, 445 Mass. 611, 624 (2005). The NH Legislature knows how to cap damages, but chose not do so do so for this law. E.g., RSA 358-A:10 (treble damages for unfair consumer practices). Second, while the statute provides that ECD may be awarded "in lieu of an administrative fine," liberal construction of the statute requires that provision to mean merely that ECD is not awarded in addition to a fine; it must not be construed to mean that the limits of the fine restrict the award of ECD. RSA 354-A:21-a, I. Finally, the legislative history demonstrates that when considering the fiscal impact of the amendment to RSA 354-A, the Legislature was aware that adding ECD as a remedy available in court could result in more cases being brought in court rather than before the Commission. Ex. 3 at 54. This implicitly recognizes that more cases would be brought in court, because ECD could far exceed the fines available at the Commission.

7. The ECD Must Not be Reduced and Punitive Damages Award Must Not be Further Reduced

The ratio of 12:1 between McPadden's actual damages and the ECD awarded by the jury is acceptable, and Wal-Mart's effort to mischaracterize the ratio as 15:1 should be ignored. Many

courts have held that ratios of 12:1 and greater are acceptable. <u>Romano v. U-Haul Int'l</u>, 233 F.3d 655 (1st Cir. 2000), <u>cert. denied</u>, 534 U.S. 815, 122 S. Ct. 41, 151 L.Ed. 2d 14 (2001) (19:1 ratio between punitive and compensatory damages was constitutionally acceptable); <u>Mathias v. Accor Econ. Lodging, Inc.</u>, 347 F.3d 672, 678 (7th Cir. 2003) (37:1 ratio upheld); <u>Deters v. Equifax Credit Info. Servs.</u>, 202 F.3d 1262, 1266, 1273 (10th Cir. 2000) (59:1 ratio approved, in part, based on reckless indifference to plaintiff's sexual harassment complaints).

In <u>TXO Prods. Corp. v. Alliance Resources Corp.</u>, 509 U.S. 443, 460-462 (1993), the Supreme Court upheld the award of $10 million in punitive damages where compensatory damages were held to be only $19,000, because due process not only considers the harm involved, but also potential harm. "Translating legal damage into money damages is a matter 'peculiarly within a jury's ken, especially in cases involving intangible, non-economic losses.'" <u>Travers v. Flight Servs. & Sys.</u>, 808 F.3d at 540.

Wal-Mart selectively quotes the Supreme Court case of <u>State Farm</u>, which merely indicates that punitive damages with single-digit multipliers "are more likely to comport with due process . . . than awards with ratios in the range of 500 to 1 or . . . 145 to 1." <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 425 (2003). The Court was not saying a single digit multiplier was required; it was saying that a multiplier in the hundreds may be too high. Furthermore, even under the <u>State Farm</u> analysis, a ratio of 12:1 does not exceed a single digit multiplier by a "significant degree" such that it will violate due process. <u>Id.</u> at 425. Courts have affirmed sizable awards against employers. <u>Monteiro v Cambridge</u>, 2011 Mass. App. Unpub. Lexis 965 ($3.5 million in punitive damages); <u>Lynn v. TNT Logistics N.A., Inc.</u>, 275 S.W.3d 304, 312 (Mo. Ct. App. 2008) ($3.75 million punitive award).

The size of the employer is a primary factor with respect to due process considerations. For example, the Federal punitive damages standard places increasing limits on the amount of punitive damages permitted, with the highest award maxing out where the employer has 500 or more employees. 42 U.S.C. § 1981a(b)(3). In this case, due process considerations are at their minimum, as Wal-Mart is literally the largest private employer in the country, with 4,200 pharmacies and 1.2 million employees. 4Tr.vII, at 16; McCaffrey Tr., at 26. This jury saw evidence that the largest private employer in the world allowed a male manager to intentionally fire a competent and conscientious professional in the middle of her career, and allowed males to be treated much more favorably. Thus, the award is not grossly excessive, nor shocking to the conscience. Furthermore, the Title VII award has already been reduced to $300,000.

Wal-Mart again cites New Hampshire cases that discuss common law ECD, which embrace a standard different from, and contrary to RSA 354-A's specifically defined test. Doc. 158-1 at p. 26. When the New Hampshire Supreme Court had occasion to consider the ratio between actual damages and punitive damages under Title VII (before RSA 354-A was amended to allow ECD), it considered the defendant's violation of due process argument and found that, "When all is said and done, a punitive damages award will stand unless it clearly appears that the amount of the award exceeds the outer boundary of the universe of sums reasonably necessary to punish and deter the defendant's conduct." Madeja, 149 N.H. at 386-387, citing Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 81 (1st Cir. 2001). The Court concluded that viewing the evidence in the light most favorable to the plaintiff, the plaintiff suffered more than just economic harm and the defendant's conduct evinced reckless disregard for the plaintiff's federally protected rights to be free from sexual harassment and retaliation. Id. at 385. Finally, the Court considered the defendant's ratio argument and found that a ratio of 5:1 was

constitutionally permissible based on factors, including the defendant's reckless indifference to plaintiff's rights (which is essentially the same standard used for ECD under RSA 354-A:21-a). Id., citing BMW of North America, Inc., v. Gore, 517 U.S. 559, 116 S. Ct. 1589 (1996) (court troubled by the 500:1 ratio between punitive and compensatory damages, but cautioned against drawing "a mathematical bright line" that would fit every case). The Jury's award of ECD and punitive damages are constitutionally permissible and should stand. Reducing the award would undermine the jury's purpose in making it, and would merely encourage like objectionable conduct in the future. See Champagne v. Rivas, et al., 05-CV-079-SM (McAuliffe, J.) 09/28/07.

## IV    CONCLUSION

McPadden requests that this Court deny Wal-Mart's post-judgment motions entirely.

Respectfully submitted,                                    Date:  April 6, 2016

**Maureen McPadden, Plaintiff**
By and through her attorneys,

**BELIVEAU, FRADETTE & GALLANT, PA**          **UPTON & HATFIELD, LLP**
By: /s/ Richard E. Fradette, Esquire                     By: /s/ Lauren Simon Irwin, Esquire
Richard E. Fradette, Esquire (Bar No. 844)               Lauren Simon Irwin, Esquire (Bar No. 10544)
91 Bay Street                                            P.O. Box 1090
Manchester, NH 03104                                     Concord, NH 03302
(603) 623-1234; rick@beliveau-fradette.com               (603) 224-7791; lirwin@uptonhatfield.com

**RODGERS, POWERS & SCHWARTZ LLP**
By: /s/ Robert S. Mantell, Esquire PHV
Robert S. Mantell (BBO No. 559715)
111 Devonshire Street, 4th Floor
Boston, MA  02109
(617) 742-7010; rmantell@theemploymentlawyers.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically through the Court's CM/ECF system and will be sent electronically to the registered participants and via first class mail to the non-registered participants as identified on the Notice of Electronic Filing.
Date:  April 6, 2016                          /s/ Lauren S. Irwin
                                              Lauren S. Irwin